DAVID SEROR – Bar No. 067488
ROBYN B. SOKOL - Bar No. 159506
SUSAN K. SEFLIN - Bar No. 213865
EZRA BRUTZKUS GUBNER LLP
21650 Oxnard Street, Suite 500
Woodland Hills, CA 91367
Telephone:  (818) 827-9000
Facsimile:  (818) 827-9099
Email:      dseror@ebg-law.com
            rsokol@ebg-law.com
            sseflin@ebg-law.com

Proposed Attorneys for Chapter 11 Debtor and
Debtor in Possession

### UNITED STATES BANKRUPTCY COURT

### CENTRAL DISTRICT OF CALIFORNIA

### SANTA ANA DIVISION

| | |
|---|---|
| In re | Bankr. Case No. 8:14-bk-15750-SC |
| ISC8, INC., | Chapter 11 |
| | **NOTICE OF EMERGENCY MOTION AND EMERGENCY MOTION OF DEBTOR FOR ENTRY OF INTERIM AND FINAL ORDERS: (A) AUTHORIZING THE DEBTOR TO BORROW MONEY SECURED BY PROPERTY OF THE ESTATE PURSUANT TO 11 U.S.C. §§ 364(c)(1) & (2) AND 364(d); (B) AUTHORIZING USE OF CASH COLLATERAL; (C) GRANTING ADEQUATE PROTECTION FOR USE OF PREPETITION COLLATERAL; AND (D) GRANTING RELATED RELIEF (11 U.S.C. §§ 363 AND 364; FEDERAL RULE OF BANKRUPTCY PROCEDURE 4001)** |
| | **DECLARATION OF KIRSTEN BAY FILED CONCURRENTLY HEREWITH** |
| | **Hearing:** |
| | **Date:**    September 25, 2014 |
| | **Time:**    11:00 a.m. |
| | **Place:**    Courtroom 5C |
| | 411 West Fourth Street |
| | Santa Ana, CA 92701 |

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.   STATEMENT OF FACTS ..........................................................................................1

    A.   General Case Background........................................................................1

    B.   Description of the Debtor's business .......................................................1

    C.   The Debtor's Capital Structure ...............................................................2

    D.   The Debtor's Secured Debt......................................................................2

    E.   The Debtor's Other Indebtedness ...........................................................5

    F.   The Need for the DIP Financing ..............................................................5

II.   COMPLIANCE WITH RULE 4001 ......................................................................7

III.   THE DEBTOR'S IMMEDIATE NEED FOR POSTPETITION FINANCING ................9

IV.   OVERVIEW OF THE DIP FINANCING AND RELATED RELIEF ...........................10

V.   THE DEBTOR HAS SATISFIED THE REQUIREMENTS NECESSARY TO
    OBTAIN CREDIT................................................................................................11

    A.   DIP Financing .......................................................................................11

    B.   Even Absent Consent, The Priming Liens Are Authorized By The Bankruptcy
    Code. ....................................................................................................14

VI.   DEBTOR HAS SATISFIED THE PROCEDURAL REQUIREMENTS
    REGARDING AUTHORITY TO OBTAIN CREDIT....................................................16

VII.   DEBTOR HAS SATISFIED THE REQUIREMENTS FOR USE OF CASH
    COLLATERAL .....................................................................................................16

    A.   Unless The Secured Creditor Consents To The Use Of Cash Collateral, The
    Debtor Must Adequately Protect The Secured Creditor's Interest..........16

    B.   The Meaning Of Adequate Protection. ...................................................17

    C.   The Preservation And Enhancement Of The Collateral Resulting From The
    Debtor's Ongoing Operations Affords Adequate Protection. .................19

    D.   Emergency Relief is Justified Under the Circumstances ........................21

VIII.   CONCLUSION....................................................................................................22

# TABLE OF AUTHORITIES

<u>Page</u>

## CASES

Accord In re Shenandoah Fed. Sav. & Loan Assoc. (In re Snowshoe Co.),
    789 F.2d 1085, 1087-90 (4th Cir. 1986) ...........................................................15

General Electric Mortgage Corp. v.  South Village, Inc. (In re South Village, Inc.),
    25 Bankr. 987, 989-90 & n.4 (Bankr. D. Utah 1982) ........................................18

In McCombs Properties VI, Ltd. v. First Texas Savings Association
    (In re McCombs Properties, VI, Ltd.), 88 Bankr. 261 (Bankr. C.D. Cal. 1988) ...............19

In re 495 Cent. Park Ave. Corp.,
    136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) .........................................................15

In re A&B Heating and Air Conditioning, Inc.,
    48 Bankr. 401, 403-04 (Bankr. N.D. Fla. 1985) ...................................................20

In re Ames Dept. Stores,
    115 B.R. 34 (Bankr. S.D.N.Y. 1990) ..........................................................12, 13

In re Antico Mfg. Co.,
    31 B.R. 103 (Bankr. E.D.N.Y. 1983) ....................................................................14

In re Aqua Assoc.,
    123 B.R. 192, 196 (Bankr. E.D. Pa. 1991) ...........................................................15

In re Beker Ind. Corp.,
    58 B.R. 725, 741-42 (Bankr. S.D.N.Y. 1986)......................................................15

In re Coody,
    59 Bankr. 164, 167 (Bankr. M.D. Ga. 1986) .......................................................21

In re Defender Drug Stores,
    126 B.R. 76 (Bankr. D. Ariz. 1991)......................................................................14

In re Ellingsen MacLean Oil Co.,
    834 F.2d 599 (6th Cir.1987) ................................................................................14

In re Heatron, Inc.,
    6 Bankr. 493, 496 (Bankr. W.D. Mo. 1980) ........................................................20

In re Hoffman,
    51 Bankr. 42, 47 (Bankr. W.D. Ark. 1985) .........................................................20

In re Hubbard Power & Light,
    202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996).........................................................14

In re Karl A. Neise, Inc.,
    16 Bankr. 600, 602 (Bankr. S.D. Fla. 1981) ........................................................21

In re Pine Lake Village Apartment Co.,
    16 Bankr. 750 (Bankr. S.D.N.Y. 1982) ...............................................................21

In re Planned System, Inc.,
    78 B.R. 852, 861-62 (Bankr. S.D. Ohio 1987) ................................................14

In re Simasko Production Co.,
    47 B.R. 444 (D. Colo.1985).............................................................................12

In re Snowshoe Co.,
    789 F.2d 1085 (4th Cir. 1986) .........................................................................12

In re Stein,
    19 Bankr. 458 (Bankr. E.D. Penn. 1982) ........................................................20

MBank Dallas, N.A. v. O'Connor (In re O'Connor),
    808 F.2d 1393, 1397-98 (10th Cir. 1987) .......................................................20

O'Toole, Adequate Protection and Post-Petition Interest in Chapter 11 Proceedings,
    56 Am. Bankr. L.J. 251, 263 (1982) ...............................................................18

Robert Neier v. Clark Oil & Refining Corp. (In re Apex Oil Company),
    85 Bankr. 538 (Bankr. E.D. Mo. 1988) ..........................................................19

United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.,
    484 U.S. 365, 108 S.Ct. 626 (1988)................................................................18

## STATUTES

11 U.S.C. § 363(c) .................................................................................................8

11 U.S.C. § 364(a) and (b) ...................................................................................12

11 U.S.C. § 364(d)(1)(B) ......................................................................................15

11 U.S.C. § 364 (d)(1) ..........................................................................................12

11 U.S.C. §§ 101 ..............................................................................................2, 1

11 U.S.C. §§ 361(1), (2), (3).................................................................................14

11 U.S.C. §§ 361, 363(e) ......................................................................................18

11 U.S.C. § 364 (c)(1)............................................................................................6

11 U.S.C. § 364 (c)(2)............................................................................................6

11 U.S.C. § 364 (d)(1) .......................................................................................6, 12

11 U.S.C. §§ 364(c) or (d) .....................................................................................7

11 U.S.C. §361 .....................................................................................................18

11 U.S.C. §363(b)(3) ............................................................................................22

11 U.S.C. §363(c)(2) .............................................................................................17

11 U.S.C. §363(e) ........................................................................................................................17

364(c)(1) of the Bankruptcy Code .................................................................................................9

Bankruptcy Code § 361 ...............................................................................................................14

Bankruptcy Code § 364(d)(1)(B)..................................................................................................14

Bankruptcy Code § 510(a) ...........................................................................................................13

Bankruptcy Code § 364(c) .....................................................................................................12, 14

Bankruptcy Code §§ 364(c) and (d)..............................................................................................11

Bankruptcy Code §363 .................................................................................................................16

Bankruptcy Code §363(c)(2) ........................................................................................................17

Bankruptcy Code §363(c)(2)(B) ...................................................................................................17

Bankruptcy Rule 4001(c)(1) .........................................................................................................16

## RULES

Federal Rule of Bankruptcy Procedure 4001(c) .............................................................................16

Federal Rule of Bankruptcy Procedure 4001(c)(1)........................................................................16

Rule 4001(c).....................................................................................................................................1

## TREATISES

2 Collier on Bankruptcy ¶ 364.04, at 364-9-11 (15th ed. 1991)....................................................12

**PLEASE TAKE NOTICE** that a hearing will be held on <u>September 25, 2014 at 11:00 a.m.</u> before the Honorable Scott C. Clarkson, United States Bankruptcy Judge for the Central District of California, for the Court to consider the motion (the "Motion") filed by ISC8, Inc. *fka* Irvine Sensors Corporation, the chapter 11 debtor and debtor in possession herein (the "Debtor"), for entry of interim and final orders authorizing the Debtor to use cash collateral, authorizing debtor in possession financing and granting related relief.  By the Motion, the Debtor seeks the following: (1) interim approval of post-petition financing from the lenders set forth on **Exhibit A** to the Declaration of Kirsten Bay filed concurrently herewith (the "Bay Declaration") with Fundamental Master LP as holder representative and agent, (2) authorization to use cash collateral on an interim basis, (3) the setting of a final hearing on the relief requested in the Motion, and (4) final approval of the debtor in possession financing and use of cash collateral after a final hearing on the Motion.

As set forth more fully in the annexed Memorandum of Points and Authorities, the Debtor is a small public company that is actively engaged in the design, development and sale of cyber-security products and solutions for government and commercial enterprises.  The Debtor has approximately 19 employees/consultants (located in the United States and abroad) and its headquarters is located at 151 Kalmus Drive, Suite A-203, Costa Mesa, California.  In order to enable the Debtor to operate its business in such a way as to avoid immediate and irreparable harm and to fund operations upon a final hearing on the Motion, the Debtor respectfully requests that the Court grant the relief requested by the Motion as set forth below.

<u>Interim Relief Requested on an Emergency Basis</u>

Per the Motion, the Debtor seeks entry of an interim order:

i.     approving the debtor in possession financing (the "DIP Financing");

ii.     authorizing the Debtor to borrow money under the DIP Financing pursuant to the order on the Motion and to execute or deliver the related agreements, instruments and documents, as they may be amended, supplemented or otherwise modified from time to time, by and between the Debtor, as borrower, and the lenders, as the postpetition lenders;

iii.     pending the final hearing on the Motion pursuant to Rule 4001(c) of the Federal Rules of Bankruptcy Procedure, authorizing the Debtor to obtain emergency postpetition loans under the

1

1 DIP Financing from the postpetition lenders as provided in the projections attached as **Exhibit B** to

2 the Bay Declaration and authorizing the Debtor to deviate from the total expenses contained in the

3 projections by no more than 15% on a cumulative basis and to deviate by categories (without the

4 need for further Court order);

5       iv.  granting to the lenders (a) first priority liens and security interests, senior to all other

6 secured and unsecured creditors  of the Debtor's estate in substantially all prepetition and

7 postpetition property of the Debtor (except avoidance actions and real property leases); and (b)

8 superpriority administrative expense treatment of the postpetition lender's claims against the estate

9 to secure the repayment of the Debtor's obligations under the DIP Financing, except with respect to

10 a carve-out for the legal fees and costs incurred by Debtor's counsel and approved by the

11 Bankruptcy Court;

12       v.  granting to the lenders as adequate protection of their prepetition collateral and cash

13 collateral, replacement liens and the security interests set forth in paragraph (iv) above to secure the

14 lenders' prepetition debt;

15       vi.  determining that the security interests of any existing lienholders are adequately

16 protected, pursuant to Sections 364(d)(1)(B) , 361 and 363(e) of 11 U.S.C. §§ 101 *et seq.* (the

17 "Bankruptcy Code"); and

18       vii.  modifying the automatic stay established pursuant to Section 362 of the Bankruptcy

19 Code to permit the postpetition lenders to take certain actions as described more fully in the Motion.

20 <u>**Relief Requested on a Final Basis Pending a Further Hearing**</u>

21       In an addition to the interim relief requested above, the Debtor also requests that the Court

22 set a continued, final hearing on the Motion so that the Debtor may seek entry of a final order

23 approving the DIP Financing, approving the Debtor's use of cash collateral and approving the

24 related relief requested herein.

25       This Motion is based upon Sections 503(b), 507, 362, 363 and 364 of the Bankruptcy Code

26 and Bankruptcy Rules 2002, 4001 and 9014 and Local Bankruptcy Rule 9075-1.  The relief

27 requested in the Motion is within the Debtor's business judgment, is in the best interest of the Debtor

28 and its estate and is essential to the continuation of the Debtor's business operations.   The value of

the Debtor's assets on a liquidation basis are substantially less than the Debtor's secured debt.  If the Debtor were forced to close its business and cease operations, junior creditors would have no interest whatsoever in the Debtor's cash collateral.  The DIP Financing allows the Debtor to continue operations, maintain the going concern value of its business and thereby provides adequate protection of the existing junior interests in the Debtor's cash collateral.

The Debtor's management conducted an extensive and active search for potential DIP lenders from March 2014 to the filing of this case, and was unable to find available DIP financing on terms remotely approaching those offered by the postpetition lenders.  The Debtor does not have an alternative source of financing at this point in time.

**PLEASE TAKE FURTHER NOTICE** that if you wish to object to the relief sought by the Motion, you must appear at the hearing and file any responsive pleading in accordance with the deadline set forth in the accompanying Notice of Emergency Motions.  Your failure to timely object may be deemed by the Court to constitute consent to the relief requested herein.

**WHEREFORE**, the Debtor respectfully requests that this Court: (a) authorize the Debtor to borrow up to $1,735,112 from the post-petition lenders; (b) authorize the Debtor to use cash collateral; (c) schedule a final hearing on the Motion; and (d) grant such other and further relief as the Court deems necessary and appropriate under the circumstances.

DATED:  September 24, 2014                    EZRA BRUTZKUS GUBNER LLP


                                                                    By:  /s/ Susan K. Seflin
                                                                            Susan K. Seflin
                                                                            Proposed Attorneys for Chapter 11 Debtor
                                                                            and Debtor in Possession

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. STATEMENT OF FACTS

**A.      General Case Background.**

1.      On September 23, 2014, ISC8, Inc. a Delaware corporation and the chapter 11 debtor and debtor in possession herein (the "Debtor") filed a voluntary petition for relief under chapter 11 of 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code").  The Debtor continues to operate its business and manage its affairs as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or committee has been appointed in the Debtor's chapter 11 case.

**B.      Description of the Debtor's business.**

2.      The Debtor designs, develops and sells cyber-security products globally.  The Debtor was incorporated in California in December of 1974 and reincorporated in Delaware in January of 1988.  The Debtor's principal place of business is located at 151 Kalmus Drive, Suite A-203, Costa Mesa, California 92626.  The Debtor's website is www.ISC8.com.

3.      The Debtor provides hardware, software and service offerings for web filtering, deep packet inspection with big data analytics and malware threat detection for advance persistent threats. The Debtor's products are installed nation-wide within the Middle East, and in mobile operators in Europe and Asia Pacific.

4.      Prior to March 2013, the Debtor also was a producer of non-cyber security/defense products.  In March 2013, the Debtor discontinued certain of its government-focused business, including the Secure Memory Systems, Cognitive and Microsystems business units (the "Government Business").  In January of 2012, the Debtor sold its thermal imaging business, which consisted of its business of researching, developing, designing, manufacturing, producing, marketing, selling and distributing thermal camera products, including clip-on thermal imagers, thermal handheld and mounted equipment devices, other infrared imaging devices and thermal cameras, and related thermal imaging products (the "Thermal Imaging Business").

///

5.      For the fiscal year 2013, the Debtor's gross revenue was $2.57 million.  The Debtor's gross revenue for 2012 was $4.1 million.  The Debtor's year to date revenue for 2014 is approximately $200,000.  The sale and divestment of the Debtor's Government Business and Thermal Imagining Business was undertaken due to significant cuts to the defense budget which led to loss of revenue from those businesses.  The Debtor believes that its cyber-security business will increase significantly and will bring in substantial revenue given the unique nature of the solution, and the ever-increasing threat being posed to businesses and governments by cyber adversaries.

**C.      The Debtor's Capital Structure.**

6.      The Debtor is a Delaware corporation and it is publicly held.  Approximately 33.61% of the Debtor's shares are held by Costa Brava Partnership III LP ("Costa Brava").  Approximately 24.31% of the Debtor's shares are held by Griffin Fund LP ("Griffin Fund").  In or around September 2013, Costa Brava and Griffin Fund converted secured debt to Series D Preferred shares.

7.      The Debtor owns directly and/or has direct interests in the following companies: (a) ISC8 Europe Limited [100% owned by the Debtor]; (b) Novalog, Inc. [96% owned by the Debtor]; (c) MicroSensors, Inc. [98% owned by the Debtor]; (d) RedHawk Vision Systems, Inc. [71% owned by the Debtor]; (e) iNetworks Corporation [95% owned by the Debtor]; and (f) ISC8 Malaysia SDN BHD [100% owned by the Debtor].  The following companies are owned 100% by ISC8 Europe Limited: (i) ISC8 Europe Ltd [Italian Branch]; (ii) ISC8 Europe Limited [UK Branch]; (iii) ISC8 Europe PTE [Singapore Branch]; and (iv) ISC8 Europe Ltd [Malaysia Branch].  The Debtor does not believe that these subsidiaries have any value either on a liquidation basis or on a going concern basis.

**D.      The Debtor's Secured Debt.**

8.      In December of 2011, the Debtor entered into a loan and security agreement (the "PFG Loan") with Partners for Growth III, L.P. ("PFG") which loan was secured by certain collateral.  As of July 28, 2014, the Debtor owed PFG approximately $3.16 million of senior secured debt holding a first priority lien.  On or about August 25, 2014, the Debtor and PFG entered into that certain agreement (the "PFG Agreement") pursuant to which, among other things, the Debtor surrendered to PFG its collateral in full satisfaction of the PFG Loan.  Pursuant to the PFG

1  Agreement, the Debtor also repurchased two patent applications from PFG for $50,000.   As of the

2  date this case was filed, the Debtor only owes PFG $25,000 of the $50,000 paid under the PFG

3  Agreement.  Because of the PFG Agreement, PFG no longer has a first priority security interest in

4  the Debtor's assets.

5  9.      In February of 2014, the Debtor's board of directors (the "Board") approved the

6  issuance of two offerings of senior subordinated secured convertible bridge notes.

7  a.      *The 2014 First Bridge Notes.*  The first set of 2014 senior subordinated

8  secured convertible bridge notes (the "2014 First Bridge Notes") were issued in the aggregate

9  principal amount of up to $3.5 million and were secured by substantially all of the assets of

10  the Debtor's estate.  A list of the lenders who lent pursuant to the 2014 First Bridge Notes are

11  set forth on **Exhibit C** to the Bay Declaration. The Debtor believes that the holders of the

12  2014 First Bridge Notes hold valid and perfected security interests in substantially all of the

13  Debtor's assets.   As of the Petition Date, the Debtor owes the lenders holding the 2014 First

14  Bridge Notes approximately $638,219.

15  b.      *The 2014 Second Bridge Notes.*  The second set of 2014 senior subordinated

16  secured convertible bridge notes (the "2014 Second Bridge Notes") were issued in the

17  aggregate principal amount of up to $6.0 million.  The 2014 Second Bridge Notes accrue

18  interest at 12% annually.  The 2014 Second Bridge Notes were sold at an original discount of

19  25%.  The list of lenders who lent the Debtor money pursuant to the 2014 Second Bridge

20  Notes are set forth on **Exhibit D** to the Bay Declaration.  The Debtor believes that the

21  holders of the 2014 Second Bridge Notes hold valid and perfected security interests in

22  substantially all of the Debtor's assets.   The Security Agreement for the 2014 Second Bridge

23  Notes is attached as **Exhibit E** to the Bay Declaration.

24  10.      While in the middle of raising funds pursuant to the 2014 Second Bridge Notes, it

25  became apparent to the Debtor, its management and the Board that a further restructuring and/or

26  chapter 11 bankruptcy filing was imminent.  PFG's refusal to support a chapter 11 reorganization

27  until PFG's obligations were fully resolved by the Debtor was one of the reasons that the Debtor's

28  management and Board decided it was in the Debtor's best interest to enter into the PFG Agreement

1 and to reduce the Debtor's overall secured debt.

2      11.    The lenders under the 2014 First Bridge Notes and under the 2014 Second Bridge

3 Notes are substantially the same lenders.  In connection with the Debtor's restructuring and in order

4 to raise sufficient funds to operate the Debtor through the summer and through the chapter 11

5 process, the Debtor agreed that any lenders who lent money from June 30, 2014 up until the Petition

6 Date (the "Post June 30th Lenders") under the 2014 Second Bridge Note would be rolled up into the

7 Debtor's post-petition debtor in possession financing (the "DIP Financing") and would receive a first

8 priority security interest in the Debtor's assets.  To obtain the DIP Financing, the lenders who lent

9 money pursuant to the 2014 First Bridge Notes and the lenders who lent money to the Debtor

10 pursuant to the 2014 Second Bridge Notes prior to June 30, 2014 (the "Pre June 30th Lenders")

11 entered into an "Intercreditor and Subordination Agreement" dated July 8, 2014 (the "Intercreditor

12 and Subordination Agreement") with the Debtor pursuant to which the lenders under the 2014 First

13 Bridge Notes and the Pre June 30th Lenders under the 2014 Second Bridge Notes agreed to

14 subordinate their security interests to the security interest of the Post June 30th Lenders and the post-

15 petition lenders (the "Post-Petition Lenders" and collectively, with the Post June 30th Lenders, the

16 "DIP Financing Lenders").  A true and correct copy of the Intercreditor and Subordination

17 Agreement is attached as **Exhibit F** to the Bay Declaration.

18      12.    **Summary:** As of the Petition Date, the Debtor has the following secured debt: (i)

19 approximately $1,264,887 of first priority, senior secured debt from the money lent to the Debtor by

20 the Post June 30th Lenders pursuant to the 2014 Second Bridge Notes; (ii) $3,233,667 of second

21 priority secured debt from the money lent to the Debtor by the Pre June 30th Lenders pursuant to the

22 2014 Second Bridge Notes; and (iii) approximately $638,219 of second priority secured debt from

23 the money lent to the Debtor pursuant to the 2014 First Bridge Notes.  Attached as **Exhibit G** to the

24 Bay Declaration is a recent UCC search setting forth all liens against the Debtor.  The Debtor

25 believes that, other than the liens related to the 2014 First Bridge Notes and the 2014 Second Bridge

26 Notes, each lien set forth in **Exhibit G**  has either been satisfied in full [e.g., the PFG financing

27 statement], terminated or has been filed for notification purposes only, but is not a lien asserted

28 against the Debtor's cash collateral.

**E.     The Debtor's Other Indebtedness.**

13.     Aside from the Debtor's obligations to the secured lenders as described above, the Debtor has an additional approximately $7.3 million in general unsecured debt which is owed to approximately 140 entities.

**F.     The Need for the DIP Financing.**

14.     The Debtor's current Chief Executive Officer ("CEO") and President, Kirsten Bay, was appointed by the Board in March of 2014.  Ms. Bay succeeded Bill Joll as the Debtor's President and CEO.  Ms. Bay's experience includes the successful restructuring of a software and services company.

15.     Prior to Ms. Bay's appointment, the Debtor had divested itself of its two core businesses that generated revenue (previously defined as the Government Business and the Thermal Imaging Business).  Since Ms. Bay's appointment, the Debtor and its management have focused on developing and marketing the Debtor's Cyber security solutions.  The Debtor believes that it has a viable business plan but needs additional funding to further develop and market its Cyber security products, and the Debtor is encumbered with substantial liabilities relating to its now divested business operations.

16.     The Debtor's management conducted an extensive and active search for potential DIP lenders from the end of March until September 2014, and was unable to find available financing for any amount near what the Post-Petition Lenders have offered.  Furthermore, the Debtor's CEO, Ms. Bay, is willing to testify as to the market place and the lack of available financing.  The Debtor does not have an alternative source of financing at this point in time.  The Debtor believes that the post-petition financing available from the Post-Petition Lenders is the "best" deal that the Debtor will find.  A list of the Post-Petition Lenders is attached as **Exhibit A** to the Bay Declaration filed concurrently herewith.

17.     In connection with the inclusion of the pre-petition $1,264,887 senior secured first priority debt with the up to $1,735.112.75 in DIP Financing that the Debtor is seeking pursuant to this Motion, the Post June 30th Lenders have agreed to waive the right to their 25% original issue discount (a total of $409,296) and have agreed to simple interest of 12% to be paid upon maturity

and/or in connection with confirmation of a chapter 11 plan of reorganization.  The terms of the

post-petition DIP Financing will be the same: simple interest of 12% to be paid upon maturity and/or

in connection with confirmation of a chapter 11 plan of reorganization.  The Post June 30th Lenders

and the Post Petition Lenders (previously defined collectively as the "DIP Financing Lenders") have

agreed to lend pursuant to the order on the DIP Financing Motion and pursuant to the post-petition

loan documents and security agreement (collectively, the "DIP Loan Documents") attached as

**Exhibits H** to **K** to the Bay Declaration.  A short summary of the following DIP Loan Documents is

as follows:[1]

      a.     Unit Purchase Agreement: This agreement summarizes the sale and issuance

of super senior secured convertible promissory notes which shall be convertible into equity

securities of the Debtor and warrants upon plan confirmation.

      b.     Super Senior Secured Convertible Promissory Note: This note obligates the

Debtor and states that "payment in kind" interest of 12% shall be paid on the note and shall

be due upon maturity of the note or at plan confirmation, whichever is later.

      c.     Warrant: This warrant describes the terms upon which the warrant is issued

and upon which it may be exercised.

      d.     Security Agreement: This is a formality as the DIP Financing Lenders will be

granted their security interests through the order on this Motion.

18.    Collateral for the DIP Financing on an Interim Basis:  Pursuant to 11 U.S.C. §§ 364

(c)(1), (c)(2) and (d)(1), the DIP Financing will be secured by a first priority priming lien on all

assets of the Debtor's estate except for avoidance actions and the Debtor's real estate leases.

19.    Collateral for the DIP Financing on a Final Basis:  Pursuant to 11 U.S.C. §§

364(c)(1), (c)(2) and (d)(1), the DIP Financing will be secured by a first priority priming lien on all

of the Debtor's assets except avoidance actions and real estate leases.

20.    In light of the circumstances of these cases, the Debtor submits that the proposed

---

[1] The DIP Loan Documents do not need to be executed in order for the DIP Financing to be completed.  Upon
transfer of the funds to the Debtor's DIP account, any money lent by the Post Petition Lenders will be deemed
to be covered by the entered order on this Motion [up to the maximum amount approved by the Court].

1    financing is fair and reasonable and, to date, the only financing available to the Debtor that is not

2    predatory.  The financing is necessary to preserve the Debtor's business because the revenue from its

3    current operations is not sufficient to sustain its business.

4         21.    Over the past three years, the Debtor has experienced great volatility in revenue, and

5    the divestiture of the two parts of its business that generated significant revenue (decisions made by

6    prior management).  While the Debtor and its management believe in the viability and eventual

7    success of its Cyber security products, the Debtor has not had sufficient time to market and

8    implement these products.  As a result, the Debtor lacks sufficient liquidity to sustain its current

9    operations.  Several additional specific factors have also contributed to the Debtor's recent liquidity

10   problems including chronic turnover in management and large financial obligations to former

11   management and directors.

12        22.    Given the Debtor's liquidity problems, the Debtor cannot operate profitably which

13   jeopardized the Debtor's continued access to financing.  Absent financing, the Debtor will be forced

14   to immediately cease operations and liquidate its assets.  Consequently, over the past several months

15   the Debtor has been involved in ongoing financing negotiations with the DIP Financing Lenders and

16   was able to obtain funding based upon the DIP Loan Documents in order to maintain operations and

17   preserve the value of its assets.

18                          **II. COMPLIANCE WITH RULE 4001**

19        Pursuant to Rule 4001 of the Federal Rules of Bankruptcy Procedure, the Debtor hereby

20   provides the following disclosures with respect to the DIP Financing:

| A grant of priority or a lien on property of the estate under 11 U.S.C. §§ 364(c) or (d) | Does apply | The DIP Financing will be secured by a first priority priming lien on all assets of the Debtor except for the Debtor's real estate leases and avoidance actions.  The DIP Financing will have priority over all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code except with respect to a carve-out for the legal fees and costs incurred by Debtor's counsel and approved by the Bankruptcy Court, and will also be senior, perfected liens.  As the DIP Financing Lenders are also the Post June 30th Lenders, the DIP Financing Lenders already have a first priority lien in all of the assets of the estate. |
|---|---|---|

7

| | | |
|---|---|---|
| The providing of adequate protection or priority for a claim that arose before the commencement of the case, including the granting of a lien on property of the estate to secure the claim, or the use of property of the estate or credit obtained under § 364 to make cash payments on account of the claim | Does apply | The Post June 30th Lenders will be obtaining the same type of first priority priming lien that the Post Petition Lenders are obtaining.  However, all valid secured pre-petition creditors other than the Post June 30th Lenders have consented to the subordination of their secured claims pursuant to the Intercreditor Agreement attached as **Exhibit F** to the Bay Declaration. |
| A determination of the validity, enforceability, priority or amount of a claim that arose before the commencement of the case, or of any lien security the claim | Does apply | The Post June 30th Lenders will be obtaining the same type of first priority priming lien that the Post Petition Lenders are obtaining in the amount of their $1,264,887 secured loans.  However, all valid secured pre-petition creditors other than the Post June 30th Lenders have consented to the subordination of their secured claims pursuant to the Intercreditor Agreement attached as **Exhibit F** to the Bay Declaration.  Furthermore, the Post June 30th Lenders have agreed to waive $409,296 of secured debt (in the form of their OID) in order to be included in the DIP Financing.  Lastly, Post June 30th Lenders are the same people/entities as the Post Petition Lenders. |
| A waiver or modification of Bankruptcy Code provisions or applicable rulings relating to the automatic stay | Does not really apply | Other than seeking relief from the automatic stay to the extent necessary to file the appropriate UCC-1 financing statement(s), this Motion does not seek any other relief that waives or modifies provisions of the Bankruptcy Code |
| A waiver or modification of any entity's authority or right to file a plan, seek an extension of time in which the Debtor has the exclusive right to file a plan, request the use of cash collateral under § 363(c), or request to obtain authority to obtain credit under § 364 | Does not apply | |
| The establishment of deadlines for filing a plan of reorganization, for approval of a disclosure statement, for a hearing on confirmation, or for entry of a confirmation order | Does not apply | While the  loan documents do not require the Debtor to establish these deadlines, the Debtor believes that it will be quickly filing a plan of reorganization in connection with obtaining exit financing |
| A waiver or modification of the applicability of nonbankruptcy law relating to the perfection of a lien on property of the estate, or on the foreclosure or other enforcement of the line | Does apply | The Final DIP Financing order will waive the requirement of the perfection of the post-petition liens being granted to the DIP Financing Lenders to secure the Debtor's post-petition obligations, which the Debtor submits is a routine right granted to a post-petition lender. |
| A release, waiver, or limitation on any claim or other cause of action belonging to the estate or the trustee, including any modification of the statute of limitations or other deadline to commence an action | Does not apply | |
| The indemnity of an entity | Does not apply | |
| A release, waiver, or limitation of any right under Section 506(c) | Does not apply | |

8

| The granting of a lien on any claim or cause of action arising under Sections 544, 545, 547, 548, 549, 553(b), 723(a) or 724(a) | Does not apply | |

## III. THE DEBTOR'S IMMEDIATE NEED FOR POSTPETITION FINANCING

As a consequence of the factors discussed above, the Debtor has insufficient available cash from operations to consistently meet ongoing obligations necessary to operate its business. As set forth in the Bay Declaration, there is insufficient cash generated from the operation of the Debtor's business. The Debtor is still in the process of finalizing and marketing its Cyber security products, and unexpected interruptions or delays may arise. Additionally, payments due on government contracts are often delayed as a result of the voluminous number of government service centers processing payment requests. As a result of these factors, the Debtor cannot rely on its projected cash collections to fund its operating needs for the period budgeted in the projections (the "Projections") attached **as Exhibit B** to the Bay Declaration.

Consequently, an immediate need exists for the Debtor to obtain financing, to assure the orderly administration of its estate. Without such financing, the Debtor will be unable to timely and consistently pay payroll and payroll expenses, rent, utility charges, professionals and general overhead, to purchase necessary materials and services, and to otherwise expend funds necessary to continue its business and operations. Without additional funding, the Debtor will be unable to operate its business or sell its business product lines as going concerns. Should the Debtor cease operations, the liquidation value of the Debtor's assets is currently less than the approximately $5.136 million of secured debt owed under the 2014 First Bridge Notes and 2014 Second Bridge Notes. Under a forced liquidation scenario, the total value of Debtor's assets would be approximately $1 million, without taking into account the costs of liquidation. The only hope of maximizing recovery for creditors is the maintenance of Debtor as a going concern and effectuating sales of Debtor's business product lines on that basis.

The Debtor has been unable to procure financing in the form of unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code, as an administrative expense under section 364(a) or (b) of the Bankruptcy Code, or in exchange for the grant of an administrative expense priority

1   pursuant to section 364(c)(1) of the Bankruptcy Code without the grant of liens on assets.  The

2   Debtor has been unable to procure the necessary financing on terms more favorable than the DIP

3   Financing.  No other lender was prepared to provide the financing needed by the Debtor.

4          Thus, the Debtor has an urgent need to obtain authority from this Court to obtain post-

5   petition financing under the terms set forth herein in order to continue operations and preserve the

6   going concern value of its business.

7              **IV. OVERVIEW OF THE DIP FINANCING AND RELATED RELIEF**

8          The Court and creditors are requested to review the DIP Financing Documents (copies of

9   which are attached as **Exhibits H** to **K** to the Bay Declaration) to become familiar with the specific

10  terms thereof.  A summary of the salient terms of the DIP Financing is as follows[2]:

11         a.      The Debtor confirms the priority, validity and unavoidability of the debt

12  owing to the Post June 30th Lenders pursuant to the 2014 Second Bridge Notes as modified herein;

13         b.      The DIP Financing Lenders will make available to the Debtor a continuing

14  credit facility up to the amount of $1,735,112.75 in accordance with the terms of the DIP Financing

15  Documents to be used to pay expenses in accordance with the Projections subject to approved

16  variances described therein.

17         c.      The DIP Financing Lenders will make advances to pay expenses incurred by

18  the Debtor through the earliest to occur (the "Termination Date") of (a) an event of default, (b) the

19  Effective Date of a confirmed plan of reorganization, or (c) the sale of all or substantially all of the

20  Debtor's assets.

21         d.      All advances will bear interest at the interest rate of 12% and the DIP

22  Financing Lenders are authorized to pay their attorneys $10,000 as set forth in the Unit Purchase

23  Agreement and to deduct that amount from the sums to be advanced (or the Debtor is authorized to

24  pay that sum from the sums advanced).

25         e.      The Debtor shall provide the DIP Financing Lenders with written reports of

26  actual operating results for the period covered by the Projections.

27  _____

28  [2]  If there are any inconsistencies between the terms of the DIP Loan Documents and this Motion,
the terms of this Motion and the order on the Motion shall control.

f.      The DIP Financing will be secured by a first priority lien or security interest in all prepetition and postpetition assets owned by the Debtor, except real property leases and avoidance actions,  and liens on Debtor's equipment which were senior to the DIP Financing Lender's liens prior to the Petition Date.  Postpetition Lender will also receive a superpriority administrative repayment right against Debtor for all advances under the DIP Financing, except for the legal fees and costs incurred by Debtor's counsel and approved by the Bankruptcy Court,.

g.      The Debtor agrees that no lien of equal or greater priority will be granted to any other creditor.

h.      As adequate protection to the DIP Financing Lenders with respect to the pre-petition collateral, the security interests granted to the DIP Financing Lenders to secure the DIP Financing also secures the pre-petition debt.

i.      The DIP Financing Lenders consent to the Debtor's use of their cash collateral.  To provide adequate protection to the DIP Financing Lender with respect to Debtor's use of cash collateral and the use of other pre-petition collateral, the DIP Financing Lenders are granted a replacement lien in and to the post-petition collateral to secure the pre-petition debt, to the extent of diminution of value (from use or decline in value) of the pre-petition collateral and the cash collateral.

j.      Any party in interest other than Debtor is given until forty-five (45) days following the date of the entry of the Interim Order to review the validity of the secured creditors' prepetition liens, the avoidability of any prepetition transactions between the Debtor and the DIP Financing Lenders or the DIP Financing Lenders status as fully secured creditors.

k.      The Projections submitted by Debtor subject to the variances, represent the minimum amount needed on a weekly basis to maintain operations and the viability of Debtor's business.

**V. THE DEBTOR HAS SATISFIED THE REQUIREMENTS
NECESSARY TO OBTAIN CREDIT**

**A.      DIP Financing**

Pursuant to Bankruptcy Code §§ 364(c) and (d), the Debtor requests authority to incur the DIP Financing allowable as an administrative expense, having priority over other administrative

1    expenses and secured by a senior lien on substantially all of the property of the Debtor's estate.  The

2    Debtor needs cash to meet ongoing obligations necessary to run its business and administer its

3    chapter 11 case.  The Debtor needs to use its cash receipts and the proceeds of the DIP Financing to

4    pay insurance, payroll, payroll expenses, rent, utility charges, professionals and general overhead, to

5    purchase necessary materials, and otherwise continue its business and operations.  As reflected by

6    the Projections, the Debtor believes that the DIP Financing will provide funds sufficient to permit

7    the Debtor to operate its business while it seeks to obtain and finalize exit financing.

8         Pursuant to Bankruptcy Code § 364(c), a debtor may, in the exercise of business judgment,

9    incur secured debt if the debtor has been unable to obtain unsecured credit and the borrowing is in

10   the best interest of the estate.  *See, e.g., In re Simasko Production Co.,* 47 B.R. 444, 448-9 (D.

11   Colo.1985) (authorizing interim financing agreement where debtor's best business judgment

12   indicated financing was necessary and reasonable for benefit of estate); *In re Ames Dept. Stores*, 115

13   B.R. 34, 38 (Bankr. S.D.N.Y. 1990) ("Ames") (with respect to post-petition credit, courts "permit

14   debtors-in-possession to exercise their basic business judgment consistent with their fiduciary

15   duties").  *See also* 2 Collier on Bankruptcy ¶ 364.04, at 364-9-11 (15th ed. 1991).  Section 364(c)

16   provides, in pertinent part, that:

17            (c)  If the trustee [or debtor in possession] is unable to obtain unsecured
             credit allowable-under section 503(b)(1) of this title as an administrative
18           expense, the court, after notice and a hearing, may authorize the obtaining
             of credit or the incurring of debt –
19                (1)  with priority over any and all administrative expenses of the
             kind specified in section 503(b) or 507(b) of this title:
20                (2)  secured by a lien on property of the estate that is not otherwise
             subject to a lien; or
21                (3)  secured by a junior lien on property of the estate that is subject
             to a lien.

22   Section 364(d)(1) of the Bankruptcy Code governs the incurrence of senior secured debt or

23   "priming" loans.  Pursuant to Section 364(d)(1), the Court may, after notice and a hearing, authorize

24   the obtaining of credit or the incurring of debt secured by a senior or equal lien only if –

25            (1)    the trustee is unable to obtain such credit otherwise; and
             (2)    there is adequate protection of the interest of the holder of the lien
26           on the property of the estate on which such senior or equal lien is proposed
             to be granted.

27   11 U.S.C. § 364 (d)(1).

28        In satisfying the standards of Section 364, a debtor need not seek credit from every available

1   source, but should make a reasonable effort to seek other sources of credit available under § 364(a)

2   and (b).  *See, e.g., In re Snowshoe Co.,* 789 F.2d 1085, 1088 (4th Cir. 1986) (trustee had

3   demonstrated by good faith effort that credit was not available without senior lien by unsuccessfully

4   contacting other financial institutions in immediate geographic area; "the statute imposes no duty to

5   seek credit from every possible lender before concluding that such credit is unavailable"); *Ames,*

6   *supra,* 115 B.R. at 40 (finding that debtors demonstrated the unavailability of unsecured financing

7   where debtors approached four lending institutions).

8          The liens granted to the DIP Financing Lenders to secure repayment of the DIP Financing

9   and as adequate protection for the use of the prepetition collateral prime the junior lien securing the

10  subordinated debt held by the Pre June 30th Lenders and the lenders under the 2014 First Bridge

11  Note (collectively, the "Junior Lenders").  The Junior Lenders entered into the Intercreditor and

12  Subordination Agreement and they will continue to hold the same junior liens and security interests

13  in the Debtor's assets as secured their claims prior to the commencement of this case.  As set forth

14  above, the Junior Lenders currently have no economic interest in the Debtor's assets at a forced

15  liquidation – those assets have a gross liquidation value of at most $1 million, which is less than the

16  $1.69 million senior lien held by the Post June 30th Lenders in such assets.  By continuing its

17  operations while further marketing and selling its Cyber security products and seeking exit

18  financing, the Debtor preserves and maintains the market value of its collateral and such

19  preservation constitutes adequate protection of the interests of junior creditors.  The DIP Financing

20  clearly constitutes a reasonable and necessary expense of preserving the value of the Debtor's assets.

21         Further, the Junior Lenders have no right to object to the Debtor's granting the security

22  interests and liens to the DIP Financing Lenders on the terms set forth herein.  The Intercreditor and

23  Subordination Agreement governing the subordinated debt constitutes an enforceable agreement in

24  this case pursuant to Bankruptcy Code § 510(a).  Under the Intercreditor and Subordination

25  Agreement, the Junior Lenders agreed that (a) their debt would at all times and in all respects be

26  subordinate and junior in right of payment to any and all indebtedness to the Debtor's senior secured

27  lender, and (b) the subordinated debt holder's security interest in the Debtor's collateral would be

28  subordinated to any existing and future security interests of Debtor's senior secured lender.  By its

1    terms, the Intercreditor and Subordination Agreement is binding on the Junior Lenders.

2         As indicated above, Section 364(c) of the Bankruptcy Code also enumerates certain

3    incentives that a court may grant to post-petition lenders.  The Section 364(c) list, however, is not

4    exhaustive.  Courts frequently have authorized the use of inducements not specified in the statute.

5    *See, e.g., In re Ellingsen MacLean Oil Co.*, 834 F.2d 599 (6th Cir. 1987) (affirming financing order

6    which prohibited any challenges to the validity of already existing liens); *In re Defender Drug*

7    *Stores,* 126 B.R. 76 (Bankr. D. Ariz. 1991) (authorizing enhancement fee to post-petition lender),

8    *aff'd* 145 B.R. 312, 316 (Bankr. 9th Cir. 1992) ("[b]ankruptcy courts . . . have regularly authorized

9    postpetition financial arrangements containing lender incentives beyond the explicit priorities and

10   liens specified in section 364"); *In re Antico Mfg. Co.*, 31 B.R. 103 (Bankr. E.D.N.Y. 1983)

11   (authorizing lien on pre-petition collateral to secure post-petition indebtedness).  The Debtor has

12   granted the DIP Financing Lenders such enhancements in the form of senior liens against its

13   prepetition and postpetition assets, debt and security acknowledgements.  The Debtor believes that

14   such enhancements are plainly reasonable requests by the DIP Financing Lenders in return for the

15   DIP Financing.

16   **B.      Even Absent Consent, The Priming Liens Are Authorized By The Bankruptcy Code.**

17        The proposed priming liens are authorized by the Bankruptcy Code, even absent the Junior

18   Lenders prior consent as set forth in the Intercreditor and Subordination Agreement.  Bankruptcy

19   Code § 364(d)(1)(B) requires the furnishing of adequate protection in favor of lien holders which

20   assert an interest in collateral.  Neither this nor any other Bankruptcy Code provision specifically

21   defines the term "adequate protection."   However, as discussed below in the cash collateral section

22   of this Motion, Bankruptcy Code § 361 provides that adequate protection is furnished to the extent

23   the debtor's "use, sale, lease or grant results in a decrease in the value of such entity's interest in

24   such property."  11 U.S.C. §§ 361(1), (2), (3) (emphasis added).  Stated succinctly, adequate

25   protection protects a secured creditor against a decrease in the value of its collateral.  *See e.g., In re*

26   *Planned System, Inc.,* 78 B.R. 852, 861-62 (Bankr. S.D. Ohio 1987).  This standard applies equally

27   with respect to a proposed "priming" financing under section 364(d)(1)(B).  *See, e.g., In re Hubbard*

28   *Power & Light*, 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996) ("The goal of adequate protection for

1   purposes of the provision entitling a debtor to obtain financing secured by liens senior to all other

2   interests is to safeguard the secured creditor from diminution in the value of its interests."); *In re*

3   *Aqua Assoc.,* 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991); *In re Beker Ind. Corp.,* 58 B.R. 725, 741-42

4   (Bankr. S.D.N.Y. 1986).   As noted above, there is no diminution in the value of collateral securing

5   the amounts owed to the Junior Lenders during the period covered by the DIP Financing Stipulation.

6   As such, the DIP Financing in and of itself adequately protects junior lien holders' interest in the

7   Debtor's collateral.

8          The Court has broad discretion to determine whether adequate protection is furnished.  *See*

9   *e.g., In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992).  Whether the party

10  entitled to such protection is over or undersecured is not dispositive of whether adequate protection

11  is furnished.  As the court *in Aqua Assoc.,* 123 B.R. 192, noted:

12                  Therefore, we believe that, while the presence of an equity cushion should
                 be a relevant factor, it should not be a determinative factor in any
13               'adequate protection' analysis, and particularly one relating to §
                 364(d)(1)(B).  The important question, in determination of whether the
14               protection to a creditor's secured interest is adequate, is whether that
                 interest, whatever it is, is being unjustifiably jeopardized.

15  *Id.* at 196 (emphasis added; approving priming financing where interest rate was 5% over prime and

16  loan likely would enhance value of estate).  *Accord In re Shenandoah Fed. Sav. & Loan Assoc. (In*

17  *re Snowshoe Co.)*, 789 F.2d 1085, 1087-90 (4th Cir. 1986).

18         The DIP Financing Lenders have a pre-petition security interest that primes the liens of the

19  Junior Lenders, who have contractually agreed to the priming.  Moreover, as indicated above, in a

20  forced liquidation there is insufficient value in the collateral at issue to satisfy the Post June 30th

21  Lenders' prepetition claims, let alone the Junior Lien holder's claims.  The infusion of superpriority

22  post-petition financing allows the continued operations of the Debtor which maintains the Debtor's

23  collateral value.  Further, the subordinated debt holder's interest in the Debtor's collateral is

24  adequately protected from diminution by virtue of the DIP Financing, which maintains the value of

25  the Debtor's collateral and preserves the Debtor's assets.  *See In re 495 Cent. Park Ave. Corp.*, 136

26  B.R. 626, 631 (approving "priming" financing for real property improvements; "Although appraisers

27  for both sides disagree as to what the value of the building would be following the infusion of

28  approximately $600,000, there is no question that the property would be improved by the proposed

renovations and that an increase in value will result.")

In short, Debtor respectfully submits that the DIP Financing satisfies the Section 363(c) and Section 364(d) standards.  As indicated above, the Debtor has attempted to obtain financing or equity infusions from various sources.  These efforts have been unsuccessful.  The best and only credit available to Debtor is the DIP Financing.  Thus, Debtor believes that it is fair, reasonable and necessary to enter into the DIP Financing.  In addition to representing the best terms presently available to Debtor, the DIP Financing is also in the best interests of the Debtor's estate.  The DIP Financing will provide Debtor needed funding to continue to operate postpetition and preserve Debtor's going concern value.  The DIP Financing therefore is plainly in the best interests of Debtor's estate.

**VI.**

**DEBTOR HAS SATISFIED THE PROCEDURAL REQUIREMENTS**

**REGARDING AUTHORITY TO OBTAIN CREDIT**

Bankruptcy Rule 4001(c) sets forth procedural requirements for obtaining credit.  Bankruptcy Rule 4001(c)(1) requires that:  "A motion for authority to obtain credit shall be made in accordance with Rule 9014 and shall be served on . . .the creditors included on the list filed pursuant to Rule 1007(d), and on such other entities as the court may direct.  The motion shall be accompanied by the copy of the agreement."   A copy of the Motion has been served by hand delivery, facsimile, electronic mail or overnight mail to Debtor's 20 largest unsecured creditors, the Office of the United States Trustee, and all secured creditors with an alleged interest in cash collateral.   Accordingly, the Motion complies with the requirements of Bankruptcy Rule 4001(c)(1).  Wherefore, Debtor requests that the Court authorize Debtor to enter into the DIP Financing.

**VII.**

**DEBTOR HAS SATISFIED THE REQUIREMENTS FOR USE**

**OF CASH COLLATERAL**

**A.	Unless The Secured Creditor Consents To The Use Of Cash Collateral, The Debtor Must Adequately Protect The Secured Creditor's Interest**

The Debtor's use of property of the estate is governed by Section 363 of the Bankruptcy

Code.  Section 363(c)(1) provides, in pertinent part, that:

> If the business of the debtor is authorized to be operated under section . . .
> 1108 . . . of this title and unless the court orders otherwise, the trustee [or
> debtor-in-possession] may enter into transactions, including the sale or
> lease of property of the estate, in the ordinary course of business, without
> notice or hearing, and may use property of the estate in the ordinary course
> of business without notice or hearing.

The Bankruptcy Code establishes a special requirement, however, regarding the debtor-in-possession's use of "cash collateral," defined as "cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest . . .."  Bankruptcy Code Section 363(a).

Bankruptcy Code §363(c)(2) permits the debtor-in-possession to use, sell or lease "cash collateral" under subsection (c)(1) only if either of two alternative circumstances exist:

> (A) each entity that has an interest in such cash collateral consents; or

> (B) the court, after notice and a hearing, authorizes such use, sale, or lease
> in accordance with the provisions of this section.  11 U.S.C. §363(c)(2).

If the secured creditor does not consent to the use of its cash collateral, the court can authorize the debtor-in-possession to use said cash collateral under Bankruptcy Code §363(c)(2)(B) if the court determines that the debtor has provided "adequate protection" of the secured creditor's interest in the cash collateral.  11 U.S.C. §363(e).  The DIP Financing Lenders have consented to the Debtor's use of cash collateral and the Debtor will provide adequate protection for such use.  The Junior Lenders, as subordinated debt holders, are adequately protected pursuant to Section 361 of the Bankruptcy Code by the maintenance of value of their collateral which is made possible by the DIP Financing and Debtor's use of cash collateral.   Moreover, pursuant to the Intercreditor and Subordination agreement, the Junior Lenders are deemed to have consented to the use of cash collateral.

**B.      The Meaning Of Adequate Protection.**

Section 361 of the Bankruptcy Code provides that:

> [W]hen adequate protection is required . . . of an interest of an entity in
> property, such adequate protection may be provided by –

> (1) requiring the trustee to make a cash payment or periodic cash
> payments to such entity, to the extent that the . . . use . . . under section

1        363 of this title . . . results in a decrease in the value of such entity's
         interest in such property;
2

3        (2) providing to such entity an additional or replacement lien to the extent
         that such . . . use . . . results in a decrease in the value of such entity's
4        interest in such property; or

5

6        (3) granting such other relief . . . as will result in the realization by such
         entity of the indubitable equivalent in such entity's interest in such
7        property.

8    11 U.S.C. §361.

9        Neither Section 361 nor any other provision of the Bankruptcy Code defines the nature and

10   extent of the "interest in property" of which a secured creditor is entitled to adequate protection

11   under section 361.  However, the statute plainly provides that a qualifying interest demands

12   protection only to the extent that the use of the creditor's collateral will result in a decrease in "the

13   value of such entity's interest in such property."  11 U.S.C. §§ 361, 363(e).  See also, *General*

14   *Electric Mortgage Corp. v.  South Village, Inc. (In re South Village, Inc.)*, 25 Bankr. 987, 989-90 &

15   n.4 (Bankr. D. Utah 1982); *O'Toole, Adequate Protection and Post-Petition Interest in Chapter 11*

16   *Proceedings,* 56 Am. Bankr. L.J. 251, 263 (1982).

17       The phrase "value of such entity's interest," although not defined in the Bankruptcy Code,

18   was addressed by the Supreme Court in the landmark decision, *United Savings Association of Texas*

19   *v. Timbers of Inwood Forest Associates, Ltd.,* 484 U.S. 365, 108 S.Ct. 626 (1988) ("*Timbers*").  For

20   the meaning of "value of such entity's interest," the Supreme Court was guided by section 506(a),

21   which defines a creditor's allowed secured claim:

22       The phrase "value of such creditor's interest" in §506(a) means "the value
         of the collateral."  H.R. Rep. No. 950-595, pp. 181, 356 (1977); see also S.
23       Rep. No. 95-989, p. 68 (1978), U.S. Code Cong. & Admin. News, 1978
         pp. 5787, 5854, 6141, 6312.  We think the phrase "value of such entity's
24       interest" in §361(1) and (2), when applied to secured creditors, means the
         same.
25

26   *Id.* at 630 (emphasis added).

27       *Timbers* teaches that a secured creditor is entitled to "adequate protection" only against

28   diminution in the value of the collateral securing the creditor's allowed secured claim.  Under

18

1  *Timbers*, therefore, where the "value of the collateral" is not diminishing by its use, sale, or lease, the

2   creditor's interest is adequately protected.  This conclusion flows directly from the equivalency of

3  "value of such entity's interests" with "value of the collateral."

4  **C.      The Preservation And Enhancement Of The Collateral Resulting From The Debtor's**

5          **Ongoing Operations Affords Adequate Protection.**

6          In *McCombs Properties VI, Ltd. v. First Texas Savings Association (In re McCombs*

7  *Properties, VI, Ltd.),* 88 Bankr. 261 (Bankr. C.D. Cal. 1988), the Bankruptcy Court applied the

8  *Timbers* decision in ruling that a secured creditor's interest in the cash and proceeds derived from a

9  debtors' operations was adequately protected where the value of the cash collateral was not declining

10  during the pendency of the bankruptcy case.  On the nature of the protection required, Bankruptcy

11  Judge Ryan noted:

12

13          The analysis of the Supreme Court in Timbers is instructive here.  The phrase
          "interest in property" in §363(e) means the value of the collateral.  That is the
14          interest that I am required to protect.  If that value is likely to diminish during the
          time of the use, adequate protection must be provided by the debtor.  As the
15          Supreme Court stated in Timbers, "thus, it is agreed if the apartment project in
          this case had been declining in value petitioner would have been entitled, under
16          §362(d)(1) to cash payments or additional security in the amount of the decline, as
          §361 describes." Id. 484 U.S. at ____, 198 S. Ct. at 629, at 748.*Id.,* at 266.

17          Similarly, in *Robert Neier v. Clark Oil & Refining Corp. (In re Apex Oil Company),* 85

18  Bankr. 538 (Bankr. E.D. Mo. 1988), the Bankruptcy Court, relying exclusively on *Timbers*, denied

19  adequate protection to a husband and wife holding over-secured claims because "[n]o evidence was

20  presented that the value of the [collateral] would diminish during the course of this Chapter 11

21  proceeding.

22          If the Motion is not granted, the Debtor will be forced to cease operations which will result in

23  the loss of the going concern value of the Debtor's business and assets and a substantially lower

24  recovery on the sale of Debtor's assets in liquidation.  Moreover, the value of Debtor's assets on a

25  forced liquidation basis are less than the approximately $1.7 million first priority secured claim of

26  the Post June 30th Lenders.  Therefore, Debtor's continued operations adequately protect the Junior

27  Lenders, whose claims are contractually subordinated to that of the Post June 30th Lenders and the

28  DIP Financing Lenders and whose junior interest in cash collateral would otherwise have no value in

1    a forced liquidation.

2        As set forth in the Projections, the Debtor has very little cash collateral and the Debtor's use

3    of the cash collateral has no net negative impact on the collateral value of Debtor's assets and there

4    is no resulting detriment to the Junior Lenders from such use.  Absent any evidence that the value of

5    their collateral will diminish during the course of this case, the Junior Lenders are not entitled to

6    adequate protection.

7        It is well established that a Bankruptcy Court, where possible, should resolve issues

8    presented in favor of preserving reorganization potential.  *In re Hoffman*, 51 Bankr. 42, 47 (Bankr.

9    W.D. Ark. 1985) (relief from stay); *In re A&B Heating and Air Conditioning, Inc.,* 48 Bankr. 401,

10   403-04 (Bankr. N.D. Fla. 1985) (injunction); *In re Heatron, Inc.,* 6 Bankr. 493, 496 (Bankr. W.D.

11   Mo. 1980) (cash collateral motion).  As the *Heatron* court stated in granting a debtor's motion to use

12   cash collateral:

13          At the beginning of the reorganization process, the Court must work with
            less evidence than might be desirable and should resolve issues in favor of
14          the reorganization, where the evidence is conflicting.
     *Id*., at 496.
15
         In *MBank Dallas, N.A. v. O'Connor (In re O'Connor)*, 808 F.2d 1393, 1397-98 (10th Cir.
16
     1987), the court summarized the foregoing principle as follows:
17
            Because the ultimate benefit to be achieved by a successful reorganization
18          inures to all the creditors of the estate, a fair opportunity must be given to
            the Debtors to achieve that end.  Thus, while interests of the secured
19          creditor . . . are of concern to the court, the interests of all other creditors
            also have bearing upon the question of whether use of cash collateral shall
20          be permitted during the early stages of administration.
            The first effort of the court must be to insure the value of the collateral
21          will be preserved.  Yet, prior to confirmation of a plan of reorganization,
            the test of that protection is not by the same measurements applied to the
22          treatment of a secured creditor in a proposed plan.  In order to encourage
            the Debtors' efforts in the formative period prior to the proposal of a
23          reorganization, the court must be flexible in applying the adequate
            protection standard.
24
25   *Id*. at 1397-98.  This principle applies equally to efforts to realize the highest value for a debtor's

26   business and assets through going concern sales.

27        Applying the foregoing, courts have frequently allowed a debtor to use cash collateral in

28   circumstances where such use would enhance or preserve the value of the collateral.  For example, in

1    *In re Stein*, 19 Bankr. 458 (Bankr. E.D. Penn. 1982), the court allowed a debtor to use cash collateral

2    where the secured party was undersecured and had no cushion for protection.  As in the present case,

3    the court in *Stein* found that the use of the cash collateral was necessary to the continued operations

4    of the debtor and "the creditor's secured position can only be enhanced by the continued operation of

5    the [debtor's business]." *Id.* at 460. *See also, In re Pine Lake Village Apartment Co.*, 16 Bankr. 750

6    (Bankr. S.D.N.Y. 1982) (debtor permitted to use cash collateral generated from rental income to

7    enhance the value of real property and secured creditor's claim); *In re Karl A. Neise, Inc.,* 16 Bankr.

8    600, 602 (Bankr. S.D. Fla. 1981) (marginally secured creditor adequately protected by lien in post-

9    petition property acquired by debtor; debtor can use cash collateral "in the normal course of their

10    business").

11      A secured creditor is only entitled to adequate protection of the value of the collateral

12    securing the creditor's allowed secured claim. *See Timbers, supra*, at 629-30.  Where, as in the

13    present case, the continuation of the debtor's business preserves the value of the creditor's alleged

14    collateral, the debtor's continued operations constitute adequate protection of the secured creditor's

15    interests in the collateral. *See, e.g., In re Coody,* 59 Bankr. 164, 167 (Bankr. M.D. Ga. 1986).

16      Debtor's continued use of cash collateral under the provisions of the DIP Financing will

17    insure that the "going concern" value of its assets are preserved, a value substantially greater than the

18    value which would be realized from a liquidation of those assets if Debtor were forced to cease

19    operations.

20    **D.**      **Emergency Relief is Justified Under the Circumstances**

21      The authorization to use cash collateral pending a final hearing will preserve the value of

22    Debtor's business only if authorization is granted immediately on short notice.  If there is any

23    interruption in the operations of the Debtor, the value of the business will be significantly impaired,

24    to the serious harm and detriment of the Debtor and its creditors, employees and customers.

25      Congress specifically recognized that it might be necessary to schedule hearings on requests

26    for interim authorization to use cash collateral on an expedited basis because of the business

27    exigencies of individual cases when it enacted Bankruptcy Code Section 363.  Section 363(b)(2)(B)

28    authorizes the use, sale, or lease of cash collateral "after notice and a hearing."  Section 363(c)(3)

1   provides in pertinent part:

2      Any hearing under paragraph (2)(B) of this subsection may be a
   preliminary hearing or may be consolidated with a hearing under
3      subsection (e) of this section, but shall be scheduled in accordance with
   the needs of the debtor . . . The court shall act promptly on any request for
4      authorization under paragraph (2)(B) of this subsection.

5   11 U.S.C. §363(b)(3); *see also* Section 102(1) of the Bankruptcy Code (defining "after notice and a

6   hearing" to mean after such notice and such opportunity for a hearing as is appropriate in the

7   particular circumstances of a given case).

8      In this instance, the Debtor must have immediate use of cash collateral and DIP Financing in

9   order to continue operating and avoid a shutdown of the business.  On the other hand, if access to its

10  cash and credit is denied, the outcome on the value of Debtor's assets will be devastating.  The

11  Junior Lenders will suffer no risk of harm if relief is granted, as any prospect for recovery by the

12  Junior Lenders on their secured claim in a forced liquidation is small. The forced liquidation value of

13  Debtor's assets is less than the secured claim of the Post June 30th Lenders which is senior to the

14  Junior Lenders.  To the extent that the Junior Lenders have an interest in cash collateral, that interest

15  is adequately protected by the preservation of the value of Debtor's assets through the use of cash

16  collateral and financing as provided in the DIP Financing.

17                 **VIII.**

18             **CONCLUSION**

19     **WHEREFORE**, the Debtor respectfully requests that this Court: (a) authorize the Debtor to

20  borrow up to $1,735,112 from the post-petition lenders; (b) authorize the Debtor to use cash

21  collateral; (c) schedule a final hearing on the Motion; and (d) grant such other and further relief as

22  the Court deems necessary and appropriate under the circumstances.

23  DATED:  September 24, 2014     EZRA BRUTZKUS GUBNER LLP

24

25           By:   /s/ Susan K. Seflin
          Susan K. Seflin
26            Proposed Attorneys for Chapter 11 Debtor
          and Debtor in Possession

27

28

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
21650 Oxnard St., Suite 500, Woodland Hills, California 91367

A true and correct copy of the foregoing document entitled: **NOTICE OF EMERGENCY MOTION AND
EMERGENCY MOTION OF DEBTOR FOR ENTRY OF INTERIM AND FINAL ORDERS: (A) AUTHORIZING THE
DEBTOR TO BORROW MONEY SECURED BY PROPERTY OF THE ESTATE PURSUANT TO 11 U.S.C. §§
364(c)(1) & (2) AND 364(d); (B) AUTHORIZING USE OF CASH COLLATERAL; (C) GRANTING ADEQUATE PROTECTION FOR
USE OF PREPETITION COLLATERAL; AND (D) GRANTING RELATED RELIEF (11 U.S.C.
§§ 363 AND 364; FEDERAL RULE OF BANKRUPTCY PROCEDURE 4001)** will be served or was served **(a)** on the judge in
chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General
Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On
September 24, 2014, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that
the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated
below:

- Elizabeth A Lossing    elizabeth.lossing@usdoj.gov
- Susan K Seflin    sseflin@ebg-law.com
- Robyn B Sokol    ecf@ebg-law.com, rsokol@ebg-law.com
- United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy
case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail,
first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the
judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method
for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on September 24, 2014, I served the
following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to
such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration
that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is
filed.

**\*Via Personal Service: The Honorable Scott C. Clarkson**
**\*\*A supplemental proof of service will be filed prior to the hearing which includes service of this document on the
Debtor's top 20 general unsecured creditors and its secured creditors**

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| 9/24/2014 | Susan K. Seflin | /s/ Susan K. Seflin |
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9013-3.1.PROOF.SERVICE**