DAVID SEROR - Bar No. 67488
ROBYN B. SOKOL - Bar No. 159506
SUSAN K. SEFLIN - Bar No. 213865
JESSICA L. BAGDANOV - Bar No. 281020
EZRA BRUTZKUS GUBNER LLP
21650 Oxnard Street, Suite 500
Woodland Hills, CA 91367
Telephone:   (818) 827-9000
Facsimile:    (818) 827-9099
Email:       dseror@ebg-law.com
             rsokol@ebg-law.com
             sseflin@ebg-law.com
             jbagdanov@ebg-law.com

Proposed Attorneys for Chapter 11 Debtor and Debtor in Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SANTA ANA DIVISION

In re

ISC8, INC.,

Case No. 8:14-bk-15750-SC

Chapter 11

**DECLARATION OF JOHANNA KIRSTEN BAY IN SUPPORT OF:**

**(1) DEBTOR'S EMERGENCY MOTION FOR ENTRY OF ORDERS: (A) AUTHORIZING THE DEBTOR TO BORROW MONEY SECURED BY PROPERTY OF THE ESTATE PURSUANT TO 11 U.S.C. §§ 364(c)(1) & (2) AND 364(d); (B) AUTHORIZING USE OF CASH COLLATERAL; (C) GRANTING ADEQUATE PROTECTION FOR USE OF PREPETITION COLLATERAL; AND (D) GRANTING RELATED RELIEF; AND**

**(2) EMERGENCY MOTION FOR AN ORDER (1) AUTHORIZING, BUT NOT REQUIRING, DEBTOR TO PAY PREPETITION (A) WAGES, SALARIES, AND OTHER COMPENSATION, (B) EMPLOYEE MEDICAL, WORKERS' COMPENSATION AND SIMILAR BENEFITS, AND (C) REIMBURSABLE EMPLOYEE EXPENSES; AND (2) AUTHORIZING AND DIRECTING APPLICABLE BANKS AND OTHER FINANCIAL INSTITUTIONS TO RECEIVE, PROCESS, HONOR, AND PAY CHECKS PRESENTED FOR PAYMENT AND TO HONOR FUND TRANSFER REQUESTS**

**Hearing:**
**Date:**    September 25, 2014
**Time:**    11:00 a.m.
**Place:**   Courtroom 5C
            411 West Fourth Street
            Santa Ana, CA 92701

1

1145546

I, Johanna Kirsten Bay, declare:

1.      I am an individual over the age of eighteen years, and have served as the Chief Executive Officer ("CEO") and President of ISC8, Inc., the chapter 11 debtor and debtor in possession of the above-entitled bankruptcy case, since March 2014.  The facts contained herein are based upon my personal knowledge or based upon the documents I review in the regular course of my duties as CEO and President and, if called as a witness, I would and could competently testify thereto.

2.      I make this declaration in support of the concurrently filed Emergency Motions as follows:

          a.   For Order Authorizing, But Not Requiring, Debtor to Pay Prepetition (A) Wages, Salaries, and Other Compensation, (B) Employee Medical and Similar Benefits, and (C) Reimbursable Employee Expenses; and (2) Authorizing and Directing Applicable Banks and Other Financial Institutions to Receive, Process, Honor, and Pay Checks Presented for Payment and to Honor Fund Transfer Requests Relating to the Foregoing (the "Prepetition Wage Motion"); and

          b.   For Interim and Final Orders (A) Authorizing the Debtor to Borrow Money Secured by Property of the Estate Pursuant to 11 U.S.C. §§ 364(c)(1) & (2) and 364(d); (B) Authorizing Use of Cash Collateral; (C) Granting Adequate Protection for Use of Prepetition Collateral; and (D) Granting Related Relief (the "DIP Financing Motion").

3.      All initial capitalized terms used but not defined herein shall have the same meaning as is affixed to them in the Prepetition Wage and DIP Financing Motions.

**A.      <u>General Case Background.</u>**

4.      On September 23, 2014, ISC8, Inc. a Delaware corporation and the chapter 11 debtor and debtor in possession herein (the "Debtor") filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtor continues to operate its business and manage its affairs as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or committee has been appointed in the Debtor's chapter 11 case.

/ / /

/ / /

2

1145546

**B.     Description of the Debtor's Business.**

5.     The Debtor designs, develops and sells cyber-security products globally.  The Debtor was incorporated in California in December of 1974 and reincorporated in Delaware in January of 1988.  The Debtor's principal place of business is located at 151 Kalmus Drive, Suite A-203, Costa Mesa, California 92626.  The Debtor's website is www.ISC8.com.

6.     The Debtor provides hardware, software and service offerings for web filtering, deep packet inspection with big data analytics and malware threat detection for advance persistent threats. The Debtor's products are installed nation-wide within the Middle East, and in mobile operators in Europe and Asia Pacific.

7.     Prior to March 2013, the Debtor also was a producer of non-cyber security/defense products.  In March 2013, the Debtor discontinued certain of its government-focused business, including the Secure Memory Systems, Cognitive and Microsystems business units (the "Government Business").  In January of 2012, the Debtor sold its thermal imaging business, which consisted of its business of researching, developing, designing, manufacturing, producing, marketing, selling and distributing thermal camera products, including clip-on thermal imagers, thermal handheld and mounted equipment devices, other infrared imaging devices and thermal cameras, and related thermal imaging products (the "Thermal Imaging Business").

8.     For the fiscal year 2013, the Debtor's gross revenue was $2.57 million.  The Debtor's gross revenue for 2012 was $4.1 million.  The Debtor's year to date revenue for 2014 is approximately $200,000.  The sale and divestment of the Debtor's Government Business and Thermal Imagining Business was undertaken due to significant cuts to the defense budget which led to loss of revenue from those businesses.  The Debtor believes that its cyber-security business will increase significantly and will bring in substantial revenue given the unique nature of the solution, and the ever-increasing threat being posed to businesses and governments by cyber adversaries.

**C.     The Debtor's Capital Structure.**

9.     The Debtor is a Delaware corporation and it is publicly held.  Approximately 33.61% of the Debtor's shares are held by Costa Brava Partnership III LP ("Costa Brava").  Approximately 24.31% of the Debtor's shares are held by Griffin Fund LP ("Griffin Fund").  In or around

1    September 2013, Costa Brava and Griffin Fund converted approximately $15.9 million of secured

2    debt to Series D Preferred shares.

3        10.     The Debtor owns directly and/or has direct interests in the following companies:

4    (a) ISC8 Europe Limited; (b) Novalog, Inc. [96% owned by the Debtor]; (c) MicroSensors, Inc.

5    [98% owned by the Debtor]; (d) RedHawk Vision Systems, Inc. [71% owned by the Debtor];

6    (e) iNetworks Corporation [95% owned by the Debtor]; and (f) ISC8 Malaysia SDN BHD.  The

7    following companies are owned 100% by ISC8 Europe Limited: (i) ISC8 Europe Ltd [Italian

8    Branch]; (ii) ISC8 Europe Limited [UK Branch]; (iii) ISC8 Europe PTE [Singapore Branch]; and

9    (iv) ISC8 Europe Ltd [Malaysia Branch].  The Debtor does not believe that these subsidiaries have

10   any value either on a liquidation basis or on a going concern basis.

11   **D.     The Debtor's Secured Debt.**

12       11.     In December of 2011, the Debtor entered into a loan and security agreement (the

13   "PFG Loan") with Partners for Growth III, L.P. ("PFG") which loan was secured by certain

14   collateral.  As of July 28, 2014, the Debtor owed PFG approximately $3.16 million of senior secured

15   debt holding a first priority lien.  On or about August 25, 2014, the Debtor and PFG entered into that

16   certain agreement (the "PFG Agreement") pursuant to which, among other things, the Debtor

17   surrendered to PFG its collateral in full satisfaction of the PFG Loan.  Pursuant to the PFG

18   Agreement, the Debtor also repurchased two patent applications from PFG for $50,000.   As of the

19   date this case was filed, the Debtor only owes PFG $25,000 of the $50,000 paid under the PFG

20   Agreement.  Because of the PFG Agreement, PFG no longer has a first priority security interest in

21   the Debtor's assets.

22       12.     In February of 2014, the Debtor's board of directors (the "Board") approved the

23   issuance of two offerings of senior subordinated secured convertible bridge notes.

24            a.     *The 2014 First Bridge Notes.*  The first set of 2014 senior subordinated

25   secured convertible bridge notes (the "2014 First Bridge Notes") were issued in the aggregate

26   principal amount of up to $3.5 million and were secured by substantially all of the assets of the

27   Debtor's estate.  A list of the lenders who lent pursuant to the 2014 First Bridge Notes is attached

28   hereto as **Exhibit C**.  I am informed and believe that the holders of the 2014 First Bridge Notes hold

1145546

1    valid and perfected security interests in substantially all of the Debtor's assets.   As of the Petition

2    Date, the Debtor owes the lenders holding the 2014 First Bridge Notes approximately $638,219.

3                    b.      *The 2014 Second Bridge Notes.*   The second set of 2014 senior subordinated

4    secured convertible bridge notes (the "2014 Second Bridge Notes") were issued in the aggregate

5    principal amount of up to $6.0 million.   The 2014 Second Bridge Notes accrue interest at 12%

6    annually.   The 2014 Second Bridge Notes were sold at an original discount of 25%.   A list of lenders

7    who lent the Debtor money pursuant to the 2014 Second Bridge Notes is set forth in **Exhibit D**

8    hereto.  I am informed and believe that the holders of the 2014 Second Bridge Notes hold valid and

9    perfected security interests in substantially all of the Debtor's assets.   The Security Agreement for

10   the 2014 Second Bridge Notes is attached hereto as **Exhibit E**.

11           13.     While in the middle of raising funds pursuant to the 2014 Second Bridge Notes, it

12   became apparent to me, the Debtor's other management and the Board that a further restructuring

13   and/or chapter 11 bankruptcy filing was imminent.   PFG's refusal to cooperate with a chapter 11

14   reorganization was one of the reasons that I, the Debtor's other management and the Board decided

15   it was in the Debtor's best interest to enter into the PFG Agreement and reduce the Debtor's overall

16   secured debt.

17           14.     The lenders under the 2014 First Bridge Notes and under the 2014 Second Bridge

18   Notes are substantially the same lenders.   In connection with the Debtor's restructuring and in order

19   to raise sufficient funds to operate the Debtor through the summer and through the chapter 11

20   process, the Debtor agreed that any lenders who lent money from June 30, 2014 up until the Petition

21   Date (the "Post June 30th Lenders") under the 2014 Second Bridge Note would be rolled up into the

22   Debtor's post-petition debtor in possession financing (the "DIP Financing") and would receive a first

23   priority security interest in the Debtor's assets.   In order to obtain the DIP Financing, the lenders

24   who lent money pursuant to the 2014 First Bridge Notes and the lenders who lent money to the

25   Debtor pursuant to the 2014 Second Bridge Notes prior to June 30, 2014 (the "Pre June 30th

26   Lenders") entered into an "Intercreditor and Subordination Agreement" dated July 8, 2014 (the

27   "Intercreditor and Subordination Agreement") with the Debtor pursuant to which the lenders under

28   the 2014 First Bridge Notes and the Pre June 30th Lenders under the 2014 Second Bridge Notes

1  agreed to subordinate their security interests to the security interest of the Post June 30th Lenders and

2  the post-petition lenders (the "Post-Petition Lenders" and collectively, with the Post June 30th

3  Lenders, the "DIP Financing Lenders").  A true and correct copy of the Intercreditor and

4  Subordination Agreement is attached hereto as **Exhibit F**.

5      15.    **Summary of Secured Debt:** As of the Petition Date, the Debtor has the following

6  secured debt: (i) approximately $1,264,887 of first priority, senior secured debt from the money lent

7  the Debtor by the Post June 30th Lenders pursuant to the 2014 Second Bridge Notes; (ii) $3,233,667

8  of second priority secured debt from the money lent the Debtor by the Pre June 30th Lenders

9  pursuant to the 2014 Second Bridge Notes; and (iii) approximately $638,219 of second priority

10  secured debt from the money lent the Debtor pursuant to the 2014 First Bridge Notes.  Attached

11  hereto as **Exhibit G** is a recent UCC search setting forth all liens against the Debtor.  I believe that,

12  other than the liens related to the 2014 First Bridge Notes and the 2014 Second Bridge Notes, each

13  lien set forth in **Exhibit G** has either been satisfied in full [*e.g.*, the PFG financing statement],

14  terminated, or has been filed for notification purposes only, but is not a lien asserted against the

15  Debtor's cash collateral.

16  **E.**    **The Debtor's Other Indebtedness.**

17      16.    Aside from the Debtor's obligations to the secured lenders as described above, the

18  Debtor has an additional approximately $7.3 million in general unsecured debt which is owed to

19  approximately 140 entities.

20  **F.**    **The Debtor's Management and Circumstances Impacting Debtor's Operations.**

21      17.    I have served as the Debtor's CEO and President since March of 2014.  I succeeded

22  Bill Joll as the Debtor's President and CEO.  Prior to my employment by the Debtor, I facilitated the

23  successful restructuring of a company that provided software and related services.

24      18.    Over the past three years, the Debtor has experienced great volatility in revenue.

25  Additionally, prior to my appointment, the Debtor divested itself of its two core businesses that

26  generated revenue (previously defined as the Government Business and the Thermal Imaging

27  Business).  Since my appointment, the Debtor and its management have focused on developing and

28  marketing the Debtor's Cyber security solutions.  While I believe in the viability and eventual

success of the Debtor's Cyber security products, the Debtor has not had sufficient time to market and implement these products. As a result, the Debtor lacks sufficient liquidity to sustain its current operations. Several additional specific factors have also contributed to the Debtor's recent liquidity problems, including chronic turnover in management and large financial obligations to former management and directors.

19.     Given the Debtor's liquidity problems, the Debtor cannot operate profitably which jeopardized the Debtor's continued access to financing. Absent financing, the Debtor would be forced to immediately cease operations and liquidate its assets. Consequently, over the past several months the Debtor has been involved in ongoing financing negotiations with the DIP Financing Lenders and was able to obtain funding based upon the DIP Loan Documents in order to maintain operations and preserve the value of its assets.

20.     Attached hereto as **Exhibit B** is a true and correct copy of the Debtor's financial projections as of September 23, 2014 ("Projections"). The Debtor has insufficient available cash from operations to consistently meet ongoing obligations necessary to operate its business. The Debtor is still in the process of finalizing and marketing its Cyber security products, and unexpected interruptions or delays may arise. Additionally, payments due on government contracts are often delayed as a result of the voluminous number of government service centers processing payment requests. As a result of these factors, the Debtor cannot rely on its projected cash collections to fund its operating needs for the period budgeted in the Projections.

21.     Consequently, an immediate need exists for the Debtor to obtain financing, to assure the orderly administration of the Debtor's business. Without such financing, the Debtor will be unable to timely and consistently pay payroll and related expenses, rent, utility charges, professionals and general overhead, to purchase necessary materials and services, and to otherwise expend funds necessary to continue its business and operations. Without additional funding, the Debtor will be unable to operate its business or sell its business product lines. Should the Debtor cease operations, I believe that the liquidation value of the Debtor's assets is currently less than the approximately $5.136 million of secured debt owed under the 2014 First Bridge Notes and 2014 Second Bridge Notes. Under a forced liquidation scenario, I believe that the total value of Debtor's

7

1 assets would be approximately $1 million, without taking into account the costs of liquidation.  I

2 believe that the only hope of maximizing recovery for creditors is the maintenance of Debtor as a

3 going concern and effectuating sales of Debtor's business product lines on that basis.

4        22.    I have conducted an extensive and active search for potential DIP lenders from the

5 end of March until September 2014, and I was unable to find available financing for any amount

6 near what the Post-Petition Lenders have offered.  The Debtor does not have an alternative source of

7 financing at this point in time.  I believe that the post-petition financing available from the Post-

8 Petition Lenders is the "best" deal that the Debtor will find.  A list of the Post-Petition Lenders is

9 attached hereto as **Exhibit A.**

10       23.    In connection with the inclusion of the pre-petition $1,264,887 senior secured first

11 priority debt with the up to $1,735.112.75 in DIP Financing that the Debtor is seeking pursuant to

12 the DIP Financing Motion, the Post June 30th Lenders have agreed to waive the right to their 25%

13 original issue discount (a total of $409,296) and have agreed to simple interest of 12% to be paid

14 upon maturity and/or in connection with confirmation of a chapter 11 plan of reorganization.  The

15 terms of the post-petition DIP Financing will be the same: simple interest of 12% to be paid upon

16 maturity and/or in connection with confirmation of a chapter 11 plan of reorganization.  The Post

17 June 30th Lenders and the Post Petition Lenders (previously defined collectively as the "DIP

18 Lenders") have agreed to lend pursuant to the order on the DIP Financing Motion and pursuant to

19 the post-petition loan documents and security agreement (collectively, the "DIP Loan Documents"),

20 attached hereto as **Exhibits H through K.**   A short summary of the following DIP Loan Documents

21 is as follows:

22        a.    Unit Purchase Agreement: This agreement summarizes the sale and issuance of super

23 senior secured convertible promissory notes which shall be convertible into equity securities of

24 Debtor and warrants upon plan confirmation, a true and correct copy is attached hereto as **Exhibit H.**

25        b.    Super Senior Secured Convertible Promissory Note: This note obligates the Debtor

26 and states that "payment in kind" interest of 12% shall be paid on the note and shall be due upon

27 maturity of the note or at plan confirmation, whichever is later.  A true and correct copy is attached

28 hereto as **Exhibit I.**

1145546

c.  <u>Warrant</u>: This warrant describes the terms upon which the warrant is issued and upon which it may be exercised.  A true and correct copy is attached hereto as **Exhibit J.**

d.  <u>Security Agreement</u>: This is a formality as the DIP Financing Lenders will be granted their security interests through the order on the DIP Financing Motion.  A true and correct copy is attached hereto as **Exhibit K.**

24.  <u>Collateral for the DIP Financing on an Interim Basis:</u>  Pursuant to 11 U.S.C. §§ 364(c)(1), (c)(2) and (d)(1), the DIP Financing will be secured by a first priority priming lien on all assets of the Debtor's estate except for avoidance actions and the Debtor's real estate leases.

25.  <u>Collateral for the DIP Financing on a Final Basis:</u>  Pursuant to 11 U.S.C. §§ 364(c)(1), (c)(2) and (d)(1), the DIP Financing will be secured by a first priority priming lien on all of the Debtor's assets except avoidance actions and real estate leases.

**G.    The Debtor's Workforce.**

26.  The Debtor employs thirteen (13) employees in the United States and (1) consultant. The Debtor also employs four (4) individuals who work for ISC8 Europe Ltd., the Debtor's Italian branch with offices located in Italy, and one employee who works in Dubai (collectively, "Employees").  The Employees in the United States are all paid pursuant to the same payroll timetable, as reflected in the spreadsheet entitled "Payroll Summary," attached hereto as **Exhibit L**.

27.  Besides myself, the following Employees are "insiders" of the Debtor as contemplated by 11 U.S.C. § 101(31): Scott Millis, John Vong, and Marcus Williams, principal of Gryphon's Door LLC, which acts as a consultant for Debtor (collectively, "Insider Employees").  By the Prepetition Wage Motion, the Debtor seeks authority to immediately pay all obligations pertaining to non-insider Employees.  With respect to the Insider Employees, no payments will be made until the expiration of the notice period with regard to the Notices of Insider Compensation filed for each of these employees.

**H.    Prepetition Wages.**

28.  As discussed above, the Debtor employs 19 employees/consultants, virtually all of whom are salaried full-time workers.  The Debtor pays its salaried employees bi-weekly (on alternating Fridays) for two weeks' work, one week in arrears.  Typically, a few days prior to each

1145546

1  payroll date, funds are transferred into the Debtor's payroll account to cover the payroll for the

2  applicable periods.

3        29.    Also, in the ordinary course of its business, the Debtor deducts from its employees'

4  paychecks (as applicable): (a) payroll taxes and the employees' portion of FICA and unemployment

5  taxes, (b) employee contributions for health and disability related benefits, (c) employee

6  contributions to 401(k) plans, and (e) other miscellaneous items (collectively, "Employee

7  Deductions").  The Debtor forwards amounts equal to the Employee Deductions from its operating

8  accounts to appropriate third-party recipients.

9        30.    Under ordinary conditions, the Debtor's next payroll for salaried employees is

10  scheduled for Friday, September 26, 2014, and would normally relate to the payroll period

11  September 8, 2014 through September 21, 2014 (*i.e.*, two weeks' pay, one week in arrears).  As a

12  result, this payroll would include amounts for the prepetition period of September 8, 2014 through

13  and including September 21, 2014.  However, given the fact that the Petition Date falls within a new

14  pay period, the Debtor seeks authority to also pay a prorated portion of the next payroll period,

15  through and including Monday, September 22, 2014.  The payroll amount associated with this

16  prepetition period is expected to be in the aggregate amount of approximately $125,193.17

17  ("Prepetition Wages").  Attached hereto as **Exhibits M and N,** respectively, are true and correct

18  spreadsheets reflecting payroll for the payroll period September 8, 2014 through September 26,

19  2014, and the one-day payroll period dated September 22, 2014.

20        31.    Additionally, the Debtor utilizes an Italian payroll processing company to process and

21  pay its international employees.  I understand that the processing company intends to cease

22  processing paychecks for the Debtor's international employees if it does not receive one-half of its

23  retainer up front, in the amount of approximately $15,000 ("International Payroll Processing

24  Payment").

25        32.    In sum, the Debtor expects to owe approximately $125,193.17 in Prepetition Wages,

26  and the additional International Payroll Processing Payment.  As of the Petition Date, no Employee

27  has a claim of more than $12,475 in Prepetition Wages on an individual basis.  *See* **Exhibit L**.  As

28  shown in **Exhibits M and N,** my employee claim and the claim of Gryphon's Door LLC have been

1145546

1    capped at the statutory maximum of $12,475.

2        33.    The Debtor seeks authority to continue with its payroll schedule in the ordinary

3    course of its business and consequently to pay all Prepetition Wages as planned on the dates

4    indicated above.  In all instances, due to the fact that no single employee has a claim of more than

5    $12,475 in Prepetition Wages, the Debtor will not make payroll distributions to any particular

6    employee in an amount that would exceed the allowable priority portion of such employee's

7    Prepetition Wages under section 507(a)(4) of the Bankruptcy Code.  The costs associated with

8    paying priority employee wage claims are relatively minimal compared with the damage to the

9    Debtor's estate that would ensue if employee morale were disrupted by the Debtor's failure to meet

10   its payroll obligations.

11       34.    In addition, the Debtor requires authority to pay or forward Employee Deductions, if

12   any, to the appropriate parties, including but not limited to all priority payroll taxes associated with

13   the Prepetition Wages.

14   **I.    Employee Benefits.**

15       35.    The Debtor has established a variety of benefit plans and programs ("Employee

16   Benefits") designed to assist its Employees and the Employees' eligible dependents in meeting

17   certain financial burdens, including those that can arise from illness, disability, and death.  The

18   Employees receive Employee Benefits pursuant to the terms and policies established by the Debtor.

19   The Debtor seeks authorization, but not direction, to pay or otherwise honor these Employee

20   Benefits, which are briefly described below.

21       36.    *Medical, Dental, Vision Insurance, Long-Term Disability, Basic Term Life Insurance*.

22   The Debtor offers all full-time Employees basic medical, dental, and vision insurance, as well as

23   long-term disability and basic term life insurance.  The Debtor's medical insurance is provided by

24   United Healthcare.  All other insurance is provided by Guardian.  A portion of the cost for each

25   Employee's insurance is deducted from his or her regular paycheck, and the Debtor contributes a

26   portion as well.  In order to maintain employee morale and not unfairly impose hardships on its

27   workforce, the Debtor seeks authority to pay any outstanding unpaid premiums, deductibles, and/or

28   claims with respect to medical, dental, and vision insurance accrued prepetition, and to continue to

1145546

1  honor its prepetition policies relating to such insurance.  The Debtor believes it is current under these

2  obligations and that there are no arrears with respect to Employees' insurance.  Attached hereto as

3  **Exhibit O** is a spreadsheet reflecting the Debtor's normally incurred benefit obligations.

4       37. _Worker's Compensation Premiums_.  Additionally, the Debtor is obligated to pay

5  worker's compensation insurance premiums for its Employees.  In the past and when Debtor was a

6  much larger operation, the Debtor owed approximately $85,000 in annual worker's compensation

7  premiums.  The Debtor has not received an invoice updated to reflect Debtor's smaller business size,

8  but expects it to arrive in the next few weeks.  Debtor seeks authority to pay this obligation in the

9  ordinary course of its business as part of its Employee Obligations.

10      38. _Retirement Benefits Plan_.  The Debtor offers eligible Employees the opportunity to

11 participate in a 401(k) Savings and Retirement Plan ("401(k) Plan").  The Debtor does not contribute

12 to the 401(k) on behalf of its Employees.  However, the Debtor forwards amounts equal to the

13 Employee's chosen contributions from its operating accounts to appropriate third-party recipients on

14 behalf of its Employees, and thus seeks authority to continue the 401(k) Plan and forward any

15 prepetition amounts as necessary.  These deductions from Employees' regular paychecks are

16 reflected in **Exhibits L through O.**

17 **J.**  **Reimbursable Expenses.**

18      39.  Employees may submit certain business-related expenses to the Debtor for

19 reimbursement.  These expenses include, among other things, car rental, meals, business supplies,

20 and other business-related costs, including those charged by Employees onto corporate credit cards.

21 As of the Petition Date, the Debtor estimates it owes Employees a _de minimis_ amount of

22 reimbursements, however the Debtor seeks authority, but not direction, to pay these Employee

23 Expenses and to continue to pay them postpetition in the ordinary course of business.

24      I declare under penalty of perjury under the laws of the United States of America that the

25 foregoing is true and correct.

26      Executed this 24th day of September, 2014, at Half Moon Bay, California.

27

28                                _____
                               Johanna Kirsten Bay

1145546

| SR. Secured Note | | | | |
| Committed | Proposed | Total | | Post Petition Lenders |
|---|---|---|---|---|
| $ 20 | $ 80 | $ 100 | | Griffin Fund II |
| $ 35 | | $ 35 | | Fundamental/Kreiger/Samuels |
| | $ 50 | $ 50 | | Reuben Richards |
| $ 25 | $ 25 | $ 50 | | Kurt Adlemean |
| $ 250 | $ 125 | $ 375 | | Bud FeldKamp |
| | $ 25 | $ 25 | | Southshore |
| | $ 50 | $ 50 | | Ladyface - Mike Poutre |
| | $ 100 | $ 100 | | Granite Partners - Warrant Lammert and Alex T |
| | $ 100 | $ 100 | | Ambassador LLC - Garret |
| | $ 50 | $ 50 | | Chris Lahidji |
| $ 200 | $ 500 | $ 700 | | Mike Bassignoni |
| $ 530 | $ 1,105 | $ 1,635 | | |

Potential Additional Funders

Seth Hamot/Costa Brava

Ron Chez

**ISCô, Inc.**
**Four - Week Cash Flow Projection**

| | Week Ending Sep. 26, 2014 | | | Week Ending Oct 3, 2014 | | | Week Ending Oct 10, 2014 | | | Week Ending Oct. 17, 2014 | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Budget | Actual | Variance | Budget | Actual | Variance | Budget | Actual | Variance | Budget | Actual | Variance | Budget | Actual | Variance |
| Cash Balance, Beginning | 26,917 | - | - | 118,193 | - | - | 97,937 | - | - | 25,891 | - | - | 26,917 | - | - |
| Receipts | | | | | | | | | | | | | | | |
| A/R | | | | | | | | | | | | | | | |
| DIP Financing (Notes) | 200,000 | - | - | | | | | | | | | | 255,000 | - | - |
| Total Receipts | 200,000 | - | - | 50,000 | - | - | 55,000 | - | - | - | - | - | 305,000 | - | - |
| Total Cash Available | 226,917 | - | - | 168,193 | - | - | 152,937 | - | - | 25,891 | - | - | 331,917 | - | - |
| Disbursement | | | | | | | | | | | | | | | |
| Salary - net | | | | | | | | | | | | | | | |
| Itemize Insiders separately | 27,967 | - | - | - | - | - | 68,625 | - | - | - | - | - | 68,625 | - | - |
| US Employees | 1,910 | | | | | | 30,683 | | | | | | 58,650 | | |
| Health - (taken from ee's paycheck) | 396 | | | | | | 2,271 | | | | | | 4,181 | | |
| Flex | - | | | | | | 440 | | | | | | 835 | | |
| Child support | 125 | | | | | | 138 | | | | | | 263 | | |
| International Employees | 41,759 | | | | | | - | | | | | | 41,759 | | |
| 401k | 920 | | | | | | 837 | | | | | | 1,757 | | |
| Total | 73,077 | - | - | - | - | - | 102,993 | - | - | - | - | - | 176,070 | - | - |
| Payroll Tax | 19,428 | - | - | - | - | - | 20,914 | - | - | - | - | - | 40,341 | - | - |
| Payroll services | 600 | - | - | - | - | - | 300 | - | - | - | - | - | 900 | - | - |
| Total | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Legal Fees | | | | | | | | | | | | | | | |
| Disclosure Law Group (subject to Court approval) | - | - | - | 5,000 | - | - | - | - | - | - | - | - | 5,000 | - | - |
| Total | - | - | - | 5,000 | - | - | - | - | - | - | - | - | 5,000 | - | - |
| Insurance | | | | | | | | | | | | | | | |
| General Liability Insurance - workers' comp, etc. | - | | | 25,000 | | | | | | | | | 25,000 | | |
| CNA - umbrella and auto | - | | | 2,800 | | | | | | | | | 2,800 | | |
| D&O | | | | - | | | | | | | | | - | | |
| United Health | | | | 20,000 | | | | | | | | | 20,000 | | |
| Colonial - supplemental | | | | 500 | | | | | | | | | 500 | | |
| Flac - supplemental | | | | 100 | | | | | | | | | 100 | | |
| Guardian - vision, dental, etc. | | | | 1,100 | | | | | | | | | 1,100 | | |
| Total | - | - | - | 49,500 | - | - | - | - | - | - | - | - | 49,500 | - | - |
| Rent | | | | | | | | | | | | | | | |
| Copper Tree - Costa Mesa Rent | | | | 2,946 | | | | | | | | | 2,946 | | |
| Regus - Texas rent | | | | 4,000 | | | | | | | | | 4,000 | | |
| Global IP Net works - Colo - Texas | | | | 750 | | | | | | | | | 750 | | |
| Total | - | - | - | 7,696 | - | - | - | - | - | - | - | - | 7,696 | - | - |
| Utilities | | | | | | | | | | | | | | | |
| Electricity | | | | - | | | | | | 1,000 | | | 1,000 | | |
| Cleyond - Costa Mesa telephone | | | | 60 | | | | | | | | | 60 | | |
| ADT - Costa Mesa alarm | | | | | | | | | | 1,000 | | | 1,000 | | |
| Global Meet - conferencing line | | | | | | | | | | | | | 500 | | |
| Time Warner - Costa Mesa | | | | | | | | | | | | | - | | |
| Total | - | - | - | 60 | - | - | - | - | - | 2,000 | - | - | 2,560 | - | - |
| Equipment Leases | | | | | | | | | | | | | | | |
| Dell | 500 | | | | | | | | | | | | 500 | | |
| GE - copier | | | | | | | | | | | | | - | | |
| Western Financial | | | | | | | | | | | | | - | | |
| Total | 500 | - | - | - | - | - | - | - | - | - | - | - | 500 | - | - |
| Total | - | - | - | - | - | - | 1,314 | - | - | - | - | - | 1,314 | 1,314 | 9/24/2014 |
| | - | - | - | - | - | - | 1,314 | - | - | - | - | - | 1,314 | - | - |

Exh B_001

**ISC8, Inc.**
**Four - Week Cash Flow Projection**

| | Week Ending Sep. 26, 2014 | | | Week Ending Oct 3, 2014 | | | Week Ending Oct. 10, 2014 | | | Week Ending Oct. 17, 2014 | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Budget | Actual | Variance | Budget | Actual | Variance | Budget | Actual | Variance | Budget | Actual | Variance | Budget | Actual | Variance |
| Travel | - | | | 1,000 | | | 1,000 | | | 1,000 | | | 3,000 | - | - |
| Office supplies | | | | | | | | | | | | | | | |
| Staples | | | | | | | 25 | | | | | | 25 | - | - |
| Sparklettes | | | | | | | | | | | | | - | - | - |
| Total | - | | | - | | | 25 | - | - | - | | | 25 | - | - |
| Postage and Storage | | | | | | | | | | | | | | | |
| Postage supplies | | | | | | | 500 | | | | | | 500 | - | - |
| Oneil Storage - of sit storage | | | | | | | | | | 1,000 | | | 1,000 | - | - |
| Total | - | | | - | | | 500 | - | - | 1,000 | | | 1,500 | - | - |
| Software | | | | | | | | | | | | | | | |
| Microsoft | | | | | | | | | | 400 | | | 400 | - | - |
| Total | - | | | - | | | - | - | - | 400 | - | - | 400 | - | - |
| Marketing | | | | 7,000 | | | | | | | | | 7,000 | - | - |
| Outside Services | | | | | | | | | | | | | | | |
| CompuShare - transfer agent fees | | | | | | | | | | 1,500 | | | 1,500 | - | - |
| Incorporating Services - Secretary State | 120 | | | | | | | | | | | | 120 | - | - |
| Radius - International back office | 15,000 | | | | | | | | | | | | 15,000 | - | - |
| Total | 15,120 | - | - | - | - | - | - | - | - | 1,500 | - | - | 16,620 | - | - |
| **Total Disbursement** | **108,724** | - | - | **70,256** | - | - | **127,046** | - | - | **5,900** | - | - | **311,926** | - | - |
| **Cash Balance, ending** | **118,193** | - | - | **97,937** | - | - | **25,891** | - | - | **19,991** | - | - | **19,991** | - | - |

**Note**
Payroll are paid one week in arrear.  For the pay date of Sept 26, 2014, normal paid period would be through Sept 19, 2014.
For this analysis, the Sept 26, 2014 pay date is paid through Sept 22, 2014

**Exh B_002**

**$3.5 million Senior Subordinated Convertible Promissory Note - Bridge Note**

| Name | Original Funding Date | Interest Accrual Begin Date | Maturity Date | Total Principle & Interest |
|---|---|---|---|---|
| Alvin Fund LLC | 02/12/14 | 02/12/14 | 07/31/14 | 210,630.14 |
| Fundamental Master LP | 02/12/14 | 02/12/14 | 07/31/14 | 157,972.60 |
| Jay Krieger | 02/12/14 | 02/12/14 | 07/31/14 | 52,657.53 |
| Fundamental Master LP | 02/13/14 | 02/13/14 | 07/31/14 | 105,260.27 |
| Jay Krieger | 02/13/14 | 02/13/14 | 07/31/14 | 26,315.07 |
| Griffin Fund | 02/13/14 | 02/13/14 | 07/31/14 | 26,315.07 |
| Jay Krieger | 02/14/14 | 02/14/14 | 07/31/14 | 26,301.37 |
| **Subtotal** | | | | **605,452.05** |

**ISC8**
**Listing of Bridge Note Investopr**
**$6.0 million Bridge Note**

| Date Fund Received | Maturity Date | From | Purchase Price | OID | Original Principal |
|---|---|---|---|---|---|
| 2/21/2014 | 7/31/2014 | Fundamental Master LP | $ 50,000 | $ 16,667 | $ 66,667 |
| 2/21/2014 | 7/31/2014 | Fundamental Credit LP | $ 125,000 | $ 41,667 | $ 166,667 |
| 3/3/2014 | 7/31/2014 | Fundamental Credit LP | $ 50,000 | $ 16,667 | $ 66,667 |
| 3/3/2014 | 7/31/2014 | Pargold | $ 100,000 | $ 33,333 | $ 133,333 |
| 3/3/2014 | 7/31/2014 | Griffin Fund II LP | $ 37,500 | $ 12,500 | $ 50,000 |
| 3/5/2014 | 7/31/2014 | Kurt Adelman | $ 25,000 | $ 8,333 | $ 33,333 |
| 3/7/2014 | 7/31/2014 | Reuben Richard | $ 250,000 | $ 83,333 | $ 333,333 |
| 3/21/2014 | 7/31/2014 | Fundamental Master LP | $ 50,000 | $ 16,667 | $ 66,667 |
| 3/21/2014 | 7/31/2014 | Fundamental Master LP | $ 50,000 | $ 16,667 | $ 66,667 |
| 3/21/2014 | 7/31/2014 | Fundamental Credit LP | $ 50,000 | $ 16,667 | $ 66,667 |
| 3/26/2014 | 7/31/2014 | Fundamental Credit LP | $ 125,000 | $ 41,667 | $ 166,667 |
| 3/27/2014 | 7/31/2014 | Fundamental Credit LP | $ 50,000 | $ 16,667 | $ 66,667 |
| 4/2/2014 | 7/31/2014 | Southshore Capital Partners LP | $ 100,000 | $ 33,333 | $ 133,333 |
| 4/2/2014 | 7/31/2014 | Fundamental Master LP | $ 200,000 | $ 66,667 | $ 266,667 |
| 4/9/2014 | 7/31/2014 | Fundamental Credit LP | $ 50,000 | $ 16,667 | $ 66,667 |
| 4/9/2014 | 7/31/2014 | Fundamental Master LP | $ 50,000 | $ 16,667 | $ 66,667 |
| 4/10/2014 | 7/31/2014 | Pargold | $ 100,000 | $ 33,333 | $ 133,333 |
| 4/11/2014 | 7/31/2014 | Thomas R. Stone | $ 25,000 | $ 8,333 | $ 33,333 |
| 4/21/2014 | 7/31/2014 | Fundamental Master LP | $ 25,000 | $ 8,333 | $ 33,333 |
| 4/23/2014 | 7/31/2014 | Fundamental Credit LP | $ 25,000 | $ 8,333 | $ 33,333 |
| 4/23/2014 | 7/31/2014 | Gayner Family Trust | $ 25,000 | $ 8,333 | $ 33,333 |
| 4/24/2014 | 7/31/2014 | KC Gamma Opportunity Fund | $ 25,000 | $ 8,333 | $ 33,333 |
| 4/25/2014 | 7/31/2014 | Pargold | $ 25,000 | $ 8,333 | $ 33,333 |
| 4/25/2014 | 7/31/2014 | Southshore Capital Partners LP | $ 25,000 | $ 8,333 | $ 33,333 |
| 5/1/2014 | 7/31/2014 | Fundamental Credit LP | $ 100,000 | $ 33,333 | $ 133,333 |
| 5/1/2014 | 7/31/2014 | Fundamental Master LP | $ 50,000 | $ 16,667 | $ 66,667 |
| 5/9/2014 | 7/31/2014 | Trancoso Partners LP | $ 30,000 | $ 10,000 | $ 40,000 |
| 5/12/2014 | 7/31/2014 | John W. Krieger | $ 15,000 | $ 5,000 | $ 20,000 |
| 5/13/2014 | 7/31/2014 | John W. Krieger | $ 18,000 | $ 6,000 | $ 24,000 |
| 5/19/2014 | 7/31/2014 | Griffin Fund II LP | $ 43,750 | $ 14,583 | $ 58,333 |
| 5/23/2014 | 7/31/2014 | Thomas R. Stone | $ 10,000 | $ 3,333 | $ 13,333 |
| 5/23/2014 | 7/31/2014 | Stephen & Shannan Bishop Family Trust | $ 76,000 | $ 25,333 | $ 101,333 |
| 5/23/2014 | 7/31/2014 | Fundamental Master LP | $ 25,000 | $ 8,333 | $ 33,333 |
| 5/23/2014 | 7/31/2014 | Fundamental Credit LP | $ 25,000 | $ 8,333 | $ 33,333 |
| 5/30/2014 | 7/31/2014 | Redwood Fund LP | $ 125,000 | $ 41,667 | $ 166,667 |
| 5/30/2014 | 7/31/2014 | Gayner Family Trust | $ 25,000 | $ 8,333 | $ 33,333 |
| 5/30/2014 | 7/31/2014 | John W. Krieger | $ 25,000 | $ 8,333 | $ 33,333 |
| 6/4/2014 | 7/31/2014 | Trancoso Partners LP | $ 50,000 | $ 16,667 | $ 66,667 |
| 6/6/2014 | 7/31/2014 | Fundamental Master LP | $ 25,000 | $ 8,333 | $ 33,333 |
| 6/6/2014 | 7/31/2014 | Fundamental Master LP | $ 20,000 | $ 6,667 | $ 26,667 |
| 6/6/2014 | 7/31/2014 | Fundamental Master LP | $ 25,000 | $ 8,333 | $ 33,333 |
| 6/11/2014 | 7/31/2014 | John W. Krieger | $ 87,397 | $ 29,132 | $ 116,530 |
| 6/11/2014 | 7/31/2014 | Griffin Fund LP | $ 87,397 | $ 29,132 | $ 116,530 |
| 6/13/2014 | 7/31/2014 | Redwood Fund LP | $ 75,000 | $ 25,000 | $ 100,000 |
| 6/17/2014 | 7/31/2014 | KC Gamma Opportunity Fund | $ 25,000 | $ 8,333 | $ 33,333 |
| 6/30/2014 | 7/31/2014 | Trancoso Partners LP | $ 37,000 | $ 12,333 | $ 49,333 |
| 7/7/2014 | 7/31/2014 | Griffin Fund LP | $ 40,000 | $ 13,333 | $ 53,333 |
| 7/8/2014 | 7/31/2014 | Trancoso Partners LP | $ 33,000 | $ 11,000 | $ 44,000 |
| 7/21/2014 | 7/31/2014 | Griffin Partners II LP | $ 328,000 | $ 109,333 | $ 437,333 |
| 7/21/2014 | 7/31/2014 | Fundamental Master LP | $ 107,000 | $ 35,667 | $ 142,667 |
| 7/21/2014 | 7/31/2014 | Fundamental Credit LP | $ 53,000 | $ 17,667 | $ 70,667 |
| 7/25/2014 | 7/31/2014 | Griffin Fund II LP | $ 16,666 | $ 5,555 | $ 22,221 |
| 7/28/2014 | 7/31/2014 | Fundamental Master LP | $ 9,008 | $ 3,003 | $ 12,011 |
| 7/28/2014 | 7/31/2014 | Fundamental Credit LP | $ 12,313 | $ 4,104 | $ 16,417 |

**Exh D_001**

| Date Fund Received | Maturity Date | From | Purchase Price | OID | Original Principal |
|---|---|---|---|---|---|
| 7/29/2014 | 7/31/2014 | Griffin Fund II LP | $ 83,300 | $ 27,767 | $ 111,067 |
| 7/31/2014 | 7/31/2014 | Fundamental Master LP | $ 28,063 | $ 9,354 | $ 37,418 |
| 7/31/2014 | 7/31/2014 | Fundamental Credit LP | $ 13,937 | $ 4,646 | $ 18,582 |
| 8/1/2014 | 7/31/2014 | Griffin Fund II LP | $ 30,600 | $ 10,200 | $ 40,800 |
| 8/3/2014 | 7/31/2014 | Griffin Fund II LP | $ 6,500 | $ 2,167 | $ 8,667 |
| 8/8/2014 | 7/31/2014 | Fundamental Credit LP | $ 6,139 | $ 2,046 | $ 8,185 |
| 8/8/2014 | 7/31/2014 | Fundamental Master LP | $ 12,361 | $ 4,120 | $ 16,481 |
| 8/27/2014 | 7/31/2014 | Gayner Family Trust | $ 25,000 | $ 8,333 | $ 33,333 |
| 9/4/2014 | 7/31/2014 | John W. Krieger | $ 25,000 | $ 8,333 | $ 33,333 |
| 9/5/2014 | 7/31/2014 | Thomas R. Stone | $ 100,000 | $ 33,333 | $ 133,333 |
| 9/8/2014 | 7/31/2014 | Fundamental Master LP | $ 8,000 | $ 2,667 | $ 10,667 |
| 9/9/2014 | 7/31/2014 | Jacqueline Samols Krieger | $ 40,000 | $ 13,333 | $ 53,333 |
| 9/19/2014 | 7/31/2014 | Pargold | $ 250,000 | $ 83,333 | $ 333,333 |
| | | **Total:** | $ **3,864,932** | $ **1,288,311** | $ **5,153,242** |

**Exh D_002**

## SECURITY AGREEMENT

THIS SECURITY AGREEMENT (this "**Security Agreement**") is executed as of March 6, 2014, by ISC8, Inc., a Delaware corporation ("**Debtor**"), and Fundamental Master LP, a Delaware limited partnership, in its capacity as Holder Representative under the Notes (as such term is defined below) (in such capacity, together with any successor appointed pursuant to the terms of the Notes, "**Holder Representative**").

RECITALS

A.     Debtor desires to issue up to $6.0 million in aggregate principal amount of Senior Subordinated Secured Convertible Promissory Notes due 2014 (the "**Notes**") to certain investors who may purchase the Notes (such purchasers, collectively the "**Purchasers**") under the terms of the Note Purchase Agreement by and between the Debtor and the signatories thereto, dated March __, 2014 ("**Purchase Agreement**").

B.     The execution and delivery of this Security Agreement is a condition precedent to the willingness of the Purchasers to enter into the Purchase Agreement and purchase and extend credit under the Notes.

ACCORDINGLY, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Debtor and Holder Representative hereby agree as follows:

**1.     REFERENCE TO LOAN DOCUMENTS.**  This Security Agreement is one of the "*Transaction Agreements*" referred to in the Purchase Agreement.

**2.     CERTAIN DEFINITIONS.**  Unless otherwise defined herein, or the context hereof otherwise requires, each term defined in any of the Notes or the UCC is used in this Security Agreement with the same meaning; *provided that*, if the definition given to such term in the Notes conflicts with the definition given to such term in the UCC, the Notes definition shall control to the extent legally allowable; and if any definition given to such term in *Chapter 9* of the UCC conflicts with the definition given to such term in any other chapter of the UCC, the *Chapter 9* definition shall prevail.  As used herein, the following terms have the meanings indicated:

**Collateral** has the meaning set forth in Section 4 hereof.

**Collateral Obligor** means any person or entity obligated with respect to any of the Collateral, whether as an account debtor, obligor on an instrument, issuer of securities, or otherwise.

**Copyrights** has the meaning set forth in Section 4(b) hereof.

**Intellectual Property** has the meaning set forth in Section 4(d) hereof.

**Obligation** means, collectively, all indebtedness, liabilities, and obligations of Debtor to the holders of the Notes and the Holder Representative arising under the Notes and this Security

Agreement.   The Obligation shall include, without limitation, future, *as well as* existing, indebtedness, liabilities, and obligations owed by Debtor to the holders of the Notes and the Holder Representative arising under the Notes and this Security Agreement.

**Patents** has the meaning set forth in <u>Section 4(c)</u> hereof.

**Permitted Liens** means the liens and Security Interests permitted by the Notes, including, for the avoidance of doubt, the liens and Security Interests securing Debtor's obligations with respect to any senior secured debt ("**Senior Debt**").

**Previous Senior Debt** means all obligations, liabilities and indebtedness of every nature of the Debtor from time to time owed to the holders of Senior Debt issued prior to the date hereof, including, without limitation, the principal amount of all debts, claims and indebtedness, accrued and unpaid interest and all costs and expenses, whether primary, secondary, direct, contingent, fixed or otherwise, heretofore, now and from time to time hereafter owing, due or payable, whether before or after the filing of a Proceeding under the Bankruptcy Code together with any interest accruing thereon after the commencement of a Proceeding, without regard to whether or not such interest is an allowed claim.

**Security Interest** means the security interest granted and the pledge and assignment made under <u>Section 3</u> hereof.

**Trademarks** has the meaning set forth in <u>Section 4(d)</u> hereof.

**UCC** means the Uniform Commercial Code, including each such provision as it may subsequently be renumbered, as enacted in the State of New York or other applicable jurisdiction, as amended at the time in question.

3.    **SECURITY INTEREST**.   In order to secure the full and complete payment and performance of the Obligation when due, Debtor hereby grants to Holder Representative for the benefit of the holders of the Notes a Security Interest in all of Debtor's rights, titles, and interests in and to the Collateral and pledges, collaterally transfers, and assigns the Collateral to Holder Representative for the benefit of the holders of the Notes, all upon and subject to the terms and conditions of this Security Agreement, which Security Interest shall be subordinated to any security interest granted with respect to Senior Debt.   Such Security Interest is granted and pledge and assignment are made as security only and shall not subject Holder Representative to, or transfer or in any way affect or modify, any obligation of Debtor with respect to any of the Collateral or any transaction involving or giving rise thereto.   If the grant, pledge, or collateral transfer or assignment of any specific item of the Collateral is expressly prohibited by any contract or by law, then the Security Interest created hereby nonetheless remains effective to the extent allowed by such contract, the UCC or other applicable laws, but is otherwise limited by that prohibition.

4.    **COLLATERAL**.   As used herein, the term "**Collateral**" means the following items and types of property, wherever located, now owned or in the future acquired by Debtor, and all proceeds and products thereof, and any substitutes or replacements therefor:

030814-DLG1

Exh E_002

(a)     All accounts, chattel paper (whether tangible or electronic), goods (including inventory, equipment, and any accessions thereto), software, instruments, investment property, documents, deposit accounts, money, commercial tort claims, letters of credit or letter-of-credit rights, supporting obligations, tax refunds, general intangibles (including payment intangibles) and all books and records pertaining to the foregoing;

(b)     (i) All copyrights (whether statutory or common law, registered or unregistered), works protectable by copyright, copyright registrations, copyright licenses, and copyright applications of Debtor, including, without limitation, all of Debtor's right, title, and interest in and to all copyrights registered in the United States Copyright Office or anywhere else in the world and also including, without limitation, the copyrights set forth on Schedule B; (ii) all renewals, extensions, and modifications thereof; (iii) all income, licenses, royalties, damages, profits, and payments relating to or payable under any of the foregoing; (iv) the right to sue for past, present, or future infringements of any of the foregoing; and (v) all other rights and benefits relating to any of the foregoing throughout the world; in each case, whether now owned or hereafter acquired by Debtor (the "**Copyrights**");

(c)     (i) All patents, patent applications, patent licenses, and patentable inventions of Debtor, including, without limitation, registrations, recordings, and applications thereof in the United States Patent and Trademark Office or in any similar office or agency of the United States, any state thereof or any other country or any political subdivision thereof; (ii) all continuations, divisions, renewals, extensions, modifications, substitutions, reexaminations, continuations-in-part, or reissues of any of the foregoing; (iii) all income, royalties, profits, damages, awards, and payments relating to or payable under any of the foregoing; (iv) the right to sue for past, present, and future infringements of any of the foregoing; and (v) all other rights and benefits relating to any of the foregoing throughout the world; in each case, whether now owned or hereafter acquired by Debtor (the "**Patents**");

(d)     (i) All trademarks, trademark licenses, trade names, corporate names, company names, business names, fictitious business names, trade styles, service marks, certification marks, collective marks, logos, other business identifiers, all registrations, recordings, and applications thereof, including, without limitation, registrations, recordings, and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any state thereof or any other country or any political subdivision thereof; (ii) all reissues, extensions, and renewals thereof; (iii) all income, royalties, damages, and payments now or hereafter relating to or payable under any of the foregoing, including, without limitation, damages or payments for past or future infringements of any of the foregoing; (iv) the right to sue for past, present, and future infringements of any of the foregoing; (v) all rights corresponding to any of the foregoing throughout the world; and (vi) all goodwill associated with and symbolized by any of the foregoing, in each case, whether now owned or hereafter acquired by Debtor (the "**Trademarks**", and collectively with the Copyrights and the Patents, the "**Intellectual Property**"); *provided* that (i) with respect to any Trademarks, applications in the United States Patent and Trademark Office to register Trademarks or service marks on the basis of the Debtor's "intent to use" such Trademarks or service marks will not be deemed to be Collateral unless and until a "Statement of Use" or "Amendment to Allege Use" has been filed and accepted in the United States Patent and Trademark Office, whereupon such application

shall be automatically subject to the Security Interest granted herein and deemed to be included in the Collateral;

(e)    All present and future distributions, income, increases, profits, combinations, reclassifications, improvements, and products of, accessions, attachments, and other additions to, tools, parts, and equipment used in connection with, and substitutes and replacements for, all or part of the Collateral described above;

(f)    All present and future accounts, contract rights, general intangibles, chattel paper, documents, instruments, cash and noncash proceeds, and other rights arising from or by virtue of, or from the voluntary or involuntary sale or other disposition of, or collections with respect to, or insurance proceeds payable with respect to, or proceeds payable by virtue of warranty or other claims against the manufacturer of, or claims against any other person or entity with respect to, all or any part of the Collateral heretofore described in this clause or otherwise; and

(g)    All present and future security for the payment to Debtor of any of the Collateral described above and goods which gave or will give rise to any such Collateral or are evidenced, identified, or represented therein or thereby.

The description of the Collateral contained in this <u>Section 4</u> shall not be deemed to permit any action prohibited by this Security Agreement or by the terms incorporated in this Security Agreement. Furthermore, notwithstanding any contrary provision, Debtor agrees that, if, but for the application of this paragraph, granting a Security Interest in the Collateral would constitute a fraudulent conveyance under *11 U.S.C. § 548* or a fraudulent conveyance or transfer under any state fraudulent conveyance, fraudulent transfer, or similar law in effect from time to time (each a "**fraudulent conveyance**"), then the Security Interest remains enforceable to the maximum extent possible without causing such Security Interest to be a fraudulent conveyance, and this Security Agreement is automatically amended to carry out the intent of this paragraph.

5.    **REPRESENTATIONS AND WARRANTIES.**  Debtor represents and warrants to Holder Representative as of the date hereof that:

(a)    <u>Transaction Agreements</u>.  Certain representations and warranties in the Transaction Agreements are applicable to it or its assets or operations, and each such representation and warranty is true and correct.

(b)    <u>Binding Obligation/Perfection</u>.  This Security Agreement creates a legal, valid, and binding Security Interest in and to the Collateral in favor of Holder Representative and enforceable against Debtor except as the enforceability thereof may be limited by bankruptcy, insolvency, moratorium, reorganization or similar laws affecting the enforcement of creditors' rights generally, and except for judicial limitations on the enforcement of the remedy of specific performance and other equitable remedies. For Collateral in which the Security Interest may be perfected by the filing of Financing Statements, once those Financing Statements have been properly filed in the applicable jurisdiction, and, in the case of the Registered IP (as defined below) with respect to which a security interest may be perfected by filing, recording or registration in the United States (or any political subdivisions thereof) and its territories and

4

possessions, upon the receipt and recording of a short form of this Security Agreement with the United States Patent and Trademark Office or the United States Copyright Office, as applicable, the Security Interest in such Collateral will be fully perfected, subject only to Permitted Liens. Other than the Financing Statements and with respect to this Security Agreement, there are no other financing statements or control agreements covering any Collateral, other than those evidencing Permitted Liens. The creation of the Security Interest does not require the consent of any person or entity that has not been obtained.

(c)     Debtor Information.   Debtor's exact legal name, mailing address, jurisdiction of organization, type of entity, and state issued organizational identification number are as set forth on Schedule A hereto.

(d)     Location/Fixtures.   (i) Debtor's place of business and chief executive office is where Debtor is entitled to receive notices hereunder; the present and foreseeable location of Debtor's books and records concerning any of the Collateral that is accounts is as set forth on Schedule A hereto, and the location of all other Collateral, including, without limitation, Debtor's inventory and equipment is as set forth on Schedule A hereto; and, *except* as noted on Schedule A hereto, all such books, records, and Collateral are in Debtor's possession.

(e)     Governmental Authority.   No authorization, approval, or other action by, and no notice to or filing with, any governmental authority is required for the pledge by Debtor of the Collateral pursuant to this Security Agreement or for the execution, delivery, or performance of this Security Agreement by Debtor, other than filings with applicable governmental authorities to perfect the Security Interests created hereby.

(f)     Liens.   Debtor owns all existing Collateral free and clear of all liens, *except* Permitted Liens.

(g)     Intellectual Property.

(i)     All of Debtor's interests in the Debtor's issued Patents, Patent applications, registered Trademarks, Trademark applications, registered Copyrights, and Copyright applications are identified on Schedule B hereto (the "**Registered IP**").

(ii)     Debtor is the owner of the Registered IP included in the Collateral, free and clear of any liens *other than* (A) any Permitted Liens or (B) any licenses permitted by Section 8(c).

6.     **COVENANTS**.   Until the Obligation is paid and performed in full, Debtor covenants and agrees with Holder Representative that Debtor will:

(a)     Information/Record of Collateral.   Maintain, at the place where Debtor is entitled to receive notices under the Notes, a current record of where all material Collateral is located, permit representatives of Holder Representative at any time, upon reasonable prior written notice during normal business hours to inspect and make abstracts from such records (*provided*, that so long as no Default exists, Holder Representative shall conduct such inspections no more frequently than annually), and furnish to Holder Representative, at such intervals as Holder Representative may reasonably request, such documents, lists, descriptions,

5

certificates, and other information as may be reasonably necessary or proper to keep Holder Representative informed with respect to the identity, location, and status of the Collateral.

(b)     Schedules.  Notwithstanding any other provision herein, Debtor's failure to describe any Collateral required to be listed on any schedule hereto shall not impair Holder Representative's Security Interest therein.

(c)     Obligations.  Notwithstanding anything contained herein to the contrary, (i) Debtor shall remain liable under the contracts, agreements, documents, and instruments included in the Collateral to the extent set forth therein to perform all of its duties and obligations thereunder to the same extent as if this Security Agreement had not been executed, and (ii) unless and until Holder Representative forecloses thereon and becomes the owner thereof pursuant to the exercise of its remedies hereunder, Holder Representative shall not have any liability or obligation under any of such contracts, agreements, documents and instruments, and Holder Representative shall not be obligated to perform any of the obligations or duties of Debtor thereunder or to take any action to collect or enforce any claim for payment assigned thereunder.

(d)     Notices.  (i) Except as may be otherwise expressly permitted under the terms of the Transaction Agreements, promptly notify Holder Representative of (A) any claim, action, or proceeding that materially affects title to all or any of the Collateral or the Security Interest; (B) any material damage to or loss of any material Collateral, and (C) the occurrence of any other event or condition (including, without limitation, matters as to lien priority) that could have a material adverse effect on the Collateral (taken as a whole) or the Security Interest created hereunder; and (ii) give Holder Representative thirty (30) days written notice before any proposed (A) relocation of its principal place of business or chief executive office, (B) change of its name or identity; (C) relocation of the place where its books and records concerning its accounts are kept; (D) relocation of any Collateral (*other than* delivery of inventory in the ordinary course of business to third party contractors for processing and sales of inventory in the ordinary course of business or as permitted by the Transaction Agreements) to a location not described on the attached Schedule A, and (E) change of its jurisdiction of organization or organizational identification number, as applicable.  Prior to making any of the changes contemplated in *clause (ii)* preceding, Debtor shall execute and deliver all such additional documents and perform all additional acts as Holder Representative may reasonably request in order to continue or maintain the existence and priority of the Security Interest in all of the Collateral.

(e)     Further Assurances.  At Debtor's expense and Holder Representative's reasonable request (i) after a Default, file or cause to be filed such applications and take such other actions as Holder Representative may reasonably request to obtain the consent or approval of any governmental authority to Holder Representative's rights hereunder, including, without limitation, the right to sell all the Collateral upon a Default without additional consent or approval from such governmental authority (and, because Debtor agrees that Holder Representative's remedies at law for failure of Debtor to comply with this provision would be inadequate and that such failure would not be adequately compensable in damages, Debtor agrees that its covenants in this provision may be specifically enforced); (ii) from time to time, either before or after a Default, promptly execute and deliver to Holder Representative all such

6

Exh E_006

other assignments, certificates, supplemental documents, and financing statements, and do all other acts or things as Holder Representative may reasonably request in order to more fully create, evidence, perfect, continue, and preserve the priority of the Security Interest and to carry out the provisions of this Security Agreement; and (iii) either before or after a Default, pay all filing fees in connection with any financing, continuation, or termination statement or other instrument with respect to the Security Interest.

      (f)   <u>Encumbrances</u>. Not create, permit, or suffer to exist, and shall defend the Collateral against, any lien or other encumbrance on the Collateral other than Permitted Liens, and shall defend Debtor's rights in the Collateral and Holder Representative's Security Interest in, the Collateral against the claims and demands of all persons or entities except those holding or claiming Permitted Liens.

      (g)   <u>Collection of Accounts</u>. In accordance with prudent business practices, endeavor to collect or cause to be collected from each account debtor under its accounts, as and when due, any and all amounts owing under such accounts.

      (h)   <u>Intellectual Property</u>.

      (i)   Give Holder Representative prompt written notice if Debtor shall obtain rights to or become entitled to the benefit of any additional issued patents, registered trademarks or registered copyrights (or makes application therefor) that are not identified on <u>Schedule B</u> hereto; if requested by Holder Representative, promptly (but in no event later than 30 days thereafter) deliver to Holder Representative an appropriate short form of this Security Agreement, containing a description of such additional Registered IP, for recording by the United States Patent and Trademark Office or the United States Copyright Office, as applicable; and cooperate as reasonably necessary to enable Holder Representative to make such recordations.

      (ii)   If a Default exists, use its reasonable efforts to obtain any consents, waivers, or agreements necessary to enable Holder Representative to exercise its rights and remedies with respect to the Intellectual Property.

      (iii)   Not transfer, assign or otherwise dispose of any of the Intellectual Property included in the Collateral except as permitted in the Note.

      (iv)   Except to the extent that failure to act could not reasonably be expected to have a Material Adverse Effect, take all commercially reasonable steps necessary to (x) maintain the validity and enforceability of any Registered IP and maintain such Registered IP in full force and effect and (y) pursue the application, obtain the relevant registration and maintain the registration of each of its Patents, Trademarks and Copyrights, including, without limitation, by the payment of required fees and taxes, the filing of responses to office actions issued by the U.S. Patent and Trademark Office, the U.S. Copyright Office or other governmental authorities, the filing of applications for renewal or extension, the filing of affidavits, the filing of divisional, continuation, continuation-in-part, reissue and renewal applications or extensions, the payment of

maintenance fees and the participation in interference, reexamination, opposition, cancellation, infringement and misappropriation proceedings.

(v) Except to the extent that failure to act could not reasonably be expected to have a Material Adverse Effect, not do or permit any act or knowingly omit to do any act whereby any of its Intellectual Property may lapse, be terminated, or become invalid or unenforceable or placed in the public domain (or in case of a trade secret, lose its competitive value).

(vi) Except to the extent that failure to act could not reasonably be expected to have a Material Adverse Effect, take all commercially reasonable steps to preserve and protect each item of its Intellectual Property, including, without limitation, maintaining the quality of any and all products or services used or provided in connection with any of the Trademarks, consistent with the quality of the products and services as of the date hereof, and taking all commercially reasonable steps necessary to ensure that all licensed users of any of the Trademarks abide by the applicable license's terms with respect to the standards of quality.

Notwithstanding the foregoing provisions of this subsection (i) or anything to the contrary in this Security Agreement, nothing in this Security Agreement shall prevent Debtor from discontinuing the use or maintenance of any of its Intellectual Property, the enforcement of its license agreements or the pursuit of actions against infringers, if Debtor determines in its reasonable business judgment that such discontinuance is desirable in the conduct of its business.

7.    **DEFAULT; REMEDIES.** If a Default exists, Holder Representative may, at its election (but subject to Section 9 below and to the terms and conditions of the Transaction Agreements), exercise any and all rights available to a secured party under the UCC, in addition to any and all other rights afforded by the Transaction Agreements, at law, in equity, or otherwise, including, without limitation, (a) requiring Debtor to assemble all or part of the Collateral and make it available to Holder Representative at a place to be designated by Holder Representative which is reasonably convenient to Debtor and Holder Representative, (b) surrendering any policies of insurance on all or part of the Collateral and receiving and applying the unearned premiums as a credit on the Obligation, (c) applying by appropriate judicial proceedings for appointment of a receiver for all or part of the Collateral (and Debtor hereby consents to any such appointment), and (d) applying to the Obligation any cash held by Holder Representative under this Security Agreement.

(a)    Notice. Reasonable notification of the time and place of any public sale of the Collateral, or reasonable notification of the time after which any private sale or other intended disposition of the Collateral is to be made, shall be sent to Debtor and to any other person or entity entitled to notice under the UCC. It is agreed that notice sent or given not less than ten calendar days prior to the taking of the action to which the notice relates is reasonable notification and notice for the purposes of this subparagraph.

(b)    Condition of Collateral; Warranties. Holder Representative has no obligation to clean-up or otherwise prepare the Collateral for sale. Holder Representative may sell the Collateral without giving any warranties as to the Collateral. Holder Representative may

8

specifically disclaim any warranties of title or the like. This procedure will not be considered adversely to affect the commercial reasonableness of any sale of the Collateral.

(c)     Compliance with Other Laws. Holder Representative may comply with any applicable state or federal laws in connection with a disposition of the Collateral and compliance will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral.

(d)     Application of Proceeds. Holder Representative shall apply the proceeds of any sale or other disposition of the Collateral under this Section 7 in the following order: *first*, to the payment of all expenses incurred in retaking, holding, and preparing any of the Collateral for sale(s) or other disposition, in arranging for such sale(s) or other disposition, and in actually selling or disposing of the same (all of which are part of the Obligation); *second*, toward repayment of amounts expended by Holder Representative under Section 8; *third*, toward payment of the balance of any amounts due with respect to Priority Liens, including with respect to the Senior Debt; and *fourth*, toward payment of the balance of the Obligation in the order and manner as Holder Representative determines in its sole discretion. Any surplus remaining shall be delivered to Debtor or as a court of competent jurisdiction may direct. If the proceeds are insufficient to pay the Obligation in full, then Debtor shall remain liable for any deficiency.

(e)     Sales on Credit. If Holder Representative sells any of the Collateral upon credit, Debtor will be credited only with payments actually made by the purchaser, received by the Holder Representative, and applied to the indebtedness of the purchaser. In the event the purchaser fails to pay for the Collateral, Holder Representative may resell the Collateral and Debtor shall be credited with the proceeds of the sale.

## 8.     OTHER RIGHTS OF HOLDER REPRESENTATIVE.

(a)     Performance. If Debtor fails to pay when due all taxes on any of the Collateral in the manner required by the Transaction Agreements, or fails to preserve the priority of the Security Interest in any of the Collateral, or fails to keep the Collateral insured as required by the Transaction Agreements, or otherwise fails to perform any of its obligations under the Transaction Agreements with respect to the Collateral, then Holder Representative may, at its option, but without being required to do so, and upon prior written notice to Debtor if no Default otherwise exists, pay such taxes, prosecute or defend any suits in relation to the Collateral, or insure and keep insured the Collateral in any amount deemed appropriate by Holder Representative, or take all other action which Debtor is required, but has failed or refused, to take under the Transaction Agreements. Any sum which may be expended or paid by Holder Representative under this subparagraph (including, without limitation, court costs and reasonable attorneys' fees) shall be payable by Debtor to Holder Representative upon demand and shall be part of the Obligation.

(b)     Collection. If a Default exists and upon written notice from Holder Representative, each Collateral Obligor with respect to any payments on any of the Collateral (including, without limitation, insurance proceeds payable by reason of loss or damage to any of the Collateral) is hereby authorized and directed by Debtor to make payment directly to Holder Representative, regardless of whether Debtor was previously making collections thereon. Until

Exh E_009

such notice is given, Debtor is authorized to retain and expend all payments made on Collateral. If a Default exists, Holder Representative shall have the right in its own name or in the name of Debtor to compromise or extend time of payment with respect to all or any portion of the Collateral for such amounts and upon such terms as Holder Representative may determine; to demand, collect, receive, receipt for, sue for, compound, and give acquittances for any and all amounts due or to become due with respect to Collateral; to take control of cash and other proceeds of any Collateral; to endorse the name of Debtor on any notes, acceptances, checks, drafts, money orders, or other evidences of payment on Collateral that may come into the possession of Holder Representative; to sign the name of Debtor on any invoice or bill of lading relating to any Collateral, on any drafts against Collateral Obligors or other persons or entities making payment with respect to Collateral, on assignments and verifications of accounts or other Collateral and on notices to Collateral Obligors making payment with respect to Collateral; to send requests for verification of obligations to any Collateral Obligor; and to do all other acts and things necessary to carry out the intent of this Security Agreement. If a Default exists and any Collateral Obligor fails or refuses to make payment on any Collateral when due, Holder Representative is authorized, in its sole discretion, either in its own name or in the name of Debtor, to take such action as Holder Representative shall deem appropriate for the collection of any amounts owed with respect to Collateral or upon which a delinquency exists. Regardless of any other provision hereof, however, Holder Representative shall never be liable for its failure to collect, or for its failure to exercise diligence in the collection of, any amounts owed with respect to Collateral, nor shall it be under any duty whatsoever to anyone *except* Debtor to account for funds that it shall actually receive hereunder.

(c)    Intellectual Property.  For purposes of enabling Holder Representative to exercise its rights and remedies under this Security Agreement and enabling Holder Representative and its successors and assigns to enjoy the full benefits of the Collateral, Debtor hereby grants to Holder Representative an irrevocable, nonexclusive license (exercisable without payment of royalty or other compensation to Debtor) to use, license, or sublicense any of Debtor's rights in the Intellectual Property to the extent such rights are transferable but only during such time as a Default exists.  During the existence of a Default, Debtor shall provide Holder Representative with reasonable access to all media in which any of the Intellectual Property may be recorded or stored and all computer programs used for the completion or printout thereof.  This license shall also inure to the benefit of all successors, assigns, and transferees of Holder Representative.  If a Default exists, Holder Representative may require that Debtor assign all of its right, title, and interest in and to the Intellectual Property or any part thereof to Holder Representative or such other person or entity as Holder Representative may designate pursuant to documents satisfactory to Holder Representative.  If no Default exists, then Debtor shall have the exclusive right and license to use the Intellectual Property in the ordinary course of business and the exclusive right to grant to other persons or entities licenses and sublicenses with respect to the Intellectual Property.

(d)    Use and Operation of Collateral.  Should any Collateral come into the possession of Holder Representative while a Default exists, Holder Representative may use or operate such Collateral for the purpose of preserving it or its value pursuant to the order of a court of appropriate jurisdiction or in accordance with any other rights held by Holder Representative in respect of such Collateral.  Debtor covenants to promptly reimburse and pay to Holder Representative, at Holder Representative's request, the amount of all reasonable expenses

030814-DLG1

Exh E_010

(including, without limitation, the cost of any insurance and payment of taxes or other charges) incurred by Holder Representative in connection with its custody and preservation of Collateral, and all such expenses, costs, taxes and other charges shall be payable by Debtor to Holder Representative upon demand and shall become part of the Obligation. However, the risk of accidental loss or damage to, or diminution in value of, Collateral is on Debtor, and Holder Representative shall have no liability whatever for failure to obtain or maintain insurance, nor to determine whether any insurance ever in force is adequate as to amount or as to the risks insured. With respect to Collateral that is in the possession of Holder Representative, Holder Representative shall have no duty to fix or preserve rights against prior parties to such Collateral and shall never be liable for any failure to use diligence to collect any amount payable in respect of such Collateral, but shall be liable only to exercise reasonable care in the safekeeping of any Collateral in its possession (it being agreed that treatment substantially equal to that which the Holder Representative accords its own property shall be deemed to constitute the exercise of reasonable care) and to account to Debtor for what it may actually collect or receive thereon. The provisions of this subparagraph are only applicable during the existence of a Default.

     (e)    Power of Attorney. Debtor hereby irrevocably constitutes and appoints Holder Representative and any officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact with full power and authority in the name of Debtor or in its own name, while a Default exists, to take any and all action and to execute any and all documents and instruments which Holder Representative at any time and from time to time deems necessary or desirable to accomplish the purposes of this Security Agreement and, without limiting the generality of the foregoing, Debtor hereby gives Holder Representative the power and right on behalf of Debtor and in its own name to do any of the following while a Default exists, without notice to or the consent of Debtor:

     (i)    to use the Intellectual Property or to grant or issue any exclusive or non-exclusive license under the Intellectual Property to anyone else, and to perform any act necessary for the Holder Representative to assign, pledge, convey, or otherwise transfer title in or dispose of the Intellectual Property to any other person or entity;

     (ii)    to demand, sue for, collect, or receive, in the name of Debtor or in its own name, any money or property at any time payable or receivable on account of or in exchange for any of the Collateral and, in connection therewith, endorse checks, notes, drafts, acceptances, money orders, documents of title or any other instruments for the payment of money under the Collateral or any policy of insurance;

     (iii)    to pay or discharge taxes, liens, or other encumbrances levied or placed on or threatened against the Collateral;

     (iv)    to notify post office authorities to change the address for delivery of Debtor to an address designated by Holder Representative and to receive, open, and dispose of mail addressed to Debtor; and

     (v)    (A) to direct account debtors and any other parties liable for any payment under any of the Collateral to make payment of any and all monies due and to become due thereunder directly to Holder Representative or as Holder Representative

030814-DLG1

shall direct; (B) to receive payment of and receipt for any and all monies, claims, and other amounts due and to become due at any time in respect of or arising out of any Collateral; (C) to sign and endorse any invoices, freight or express bills, bills of lading, storage or warehouse receipts, drafts against debtors, assignments, proxies, stock powers, verifications, and notices in connection with accounts and other documents relating to the Collateral; (D) to commence and prosecute any suit, action, or proceeding at law or in equity in any court of competent jurisdiction to collect the Collateral or any part thereof and to enforce any other right in respect of any Collateral; (E) to defend any suit, action, or proceeding brought against Debtor with respect to any Collateral; (F) to settle, compromise, or adjust any suit, action, or proceeding described above and, in connection therewith, to give such discharges or releases as Holder Representative may deem appropriate; (G) to exchange any of the Collateral for other property upon any merger, consolidation, reorganization, recapitalization, or other readjustment of the issuer thereof and, in connection therewith, deposit any of the Collateral with any committee, depositary, transfer agent, registrar, or other designated agency upon such terms as Holder Representative may determine; (H) to add or release any guarantor, indorser, surety, or other party to any of the Collateral; (I) to renew, extend, or otherwise change the terms and conditions of any of the Collateral; (J) to endorse Debtor's name on all applications, documents, papers, and instruments necessary or desirable in order for Holder Representative to use or maintain any of the Intellectual Property; (K) to make, settle, compromise or adjust any claims under or pertaining to any of the Collateral (including claims under any policy of insurance); (L) to file on behalf of Debtor any financing statements or continuation statements with respect to the Security Interests created hereby, and to do any and all acts and things to protect and preserve the Collateral, including, without limitation, the protection and prosecution of all rights included in the Collateral; and (M) to sell, transfer, pledge, convey, make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though Holder Representative were the absolute owner thereof for all purposes, and to do, at Holder Representative's option and Debtor's expense, at any time, or from time to time, all acts and things which Holder Representative deems necessary to protect, preserve, maintain, or realize upon the Collateral and Holder Representative's Security Interest therein. This power of attorney is a power coupled with an interest and shall be irrevocable unless or until all principal and interest payable under the Note have been repaid in full. Holder Representative shall be under no duty to exercise or withhold the exercise of any of the rights, powers, privileges, and options expressly or implicitly granted to Holder Representative in this Security Agreement, and shall not be liable for any failure to do so or any delay in doing so. Neither Holder Representative nor any person or entity designated by Holder Representative shall be liable for any act or omission or for any error of judgment or any mistake of fact or law. This power of attorney is conferred on Holder Representative solely to protect, preserve, maintain, and realize upon its Security Interest in the Collateral. Holder Representative shall not be responsible for any decline in the value of the Collateral and shall not be required to take any steps to preserve rights against prior parties or to protect, preserve, or maintain any Lien given to secure the Collateral; provided, however, that the Holder Representative shall use reasonable care in the safekeeping of any Collateral in its possession (it being

12

Exh E_012

agreed that treatment substantially equal to that which the Holder Representative accords its own property shall be deemed to constitute the exercise of reasonable care).

9.     **SUBORDINATION OF LIENS.** It is a requirement of the Senior Debt that the liens or Security Interests securing the Notes be subordinate and junior to the liens and security interests securing the Indebtedness of the Debtor in respect of the Senior Debt. Accordingly, and notwithstanding anything contained herein or in the other Transaction Agreements, the Holder Representative, on behalf of the holders of the Notes, hereby covenants and agrees with the Debtor as follows:

(a)     Acknowledgment.  The Holder Representative acknowledges that the holders of the Senior Debt have been granted a security interest in the Collateral.  The Holder Representative acknowledges and agrees that the Security Interest granted to it in the Collateral for the benefit of the holders of the Notes is subordinated to the respective security interests of the holders of the Senior Debt in the Collateral (to the extent that a security interest in the Collateral has been granted to such holders), all in the manner and pursuant to the terms set forth in this Section 9.

(b)     Priority of Liens.  The Holder Representative hereby confirms that regardless of the relative times of attachment or perfection thereof, and regardless of anything in any Transaction Document to the contrary, any security interests or liens granted from time to time to the holders of the Senior Debt in all or any part of the Collateral as security for the Senior Debt, shall in all respects be first and senior security interests and liens, superior to any Security Interests or liens at any time granted to the Holder Representative for the benefit of the holders of the Notes in such Collateral as security for the Obligations.  The priority specified herein is applicable irrespective of the time, order or method of attachment or perfection of Security Interests or the time or order of filing of financing statements.  The Holder Representative agrees on behalf of the holders of the Notes not to seek to challenge, to avoid, to subordinate or to contest or directly or indirectly to support any other Person in challenging, avoiding, subordinating or contesting in any judicial or other proceeding, including, without limitation, any Proceeding involving the Debtor, the priority, validity, extent, perfection or enforceability of any lien held by the holders of Senior Debt in all or any part of the Collateral.

(c)     No Improvements.  This Section 9 shall not be construed in any way to limit or impair the right of (i) the Holder Representative to bid for and purchase any Collateral at any private sale, public sale or judicial foreclosure upon such Collateral initiated by the holders of the Senior Debt, (ii) the Holder Representative to join (but not control) any foreclosure or other judicial lien enforcement proceeding with respect to the Collateral initiated by the holders of the Senior Debt, so long as it does not delay or interfere with the exercise by the holders of the Senior Debt of their rights and subject to the terms of this Security Agreement, the right of the Holder Representative to receive payments from the proceeds of the collection, sale or other disposition of any Collateral after the Senior Debt (if secured by liens on such Collateral) has been indefeasibly paid in full in cash.

13

Exh E_013

**10.    MISCELLANEOUS.**

(a)    <u>Continuing Security Interest</u>.    This Security Agreement creates a continuing Security Interest in the Collateral and shall (i) remain in full force and effect until the Obligation is paid and performed in full; and (ii) inure to the benefit of and be enforceable by Holder Representative and its successors, transferees, and assigns.    Without limiting the generality of the foregoing <u>clause (ii)</u>, Holder Representative may assign or otherwise transfer any of their respective rights under this Security Agreement to any other person or entity upon ten business day's prior written notice to Debtor provided that the assignee agrees to be bound by the terms and conditions of the Transaction Agreements.    To the extent of such assignment or transfer, such person or entity shall thereupon become vested with all the rights and benefits in respect thereof granted herein or otherwise to Holder Representative.    Upon payment in full of the Obligation, Debtor shall be entitled to the return, upon its request and at its expense, of (i) any confidential information provided to Holder Representative or its agents or assignees pursuant to the Transaction Agreements and (ii) such of the Collateral as shall not have been sold or otherwise applied pursuant to the terms hereof.

(b)    <u>Termination and Release</u>.

(i)    Upon the full and final payment and performance of the Obligation, this Security Agreement shall automatically terminate.

(ii)    The liens created by this Security Agreement on any of the Collateral shall be automatically released if Debtor disposes of such Collateral pursuant to a transaction permitted by the Note.

(iii)    In connection with any termination or release pursuant to clauses (i) or (ii), Holder Representative shall promptly execute and deliver to Debtor, at Debtor's expense, all documents that Debtor shall reasonably request to evidence such termination or release.    Any execution and delivery of documents pursuant to this Section 10(b)(iii) shall be without recourse to or warranty by Holder Representative.

(c)    <u>Actions Not Releases</u>.    The Security Interest and Debtor's obligations and Holder Representative's rights hereunder shall not be released, diminished, impaired, or adversely affected by the occurrence of any one or more of the following events: (i) the taking or accepting of any other security or assurance for any or all of the Obligation; (ii) any release, surrender, exchange, subordination, or loss of any security or assurance at any time existing in connection with any or all of the Obligation; (iii) the modification of, amendment to, or waiver of compliance with any terms of any of the other Transaction Agreements without the notification or consent of Debtor, *except* as required therein; (iv) the insolvency, bankruptcy, or lack of corporate or trust power of any party at any time liable for the payment of any or all of the Obligation, whether now existing or hereafter occurring; (v) any renewal, extension, or rearrangement of the payment of any or all of the Obligation, either with or without notice to or consent of Debtor, or any adjustment, indulgence, forbearance, or compromise that may be granted or given by Holder Representative to Debtor; (vi) any neglect, delay, omission, failure, or refusal of Holder Representative to take or prosecute any action in connection with any other agreement, document, guaranty, or instrument evidencing, securing, or assuring the payment of

14

Exh E_014

all or any of the Obligation; (vii) any failure of Holder Representative to notify Debtor of any renewal, extension, or assignment of the Obligation or any part thereof, or the release of any Collateral or other security, or of any other action taken or refrained from being taken by Holder Representative against Debtor or any new agreement between or among Holder Representative and Debtor, *it being understood that* except as expressly provided herein or required by law, Holder Representative shall not be required to give Debtor any notice of any kind under any circumstances whatsoever with respect to or in connection with the Obligation, including, without limitation, notice of acceptance of this Security Agreement or any Collateral ever delivered to or for the account of Holder Representative hereunder; (viii) the illegality, invalidity, or unenforceability of all or any part of the Obligation against any party obligated with respect thereto by reason of the fact that the Obligation, or the interest paid or payable with respect thereto, exceeds the amount permitted by applicable laws, the act of creating the Obligation, or any part thereof, is *ultra vires*, or the officers, partners, or trustees creating same acted in excess of their authority, or for any other reason; or (ix) if any payment by any party obligated with respect thereto is held to constitute a preference under applicable laws or for any other reason Holder Representative is required to refund such payment or pay the amount thereof to someone else.

(d)   Waivers.  Except to the extent expressly otherwise provided herein or in other Transaction Agreements and to the fullest extent permitted by applicable laws, Debtor waives (i) any right to require Holder Representative to proceed against any other person or entity, to exhaust its rights in Collateral, or to pursue any other right which Holder Representative may have; (ii) with respect to the Obligation, presentment and demand for payment, protest, notice of protest and nonpayment, and notice of the intention to accelerate; and (iii) all rights of marshaling in respect of any and all of the Collateral.

(e)   Financing Statement; Authorization.  Debtor hereby irrevocably authorizes Holder Representative at any time and from time to time to file in any UCC jurisdiction any initial financing statements and amendments thereto (without the requirement for Debtor's signature thereon) that (i) indicate the Collateral (A) as all assets of Debtor or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the UCC of the state or such jurisdiction or whether such assets are included in the Collateral hereunder, or (B) as being of an equal or lesser scope or with greater detail, and (ii) contain any other information required by Article 9 of the UCC of the state or such jurisdiction for the sufficiency or filing office acceptance of any financing statement or amendment, including whether the Debtor is an organization, the type of organization, and any organization identification number issued to Debtor.  Debtor agrees to furnish any such information to Holder Representative promptly upon request.

(f)   Amendments.  This Security Agreement may be amended only by an instrument in writing executed jointly by Debtor and Holder Representative, and supplemented only by documents delivered or to be delivered in accordance with the express terms hereof.

(g)   Multiple Counterparts.  This Security Agreement has been executed in a number of identical counterparts, each of which shall be deemed an original for all purposes and all of which constitute, collectively, one agreement; but, in making proof of this Security Agreement, it shall not be necessary to produce or account for more than one such counterpart.

030814-DLG1

Exh E_015

(h)     Parties Bound; Assignment.  This Security Agreement shall be binding on Debtor and Debtor's heirs, legal representatives, successors, and assigns and shall inure to the benefit of Holder Representative and Holder Representative's successors and assigns; *provided that* Debtor may not, without the prior written consent of Holder Representative, assign any rights, duties, or obligations hereunder.

(i)     General Authority of Holder Representative.   By acceptance of the benefits of this Security Agreement, each holder of the Notes (whether or not a signatory hereto) shall be deemed irrevocably (a) to consent to the appointment of Holder Representative as its agent hereunder, (b) to confirm that Holder Representative shall have the authority to act as the exclusive agent of such Person for the enforcement of any provisions of this Security Agreement against Debtor, the exercise of remedies hereunder and the giving or withholding of any consent or approval hereunder relating to any Collateral or Debtor's obligations with respect thereto, (c) to agree that it shall not take any action to enforce any provisions of this Security Agreement against Debtor, to exercise any remedy hereunder or to give any consents or approvals hereunder except as expressly provided in this Security Agreement or in the Notes and (d) to agree to be bound by the terms of this Security Agreement.

(j)     GOVERNING LAW.  THIS SECURITY AGREEMENT SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, AND ALL QUESTIONS CONCERNING THE CONSTRUCTION, VALIDITY, INTERPRETATION AND PERFORMANCE OF THIS NOTE SHALL BE GOVERNED BY, THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO ANY CHOICE OF LAW OR CONFLICT OF LAW PROVISION OR RULE (WHETHER OF THE STATE OF DELAWARE OR ANY OTHER JURISDICTIONS) THAT WOULD CAUSE THE APPLICATION OF THE LAWS OF ANY JURISDICTIONS OTHER THAN THE STATE OF DELAWARE.

*Remainder of Page Intentionally Blank.*
*Signature Page to Follow.*

030814-DLG1

Exh E_016

EXECUTED as of the date first stated in this Security Agreement.

**DEBTOR:**

**ISC8, INC.**

By: _____

Name:

Title:

HOLDER REPRESENTATIVE:

FUNDAMENTAL MASTER, LP

By: Fundamental Capital Management LLC
its General Partner

By: _____
Name: John W. Krieger
Title: Managing Member

Exh E_018

_____

as a Holder of Notes


By:_____
     Name:
     Title:

## SCHEDULE A

### DEBTOR INFORMATION AND LOCATION OF COLLATERAL

| | | |
|---|---|---|
| A. | Exact Legal Name of Debtor: | ISC8, Inc. |
| B. | Mailing Address of Debtor: | 151 Kalmus Drive<br>Costa Mesa, CA 92626 |
| C. | Type of Entity: | Corporation |
| D. | Jurisdiction of Organization: | Delaware |
| E. | State Issued Organizational<br>Identification Number: | 2149404 |
| F. | Location of Books and Records: | 151 Kalmus Drive, Costa Mesa, California 92626 |
| G. | Location(s) of Collateral: | 151 Kalmus Drive, Costa Mesa, California 92626 |
| H. | Jurisdiction(s) for Filing<br>Financing Statements: | Delaware |

## SCHEDULE B

A.    Registered Copyrights and Copyright Applications:

    None

B.    Issued Patents and Patent Applications:

    Patent Applications:

| Patent Title | Country | Status | Application No. | Filed |
|---|---|---|---|---|
| Portable Lip Reading Sensor System | U.S. | Patent | 8,271,262 | 9/18/2012 |
| Thermal Power Distribution System | U.S. | Non-Provisional | 12/657,090 | 1/14/2010 |
| Micro Gas Cell Array Device and Method | U.S. | Patent | 8,264,689 | 9/11/2012 |
| Micro-Combustion Power System with Dual Counter-Flow | U.S. | Non-Provisional | 12/584,460 | 9/4/2009 |
| Micro-Image Acquisition and Transmission System | U.S. | Patent | 8,362,673 | 1/29/2013 |
| Micro-Image Acquisition and Transmission System | U.S. | Non-Provisional | 13/711,373 | 12/11/2012 |
| Multi-Layer Photon Counting Electronic Module | U.S. | Non-Provisional | 12/924,141 | 9/20/2010 |
| Launch Tube Deployable Surveillance and Reconnaissance System (TOWHAWK) | U.S. | Non-Provisional | 12/799,297 | 4/21/2010 |
| Energy Efficient Micro Combustion System for Power Generation and Fuel Processing | U.S. | Patent | 8,546,680 | 10/1/2013 |
| Energy-Efficient Micro-Combustion System for Power Generation and Fuel Processing | U.S. | Non-Provisional | 12/909,332 | 10/21/2010 |
| Micro-Combustion Power System with Metal Foam Heat Exchanger | U.S. | Non-Provisional | 12/800,746 | 5/21/2010 |
| Apparatus Comprising Artificial Neuronal Assembly | U.S. | Patent | 8,510,244 | 8/13/2013 |
| Frequency Modulated Micro-Gyroscope Signal Processing Device and Method | U.S. | Patent | 8,327,705 | 12/11/2012 |
| Frequency Modulated Micro-Gyro Half-Period Signal Processing Method | U.S. | Non-Provisional | 13/982,537 | 10/15/2012 |
| Phase Sensing LADAR Using Atmoshperic Absorption Bands | U.S. | Patent | 8,279,420 | 10/2/2012 |
| AM Chirp LADAR Readout Circuit and Module | U.S. | Patent | 8,125,367 | 2/28/2012 |
| Gravity operated, rotatable lens curtain for thermal imager | U.S. | Patent | 8,411,346 | 4/2/2013 |

| | | | | |
|---|---|---|---|---|
| Tamper -Resistant Electronic Circuit and Module Incorporating Electrically Conductive Nano-Structures | U.S. | Non-Provisional | 12/806,127 | 8/4/2010 |
| Energy Harvesting Buoy | U.S. | Patent | 8,415,819 | 4/9/2013 |
| Secure Anti-Tamper Integrated Layer Security Device Comprising Nano-Structures | U.S. | Non-Provisional | 13/045,880 | 3/11/2011 |
| Thermal Management Device Comprising Thermally Conductive Heat Spreader with Electrically Isolated Through-Hole Vias | U.S. | Non-Provisional | 12/925,147 | 10/13/2010 |
| Ultra-Low Profile Multi-Chip Module | U.S. | Non-Provisional | 12/925,620 | 10/25/2010 |
| Compact Intelligent Surveillance System Comprising Intent Recognition | U.S. | Non-Provisional | 12,928,083 | 12/1/2010 |
| High Density Array Module and Connector | U.S. | Non-Provisional | 12/928,797 | 12/16/2010 |
| Quick Release Launch connector for micro unmanned aerial vehicle | U.S. | Non-Provisional | 12/928,796 | 12/16/2010 |
| Aerial Surveillance System and Method | U.S. | Non-Provisional | 12/928,458 | 12/9/2010 |
| Anti-Tampering Obscurity Using Firmware Power Mirror Compiler | U.S. | Patent | 8,384,413 | 2/26/2013 |
| Large Displacement Micro-Lamellar Grating Interferometer | U.S. | Non-Provisional | 13/010,745 | 1/20/2011 |
| Fast, High Resolution 3-D Flash LADAR Imager | U.S. | Non-Provisional | 13/099,829 | 5/3/2011 |
| Multi-Source Imagery and Geopositional Exploitation | U.S. | Non-Provisional | 13/109,793 | 5/17/2011 |
| Wear-Resistant Conformal Coating for Micro-Channel Structure | U.S. | Non-Provisional | 13/155,986 | 6/8/2011 |
| Anti-Tampering Detection Using Target Circuit RF Signature | U.S. | Non-Provisional | 13/098,738 | 5/2/2011 |
| Switched and Smart Switched Tracking Power Supply | U.S. | Non-Provisional | 13/098,684 | 5/2/2011 |
| EAGLE - High-Speed Processor Core Comprising Direct Processor-to-Memory Interconnectivity | U.S. | Patent | 8,519,739 | 8/27/2013 |
| High-Speed Processor Core Comprising Mapped Auxilliary Component Functionality | U.S. | Non-Provisional | 13/965,810 | 8/13/2013 |
| Sensor Element and System Comprising Wide Field-of-View 3-D Imaging LIDAR | U.S. | Non-Provisional | 13/108,172 | 5/16/2011 |
| Background Limited Focal Plane Array Assembly | U.S. | Non-Provisional | 13/589,231 | 8/20/2012 |
| Long Range Acquisition and Tracking SWIR Sensor System Comprising Micro-Lamellar Spectrometer | U.S. | Non-Provisional | 13/397,275 | 2/15/2012 |

Exh E_022

| | | | | |
|---|---|---|---|---|
| Active Tracking and Imaging Sensor System Comprising Illuminator Analysis Function | U.S. | Non-Provisional | 13/563,794 | 8/1/2012 |
| Multi-Operations Sensor System | U.S. | Non-Provisional | 13/671,643 | 11/8/2012 |
| Ultra High Resolution Holographic Camera | U.S. | Non-Provisional | 13/908,758 | 6/3/2013 |
| Multi-Spectral Sensor System Comprising a Plurality of Buttable Focal Plane Arrays | U.S. | Non-Provisional | 13/655,563 | 10/19/2012 |
| Self-Calibrating Targeting Sight | U.S. | Non-Provisional | 13/292,325 | 11/9/2011 |
| Low-Power LIDAR Scan and Receive Device and Method | U.S. | Non-Provisional | 13912282 | 6/7/2013 |
| Threshold Detection Method and Device for LIDAR Time of Flight System Using Differentiated Gaussian Signal | U.S. | Non-Provisional | 13/425,535 | 3/21/2012 |
| Threshold Detection Method, Module and Readout Integrated Circuit Layer for LIDAR Time of Flight System Using Differentiated Gaussian Signal | U.S. | Non-Provisional | 13/430,075 | 3/26/2012 |
| Sensor System Comprising Stacked Micro-Channel Plate Detector | U.S. | Non-Provisional | 13/338,332 | 12/28/2011 |
| Low Power Image Intensifier Device Comprising black Silicon Detector Element | U.S. | Non-Provisional | 13/272,341 | 10/13/2011 |
| LIDAR System Comprising Large Area Micro-Channel Plate Focal Plane Array | U.S. | Non-Provisional | 13/372,184 | 2/13/2012 |
| Stacked Micro-Channel Plate Assembly Comprising a Micro-Lens | U.S. | Non-Provisional | 13/338,328 | 12/28/2011 |
| Wirebond Through-Via Structure and Method | U.S. | Non-Provisional | 13/209,898 | 8/15/2011 |
| Anti-Tamper Wrapper Interconnect Method and Device | U.S. | Non-Provisional | 13/370,381 | 2/10/2012 |
| Method for Fabricating a Small Footpring Chip-Scale Package and a Device Made from the Method | U.S. | Non-Provisional | 13/399,051 | 2/17/2012 |
| Method for Fabricating a Neo-Layer Using Stud Bumped Bare Die | U.S. | Patent | 8,609,473 | 12/17/2013 |
| Cap Chip and Reroute Layer for Stacked Microelectronic Module | U.S. | Non-Provisional | 13/549,695 | 7/16/2012 |
| Method for Control of Solder Collapse in Stacked Microelectronic Structure | U.S. | Non-Provisional | 13/209,933 | 8/15/2011 |
| Method for Depackaging Prepackaged Integrated Circuit Die and a Procedure From the Method | U.S. | Patent | 8,586,407 | 11/19/2013 |

| | | | | |
|---|---|---|---|---|
| Method for Defining an Electronically Conductive Metal Structure on a Three-Dimensional Element and a Device Made From the Method | U.S. | Non-Provisional | 13/267,651 | 10/6/2011 |
| Nano-Resonator Inertial Sensor Assembly | U.S. | Patent | 8,584,524 | 11/19/2013 |
| Zero-Added Footprint Captive Float Nut | U.S. | Non-Provisional | 13/526,221 | 6/18/2012 |
| Semiconductor Micro-Connector With Through-Hole via and a Method for Making the Same | U.S. | Non-Provisional | 13/479,585 | 5/24/2012 |
| Gravity-Stabilized Sensor Mount for Moving Platform | U.S. | Non-Provisional | 13/457,566 | 4/27/2012 |
| GPS-Independent Positioning Method | U.S. | Non-Provisional | 13/772,589 | 2/21/2013 |
| Method and Apparatus for Foldable Wing UAV | U.S. | Non-Provisional | 13/774,157 | 2/22/2013 |
| Tamper Resistant Memory Device with Variable Data Transmission Rate | U.S. | Non-Provisional | 13/363,571 | 2/1/2012 |
| Imaging Device and Method for Video Data Transmission Optimization | U.S. | Non-Provisional | 13/480,629 | 5/25/2012 |
| Wave Energy Capture System (WECS) | U.S. | Non-Provisional | 13/487,404 | 6/4/12 |
| Stacked Physically Uncoloeable Function Sense and Respond Module | U.S. | Non-Provisional | 13/486,500 | 6/1/2012 |
| Local Alignment & Positioning Device and Method | U.S. | Non-Provisional | 13/567,277 | 8/6/2012 |
| Launch Device for Tube-Launched Projectile | U.S. | Non-Provisional | 13/769,430 | 2/18/2013 |
| Thermally-Managed Electronic Device | U.S. | Non-Provisional | 13/625,019 | 9/24/2012 |
| Self-calibrating Micro-Gyroscope | U.S. | Non-Provisional | 13/763,151 | 2/8/2013 |
| Cyber Behavior Analysis and Detection Method, System and Architecture | U.S. | Non-Provisional | 13/693,226 | 12/4/2012 |
| Neo-Carrier comprising T-Connect and Through Via Structures | U.S. | Provisional | 61/577,443 | 12/19/2011 |
| Neo-Carrier comprising T-Connect and Through Via Structures | U.S. | Non-Provisional | 13/736,192 | 1/8/2013 |
| High Sensitivity Micro Piezoelectric Tunable Resonator | U.S. | Non-Provisional | 13/744,064 | 1/17/2013 |
| Autonomous Remote Anchor System (ARAS) | U.S. | Non-Provisional | 13/796,009 | 3/12/2013 |
| Hovering Surveillance Air Vehicle | U.S. | Non-Provisional | 13/848,443 | 3/21/2013 |
| LIDAR Comprising Polyhedron Transmission and Receiving Scanning Element | U.S. | Non-Provisional | 13/852,457 | 3/28/2013 |

| | | | | |
|---|---|---|---|---|
| Imaging Apparatus and Meethod Comprising Imager and Optics Actuator Means | U.S. | Non-Provisional | 13/875,037 | 5/1/2013 |
| Imaging Apparatus Comprising Imager and Optics Actuator Means to Increase Depth of Field | U.S. | Provisional | 61/772,636 | 3/5/2013 |
| Hyper-spectral and Hyper-spatial Search, Track and Recognition Sensor | U.S. | Non-Provisional | 13/948,766 | 7/23/2013 |
| Persistent Imaging Surveillance System | U.S. | Non-Provisional | 14/013,737 | 8/29/2013 |
| Solid State Drive Memory Device Comprising Secure Erase Function | U.S. | Non-Provisional | 13/923,310 | 6/20/2013 |
| Time of Flight and Amplitude Detecting LIDAR Receiver circuit Using FIFO Architecture | U.S. | Non-Provisional | 14/053,209 | 10/14/2013 |
| Offset Axis Laser Scanner Apparatus | U.S. | Non-Provisional | 14/057,065 | 10/18/2013 |
| Device and Method for Detection of Anomalous Behavior in a Computer Network | U.S. | Non-Provisional | 14/147,105 | 1/3/2014 |
| Low Power Blast Dosimeter | U.S. | Non-Provisional | 14/064,292 | 10/28/2013 |
| MEMS Drive and Beam-Steering Apparatus | U.S. | Non-Provisional | 14/068,714 | 10/31/2013 |
| System and Method for Network Traffic Data Retention and Correlated Information Management | U.S. | Non-Provisional | 13/672,579 | 11/8/2012 |
| System & Method for Run-Time Correlation Operations on Multi-Domain Network Activities | U.S. | Non-Provisional | 13/673,238 | 11/9/2012 |
| System and Method for High-Performance Storage and Retrieval of Correlated Network Traffic Data | U.S. | Non-Provisional | 13/673,469 | 11/9/2012 |
| Black Silicon Thermal Interface Device and Method | U.S. | Non-Provisional | 14/545,780 | 1/14/2014 |
| Device for Creating Convolute Channel in a Solid Structure (TDEM) | U.S. | Provisional | 61/760,681 | 2/5/2013 |
| High-Sensitivity Frequenty-Modulated Micro-Gyro | U.S. | Provisional | 61/791,298 | 3/15/2013 |
| Analysis, Labeling and Exploitation of Data in Real Time for Hyper-Spectral Sensors | U.S. | Provisional | 61/802,700 | 3/17/2013 |
| Thermally-Managed Stacked Electronic Module | U.S. | Provisional | 61/863,576 | 8/8/2013 |

C.    Registered Trademarks and Trademark Applications:

Registered Trademarks:

| Serial # | Registration # | Trademark |
|---|---|---|
| 78922582 | 3302416 | NEO-STACK |
| 78544618 | 3087338 | PMTV |
| 77722549 | 3714810 | TOWHAWK |
| 76552662 | 3252640 | IRVINE SENSORS CORPORATION (design plus words) |

Trademark Applications:

| Serial # | Trademark |
|----------|-----------|
| 85247679 | VAULT-SMM |
| 85238833 | VAULT-MM |

## INTERCREDITOR AND SUBORDINATION AGREEMENT

This Intercreditor and Subordination Agreement (as amended, modified or otherwise supplemented from time to time, this "**Agreement**"), dated as of July 8, 2014, is entered into by and between ISC8, Inc., a Delaware corporation (together with its successors and assigns, the "**Company**"), the lenders set forth on <u>Exhibit A</u> attached hereto (the "**Lenders**") and the prior lenders set forth on <u>Exhibit B</u> attached hereto (the "**Prior Lenders**").

## RECITALS

A.      Capitalized terms used in these recitals have the meanings attributed to them in this Agreement.

B.      The Lenders have agreed to provide certain credit facilities to the Company.

C.      Payment of the Obligations (as hereinafter defined) of the Company to the Lenders (the "**Lender Obligations**") is and will be secured by the Lender's Security (as hereinafter defined).

D.      The Company has certain obligations to the Prior Lenders pursuant to secured promissory notes in the principal amount of three million four hundred sixty-six thousand seven hundred twenty-six and 03/100 dollars ($3,466,726.03) Dollars and a total purchase price of two million six hundred thousand forty-four and 52/100 Dollars ($2,600,044.52)  (the "**Prior Notes**").

E.      Payment of the Obligations of the Company to the Prior Lenders (the "**Prior Lender Obligations**") is and will be secured by, inter alia, the Prior Lender Security.

F.      The parties wish to enter into this Agreement to establish and confirm the relative rights and priorities of their respective security and the obligations of the Company secured thereby.

**NOW THEREFORE**, for value received and intending to be legally bound by this Agreement, the parties agree as follows:

1.      **Defined Terms.**  In this Agreement, in addition to the terms defined in other Sections:

(a)      "**Inventory**" means property of the Company held for sale or lease including products purchased for resale, finished goods, work in process and raw materials but not including any property not intended to be directly incorporated in finished goods or products to be sold.

(b)      "**Lender Security**" means all present and future security issued by the Company or any predecessor corporation to the Company held by or for the Lenders as security for payment of all or part of the Lender Obligations including, without limitation, debentures, general security agreements and all other security issued or delivered by or on behalf of the Company.

(c)      "**Obligations**" means all the obligations of the person (the "**obligor**") in respect of which the term is used, to another person, including all debts and liabilities, present and future, direct or indirect, absolute or contingent, matured or not, at any time owing by the obligor to the other person in any currency or remaining unpaid by the obligor to such person in any currency whether arising from dealings between the obligor and such person or from any other dealings or proceedings by which such person may be or become in any manner whatever a creditor of the obligor and wherever incurred, and whether incurred by the obligor alone or with another or others and whether as principal or surety, and includes all interest, fees, legal and other costs, charges and expenses in connection with the foregoing.

(d)      "**Prior Lender Security**" means all present and future security issued by the Company or any predecessor corporation to the Company held by or for the Prior Lenders as security for payment of all or part of the Prior Lender Obligations including, without limitation, general security agreements and all other security issued or delivered by or on behalf of the Company.

(e)      "**Proceeds**" means identifiable or traceable personal property in any form derived directly or indirectly from any dealing with the property and assets of the Company or the proceeds therefrom, including but not limited to any payment representing indemnity or compensation for loss or damage to any property and assets of the Company or proceeds therefrom, trade-ins, lease or sale proceeds and cash.

(f)      "**Receivables**" means all books, accounts and book debts and generally all accounts, debts, dues, claims, choices in action and demands of every nature and kind howsoever arising or secured including letters of credit and advice of credit, which are now or may hereafter become due, owing or accruing or growing due to or owned by the Company.

(g)      "**Regularly Scheduled Payments**" means with respect to the instrument or agreement in respect of which the phrase is used, payments required to be made under the instrument or agreement on a regular periodic and business as usual basis such as, for example, consecutive monthly payments of principal or interest and payments of the outstanding principal balance of the instrument as scheduled pursuant to or at the end of its term provided that the phrase does not mean or include any prepayments or mean or include any payments required to be made following default or following another event which causes any payments or payment dates to be accelerated.

2.      **Consents and Acknowledgement.**  The Lenders hereby consent to the creation by the Company of the Prior Lender Obligations and the Prior Lender Security.  Each of the Prior Lenders hereby consents to the creation by the Company of the Lender Obligations and the Lender Security.

3.      **Security**.

(a)      Each of the Company and the Lenders agrees that it will not directly or indirectly take any action, consent to the taking of any action, or cause or assist any person to take any action to challenge the validity, legality, perfection or enforceability of the Prior Lender Security.

(b)     Each of the Company and the Prior Lenders agrees that it will not directly or indirectly take any action, consent to the taking of any action, or cause or assist any person to take any action to challenge the validity, legality, perfection or enforceability of the Lender Security.

4.     **Priorities**.

(a)     With respect to all of the assets of the Company including without limitation the property of the Company, Inventory and Receivables, the Lender Security and the Prior Lender Security shall rank and be enforceable in all respects and for all purposes in the following priorities:

(i)     first, the Lender Security to the extent of the Lender Obligations;

(ii)     second, the Prior Lender Security to the extent of the Prior Lender Obligations.

(b)     The priorities herein shall apply in all events and circumstances regardless of:

(i)     the date of execution, delivery, attachment, filing, registration, perfection or enforcement, or the method of perfection of any of the Lender Security or the Prior Lender Security;

(ii)     the date of any loan, advance, advances or other accommodation; or

(iii)     the date of any default or enforcement under or in respect of any of the Lender Obligations, the Lender Security, the Prior Lender Obligations, the Prior Lender Security or the dates of any crystallization of any floating charges constituted by the Lender Security or the Prior Lender Security.

(c)     Any insurance proceeds received by the Company shall be dealt with in accordance with this Agreement as though such insurance proceeds were paid or payable as proceeds of realization of the collateral for which they compensate.

(d)     Subject to Section 3, nothing in this Agreement shall be construed as entitling any of the Lenders or the Prior Lenders to receive any of the proceeds of disposition of any of the property, assets or undertaking of the Company in respect of which it does not have security or in respect of which such party's security is invalid or unenforceable.

5.     **Subordination of Payment**.

(a)     Payment of the Prior Lender Obligations is hereby subordinated and postponed to the indefeasible payment in full of the Lender Obligations provided, however, that so long as no the Lender Blockage Notice (as defined below) has been received by the Prior Lenders, the Company shall be permitted to pay to the Prior Lenders, and the Prior Lenders shall

be permitted to receive and retain Regularly Scheduled Payments in accordance with the Prior Lender Obligations.

(b)     If a default or an event of default as provided for in the Lender Security with respect to the Lender Obligations occurs or has not occurred but could reasonably be expected to occur as a result of a payment being made to the Prior Lenders in respect of the Prior Lender Obligations and a notice to that effect (the "**Lender Blockage Notice**") is sent by or on behalf of the Lenders to the Company and the Prior Lenders, and the Company and the Prior Lenders have received (or are deemed in accordance with the provisions of Section 16 to have received) the Lender Blockage Notice, the payments otherwise permitted under Section 5(a) shall not be permitted to be made or received from the date of the Lender Blockage Notice until the earlier to occur of:

(i)     the day of the expiry of the Lender Blockage Period; and

(ii)     the day at the end of the maximum number of days calculated under Section 5(d) if that day is earlier than the day of the expiry of the Lender Blockage Period.

In this Section 5(b), the "**Lender Blockage Period**" means the period between the date that each of the Company and the Prior Lenders receives or is deemed to have received a the Lender Blockage Notice under this Section 5(b) and the date that each of the Company and the Prior Lenders receives from the Lenders a notice waiving the default or event of default referred to in that the Lender Blockage Notice or indicating that such default or event of default has been cured, which notice the Lenders agrees to provide to the Company and the Prior Lenders in a timely manner following the cure or waiver of such default or enforcement, as the case may be, provided that the Lenders' rights hereunder shall not be affected by the Lenders' failure to give such a notice.

(c)     The parties agree that the maximum consecutive number of days in any particular the Lender Blockage Period as it relates to payments to the Prior Lenders shall be 365 days.  For greater certainty, the Lenders shall not be entitled to send a new the Lender Blockage Notice following the end of such 365 day period in respect of the same continuing event of default giving rise to such the Lender Blockage Period.

6.     **Prohibited Payments**.  Except as otherwise expressly provided in Section 5, so long as any of the Lender Obligations shall be outstanding, the Company shall neither make nor be entitled to make and the Prior Lenders shall not receive or be entitled to receive, any payment, prepayment or other compensation in respect of the Prior Lender Obligations.  If the Prior Lenders receive any payment, prepayment or other compensation or proceeds in respect of the Prior Lender Obligations contrary to this Agreement, the payment, prepayment, compensation or proceeds shall be held by the recipient in trust for the Lenders and shall be forthwith paid over to the Lenders on account of the Lender Obligations.  To the extent the Prior Lenders pay over any amounts to the Lenders in accordance with the provisions of the immediately preceding sentence, then in such case, the Company irrevocably agrees in favor of the Prior Lenders, that such amount will be deemed not to have been paid to the Prior Lenders by the Company and that such amount will be repaid by the Company to the Prior Lenders forthwith on demand but only

following receipt by the Lenders of all remaining amounts then owing in respect of the Lender Obligations.

7. **Prior Lender Standstill Requirements**.  So long as any of the Lender Obligations shall be outstanding, the Prior Lenders shall not be entitled to enforce any rights under any of the Prior Lender Security, petition the Company into bankruptcy, initiate or participate in the initiation of any similar proceeding (including but not limited to a proceeding in respect of the Company under the bankruptcy laws of the governing jurisdiction or initiate or participate in the initiation of any proceeding claiming judgment for payment or performance of the Prior Lender Obligations except:

(a)     if also permitted by the terms of the Prior Lender Obligations, the Prior Lenders with respect to the Prior Lender Obligations shall be entitled to exercise any rights available to the Prior Lenders, if and only if:

(i)     the Lender Obligations have been accelerated and the Lenders have taken steps to enforce the Lender Security over substantially all of the assets of the Company; or

(ii)     a receiver or trustee in bankruptcy has been appointed in respect of the Company within the meaning of the bankruptcy laws of the governing jurisdiction or any person takes control or possession of substantially all of the assets of the Company for the purpose of realization, liquidation, winding up or enforcement of creditors' rights and such appointment or action has not been terminated or stayed within 365 days; or

(iii)     an order has been made under the laws of the governing jurisdiction with respect to the Company or a filing has been made by the Company under the proposal provisions of bankruptcy laws of the governing jurisdiction or a proceeding for reorganization, arrangement or compromise of the Prior Lender Obligations has been brought in respect of the Company under the laws of its jurisdiction of incorporation and, in any such case, the resulting proceedings have not been concluded with the consent of the Prior Lenders within 365 days from their commencement; or

(iv)     an event of default under the Prior Lender Obligations has occurred and is continuing and the Prior Lenders have given the Lenders not less than 365 days written notice of the occurrence of the event of default with details of the default.

(b)     if proceedings contemplated in Section 7(a)(iii) are instituted, the Prior Lenders shall be entitled to take any steps reasonably required to preserve their rights in respect of the Prior Lender Obligations and Prior Lender Security but shall not take any steps to terminate the proceedings or have them not apply to the Prior Lenders for a period for 365 days from their commencement.  Without limiting the foregoing, the Prior Lenders shall not be entitled to take any steps contemplated in this Section solely as a result of non-payment of the Prior Lender Obligations on its maturity or due date except as otherwise expressly permitted herein.  Notwithstanding anything to the contrary set out above in this Section 7(a) or elsewhere in this Agreement, the Prior Lenders shall be entitled under any and all circumstances (and whether or not the Prior Lenders have received a the Lender Blockage Notice), (i) to accelerate

Exh F_005

repayment of all of the Prior Lender Obligations, (ii) to participate in and vote with respect to the Prior Lenders' own interest in respect of the Prior Lender Obligations in any insolvency proceeding involving the Company (including without limitation a proceeding under the bankruptcy laws of the governing jurisdiction and (iii) receive and retain any proceeds of realization or distribution in respect of the Company's property, assets and undertaking, in accordance with but subject to the priorities set out in <u>Section 4</u>.

8.    **Amendments to Obligations**.  The Company and the Prior Lenders shall not be entitled to amend any documents now or hereafter entered into between them with respect to the Prior Lender Obligations, or any portion thereof, without the prior written consent of the Lenders.  Each of the parties hereto hereby expressly acknowledges and agrees that the Lender Obligations, the Lender Security, the Prior Lender Obligations, the Prior Lender Security and any other documents relating thereto are subject to the terms and conditions of this Agreement.

9.    **Notices by the Lenders and Prior Lender**.  The Lenders agree that it will send to the Prior Lenders a copy of the notice it sends to the Company of the occurrence of any event of default under or in respect of the Lender Obligations.  Each of the Prior Lenders agrees that it will send to the Lenders a copy of any notice it delivers to the Company of the occurrence of any event of default under or in respect of the Prior Lender Obligations.

10.    **Remedies**.  Each of the Lenders and the Prior Lenders acknowledges that all covenants, provisions and restrictions in this Agreement are necessary and fundamental in order to establish the respective priorities of the Lender Security and the Prior Lender Security and that a breach by the Lenders or the Prior Lenders of any covenant, provision or restriction would result in damages that could not adequately be compensated by monetary award.  Accordingly, it is expressly agreed that, in addition to and without limiting other remedies available to it, the Lenders and the Prior Lenders (as the case may be) shall be entitled to the immediate remedy of restraining orders, interim injunctions, injunctions and other forms of injunctive and other relief as may be decreed or issued by any court of competent jurisdiction to restrain or enjoin the Lenders and the Prior Lenders (as the case may be) from breaching the covenants, provisions and restrictions of this Agreement.

11.    **Acknowledgement of the Company**.  The Company acknowledges that it has actual notice of the terms of this Agreement, consents hereto, agrees to be bound by the terms hereof, and covenants with each of the parties that it will at all times during the continuance hereof comply with and act in accordance with the terms, provisions and intent of this Agreement.  The Company also acknowledges that the terms and conditions of this Agreement are for the sole benefit of the Lenders and the Prior Lenders and that nothing in this Agreement shall be construed as conferring any rights upon the Company or any third party.

12.    **Exchange of Information**.  The Company irrevocably consents to the Lenders and the Prior Lenders exchanging any information they have from time to time concerning the Company and its undertaking, property and assets.  Each of the Lenders and the Prior Lenders agrees to exchange information with each other as to the amounts owed to them from time to time.  The Company irrevocably consents to

          (a)     the Lenders' giving the Prior Lenders notice from time to time of the occurrence of:

          (i)     any event of default with respect to the Lender Obligations; and

          (ii)     any event which would with the passage of time, delivery of notice or other act, constitute an event of default with respect to the Lender Obligations,

          (iii)     provided that the Lenders shall, except as provided in <u>Section 9</u>, not be obligated to give such a notice and the Lenders' rights hereunder shall not be affected by the Lenders' failure to give such a notice.

          (b)     the Prior Lenders' giving to the Lenders notice from time to time of the occurrence of:

          (i)     an event of default with respect to the Prior Lender Obligations; and

          (ii)     any event which would with the passage of time, delivery of notice or other act, constitute an event of default with respect to the Prior Lender Obligations,

provided that the Prior Lenders shall, except as provided in <u>Section 9</u>, not be obligated to give such a notice and the Prior Lenders' rights hereunder shall not be affected by the Prior Lenders not giving such a notice.

     13.    **Agreement to Govern**.  This Agreement contains the entire understanding of the parties concerning the priorities of the Lender Obligations, the Lender Security, the Prior Lender Obligations and the Prior Lender Security and supersedes any prior agreements, undertakings, representations and understandings, both written and oral, with respect to such priorities and shall apply until the indefeasible payment in full of the Lender Obligations.  Notwithstanding any other provisions of this Agreement to the contrary, this Agreement may only be amended by written agreement of the Lenders and the Prior Lenders.  In the event of a conflict between a provision of the Lender Security or the Prior Lender Security, or other agreement relating thereto and a provision of this Agreement, the provision of this Agreement will govern to the extent required to remove the conflict.

     14.    **Further Assurances**.  The parties shall execute and deliver such further deeds and assurances and do or cause to be done all such acts, matters and things as may from time to time be necessary or conducive to the carrying out of the terms and intent of this Agreement.  No party shall take any action by which the terms or intent of this Agreement might be impaired or defeated.

     15.    **Waiver, Etc**.  No right of the Lenders to enforce its rights under this Agreement shall at any time or in any way be prejudiced or impaired by any act or failure to act on the part of the Company, by any act or failure to act on the part of the Lenders, or by any non-compliance by the Company or the Prior Lenders with the terms of this Agreement, regardless of any knowledge thereof which the Lenders may have or be deemed to have.  This Agreement shall not

suspend or otherwise affect the present or future rights and remedies of the Lenders with respect to the Lender Obligations or the Lender Security.

16. **Notices**.   All notices, requests, demands, claims, and other communications hereunder will be in writing.   Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given if (and then two business days after) it is sent by registered or certified mail, return receipt requested, postage prepaid, and addressed to the intended recipient as set forth below.   Any party may send any notice, request, demand, claim, or other communication hereunder to the intended recipient at the address set forth below using any other means (including personal delivery; expedited, overnight, nationally recognized courier, messenger service; telecopy, telex; certified mail, postage prepaid, return receipt requested; or electronic mail), but no such notice, request, demand, claim, or other communication shall be deemed to have been duly given unless and until it actually is received by the intended recipient. Any party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other party notice in the manner herein set forth:

        (a)    to the Lenders at:

        Fundamental Master LP
        140 S. Lake Avenue, Suite 302
        Pasadena, CA  91101
        Attn: Jay Krieger
        E-Mail: jkrieger@fundamentallp.com

        With a copy to (which shall not constitute notice):

        Foundation Law Group LLP
        445 S. Figueroa Street, Suite 2700
        Los Angeles, CA 90071
        Attn: Armen S. Martin, Esq.
        E-Mail: armen@foundationllp.com

        (b)    to the Prior Lenders at:

        Fundamental Master LP
        140 S. Lake Avenue, Suite 302
        Pasadena, CA  91101
        Attn: Jay Krieger
        E-Mail: jkrieger@fundamentallp.com

        Fundamental Credit LP
        140 S. Lake Avenue, Suite 302
        Pasadena, CA  91101
        Attn: Jay Krieger
        E-Mail: jkrieger@fundamentallp.com

(c)    to the Company at:

ISC8, Inc.
151 Kalmus Drive
Costa Mesa, CA 92626
Attn: Chief Financial Officer
E-Mail: jvong@isc8.com

17.    **Successors and Assigns**.  This Agreement shall enure to the benefit of and be binding upon the parties hereto and their respective legal representatives, successors and permitted assigns.  Without limiting the generality of the foregoing this Agreement shall be binding on all present and future holders of the Prior Lender Obligations.  There shall be no sale, assignment or transfer of the Prior Lender Obligations, or any part thereof, to any person unless the prospective purchaser, assignee or transferee enters into an agreement in a form acceptable to the Lenders, acting reasonably, in favor of the other parties to this Agreement to be bound by its terms as if such purchaser, assignee or transferee was an original party to this Agreement.  There shall be no sale, assignment or transfer of the Lender Obligations, or any part thereof, to any person unless the prospective purchaser, assignee or transferee enters into an agreement in favor of the other parties to this Agreement to be bound by the terms of this Agreement as if such purchaser, assignee or transferee was an original party to this Agreement.

18.    **Term of Agreement**.  Unless terminated by written agreement of the Lenders and the Prior Lenders, this Agreement shall continue until the indefeasible payment in full of all the Lender Obligations upon which this Agreement shall terminate.  The Prior Lenders shall be released in full from this Agreement upon the indefeasible payment in full of all Prior Lender Obligations in accordance with the terms of this Agreement and the discharge and release in full of all Prior Lender Security.

19.    **Counterparts and Facsimile**.  This Agreement may be executed in one or more counterparts and by facsimile signatures, each of which counterparts when executed by original or facsimile signatures shall constitute an original and all of which counterparts when executed by original or facsimile signatures shall constitute one and the same agreement.  A party executing by facsimile shall immediately after execution provide the other parties with an originally signed counterpart.

20.    **Governing Law**.  This Agreement shall be construed and interpreted in accordance with the laws of the State of New York and each of the parties hereby attorns to the non-exclusive jurisdiction of the courts thereof.

**IN WITNESS WHEREOF** the parties have executed this Agreement on the date first
written above.

COMPANY:
ISC8, INC.

By: _____

Name: J. Kirsten Bay

Title: President and CEO

LENDERS:
FUNDAMENTAL MASTER LP,
as Collateral Agent for Lenders

By: _____

Name: John W. Krieger

Title: Managing Member of its General Partner

PRIOR LENDERS:
FUNDAMENTAL MASTER LP,
as Collateral Agent for Prior Lenders

By: _____

Name: John W. Krieger

Title: Managing Member of its General Partner

FUNDAMENTAL CREDIT LP,

By: _____

Name: John W. Krieger

Title: Managing Member of its General Partner

**IN WITNESS WHEREOF** the parties have executed this Agreement on the date first
written above.

COMPANY:
ISC8, INC.

By: _____

Name: _____J. Kirsten Bay_____

Title: _____President and CEO_____

LENDERS:
FUNDAMENTAL MASTER LP,
as Collateral Agent for Lenders

By: _____

Name: _____John W. Krieger_____

Title: _____Managing member of general partner of Fundamental Master LP____

PRIOR LENDERS:
FUNDAMENTAL MASTER LP,
as Collateral Agent for Prior Lenders

By: _____

Name: _____John W. Krieger_____

Title: _____Managing member of GP of. FMLP____

JOHN W. KRIEGER,

By: _____

Name: _____John W. Krieger_____

# Exhibit A

## "Lenders"

| Date Fund Received | Date of the Agreement | Maturity Date | From | Purchase Price | OID | Original Principal |
|---|---|---|---|---|---|---|
| 6/30/2014 | 6/30/2014 | 7/31/2014 | Trancoso Partners LP | $ 37,000 | $ 12,333 | $ 49,333 |
| 7/7/2014 | 7/7/2014 | 7/31/2014 | Griffin Fund LP | $ 40,000 | $ 13,333 | $ 53,333 |
| 7/8/2014 | 7/8/2014 | 7/31/2014 | Trancoso Partners LP | $ 33,000 | $ 11,000 | $ 44,000 |
| 7/21/2014 | 7/21/2014 | 7/31/2014 | Griffin Partners II LP | $ 328,000 | $ 109,333 | $ 437,333 |
| 7/21/2014 | 7/21/2014 | 7/31/2014 | Fundamental Master LP | $ 107,000 | $ 35,667 | $ 142,667 |
| 7/21/2014 | 7/21/2014 | 7/31/2014 | Fundamental Credit LP | $ 53,000 | $ 17,667 | $ 70,667 |
| 7/25/2014 | 7/25/2014 | 7/31/2014 | Griffin Fund II LP | $ 16,666 | $ 5,555 | $ 22,221 |
| 7/28/2014 | 7/28/2014 | 7/31/2014 | Fundamental Master LP | $ 9,008 | $ 3,003 | $ 12,011 |
| 7/28/2014 | 7/28/2014 | 7/31/2014 | Fundamental Credit LP | $ 12,313 | $ 4,104 | $ 16,417 |
| 7/29/2014 | 7/29/2014 | 7/31/2014 | Griffin Fund II LP | $ 83,300 | $ 27,767 | $ 111,067 |
| 7/31/2014 | 7/31/2014 | 7/31/2014 | Fundamental Master LP | $ 28,063 | $ 9,354 | $ 37,418 |
| 7/31/2014 | 7/31/2014 | 7/31/2014 | Fundamental Credit LP | $ 13,937 | $ 4,646 | $ 18,582 |
| 8/1/2014 | 8/1/2014 | 7/31/2014 | Griffin Fund II LP | $ 30,600 | $ 10,200 | $ 40,800 |
| 8/3/2014 | 8/3/2014 | 7/31/2014 | Griffin Fund II LP | $ 6,500 | $ 2,167 | $ 8,667 |
| 8/8/2014 | 8/8/2014 | 7/31/2014 | Fundamental Credit LP | $ 6,139 | $ 2,046 | $ 8,185 |
| 8/8/2014 | 8/8/2014 | 7/31/2014 | Fundamental Master LP | $ 12,361 | $ 4,120 | $ 16,481 |
| 8/27/2014 | 8/27/2014 | 7/31/2014 | Gayner Family Trust | $ 25,000 | $ 8,333 | $ 33,333 |
| 9/4/2014 | 9/4/2014 | 7/31/2014 | John W. Krieger | $ 25,000 | $ 8,333 | $ 33,333 |
| 9/5/2014 | 9/5/2014 | 7/31/2014 | Thomas R. Stone | $ 100,000 | $ 33,333 | $ 133,333 |
| 9/8/2014 | 9/8/2014 | 7/31/2014 | Fundamental Master LP | $ 8,000 | $ 2,667 | $ 10,667 |
| 9/9/2014 | 9/9/2014 | 7/31/2014 | Jacqueline Samols Krieger | $ 40,000 | $ 13,333 | $ 53,333 |

## Exhibit B

## "Prior Lenders"

| Date Fund Received | Date of the Agreement | Maturity Date | From | Purchase Price | OID | Original Principal |
|---|---|---|---|---|---|---|
| 2/21/2014 | 3/6/2014 | 7/31/2014 | Fundamental Master LP | $ 50,000 | $ 16,667 | $ 66,667 |
| 2/21/2014 | 3/6/2014 | 7/31/2014 | Fundamental Credit LP | $ 125,000 | $ 41,667 | $ 166,667 |
| 3/3/2014 | 3/6/2014 | 7/31/2014 | Fundamental Credit LP | $ 50,000 | $ 16,667 | $ 66,667 |
| 3/3/2014 | 3/6/2014 | 7/31/2014 | Pargold | $ 100,000 | $ 33,333 | $ 133,333 |
| 3/3/2014 | 3/6/2014 | 7/31/2014 | Griffin Fund II LP | $ 37,500 | $ 12,500 | $ 50,000 |
| 3/5/2014 | 3/6/2014 | 7/31/2014 | Kurt Adelman | $ 25,000 | $ 8,333 | $ 33,333 |
| 3/7/2014 | 3/7/2014 | 7/31/2014 | Reuben Richard | $ 250,000 | $ 83,333 | $ 333,333 |
| 3/21/2014 | 3/21/2014 | 7/31/2014 | Fundamental Master LP | $ 50,000 | $ 16,667 | $ 66,667 |
| 3/21/2014 | 3/21/2014 | 7/31/2014 | Fundamental Master LP | $ 50,000 | $ 16,667 | $ 66,667 |
| 3/21/2014 | 3/21/2014 | 7/31/2014 | Fundamental Credit LP | $ 50,000 | $ 16,667 | $ 66,667 |
| 3/26/2014 | 3/26/2014 | 7/31/2014 | Fundamental Credit LP | $ 125,000 | $ 41,667 | $ 166,667 |
| 3/27/2014 | 3/27/2014 | 7/31/2014 | Fundamental Credit LP | $ 50,000 | $ 16,667 | $ 66,667 |
| 4/2/2014 | 4/2/2014 | 7/31/2014 | Southshore Capital Partners LP | $ 100,000 | $ 33,333 | $ 133,333 |
| 4/2/2014 | 4/2/2014 | 7/31/2014 | Fundamental Master LP | $ 200,000 | $ 66,667 | $ 266,667 |
| 4/9/2014 | 4/9/2014 | 7/31/2014 | Fundamental Credit LP | $ 50,000 | $ 16,667 | $ 66,667 |
| 4/9/2014 | 4/9/2014 | 7/31/2014 | Fundamental Master LP | $ 50,000 | $ 16,667 | $ 66,667 |
| 4/10/2014 | 4/10/2014 | 7/31/2014 | Pargold | $ 100,000 | $ 33,333 | $ 133,333 |
| 4/11/2014 | 4/11/2014 | 7/31/2014 | Thomas R. Stone | $ 25,000 | $ 8,333 | $ 33,333 |
| 4/21/2014 | 4/21/2014 | 7/31/2014 | Fundamental Master LP | $ 25,000 | $ 8,333 | $ 33,333 |
| 4/23/2014 | 4/23/2014 | 7/31/2014 | Fundamental Credit LP | $ 25,000 | $ 8,333 | $ 33,333 |
| 4/23/2014 | 4/23/2014 | 7/31/2014 | Gayner Family Trust | $ 25,000 | $ 8,333 | $ 33,333 |
| 4/24/2014 | 4/24/2014 | 7/31/2014 | KC Gamma Opportunity Fund | $ 25,000 | $ 8,333 | $ 33,333 |
| 4/25/2014 | 4/25/2014 | 7/31/2014 | Pargold | $ 25,000 | $ 8,333 | $ 33,333 |
| 4/25/2014 | 4/25/2014 | 7/31/2014 | Southshore Capital Partners LP | $ 25,000 | $ 8,333 | $ 33,333 |
| 5/1/2014 | 5/1/2014 | 7/31/2014 | Fundamental Credit LP | $ 100,000 | $ 33,333 | $ 133,333 |
| 5/1/2014 | 5/1/2014 | 7/31/2014 | Fundamental Master LP | $ 50,000 | $ 16,667 | $ 66,667 |
| 5/9/2014 | 5/9/2014 | 7/31/2014 | Trancoso Partners LP | $ 30,000 | $ 10,000 | $ 40,000 |
| 5/12/2014 | 5/12/2014 | 7/31/2014 | John W. Krieger | $ 15,000 | $ 5,000 | $ 20,000 |
| 5/13/2014 | 5/13/2014 | 7/31/2014 | John W. Krieger | $ 18,000 | $ 6,000 | $ 24,000 |
| 5/19/2014 | 5/19/2014 | 7/31/2014 | Griffin Fund II LP | $ 43,750 | $ 14,583 | $ 58,333 |
| 5/23/2014 | 5/23/2014 | 7/31/2014 | Thomas R. Stone | $ 10,000 | $ 3,333 | $ 13,333 |
| 5/23/2014 | 5/23/2014 | 7/31/2014 | Stephen & Shannan Bishop Family Trust | $ 76,000 | $ 25,333 | $ 101,333 |
| 5/23/2014 | 5/23/2014 | 7/31/2014 | Fundamental Master LP | $ 25,000 | $ 8,333 | $ 33,333 |
| 5/23/2014 | 5/23/2014 | 7/31/2014 | Fundamental Credit LP | $ 25,000 | $ 8,333 | $ 33,333 |
| 5/30/2014 | 5/30/2014 | 7/31/2014 | Redwood Fund LP | $ 125,000 | $ 41,667 | $ 166,667 |
| 5/30/2014 | 5/30/2014 | 7/31/2014 | Gayner Family Trust | $ 25,000 | $ 8,333 | $ 33,333 |
| 5/30/2014 | 5/30/2014 | 7/31/2014 | John W. Krieger | $ 25,000 | $ 8,333 | $ 33,333 |
| 6/4/2014 | 6/3/2014 | 7/31/2014 | Trancoso Partners LP | $ 50,000 | $ 16,667 | $ 66,667 |
| 6/6/2014 | 6/6/2014 | 7/31/2014 | Fundamental Master LP | $ 25,000 | $ 8,333 | $ 33,333 |
| 6/6/2014 | 6/6/2014 | 7/31/2014 | Fundamental Master LP | $ 20,000 | $ 6,667 | $ 26,667 |
| 6/6/2014 | 6/6/2014 | 7/31/2014 | Fundamental Master LP | $ 25,000 | $ 8,333 | $ 33,333 |
| 6/11/2014 | 6/11/2014 | 7/31/2014 | John W. Krieger | n/a | n/a | n/a |
| 6/11/2014 | 6/11/2014 | 7/31/2014 | Griffin Fund LP | n/a | n/a | n/a |
| 6/13/2014 | 6/13/2014 | 7/31/2014 | Redwood Fund LP | $ 75,000 | $ 25,000 | $ 100,000 |
| 6/17/2014 | 6/17/2014 | 7/31/2014 | KC Gamma Opportunity Fund | $ 25,000 | $ 8,333 | $ 33,333 |

## SCHEDULE "A"

**[Copy of Prior Notes and Security]**

# SCHEDULE "A"

# [Copy of Prior Notes and Security]



**Searched Through:**   07/17/2014
**Subject:**   ISC8 Inc.
**Jurisdiction:**   Secretary of State, DE
**Index Searched:**   Certified UCC/Federal Lien

| FILE DATE | FILE # | TYPE OF FILING | SECURED PARTY |
|---|---|---|---|
| 07/29/2011 | 12937921 | Financing Statement | FARNAM STREET FINANCIAL, INC. MINNETONKA, MN |
| 11/06/2013 | 34369410 | Amendment | |
| 12/14/2011 | 14794163 | Financing Statement | PARTNERS FOR GROWTH III, L.P. SAN FRANCISCO, CA |
| 02/01/2012 | 20405748 | Amendment | |
| 12/06/2013 | 34830502 | Amendment | |
| 09/10/2013 | 33526879 | Financing Statement | DELL FINANCIAL SERVICES L.L.C. ROUND ROCK, TX |
| 11/06/2013 | 34366879 | Financing Statement | FARNAM STREET FINANCIAL, INC. MINNETONKA, MN |
| 02/27/2014 | 40769067 | Financing Statement | FUNDAMENTAL MASTER LP PASADENA, CA |

SEE ATTACHED CERTIFIED OR OTHER SEARCH PERFORMED BY FILING OFFICE.

# Delaware

*PAGE    1*

### The First State

CERTIFICATE

```
SEARCHED JULY 23, 2014, AT  5:22 P.M.
FOR DEBTOR "ISC8 INC."

 1 OF    5   FINANCING STATEMENT           12937921
           EXPIRATION DATE: JULY 29, 2016
 DEBTOR: IRVINE SENSORS CORPORATION
          3001 RED HILL AVENUE                 ADDED 07-29-11
          BUILDING 4
          STE 108
          COSTA MESA            CA   92626   REMOVED 11-06-13
 DEBTOR: ISC8 INC.
          840 F AVENUE                         ADDED 11-06-13
          SUITE 105
          PLANO                TX   75093
SECURED: FARNAM STREET FINANCIAL, INC.
          5850 OPUS PARKWAY, SUITE 240         ADDED 07-29-11
          MINNETONKA           MN   55343
              F I L I N G   H I S T O R Y
12937921  FILED 07-29-11   AT 11:49 A.M.  FINANCING STATEMENT
34369410  FILED 11-06-13   AT  2:18 P.M.  AMENDMENT

 2 OF    5   FINANCING STATEMENT           14794163
           EXPIRATION DATE: DECEMBER 14, 2016
 DEBTOR: IRVINE SENSORS CORPORATION
          3001 RED HILL AVE., BLDG. 4/108      ADDED 12-14-11
          COSTA MESA           CA   92926    REMOVED 12-06-13
 DEBTOR: ISC8, INC.
          3011 RED HILL AVE., BLDG. 4-108      ADDED 12-06-13
          COSTA MESA           CA   92926
SECURED: PARTNERS FOR GROWTH III, L.P.
          150 PACIFIC AVENUE                   ADDED 12-14-11
          SAN FRANCISCO        CA   94111
              F I L I N G   H I S T O R Y
14794163  FILED 12-14-11   AT  1:57 P.M.  FINANCING STATEMENT
20405748  FILED 02-01-12   AT 12:36 P.M.  AMENDMENT
34830502  FILED 12-06-13   AT  6:24 P.M.  AMENDMENT

 3 OF    5   FINANCING STATEMENT           33526879
```

Jeffrey W. Bullock, Secretary of State

20142935880UCXL

140989808

AUTHENTICATION: 1561562

DATE: 07-23-14

Exh G_002

# Delaware

*PAGE    2*

## The First State

```
        EXPIRATION DATE: SEPTEMBER 10, 2018
 DEBTOR: ISC8 INC.
         151 KALMUS DR, STE A-203              ADDED 09-10-13
         COSTA MESA            CA  92626
SECURED: DELL FINANCIAL SERVICES L.L.C.
         MAIL STOP-PS2DF-23 ONE DELL WAY       ADDED 09-10-13
         ROUND ROCK           TX  78682
             F I L I N G   H I S T O R Y
33526879  FILED 09-10-13   AT  5:44 P.M.  FINANCING STATEMENT

   4 OF   5  FINANCING STATEMENT            34366879
        EXPIRATION DATE: NOVEMBER 6, 2018
 DEBTOR: ISC8 INC.
         840 F AVENUE                          ADDED 11-06-13
         SUITE 105
         PLANO                TX  75093
SECURED: FARNAM STREET FINANCIAL, INC.
         5850 OPUS PARKWAY, SUITE 240          ADDED 11-06-13
         MINNETONKA           MN  55343
             F I L I N G   H I S T O R Y
34366879  FILED 11-06-13   AT  1:30 P.M.  FINANCING STATEMENT

   5 OF   5  FINANCING STATEMENT            40769067
        EXPIRATION DATE: FEBRUARY 27, 2019
 DEBTOR: ISC8, INC.
         151 KALMUS DRIVE                      ADDED 02-27-14
         COSTA MESA           CA  92626
SECURED: FUNDAMENTAL MASTER LP
         140 S. LAKE AVENUE, SUITE 302         ADDED 02-27-14
         PASADENA             CA  91101
             F I L I N G   H I S T O R Y
40769067  FILED 02-27-14   AT  2:46 P.M.  FINANCING STATEMENT
         E N D   O F   F I L I N G   H I S T O R Y
```

   THE UNDERSIGNED FILING OFFICER HEREBY CERTIFIES THAT THE
ABOVE LISTING IS A RECORD OF ALL PRESENTLY EFFECTIVE FINANCING
STATEMENTS, LAPSED FINANCING STATEMENTS, FEDERAL TAX LIENS AND
UTILITY SECURITY INSTRUMENTS FILED IN THIS OFFICE WHICH NAME THE
ABOVE DEBTOR, AS OF JULY 17, 2014 AT 11:59 P.M.

Jeffrey W. Bullock, Secretary of State

20142935880UCXL

140989808

AUTHENTICATION: 1561562

DATE: 07-23-14

Exh G_003

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

| A. NAME & PHONE OF CONTACT AT FILER [optional] | |
|---|---|
| Steve Morgan | 9529080850 |

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

```
FARNAM STREET FINANCIAL, INC.

5850 OPUS PARKWAY

SUITE 240


MINNETONKA MN 55343
```

*DELAWARE DEPARTMENT OF STATE*
*U.C.C. FILING SECTION*
*FILED 11:49 AM 07/29/2011*
*INITIAL FILING # 2011 2937921*

*SRV: 110872283*

---

**1. DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| IRVINE SENSORS CORPORATION | | | | | |

| OR 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX | |
|---|---|---|---|---|---|
| | | | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 3001 RED HILL AVENUE BUILDING 4 STE 108 | COSTA MESA | CA | 92626 | US |

| | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | |
|---|---|---|---|
| | CORPORATION | DE | |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| | | | | | |

| OR 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX | |
|---|---|---|---|---|---|
| | | | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | |
|---|---|---|---|
| | | | |

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| FARNAM STREET FINANCIAL, INC. | | | | | |

| OR 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX | |
|---|---|---|---|---|---|
| | | | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 5850 OPUS PARKWAY, SUITE 240 | MINNETONKA | MN | 55343 | US |

**4. This FINANCING STATEMENT covers the following collateral:**

Collateral Description  - please see attachment

---

**5. ALTERNATIVE DESIGNATION - Lessee-Lessor**

| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.    Attach Addendum    [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]    [optional] | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |
|---|---|---|---|---|

8. OPTIONAL FILER REFERENCE DATA

ADDENDUM NO. 1

This transaction is a true lease and is not intended by the parties as a secured transaction. Filing is only intended to make the true lease a matter of public record. Farnam Street Financial, Inc. is the owner of all the equipment contained on this filing and any and all other equipment now or hereafter the subject of any lease agreement or lease schedule by and between the parties and all accessories, attachments, additions, and any substitutions and/or replacement of the equipment contained on this filing or any lease agreement or lease schedule between the parties. The lessee has no rights, express or implied, to sell, exchange, encumber, or otherwise dispose of any equipment contained on this filing or any lease agreement or lease schedule by and between the parties. The parties agree that this financing statement covers any and all equipment now or hereafter the subject of any lease agreement or lease schedule by and between the parties, including, but not limited to equipment contained on or subject to. Lease Agreement Number IR072611 or any lease schedule executed pursuant thereto, together with all substitutions, replacements, accessions, process, rent, revenue, insurance, and proceeds related to the equipment contained on this filing or any lease agreement or lease schedule by and between the parties.

Every Term is Agreed to and Accepted:

FARNAM STREET FINANCIAL, INC.
"LESSOR"

By: _____

Print
Name: _Steven C. Morgan_

Title: _Pres't_

Date: _July 27, 2011_

Every Term is Agreed to and Accepted:

IRVINE SENSORS CORPORATION
"LESSEE"

By: _____

Print
Name: _James A Pipp_

Title: _Controller_

Date: _7/26/2011_

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

| A. NAME & PHONE OF CONTACT AT FILER [optional] | |
|---|---|
| Steve Morgan | 9529080850 |

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

```
FARNAM STREET FINANCIAL, INC.

5850 OPUS PARKWAY

SUITE 240


MINNETONKA MN 55343
```

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 02:18 PM 11/06/2013
INITIAL FILING # 2011 2937921
AMENDMENT    # 2013 4369410
SRV: 131278662

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE # | 1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. |
|---|---|
| 2011 2937921 | |

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ **ASSIGNMENT** (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. **AMENDMENT (PARTY INFORMATION):** This Amendment affects ☒ Debtor _or_ ☐ Secured Party of record. Check only _one_ of these two boxes.

Also check _one_ of the following three boxes _and_ provide appropriate information in items 6 and/or 7.

☒ CHANGE name and/or address: Give current record name in item 6a or 6b; also give new name (if name change) in item 7a or 7b and/or new address (if address change) in item 7c.    ☐ DELETE name: Give record name to be deleted in item 6a or 6b.    ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7d-7g (if applicable).

6. CURRENT RECORD INFORMATION:

| OR | 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | IRVINE SENSORS CORPORATION | | | |
| | 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | | |

7. CHANGED (NEW) OR ADDED INFORMATION:

| OR | 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | ISC8 INC. | | | |
| | 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | | |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 840 F AVENUE SUITE 105 | PLANO | TX | 75093 | US |

| | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | |
|---|---|---|---|
| | CORPORATION | DE | |

8. AMENDMENT (COLLATERAL CHANGE): check only _one_ box.

Describe collateral ☐ deleted _or_ ☐ added, _or_ give entire ☐ restated collateral description, or describe collateral ☐ assigned.

9. **NAME of SECURED PARTY of RECORD AUTHORIZING THIS AMENDMENT**

Farnam Street Financial, Inc.

10. OPTIONAL FILER REFERENCE DATA

IR072611

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

| A. NAME & PHONE OF CONTACT AT FILER [optional] | |
|---|---|
| Corporation Service Company | 8008585294 |

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 01:57 PM 12/14/2011
INITIAL FILING # 2011 4794163

SRV: 111291828

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

```
CORPORATION SERVICE COMPANY

2711 CENTERVILLE ROAD

SUITE 400

WILMINGTON DE 19808
```

---

## 1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

**1a. ORGANIZATION'S NAME**
IRVINE SENSORS CORPORATION

OR

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 3001 RED HILL AVE., BLDG. 4/108 | COSTA MESA | CA | 92926 | US |

| 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION |
|---|---|
| CORPORATION | DE |

## 2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

**2a. ORGANIZATION'S NAME**

OR

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION |
|---|---|
| | |

## 3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

**3a. ORGANIZATION'S NAME**
PARTNERS FOR GROWTH III, L.P.

OR

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 150 PACIFIC AVENUE | SAN FRANCISCO | CA | 94111 | US |

## 4. This FINANCING STATEMENT covers the following collateral:

All of Debtor's present and future assets of any and every kind, including without limitation: (1) all right, title and interest of Debtor in and to all of the following, whether now owned or hereafter arising or acquired and wherever located: all Accounts; all Inventory; all Equipment; all Deposit Accounts; all General Intangibles (including without limitation all Intellectual Property); all Investment Property; all Other Property; and any and all claims, rights and interests in any of the above, and all guaranties and security for any of the above, and all substitutions and replacements for, additions, accessions, attachments, accessories, and improvements to, and proceeds (including proceeds of any insurance policies, proceeds of proceeds and claims against third parties) of, any and all of the above, and all of Debtor's books relating to any and all of the above, and (2) the Collateral and types and items of property described on Exhibit A (below) hereto (but this Financing Statement shall be fully effective notwithstanding any lack of any Exhibit A):

Exhibit A

---

| 6. | This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | All Debtors | Debtor 1 | Debtor 2 |
|---|---|---|---|---|---|

8. OPTIONAL FILER REFERENCE DATA

[63090216]

**UCC FINANCING STATEMENT ADDENDUM**  COLLATERAL

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

| 9. NAME OF FIRST DEBTOR (1a or 1b) ON RELATED FINANCING STATEMENT | | |
|---|---|---|
| 9a. ORGANIZATION'S NAME | | |
| IRVINE SENSORS CORPORATION | | |
| 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME,SUFFIX |

This **FINANCING STATEMENT** covers the following collateral

"Collateral" means:  all right, title and interest of Borrower in and to all of the following, whether now owned or hereafter arising or acquired and wherever located: all Accounts; all Inventory; all Equipment; all Deposit Accounts; all General Intangibles (including without limitation all Intellectual Property); all Investment Property; all Other Property; and any and all claims, rights and interests in any of the above, and all guaranties and security for any of the above, and all substitutions and replacements for, additions, accessions, attachments, accessories, and improvements to, and proceeds (including proceeds of any insurance policies, pro ceeds of proceeds and claims against third parties) of, any and all of the above, and all Borrower's books relating to any and all of the above.

"Accounts" means all present and future "accounts" as defined in the California Uniform Commercial Code in effect on the date hereof with such additions to such term as may hereafter be made, and includes without limitation all accounts receivable, healthcare receivables and other sums owing to Borrower.

"Deposit Accounts" means all present and future "deposit accounts" as defined in the California Uniform Commercial Code in effect on the date hereof with such additions to such term as may hereafter be made, and includes without limitation all general and special bank accounts, demand accounts, checking accounts, savings accounts and certificates of deposit.

 "Equipment" means all present and future "equipment" as defined in the California Uniform Commercial Code in effect on the date hereof with such additions to such term as may hereafter be made, and includes without limitation all machinery, fixtures, goods, vehicles (including motor vehicles and trailers), and any interest in any of the foregoing.

"General Intangibles" means all present and future "general intangibles" as defined in the California Uniform Commercial Code in effect on the date hereof with such additions to such term as may hereafter be made, and includes without limitation all Intellectual Property, payment intangibles, royalties, contract rights, goodwill, franchise agreements, purchase orders, customer lists, route lists, telephone numbers, domain names, domain rights, claims, income tax refunds, security and other deposits, options to purchase or sell real or personal property, rights in all litigation presently or hereafter pending (whether in contract, tort or otherwise), insurance policies (including without limitation key man, property damage, and business interruption insurance), payments of insurance and rights to payment of any kind.

"Intellectual Property" means all present and future: (a) copyrights, copyright rights, copyright applications, copyright registrations and like protections in each work of authorship and derivative work thereof, whether published or unpublished, (b) trade secret rights, including all rights to unpatented inventions and know how, and confidential information; (c) mask work or similar rights available for the protection of semiconductor chips; (d) patents, patent applications and like protections including without limitation improvements, divisions, continuations, renewals, reissues, extensions and continuations-in-part of the same; (e) trademarks, servicemarks, trade styles, and trade names, whether or not any of the foregoing are registered, and all applications to register and registrations of the same and like protections, and the entire goodwill of the business of Borrower connected with and symbolized by any such trademarks; (f) computer software and computer software products; (g) designs and design rights; (h) technology; (i) all claims for damages by way of past, present and future infringement of any of the rights included above; and (j) all licenses or other rights to use any property or rights of a type described above.

"Inventory" means all present and future "inventory" as defined in the California Uniform Commercial Code in effect on the date hereof with such additions to such term as may hereafter be made, and includes without limitation all merchandise, raw materials, parts, supplies, packing and shipping materials, work in process and finished products, including without limitation such inventory as is temporarily out of Borrower's custody or possession or in transit and including any returned goods and any documents of title representing any of the above.

"Investment Property" means all present and future investment property, securities, stocks, bonds, debentures, debt securities, partnership

**UCC FINANCING STATEMENT ADDENDUM** Document COLLATERAL of 203

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

| 9. NAME OF FIRST DEBTOR (1a or 1b) ON RELATED FINANCING STATEMENT | | |
|---|---|---|
| OR | 9a. ORGANIZATION'S NAME | |
| | IRVINE SENSORS CORPORATION | |
| | 9b. INDIVIDUAL'S LAST NAME | FIRST NAME / MIDDLE NAME,SUFFIX |

This **FINANCING STATEMENT** covers the following collateral

interests, limited liability company interests, options, security entitlements, securities accounts, commodity contracts, commodity accounts, and all financial assets held in any securities account or otherwise, and all options and warrants to purchase any of the foregoing, wherever located, and all other securities of every kind, whether certificated or uncertificated. "Other Property" means the following as defined in the California Uniform Commercial Code in effect on the date hereof with such additions to such term as may hereafter be made, and all rights relating thereto: all present and future "commercial tort claims" (including without limitation any commercial tort claims identified in the Representations), "documents", "instruments", "promissory notes", "chattel paper", "letters of credit", "letter-of-credit rights", "fixtures", "farm products" and "money"; and all other goods and personal property of every kind, tangible and intangible, whether or not governed by the California Uniform Commercial Code.

## UCC FINANCING STATEMENT AMENDMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGEMENT TO: (Name and Address)

*DELAWARE DEPARTMENT OF STATE*
*U.C.C. FILING SECTION*
*FILED 12:36 PM 02/01/2012*
*INITIAL FILING # 2011 4794163*
*AMENDMENT       # 2012 0405748*
*SRV: 120110409*

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE # | 1b. | This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. |
|---|---|---|
| 2011 4794163  Date: 12/14/2011 | ☐ | |

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☐ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ ASSIGNMENT (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c, and also give name of assignor in item 9.

5. AMENDMENT (PARTY INFORMATION): This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.
Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Give current record name in item 6a or 6b; also give new name (if name change) in item 7a or 7b and/or new address (if address change) in item 7c.   ☐ DELETE name: Give record name to be deleted in item 6a or 6b.   ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7d-7g (if applicable).

6. CURRENT RECORD INFORMATION:

| | 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

7. CHANGED (NEW) OR ADDED INFORMATION:

| | 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

| ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID#, if any | ☐ NONE |
|---|---|---|---|---|

8. AMENDMENT (COLLATERAL CHANGE): check only one box.

Describe collateral ☒ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned

The Purchased Assets as defined in that certain Asset Purchase Agreement dated October 17, 2011 by and between Irvine Sensors Corporation and Vectronix Inc.

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

| | 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | Partners for Growth III, L.P. | | | |
| | 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA
DE SOS / Debtor: Irvine Sensors Corporation (471611-00020)

FILING OFFICE COPY – NATIONAL UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) – CALIFORNIA (REV. 01/01/08)

Exh G_010

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

Corporation Service Company                                      8008585294

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

CORPORATION SERVICE COMPANY

2711 CENTERVILLE ROAD

SUITE 400

WILMINGTON DE 19808

---

```
DELAWARE DEPARTMENT OF STATE
    U.C.C. FILING SECTION
  FILED 06:24 PM 12/06/2013
INITIAL FILING # 2011 4794163
AMENDMENT     # 2013 4830502
      SRV: 131391548
```

---

| 1a. INITIAL FINANCING STATEMENT FILE # | 1b. This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. |
|---|---|
| 2011 4794163 | ☐ |

**2.** ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

**3.** ☐ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

**4.** ☐ ASSIGNMENT (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

**5.** AMENDMENT (PARTY INFORMATION): This Amendment affects ☒ Debtor or ☐ Secured Party of record. Check only one of these two boxes.

Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

| ☒ CHANGE name and/or address: Give current record name in item 6a or 6b; also give new name (if name change) in item 7a or 7b and/or new address (if address change) in item 7c. | ☐ DELETE name: Give record name to be deleted in item 6a or 6b. | ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7d-7g (if applicable). |
|---|---|---|

**6. CURRENT RECORD INFORMATION:**

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| IRVINE SENSORS CORPORATION | | | |

| OR | 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|
| | | | | |

**7. CHANGED (NEW) OR ADDED INFORMATION:**

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| ISC8, INC. | | | |

| OR | 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 3011 RED HILL AVE., BLDG. 4-108 | COSTA MESA | CA | 92926 | US |

| 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | |
|---|---|---|
| | | |

**8. AMENDMENT (COLLATERAL CHANGE):** check only one box.

Describe collateral ☐ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

---

**9. NAME of SECURED PARTY of RECORD AUTHORIZING THIS AMENDMENT**

Partners For Growth III, L.P.

**10.** OPTIONAL FILER REFERENCE DATA

Debtor: Irvine Sensors Corporation - ISC8

Exh G_011

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

Gisella Melendez                                    8008335778

B. SEND ACKNOWLEDGMENT TO:  (Name and Address)

    UCC DIRECT SERVICES

    2727 ALLEN PARKWAY

    SUITE 1000

    HOUSTON TX 77019

*DELAWARE DEPARTMENT OF STATE*
*U.C.C. FILING SECTION*
*FILED 05:44 PM 09/10/2013*
*INITIAL FILING # 2013 3526879*

*SRV: 131074140*

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| ISC8 INC. | | | | | |

OR

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | | SUFFIX |
|---|---|---|---|---|---|
| | | | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 151 KALMUS DR, STE A-203 | COSTA MESA | CA | 92626 | US |

| | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION |
|---|---|---|
| | CORPORATION | DE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| | | | | | |

OR

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | | SUFFIX |
|---|---|---|---|---|---|
| | | | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION |
|---|---|---|
| | | |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| DELL FINANCIAL SERVICES L.L.C. | | | | | |

OR

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | | SUFFIX |
|---|---|---|---|---|---|
| | | | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| MAIL STOP-PS2DF-23 ONE DELL WAY | ROUND ROCK | TX | 78682 | US |

## 4. This FINANCING STATEMENT covers the following collateral:

All computer equipment, peripherals, and other equipment (collectively "Equipment") wherever located, financed under and described in the Master Lease Agreement ("MLA") between Lessee and Lessor and all of Lessee's rights, title and interest in and to use any software and services (collectively "Software") financed under and described in the MLA, along with any modifications or supplements to the MLA which are incorporated or evidenced in writing and all substitutions, additions, accessions and replacements to the Equipment or Software now or hereafter installed in, affixed to, or used in conjunction with the Equipment or Software and the proceeds thereof together with all payments, insurance proceeds, credits or refunds obtained by Lessee from a manufacturer, licensor or service provider, or other proceeds and payments due and to become due and arising from or relating to such Equipment, Software or the MLA.

5. ALTERNATIVE DESIGNATION - Lessee-Lessor

6. This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.    Attach Addendum    [if applicable]

7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]    [optional]    | All Debtors | Debtor 1 | Debtor 2

8. OPTIONAL FILER REFERENCE DATA

DE-0-39746520-47766407

Exh G_012

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

Steve Morgan     9529080850

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

FARNAM STREET FINANCIAL, INC.

5850 OPUS PARKWAY

SUITE 240

MINNETONKA MN 55343

*DELAWARE DEPARTMENT OF STATE*
*U.C.C. FILING SECTION*
*FILED 01:30 PM 11/06/2013*
*INITIAL FILING # 2013 4366879*

*SRV: 131278156*

---

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

1a. ORGANIZATION'S NAME
ISC8 INC.

OR

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 840 F AVENUE SUITE 105 | PLANO | TX | 75093 | US |

| | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | |
|---|---|---|---|
| | CORPORATION | DE | |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

2a. ORGANIZATION'S NAME

OR

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | |
|---|---|---|---|
| | | | |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

3a. ORGANIZATION'S NAME
FARNAM STREET FINANCIAL, INC.

OR

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 5850 OPUS PARKWAY, SUITE 240 | MINNETONKA | MN | 55343 | US |

4. This FINANCING STATEMENT covers the following collateral:

Collateral Description - please see attachment

---

5. ALTERNATIVE DESIGNATION - Lessee-Lessor

| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.  Attach Addendum [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |
|---|---|---|---|---|

8. OPTIONAL FILER REFERENCE DATA

IS062113

Exh G_013

## ADDENDUM NO. 1

This transaction is a true lease and is not intended by the parties as a secured transaction. Filing is only intended to make the true lease a matter of public record. Farnam Street Financial, Inc. is the owner of all the equipment contained on this filing and any and all other equipment now or hereafter the subject of any lease agreement or lease schedule by and between the parties and all accessories, attachments, additions, and any substitutions and/or replacement of the equipment contained on this filing or any lease agreement or lease schedule between the parties. The lessee has no rights, express or implied, to sell, exchange, encumber, or otherwise dispose of any equipment contained on this filing or any lease agreement or lease schedule by and between the parties. The parties agree that this financing statement covers any and all equipment now or hereafter the subject of any lease agreement or lease schedule by and between the parties, including, but not limited to equipment contained on or subject to. Lease Agreement Number IS062113 or any lease schedule executed pursuant thereto, together with all substitutions, replacements, accessions, process, rent, revenue, insurance, and proceeds related to the equipment contained on this filing or any lease agreement or lease schedule by and between the parties.

Every Term is Agreed to and Accepted:
FARNAM STREET FINANCIAL, INC.
"LESSOR"

By: _____

Print
Name: Steven C. Morgan

Title: President

Date: Oct. 22, 2013

Every Term is Agreed to and Accepted:
ISC8 INC.
"LESSEE"

By: _____

Print
Name: JOHN VONG

Title: CFO

Date: 10 - 4 - 2013

Every Term is Agreed to and Accepted:
IRVINE SENSORS CORPORATION
"LESSEE"

By: _____

Print
Name: John C. Carson

Title: President & CEO

Date: 10 / 1 / 13

███████████████
███████████████
███████████████
███████████████

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional) | DELAWARE DEPARTMENT OF STATE |
|---|---|
| National Corporate Research, Ltd. | U.C.C. FILING SECTION |

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
National Corporate Research, Ltd.

**B. E-MAIL CONTACT AT FILER (optional)**

**C. SEND ACKNOWLEDGMENT TO:  (Name and Address)**

Armen Martin
Foundation Law Group LLP
445 S. Figueroa Street, Suite 2700
Los Angeles, CA 90071

*DELAWARE DEPARTMENT OF STATE*
*U.C.C. FILING SECTION*
*FILED 02:46 PM 02/27/2014*
*INITIAL FILING # 2014 0769067*

*SRV: 140257936*

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| ISC8, Inc. | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 151 Kalmus Drive | Costa Mesa | CA | 92626 | |

**2. DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

**3. SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Fundamental Master LP | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 140 S. Lake Avenue, Suite 302 | Pasadena | CA | 91101 | |

**4. COLLATERAL:** This financing statement covers the following collateral:

As used herein, the term "Collateral" means the following items and types of property, wherever located, now owned or in the future acquired by Debtor, and all proceeds and products thereof, and any substitutes or replacements therefor:

(a) All accounts, chattel paper (whether tangible or electronic), goods (including inventory, equipment, and any accessions thereto), software, instruments, investment property, documents, deposit accounts, money, commercial tort claims, letters of credit or letter-of-credit rights, supporting obligations, tax refunds, general intangibles (including payment intangibles) and all books and records pertaining to the foregoing;

Continues in Item 12

| 5. Check only if applicable and check only one box: Collateral is | ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) | ☐ being administered by a Decedent's Personal Representative |
|---|---|---|
| 6a. Check only if applicable and check only one box: | | 6b. Check only if applicable and check only one box: |
| ☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility | | ☐ Agricultural Lien  ☐ Non-UCC Filing |
| 7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor | | |
| 8. OPTIONAL FILER REFERENCE DATA: | | |

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)    International Association of Commercial Administrators (IACA)

## UCC FINANCING STATEMENT ADDENDUM - COLLATERAL

| 9a. NAME OF FIRST DEBTOR (1a OR 1b) ON RELATED FINANCING STATEMENT | | |
|---|---|---|
| ISCB, Inc. | | |
| 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME, SUFFIX |
| | | |

ITEM 12 – ADDITIONAL SPACE FOR ITEM 4

(b)    (i) All copyrights (whether statutory or common law, registered or unregistered), works protectable by copyright, copyright registrations, copyright licenses, and copyright applications of Debtor, including, without limitation, all of Debtor's right, title, and interest in and to all copyrights registered in the United States Copyright Office or anywhere else in the world and also including, without limitation, the copyrights set forth on Schedule B; (ii) all renewals, extensions, and modifications thereof; (iii) all income, licenses, royalties, damages, profits, and payments relating to or payable under any of the foregoing; (iv) the right to sue for past, present, or future infringements of any of the foregoing; and (v) all other rights and benefits relating to any of the foregoing throughout the world; in each case, whether now owned or hereafter acquired by Debtor (the "**Copyrights**");

(c)    (i) All patents, patent applications, patent licenses, and patentable inventions of Debtor, including, without limitation, registrations, recordings, and applications thereof in the United States Patent and Trademark Office or in any similar office or agency of the United States, any state thereof or any other country or any political subdivision thereof; (ii) all continuations, divisions, renewals, extensions, modifications, substitutions, reexaminations, continuations-in-part, or reissues of any of the foregoing; (iii) all income, royalties, profits, damages, awards, and payments relating to or payable under any of the foregoing; (iv) the right to sue for past, present, and future infringements of any of the foregoing; and (v) all other rights and benefits relating to any of the foregoing throughout the world; in each case, whether now owned or hereafter acquired by Debtor (the "**Patents**");

(d)    (i) All trademarks, trademark licenses, trade names, corporate names, company names, business names, fictitious business names, trade styles, service marks, certification marks, collective marks, logos, other business identifiers, all registrations, recordings, and applications thereof, including, without limitation, registrations, recordings, and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any state thereof or any other country or any political subdivision thereof; (ii) all reissues, extensions, and renewals thereof; (iii) all income, royalties, damages, and payments now or hereafter relating to or payable under any of the foregoing, including, without limitation, damages or payments for past or future infringements of any of the foregoing; (iv) the right to sue for past, present, and future infringements of any of the foregoing; (v) all rights corresponding to any of the foregoing throughout the world; and (vi) all goodwill associated with and symbolized by any of the foregoing, in each case, whether now owned or hereafter acquired by Debtor (the "**Trademarks**", and collectively with the Copyrights and the Patents, the "**Intellectual Property**"); *provided* that (i) with respect to any Trademarks, applications in the United States Patent and Trademark Office to register Trademarks or service marks on the basis of the Debtor's "intent to use" such Trademarks or service marks will not be deemed to be Collateral unless and until a "Statement of Use" or "Amendment to Allege Use" has been filed and accepted in the United States Patent and Trademark Office, whereupon such application shall be automatically subject to the Security Interest granted herein and deemed to be included in the Collateral;

## UCC FINANCING STATEMENT ADDENDUM - COLLATERAL

| 9a. NAME OF FIRST DEBTOR (1a OR 1b) ON RELATED FINANCING STATEMENT | | |
|---|---|---|
| ISC8, Inc. | | |
| 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME, SUFFIX |
| | | |

(e)     All present and future distributions, income, increases, profits, combinations, reclassifications, improvements, and products of, accessions, attachments, and other additions to, tools, parts, and equipment used in connection with, and substitutes and replacements for, all or part of the Collateral described above;

(f)     All present and future accounts, contract rights, general intangibles, chattel paper, documents, instruments, cash and noncash proceeds, and other rights arising from or by virtue of, or from the voluntary or involuntary sale or other disposition of, or collections with respect to, or insurance proceeds payable with respect to, or proceeds payable by virtue of warranty or other claims against the manufacturer of, or claims against any other person or entity with respect to, all or any part of the Collateral heretofore described in this clause or otherwise; and

(g)     All present and future security for the payment to Debtor of any of the Collateral described above and goods which gave or will give rise to any such Collateral or are evidenced, identified, or represented therein or thereby.

The description of the Collateral contained in this Section 4 shall not be deemed to permit any action prohibited by this Security Agreement or by the terms incorporated in this Security Agreement. Furthermore, notwithstanding any contrary provision, Debtor agrees that, if, but for the application of this paragraph, granting a Security Interest in the Collateral would constitute a fraudulent conveyance under 11 U.S.C. § 548 or a fraudulent conveyance or transfer under any state fraudulent conveyance, fraudulent transfer, or similar law in effect from time to time (each a "**fraudulent conveyance**"), then the Security Interest remains enforceable to the maximum extent possible without causing such Security Interest to be a fraudulent conveyance, and this Security Agreement is automatically amended to carry out the intent of this paragraph.



| | Date: | 07/23/2014 |
| | Reference: | ISC8 Inc. |
| | Copies Requested: | All Copies Excluding Lapsed Filings |
| | Page Limit: | 30 |

| | | |
|---|---|---|
| Searched Through: | 07/17/2014 | |
| Subject: | Irvine Sensors Corporation | |
| Jurisdiction: | Secretary of State, DE | |
| Index Searched: | Certified UCC/Federal Lien | |

| FILE DATE | FILE # | TYPE OF FILING | SECURED PARTY |
|---|---|---|---|
| 11/05/2008 | 83716998 | Financing Statement | RUDOLPH, AS COLLATERAL AGENT FOR BRIDGE LENDERS, S. MICHAEL SAN FRANCISCO, CA |
| 06/08/2009 | 91801718 | Termination | |
| 05/12/2009 | 91503389 | Financing Statement | GREYSTONE COMMERCIAL SERVICES LP DALLAS, TX |
| 05/14/2009 | 91539748 | Termination | |
| 05/26/2009 | 91657789 | Financing Statement | SUMMIT FINANCIAL RESOURCES, L.P. SALT LAKE CITY, UT |
| 01/27/2012 | 20363095 | Termination | |
| 04/15/2010 | 01303589 | Financing Statement | LOONEY, TIMOTHY PARKER, TX |
| 01/27/2012 | 20363053 | Termination | |
| 01/06/2011 | 10055502 | Financing Statement | COSTA BRAVA PARTNERSHIP III L.P. BOSTON, MA |
| 02/01/2012 | 20405870 | Amendment | |
| 03/29/2011 | 11149148 | Financing Statement | COSTA BRAVA PARTNERSHIP III L.P. BOSTON, MA |
| 02/01/2012 | 20405821 | Amendment | |
| 06/08/2011 | 12179045 | Financing Statement | WESTERN FINANCE & LEASE INC DEVILS LAKE, ND |
| 07/29/2011 | 12937921 | Financing Statement | FARNAM STREET FINANCIAL, INC. MINNETONKA, MN |
| 11/06/2013 | 34369410 | Amendment | |
| 11/24/2011 | 14513969 | Financing Statement | IKON FINANCIAL SVCS MACON,GA |
| 12/14/2011 | 14794163 | Financing Statement | PARTNERS FOR GROWTH III, L.P. SAN FRANCISCO, CA |
| 02/01/2012 | 20405748 | Amendment | |



Date:              07/23/2014
Reference:         ISC8 Inc.
Copies Requested:  All Copies Excluding Lapsed Filings
Page Limit:        30

| | |
|---|---|
| **Searched Through:** | 07/17/2014 |
| **Subject:** | Irvine Sensors Corporation |
| **Jurisdiction:** | Secretary of State, DE |
| **Index Searched:** | Certified UCC/Federal Lien |

| FILE DATE | FILE # | TYPE OF FILING | SECURED PARTY |
|---|---|---|---|
| 12/06/2013 | 34830502 | Amendment | |
| 08/15/2013 | 33202125 | Financing Statement | EVOQUA WATER TECHNOLOGIES LLC (FKA) SIEMENS WATER TECHNOLOGIES LLC ALPHARETTA, GA |
| 09/19/2013 | 33655777 | Amendment | |
| 01/31/2014 | 40409458 | Amendment | |
| 08/15/2013 | 33202133 | Financing Statement | SIEMENS INDUSTRY, INC. BUFFALO GROVE, IL |
| 09/19/2013 | 33655793 | Amendment | |
| 01/31/2014 | 40409466 | Amendment | |
| 11/06/2013 | 34367216 | Financing Statement | FARNAM STREET FINANCIAL, INC. MINNETONKA, MN |

SEE ATTACHED CERTIFIED OR OTHER SEARCH PERFORMED BY FILING OFFICE.



# Delaware

*PAGE    1*

### The First State

*CERTIFICATE*

```
    SEARCHED JULY 23, 2014, AT  5:22 P.M.
    FOR DEBTOR "IRVINE SENSORS CORPORATION"

   1 OF   13   FINANCING STATEMENT            83716998
        EXPIRATION DATE: NOVEMBER 5, 2013
 DEBTOR: IRVINE SENSORS CORPORATION
        3001 RED HILL AVENUE,                    ADDED 11-05-08
        BUILDING 4, SUITE 108
        COSTA MESA              CA  92626-4532
SECURED: RUDOLPH, AS COLLATERAL AGENT FOR BRIDGE LENDERS, S. MICH
AEL
        600 MONTGOMERY STREET,                  ADDED 11-05-08
        44TH STREET
        SAN FRANCISCO          CA  94111
             F I L I N G   H I S T O R Y
83716998  FILED 11-05-08   AT  6:10 P.M.   FINANCING STATEMENT
91801718  FILED 06-08-09   AT 12:35 P.M.   TERMINATION

   2 OF   13   FINANCING STATEMENT            91503389
        EXPIRATION DATE: MAY 12, 2014
 DEBTOR: IRVINE SENSORS CORPORATION
        3001 RED HILL AVENUE                     ADDED 05-12-09
        COSTA MESA              CA  92626
SECURED: GREYSTONE COMMERCIAL SERVICES LP
        8144 WALNUT HILL LANE, SUITE 900         ADDED 05-12-09
        DALLAS                 TX  75231
             F I L I N G   H I S T O R Y
91503389  FILED 05-12-09   AT  4:45 P.M.   FINANCING STATEMENT
91539748  FILED 05-14-09   AT  4:27 P.M.   TERMINATION

   3 OF   13   FINANCING STATEMENT            91657789
        EXPIRATION DATE: MAY 26, 2014
 DEBTOR: IRVINE SENSORS CORPORATION
        3001 RED HILL AVENUE                     ADDED 05-26-09
        COSTA MESA              CA  92626
SECURED: SUMMIT FINANCIAL RESOURCES, L.P.
        2455 EAST PARLEYS WAY                    ADDED 05-26-09
        SALT LAKE CITY         UT  84109
```

Jeffrey W. Bullock, Secretary of State

20142935922UCXL

140989815

*AUTHENTICATION: 1561566*

*DATE: 07-23-14*

**Exh G_020**

# Delaware

*PAGE    2*

### The First State

```
            F I L I N G   H I S T O R Y
91657789  FILED 05-26-09   AT  6:10 P.M.  FINANCING STATEMENT
20363095  FILED 01-27-12   AT  6:35 P.M.  TERMINATION

    4 OF   13   FINANCING STATEMENT           01303589
           EXPIRATION DATE: APRIL 15, 2015
 DEBTOR: IRVINE SENSORS CORPORATION
         3001 RED HILL AVENUE                  ADDED 04-15-10
         BUILDING 4, SUITE 108
         COSTA MESA            CA   92626
SECURED: LOONEY, TIMOTHY
         4306 SAVANNAH                         ADDED 04-15-10
         PARKER               TX   75002
            F I L I N G   H I S T O R Y
01303589  FILED 04-15-10   AT 11:24 A.M.  FINANCING STATEMENT
20363053  FILED 01-27-12   AT  6:32 P.M.  TERMINATION

    5 OF   13   FINANCING STATEMENT           10055502
           EXPIRATION DATE: JANUARY 6, 2016
 DEBTOR: IRVINE SENSORS CORPORATION
         3001 RED HILL AVENUE,                 ADDED 01-06-11
         BUILDING 4, STE 108
         COSTA MESA            CA   92626
SECURED: COSTA BRAVA PARTNERSHIP III L.P.
         222 BERKELEY STREET, 17TH FLOOR       ADDED 01-06-11
         BOSTON               MA   02116
            F I L I N G   H I S T O R Y
10055502  FILED 01-06-11   AT  1:21 P.M.  FINANCING STATEMENT
20405870  FILED 02-01-12   AT 12:37 P.M.  AMENDMENT

    6 OF   13   FINANCING STATEMENT           11149148
           EXPIRATION DATE: MARCH 29, 2016
 DEBTOR: IRVINE SENSORS CORPORATION
         3001 RED HILL AVENUE,                 ADDED 03-29-11
         BUILDING 4, STE 108
         COSTA MESA            CA   92626
SECURED: COSTA BRAVA PARTNERSHIP III L.P.
         222 BERKELEY STREET, 17TH FLOOR       ADDED 03-29-11
         BOSTON               MA   02116
            F I L I N G   H I S T O R Y
```

Jeffrey W. Bullock, Secretary of State

*20142935922UCXL*

*140989815*

*AUTHENTICATION: 1561566*

*DATE: 07-23-14*

Exh G_021

# Delaware

*PAGE    3*

### The First State


```
11149148  FILED 03-29-11    AT  2:51 P.M.   FINANCING STATEMENT
20405821  FILED 02-01-12    AT 12:37 P.M.   AMENDMENT

   7 OF   13   FINANCING STATEMENT           12179045
              EXPIRATION DATE: JUNE 8, 2016
 DEBTOR:  IRVINE SENSORS CORPORATION
          3001 RED HILL AVE STE 4-108           ADDED 06-08-11
          COSTA MESA              CA   92626
SECURED:  WESTERN FINANCE & LEASE INC
          PO BOX 640                            ADDED 06-08-11
          DEVILS LAKE             ND   58301
             F I L I N G    H I S T O R Y
12179045  FILED 06-08-11    AT  4:49 A.M.   FINANCING STATEMENT

   8 OF   13   FINANCING STATEMENT           12937921
              EXPIRATION DATE: JULY 29, 2016
 DEBTOR:  IRVINE SENSORS CORPORATION
          3001 RED HILL AVENUE                  ADDED 07-29-11
          BUILDING 4
          STE 108
          COSTA MESA              CA   92626   REMOVED 11-06-13
 DEBTOR:  ISC8 INC.
          840 F AVENUE                          ADDED 11-06-13
          SUITE 105
          PLANO                   TX   75093
SECURED:  FARNAM STREET FINANCIAL, INC.
          5850 OPUS PARKWAY, SUITE 240          ADDED 07-29-11
          MINNETONKA              MN   55343
             F I L I N G    H I S T O R Y
12937921  FILED 07-29-11    AT 11:49 A.M.   FINANCING STATEMENT
34369410  FILED 11-06-13    AT  2:18 P.M.   AMENDMENT

   9 OF   13   FINANCING STATEMENT           14513969
              EXPIRATION DATE: NOVEMBER 24, 2016
 DEBTOR:  IRVINE SENSORS CORPORATION
          3001 RED HILL AVE STE 4-108           ADDED 11-24-11
          COSTA MESA              CA   92626-4526
SECURED:  IKON FINANCIAL SVCS
          1738 BASS RD                          ADDED 11-24-11
          MACON                   GA   31210-1043
```

Jeffrey W. Bullock, Secretary of State

20142935922UCXL

140989815

AUTHENTICATION: 1561566

DATE: 07-23-14

Exh G_022

# Delaware

*PAGE    4*

### The First State

```
        F I L I N G     H I S T O R Y
14513969  FILED 11-24-11    AT  5:29 A.M.  FINANCING STATEMENT

  10 OF   13   FINANCING STATEMENT           14794163
              EXPIRATION DATE: DECEMBER 14, 2016
 DEBTOR: IRVINE SENSORS CORPORATION
         3001 RED HILL AVE., BLDG. 4/108          ADDED 12-14-11
         COSTA MESA            CA  92926     REMOVED 12-06-13
 DEBTOR: ISC8, INC.
         3011 RED HILL AVE., BLDG. 4-108          ADDED 12-06-13
         COSTA MESA            CA  92926
SECURED: PARTNERS FOR GROWTH III, L.P.
         150 PACIFIC AVENUE                       ADDED 12-14-11
         SAN FRANCISCO         CA  94111
        F I L I N G     H I S T O R Y
14794163  FILED 12-14-11    AT  1:57 P.M.  FINANCING STATEMENT
20405748  FILED 02-01-12    AT 12:36 P.M.  AMENDMENT
34830502  FILED 12-06-13    AT  6:24 P.M.  AMENDMENT

  11 OF   13   FINANCING STATEMENT           33202125
              EXPIRATION DATE: AUGUST 15, 2018
 DEBTOR: IRVINE SENSORS CORPORATION
         3001 RED HILL AVENUE SUITE 4-108         ADDED 08-15-13
         COSTA MESA            CA  92626
SECURED: SIEMENS INDUSTRY, INC.
         1000 DEERFIELD PARKWAY                   ADDED 08-15-13
         BUFFALO GROVE         IL  60089     REMOVED 09-19-13
SECURED: SIEMENS WATER TECHNOLOGIES LLC (FKA) SIEMENS INDUSTRY, I
         NC.
         4800 NORTH POINT PARKWAY SUITE 2         ADDED 09-19-13
         50, 2ND FLOOR
         ALPHARETTA            GA  30022     REMOVED 01-31-14
SECURED: EVOQUA WATER TECHNOLOGIES LLC (FKA) SIEMENS WATER TECHNO
         LOGIES LLC
         4800 NORTH POINT PARKWAY SUITE 2         ADDED 01-31-14
         50, 2ND FLOOR
         ALPHARETTA            GA  30022
        F I L I N G     H I S T O R Y
33202125  FILED 08-15-13    AT  1:22 P.M.  FINANCING STATEMENT
33655777  FILED 09-19-13    AT  2:53 P.M.  AMENDMENT
```

Jeffrey W. Bullock, Secretary of State

*20142935922UCXL*

*140989815*

*AUTHENTICATION: 1561566*

*DATE: 07-23-14*

Exh G_023

# Delaware

*PAGE    5*

## The First State

*40409458  FILED 01-31-14    AT 12:37 P.M.   AMENDMENT*

  *12 OF   13   FINANCING STATEMENT               33202133*
      *EXPIRATION DATE: AUGUST 15, 2018*
 *DEBTOR: IRVINE SENSORS CORPORATION*
      *3001 RED HILL AVENUE SUITE 4-108        ADDED 08-15-13*
      *COSTA MESA              CA   92626*
*SECURED: SIEMENS INDUSTRY, INC.*
      *1000 DEERFIELD PARKWAY                  ADDED 08-15-13*
      *BUFFALO GROVE           IL   60089    REMOVED 09-19-13*
*SECURED: SIEMENS WATER TECHNOLOGIES LLC (FKA) SIEMENS INDUSTRY, I*
      *NC.*
      *4800 NORTH POINT PARKWAY SUITE 2        ADDED 09-19-13*
      *50, 2ND FLOOR*
      *ALPHARETTA              GA   30022    REMOVED 01-31-14*
*SECURED: EVOQUA WATER TECHNOLOGIES LLC (FKA) SIEMENS WATER TECHNO*
      *LOGIES LLC*
      *4800 NORTH POINT PARKWAY SUITE 2        ADDED 01-31-14*
      *50, 2ND FLOOR*
      *ALPHARETTA              GA   30022*
      *F I L I N G   H I S T O R Y*
*33202133  FILED 08-15-13    AT  1:22 P.M.   FINANCING STATEMENT*
*33655793  FILED 09-19-13    AT  2:53 P.M.   AMENDMENT*
*40409466  FILED 01-31-14    AT 12:37 P.M.   AMENDMENT*

  *13 OF   13   FINANCING STATEMENT               34367216*
      *EXPIRATION DATE: NOVEMBER 6, 2018*
 *DEBTOR: IRVINE SENSORS  CORPORATION*
      *3001 RED HILL AVENUE                    ADDED 11-06-13*
      *B3-108*
      *COSTA MESA              CA   92626*
*SECURED: FARNAM STREET FINANCIAL, INC.*
      *5850 OPUS PARKWAY, SUITE 240            ADDED 11-06-13*
      *MINNETONKA              MN   55343*
      *F I L I N G   H I S T O R Y*
*34367216  FILED 11-06-13    AT  1:35 P.M.   FINANCING STATEMENT*
      *E N D   O F   F I L I N G   H I S T O R Y*

   *THE UNDERSIGNED FILING OFFICER HEREBY CERTIFIES THAT THE*
*ABOVE LISTING IS A RECORD OF ALL PRESENTLY EFFECTIVE FINANCING*

Jeffrey W. Bullock, Secretary of State

*20142935922UCXL*                    *AUTHENTICATION: 1561566*

*140989815*                          *DATE: 07-23-14*

Exh G_024

# Delaware

### The First State

*STATEMENTS, LAPSED FINANCING STATEMENTS, FEDERAL TAX LIENS AND
UTILITY SECURITY INSTRUMENTS FILED IN THIS OFFICE WHICH NAME THE
ABOVE DEBTOR, AS OF JULY 17, 2014 AT 11:59 P.M.*

Jeffrey W. Bullock, Secretary of State

*20142935922UCXL*

*140989815*

*AUTHENTICATION: 1561566*

*DATE: 07-23-14*

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 11:24 AM 04/15/2010
INITIAL FILING # 2010 1303589

SRV: 100386790

A. NAME & PHONE OF CONTACT AT FILER [optional]
**Lyn Duerson (214) 651.5502**

B. SEND ACKNOWLEDGMENT TO:  (Name and Address)

**Haynes and Boone, LLP**
**2323 Victory Avenue, Suite 700**
**Dallas, TX  75219**
**Attn: Kenneth A. Rogers, Esq.**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **Irvine Sensors Corporation** | | | | |

OR

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **3001 Red Hill Avenue, Bldg. 4, Suite 108** | **Costa Mesa** | **CA** | **92626** | **U.S.A.** |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | corporation | Delaware | ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |

OR

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |

OR

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|
| **Looney** | **Timothy** | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **4306 Savannah** | **Parker** | **TX** | **75002** | **U.S.A.** |

4. This FINANCING STATEMENT covers the following collateral:

**All assets of Debtor whether now owned or hereafter acquired and wherever located.**

| 5. ALTERNATIVE DESIGNATION [if applicable]: | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|
| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.    Attach Addendum    [if applicable] | | | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]    [optional] | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |

8. OPTIONAL FILER REFERENCE DATA

**File with: Delaware Secretary of State; d-1839332.1**

*7818535-MRF*

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

Exh G_026

▮▮▮▮
▮▮▮▮
▮▮▮▮
▮▮▮▮

# UCC FINANCING STATEMENT AMENDMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGEMENT TO: (Name and Address)

Registered Agent Solutions, inc.

515 Congress Ave.
Suite 2300
Austin, TX 78701
(888) 705-7274 (Phone) / (888) 706-7274 (Fax)

*DELAWARE DEPARTMENT OF STATE*
*U.C.C. FILING SECTION*
*FILED 06:32 PM 01/27/2012*
*INITIAL FILING # 2010 1303589*
*AMENDMENT      # 2012 0363053*
*SRV: 120097063*

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE # | 1b. [ ] This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. |
|---|---|
| 2010 1303589 Date: 04/15/2010 | |

2. [X] TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. [ ] CONTINUATION: Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. [ ] ASSIGNMENT (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. AMENDMENT (PARTY INFORMATION): This Amendment affects [ ] Debtor or [ ] Secured Party of record. Check only one of these two boxes.
Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.
[ ] CHANGE name and/or address: Give current record name in item 6a or 6b; also give new name (if name change) in item 7a or 7b and/or new address (if address change) in item 7c.  [ ] DELETE name: Give record name to be deleted in item 6a or 6b.  [ ] ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7d-7g (if applicable).

6. CURRENT RECORD INFORMATION:

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

7. CHANGED (NEW) OR ADDED INFORMATION:

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

| ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID#, if any | [ ] NONE |
|---|---|---|---|---|

8. AMENDMENT (COLLATERAL CHANGE): check only one box.
Describe collateral [ ] deleted or [ ] added, or give entire [ ] restated collateral description, or describe collateral [ ] assigned.

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here [ ] and enter name of DEBTOR authorizing this Amendment.

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| Looney | Timothy | | |

10. OPTIONAL FILER REFERENCE DATA
DE SOS / Debtor: Irvine Sensors Corporation (471611-00020)

FILING OFFICE COPY – NATIONAL UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) – CALIFORNIA (REV. 01/01/08)

Exh G_027

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**A. NAME & PHONE OF CONTACT AT FILER [optional]**

**B. SEND ACKNOWLEDGMENT TO:  (Name and Address)**

Alicia M. Smith
c/o Ropes & Gray LLP
800 Boylston Street
Boston, MA 02199

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 01:21 PM 01/06/2011
INITIAL FILING # 2011 0055502

SRV: 110017912

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| | | | | |
|---|---|---|---|---|
| 1a. ORGANIZATION'S NAME | | | | |
| **Irvine Sensors Corporation** | | | | |

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **3001 Red Hill Avenue, Building 4, Ste 108** | **Costa Mesa** | **CA** | **92626** | **USA** |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | **Corporation** | **Delaware** | ☐ NONE |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| | | | | |
|---|---|---|---|---|
| 2a. ORGANIZATION'S NAME | | | | |

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| | | | | |
|---|---|---|---|---|
| 3a. ORGANIZATION'S NAME | | | | |
| **Costa Brava Partnership III L.P.** | | | | |

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **222 Berkeley Street, 17th floor** | **Boston** | **MA** | **02116** | **USA** |

**4.** This FINANCING STATEMENT covers the following collateral:

**All assets of Debtor whether now owned or hereafter acquired and wherever located.**

| 5. ALTERNATIVE DESIGNATION [if applicable] | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|

| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.    Attach Addendum    [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]    [optional] | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |
|---|---|---|---|---|

**8. OPTIONAL FILER REFERENCE DATA**

To be filed with the Secretary of State of Delaware

CBPL-015

## UCC FINANCING STATEMENT **AMENDMENT**

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

| A. NAME & PHONE OF CONTACT AT FILER [optional] |
|---|

| B. SEND ACKNOWLEDGEMENT TO: (Name and Address) |
|---|

*DELAWARE DEPARTMENT OF STATE*
*U.C.C. FILING SECTION*
*FILED 12:37 PM 02/01/2012*
*INITIAL FILING # 2011 0055502*
*AMENDMENT # 2012 0405870*
*SRV: 120110428*

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

| 1a. INITIAL FINANCING STATEMENT FILE # | 1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. |
|---|---|
| 2011 0055502 Date: 01/06/2011 | |

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ **ASSIGNMENT** (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. **AMENDMENT (PARTY INFORMATION):** This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.
Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.
☐ CHANGE name and/or address: Give current record name in item 6a or 6b; also give new name (if name change) in item 7a or 7b and/or new address (if address change) in item 7c. ☐ DELETE name: Give record name to be deleted in item 6a or 6b. ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7d-7g (if applicable).

6. CURRENT RECORD INFORMATION:

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

7. CHANGED (NEW) OR ADDED INFORMATION:

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

| ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID#, if any | ☐ NONE |
|---|---|---|---|---|

8. AMENDMENT (COLLATERAL CHANGE): check only one box.

Describe collateral ☒ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

The Purchased Assets as defined in that certain Asset Purchase Agreement dated October 17, 2011 by and between Irvine Sensors Corporation and Vectronix Inc.

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Costa Brava Partnership III L.P. | | | |
| OR 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA

DE SOS / Debtor: Irvine Sensors Corporation (471611-00020)

**FILING OFFICE COPY —** NATIONAL UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) – CALIFORNIA (REV. 01/01/08)

Exh G_029

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**A. NAME & PHONE OF CONTACT AT FILER [optional]**

**B. SEND ACKNOWLEDGMENT TO:** (Name and Address)

Alicia M. Smith
c/o Ropes & Gray LLP
800 Boylston Street
Boston, MA 02199

CBPL-015

*DELAWARE DEPARTMENT OF STATE*
*U.C.C. FILING SECTION*
*FILED 02:51 PM 03/29/2011*
*INITIAL FILING # 2011 1149148*

*SRV: 110352800*

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| | | | | |
|---|---|---|---|---|
| **1a. ORGANIZATION'S NAME** | | | | |
| **Irvine Sensors Corporation** | | | | |
| **1b. INDIVIDUAL'S LAST NAME** | FIRST NAME | MIDDLE NAME | | SUFFIX |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **3001 Red Hill Avenue, Building 4, Ste 108** | **Costa Mesa** | **CA** | **92626** | **USA** |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | **Corporation** | **Delaware** | ☐ NONE |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| | | | | |
|---|---|---|---|---|
| 2a. ORGANIZATION'S NAME | | | | |
| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| | | | | |
|---|---|---|---|---|
| 3a. ORGANIZATION'S NAME | | | | |
| **Costa Brava Partnership III L.P.** | | | | |
| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **222 Berkeley Street, 17th floor** | **Boston** | **MA** | **02116** | **USA** |

**4. This FINANCING STATEMENT covers the following collateral:**

**All assets of Debtor whether now owned or hereafter acquired and wherever located.**

**To be filed with the Secretary of State of Delaware**

| 5. ALTERNATIVE DESIGNATION [if applicable]: | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|
| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable] | | | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |

**8. OPTIONAL FILER REFERENCE DATA**

SP reference: Costa Brava Partnership III L.P., as Holder Representative under the Security Agreement, dated as of 3/16/11, between Debtor and Secured Party

International Association of Commercial Administrators (IACA)

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

**Exh G_030**

# UCC FINANCING STATEMENT **AMENDMENT**

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGEMENT TO:  (Name and Address)

*DELAWARE DEPARTMENT OF STATE*
*U.C.C. FILING SECTION*
*FILED 12:37 PM 02/01/2012*
*INITIAL FILING # 2011 1149148*
*AMENDMENT       # 2012 0405821*
*SRV: 120110421*

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE # | 1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. |
|---|---|
| 2011 1149148  Date: 03/29/2011 | |

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☐ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ ASSIGNMENT (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c, and also give name of assignor in item 9.

5. AMENDMENT (PARTY INFORMATION): This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.
Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address. Give current record name in item 6a or 6b; also give new name (if name change) in item 7a or 7b and/or new address (if address change) in item 7c. ☐ DELETE name: Give record name to be deleted in item 6a or 6b. ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7d-7g (if applicable).

6. CURRENT RECORD INFORMATION:

| | 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

7. CHANGED (NEW) OR ADDED INFORMATION:

| | 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

| ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID#, if any | ☐ NONE |
|---|---|---|---|---|

8. AMENDMENT (COLLATERAL CHANGE): check only one box.

Describe collateral ☒ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

The Purchased Assets as defined in that certain Asset Purchase Agreement dated October 17, 2011 by and between Irvine Sensors Corporation and Vectronix Inc.

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment

| | 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | Costa Brava Partnership III L.P. | | | |
| | 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA

DE SOS / Debtor: Irvine Sensors Corporation (471611-00020)

**FILING OFFICE COPY** – NATIONAL UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) – CALIFORNIA (REV. 01/01/08)

Exh G_031

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**A. NAME & PHONE OF CONTACT AT FILER [optional]**

8008335778

**B. SEND ACKNOWLEDGMENT TO: (Name and Address)**

UCC DIRECT SERVICES

2727 ALLEN PARKWAY

SUITE 1000

HOUSTON TX 77019

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 04:49 AM 06/08/2011
INITIAL FILING # 2011 2179045

SRV: 110699256

**1. DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| IRVINE SENSORS CORPORATION | | | | |

| OR 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 3001 RED HILL AVE STE 4-108 | COSTA MESA | CA | 92626 | US |

| | 1d. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION |
|---|---|---|
| | CORPORATION | DE |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |

| OR 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| | 2d. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION |
|---|---|---|
| | | |

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| WESTERN FINANCE & LEASE INC | | | | |

| OR 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| PO BOX 640 | DEVILS LAKE | ND | 58301 | US |

**4. This FINANCING STATEMENT covers the following collateral:**

THE FOLLOWING EQUIPMENT OR INVENTORY:13HP Smart Buy Elitebook 8560p
Commercial PC SN:4CZ1171CHT,        4CZ1171CHR, 4CZ1171CJ4,
4CZ1171CHS, 4CZ1171CJ3, 4CZ117700T8,        4CZ11800NR, 4CZ1171CHM,
4CZ1171CHW, 4CZ11700TX, 4CZ11700TF,        4CZ11700TT,
4CZ1171CHS13230W Docking Station (includes a/c adapter) Hewlett Packard
    Accessories1HP Smart Buy EliteBook 8740W Commercial PC1230W Docking
Station (includes a/c adapter) 14Asus 24in VE248H Full Widescreen LCD Monitor
SN:B3LMQS061792,        B3LMQS061815, B3LMQS061783, B3LMQS061784,
B3LMQS061789,        B3LMQS061793, B3LMQS061802, B3LMQS061810,
B3LMQS061788,        B3LMQS061787, B3LMQS061803, B3LMQS061814,
B3LMQS061806,        B3LMQS061813I4SoftWare - Corp. MOB Office
Professional Plus 2010 License Only 17HP Smart Buy Pro 3130 Commercial PC
SN:SMXL1161PZG, SMXL1161PX5,        SMXL1161PWY, SMXL1161Q0Z,
SMXL1161PYW, SMXL1161PY3, SMXL1161PYM,        SMXL1161PYM,
SMXL1161PYC, SMXL1161PYR, SMXL1161PYQ, SMXL1161PYB,
SMXL1161PYY, SMXL1161PY9, SMXL1161PYX, SMXL1161PY2, SMXL1161PYP TOGETHER WITH
ALL PRESENT AND FUTURE ATTACHMENTS, ACCESSORIES, REPLACEMENT PARTS, ADDITIONS

| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.    Attach Addendum    [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]    [optional] | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |
|---|---|---|---|---|

**8. OPTIONAL FILER REFERENCE DATA**

DE-0-45563783

Exh G_032

**UCC FINANCING STATEMENT ADDENDUM — COLLATERAL**

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

| 9. NAME OF FIRST DEBTOR (1a or 1b) ON RELATED FINANCING STATEMENT | | |
|---|---|---|
| 9a. ORGANIZATION'S NAME | | |
| IRVINE SENSORS CORPORATION | | |
| 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME,SUFFIX |

This FINANCING STATEMENT covers the following collateral

**AND ALL CASH AND NON-CASH PROCEEDS THEREOF.**

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

Steve Morgan                                              9529080850

B. SEND ACKNOWLEDGMENT TO:  (Name and Address)

> FARNAM STREET FINANCIAL, INC.
>
> 5850 OPUS PARKWAY
>
> SUITE 240
>
> MINNETONKA MN 55343

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 11:49 AM 07/29/2011
INITIAL FILING # 2011 2937921

SRV: 110872283

## 1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| IRVINE SENSORS CORPORATION | | | |

OR

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 3001 RED HILL AVENUE BUILDING 4 STE 108 | COSTA MESA | CA | 92626 | US |

| | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | |
|---|---|---|---|
| | CORPORATION | DE | |

## 2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |

OR

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | |
|---|---|---|---|
| | | | |

## 3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| FARNAM STREET FINANCIAL, INC. | | | |

OR

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 5850 OPUS PARKWAY, SUITE 240 | MINNETONKA | MN | 55343 | US |

## 4. This FINANCING STATEMENT covers the following collateral:

Collateral Description  - please see attachment

5. ALTERNATIVE DESIGNATION - Lessee-Lessor

| 6. | This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.   Attach Addendum            [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]                [optional] | | All Debtors | Debtor 1 | Debtor 2 |
|---|---|---|---|---|---|---|

8. OPTIONAL FILER REFERENCE DATA

JUL 27 2011

# ADDENDUM NO. 1

This transaction is a true lease and is not intended by the parties as a secured transaction. Filing is only intended to make the true lease a matter of public record. Farnam Street Financial, Inc. is the owner of all the equipment contained on this filing and any and all other equipment now or hereafter the subject of any lease agreement or lease schedule by and between the parties and all accessories, attachments, additions, and any substitutions and/or replacement of the equipment contained on this filing or any lease agreement or lease schedule between the parties. The lessee has no rights, express or implied, to sell, exchange, encumber, or otherwise dispose of any equipment contained on this filing or any lease agreement or lease schedule by and between the parties. The parties agree that this financing statement covers any and all equipment now or hereafter the subject of any lease agreement or lease schedule by and between the parties, including, but not limited to equipment contained on or subject to. Lease Agreement Number IR072611 or any lease schedule executed pursuant thereto, together with all substitutions, replacements, accessions, process, rent, revenue, insurance, and proceeds related to the equipment contained on this filing or any lease agreement or lease schedule by and between the parties.

**Every Term is Agreed to and Accepted:**

**FARNAM STREET FINANCIAL, INC.**
"LESSOR"

By: _____

Print
Name: _Steven C. Morgan_

Title: _Pres. / _____

Date: _July 27, 2011_____

**Every Term is Agreed to and Accepted:**

**IRVINE SENSORS CORPORATION**
"LESSEE"

By: _____

Print
Name: _James A Pipp_

Title: _Controller_

Date: _7/26/2011_____

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

| A. NAME & PHONE OF CONTACT AT FILER [optional] | |
|---|---|
| Steve Morgan | 9529080850 |

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

FARNAM STREET FINANCIAL, INC.

5850 OPUS PARKWAY

SUITE 240

MINNETONKA MN 55343

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 02:18 PM 11/06/2013
INITIAL FILING # 2011 2937921
AMENDMENT     # 2013 4369410
SRV: 131278662

| 1a. INITIAL FINANCING STATEMENT FILE # | 1b. This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. |
|---|---|
| 2011 2937921 | ☐ |

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ **ASSIGNMENT** (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. **AMENDMENT (PARTY INFORMATION):** This Amendment affects ☒ Debtor or ☐ Secured Party of record. Check only one of these two boxes.

Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

| ☒ CHANGE name and/or address: Give current record name in item 6a or 6b; also give new name (if name change) in item 7a or 7b and/or new address (if address change) in item 7c. | ☐ DELETE name: Give record name to be deleted in item 6a or 6b. | ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7d-7g (if applicable). |
|---|---|---|

6. CURRENT RECORD INFORMATION:

| | 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | IRVINE SENSORS CORPORATION | | | |
| | 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | | |

7. CHANGED (NEW) OR ADDED INFORMATION:

| | 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | ISC8 INC. | | | |
| | 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | | |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 840 F AVENUE SUITE 105 | PLANO | TX | 75093 | US |

| | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | |
|---|---|---|---|
| | CORPORATION | DE | |

8. AMENDMENT (COLLATERAL CHANGE): check only one box.

Describe collateral ☐ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

9. **NAME of SECURED PARTY of RECORD AUTHORIZING THIS AMENDMENT**
Farnam Street Financial, Inc.

10. OPTIONAL FILER REFERENCE DATA
IR072611

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

| A. NAME & PHONE OF CONTACT AT FILER [optional] | |
|---|---|
| Gisella Melendez | 8008335778 |

B. SEND ACKNOWLEDGMENT TO:  (Name and Address)

```
┌                                                    ┐
  UCC DIRECT SERVICES
  2727 ALLEN PARKWAY
  SUITE 1000

  HOUSTON TX 77019
└                                                    ┘
```

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 05:29 AM 11/24/2011
INITIAL FILING # 2011 4513969

SRV: 111228724

---

**1. DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| IRVINE SENSORS CORPORATION | | | | | |

| OR 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | | SUFFIX |
|---|---|---|---|---|---|
| | | | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 3001 RED HILL AVE STE 4-108 | COSTA MESA | CA | 926264526 | US |

| | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | |
|---|---|---|---|
| | CORPORATION | DE | |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| | | | | | |

| OR 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | | SUFFIX |
|---|---|---|---|---|---|
| | | | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | |
|---|---|---|---|
| | | | |

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| IKON FINANCIAL SVCS | | | | | |

| OR 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | | SUFFIX |
|---|---|---|---|---|---|
| | | | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1738 BASS RD | MACON | GA | 312101043 | US |

**4. This FINANCING STATEMENT covers the following collateral:**

The terms "Debtor" and "Secured Party" shall mean "Lessor" and "Lessee", respectively. This financing statement covers the following types (or items) of property: All equipment now or hereafter leased in an equipment leasing transaction in connection with that certain Master Agreement No. see below, Product Schedule No./Agreement No. see below ("Lease"), as amended from time to time, between IOS Capital, LLC as lessor, and the above referenced Lessee/Debtor, including, without limit, the equipment listed below, and all additions, improvements, attachments, accessories, accessions, upgrades and replacements related thereto, and any and all substitutions or exchanges, and any and all products, insurance and/or other proceeds (cash and non-cash) there from: The equipment location is as identified in the Lease. This is intended to be a true lease transaction. Neither the execution nor filing of this financing statement shall in any manner imply that the relationship between the parties to which this document applies

---

**5. ALTERNATIVE DESIGNATION** - Lessee-Lessor

| 6. This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.    Attach Addendum    [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]    [optional] | All Debtors | Debtor 1 | Debtor 2 |
|---|---|---|---|---|

**8. OPTIONAL FILER REFERENCE DATA**

DE-0-30749088-46040502

**UCC FINANCING STATEMENT ADDENDUM** Main Document COLLATERAL of 203

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

| 9. NAME OF FIRST DEBTOR (1a or 1b) ON RELATED FINANCING STATEMENT | | |
|---|---|---|
| 9a. ORGANIZATION'S NAME | | |
| IRVINE SENSORS CORPORATION | | |
| 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME,SUFFIX |

OR

This **FINANCING STATEMENT** covers the following collateral

 is other than lessor and lessee, respectively. This financing statement is
filed solely to protect the interests of the
parties in the event of unwarranted assertions by any third
party. This statement is filed in connection with a lease
transaction and is filed for precautionary purposes only.
Product Schedule No./Agreement No. 2823876, Master Agreement/Lease No.
----------. CUSTOMER:      89439 RIMPC6501 C30097410 RIMPC6501 C30097409
RIMPC3501 C30097428 RIMPC3501 C30097429 RIMPC3501 C85000741 RIMP3351SP
C30097412

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

Corporation Service Company                    8008585294

B. SEND ACKNOWLEDGMENT TO:  (Name and Address)

CORPORATION SERVICE COMPANY

2711 CENTERVILLE ROAD

SUITE 400

WILMINGTON DE 19808

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 01:57 PM 12/14/2011
INITIAL FILING # 2011 4794163

SRV: 111291828

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| IRVINE SENSORS CORPORATION | | | | |

OR

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 3001 RED HILL AVE., BLDG. 4/108 | COSTA MESA | CA | 92926 | US |

| 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION |
|---|---|
| CORPORATION | DE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |

OR

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION |
|---|---|
| | |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| PARTNERS FOR GROWTH III, L.P. | | | | |

OR

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 150 PACIFIC AVENUE | SAN FRANCISCO | CA | 94111 | US |

4.  This FINANCING STATEMENT covers the following collateral:

All of Debtor's present and future assets of any and every kind, including
without limitation: (1) all right, title and interest of Debtor in and to all
of the following, whether now owned or hereafter arising or acquired and
wherever located: all Accounts; all Inventory; all Equipment; all Deposit
Accounts; all General Intangibles (including without limitation all
Intellectual Property); all Investment Property; all Other Property; and any
and all claims, rights and interests in any of the above, and all guaranties
and security for any of the above, and all substitutions and replacements
for, additions, accessions, attachments, accessories, and improvements to,
and proceeds (including proceeds of any insurance policies, proceeds of
proceeds and claims against third parties) of, any and all of the above, and
all of Debtor's books relating to any and all of the above, and (2) the
Collateral and types and items of property described on Exhibit A (below)
hereto (but this Financing Statement shall be fully effective notwithstanding
any lack of any Exhibit A):

Exhibit A

6. [ ] This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.    Attach Addendum    [if applicable]    7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]    [optional]    [ ] All Debtors    [ ] Debtor 1    [ ] Debtor 2

8. OPTIONAL FILER REFERENCE DATA

[63090216]

**UCC FINANCING STATEMENT ADDENDUM (COLLATERAL)**

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

| 9. NAME OF FIRST DEBTOR (1a or 1b) ON RELATED FINANCING STATEMENT | | |
|---|---|---|
| OR | 9a. ORGANIZATION'S NAME IRVINE SENSORS CORPORATION | |
| | 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME,SUFFIX |

This FINANCING STATEMENT covers the following collateral

"Collateral" means: all right, title and interest of Borrower in and to all of the following, whether now owned or hereafter arising or acquired and wherever located: all Accounts; all Inventory; all Equipment; all Deposit Accounts; all General Intangibles (including without limitation all Intellectual Property); all Investment Property; all Other Property; and any and all claims, rights and interests in any of the above, and all guaranties and security for any of the above, and all substitutions and replacements for, additions, accessions, attachments, accessories, and improvements to, and proceeds (including proceeds of any insurance policies, pro ceeds of proceeds and claims against third parties) of, any and all of the above, and all Borrower's books relating to any and all of the above.

"Accounts" means all present and future "accounts" as defined in the California Uniform Commercial Code in effect on the date hereof with such additions to such term as may hereafter be made, and includes without limitation all accounts receivable, healthcare receivables and other sums owing to Borrower.

"Deposit Accounts" means all present and future "deposit accounts" as defined in the California Uniform Commercial Code in effect on the date hereof with such additions to such term as may hereafter be made, and includes without limitation all general and special bank accounts, demand accounts, checking accounts, savings accounts and certificates of deposit.

"Equipment" means all present and future "equipment" as defined in the California Uniform Commercial Code in effect on the date hereof with such additions to such term as may hereafter be made, and includes without limitation all machinery, fixtures, goods, vehicles (including motor vehicles and trailers), and any interest in any of the foregoing.

"General Intangibles" means all present and future "general intangibles" as defined in the California Uniform Commercial Code in effect on the date hereof with such additions to such term as may hereafter be made, and includes without limitation all Intellectual Property, payment intangibles, royalties, contract rights, goodwill, franchise agreements, purchase orders, customer lists, route lists, telephone numbers, domain names, domain rights, claims, income tax refunds, security and other deposits, options to purchase or sell real or personal property, rights in all litigation presently or hereafter pending (whether in contract, tort or otherwise), insurance policies (including without limitation key man, property damage, and business interruption insurance), payments of insurance and rights to payment of any kind.

"Intellectual Property" means all present and future: (a) copyrights, copyright rights, copyright applications, copyright registrations and like protections in each work of authorship and derivative work thereof, whether published or unpublished, (b) trade secret rights, including all rights to unpatented inventions and know how, and confidential information; (c) mask work or similar rights available for the protection of semiconductor chips; (d) patents, patent applications and like protections including without limitation improvements, divisions, continuations, renewals, reissues, extensions and continuations-in-part of the same; (e) trademarks, servicemarks, trade styles, and trade names, whether or not any of the foregoing are registered, and all applications to register and registrations of the same and like protections, and the entire goodwill of the business of Borrower connected with and symbolized by any such trademarks; (f) computer software and computer software products; (g) designs and design rights; (h) technology; (i) all claims for damages by way of past, present and future infringement of any of the rights included above; and (j) all licenses or other rights to use any property or rights of a type described above.

"Inventory" means all present and future "inventory" as defined in the California Uniform Commercial Code in effect on the date hereof with such additions to such term as may hereafter be made, and includes without limitation all merchandise, raw materials, parts, supplies, packing and shipping materials, work in process and finished products, including without limitation such inventory as is temporarily out of Borrower's custody or possession or in transit and including any returned goods and any documents of title representing any of the above.

"Investment Property" means all present and future investment property, securities, stocks, bonds, debentures, debt securities, partnership

**UCC FINANCING STATEMENT ADDENDUM** Main Document COLLATERAL of 203

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

| 9. NAME OF FIRST DEBTOR (1a or 1b) ON RELATED FINANCING STATEMENT | | |
|---|---|---|
| **9a. ORGANIZATION'S NAME** | | |
| IRVINE SENSORS CORPORATION | | |
| **9b. INDIVIDUAL'S LAST NAME** | FIRST NAME | MIDDLE NAME,SUFFIX |

This **FINANCING STATEMENT** covers the following collateral

interests, limited liability company interests, options, security entitlements, securities accounts, commodity contracts, commodity accounts, and all financial assets held in any securities account or otherwise, and all options and warrants to purchase any of the foregoing, wherever located, and all other securities of every kind, whether certificated or uncertificated. "Other Property" means the following as defined in the California Uniform Commercial Code in effect on the date hereof with such additions to such term as may hereafter be made, and all rights relating thereto: all present and future "commercial tort claims" (including without limitation any commercial tort claims identified in the Representations), "documents", "instruments", "promissory notes", "chattel paper", "letters of credit", "letter-of-credit rights", "fixtures", "farm products" and "money"; and all other goods and personal property of every kind, tangible and intangible, whether or not governed by the California Uniform Commercial Code.

# UCC FINANCING STATEMENT **AMENDMENT**

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGEMENT TO:  (Name and Address)

*DELAWARE DEPARTMENT OF STATE*
*U.C.C. FILING SECTION*
*FILED 12:36 PM 02/01/2012*
*INITIAL FILING # 2011 4794163*
*AMENDMENT       # 2012 0405748*
*SRV: 120110409*

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE # | 1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. |
|---|---|
| 2011 4794163  Date: 12/14/2011 | |

2. ☐ **TERMINATION**: Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☐ **CONTINUATION**: Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ **ASSIGNMENT** (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c, and also give name of assignor in item 9.

5. **AMENDMENT (PARTY INFORMATION)**: This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.
Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Give current record name in item 6a or 6b; also give new name (if name change) in item 7a or 7b and/or new address (if address change) in item 7c.   ☐ DELETE name: Give record name to be deleted in item 6a or 6b.   ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7d-7g (if applicable).

6. CURRENT RECORD INFORMATION:

| | 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | | | | |
| | 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

7. CHANGED (NEW) OR ADDED INFORMATION:

| | 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | | | | |
| | 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID#, if any | ☐ NONE |
|---|---|---|---|---|

8. AMENDMENT (COLLATERAL CHANGE): check only one box.

Describe collateral ☒ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned

The Purchased Assets as defined in that certain Asset Purchase Agreement dated October 17, 2011 by and between Irvine Sensors Corporation and Vectronix Inc.

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

| | 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | Partners for Growth III, L.P. | | | |
| OR | | | | |
| | 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA
DE SOS / Debtor: Irvine Sensors Corporation (471611-00020)

**FILING OFFICE COPY** – NATIONAL UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) – CALIFORNIA (REV. 01/01/08)

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

Corporation Service Company                    8008585294

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

```
CORPORATION SERVICE COMPANY

2711 CENTERVILLE ROAD

SUITE 400

WILMINGTON DE 19808
```

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 06:24 PM 12/06/2013
INITIAL FILING # 2011 4794163
AMENDMENT     # 2013 4830502
SRV: 131391548

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE # | 1b. This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. |
|---|---|
| 2011 4794163 | ☐ |

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☐ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ ASSIGNMENT (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. AMENDMENT (PARTY INFORMATION): This Amendment affects ☒ Debtor or ☐ Secured Party of record. Check only one of these two boxes.

Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

| ☒ CHANGE name and/or address: Give current record name in item 6a or 6b; also give new name (if name change) in item 7a or 7b and/or new address (if address change) in item 7c. | ☐ DELETE name: Give record name to be deleted in item 6a or 6b. | ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7d-7g (if applicable). |
|---|---|---|

6. CURRENT RECORD INFORMATION:

| | 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | IRVINE SENSORS CORPORATION | | | |
| | 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

7. CHANGED (NEW) OR ADDED INFORMATION:

| | 7a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|---|
| OR | ISC8, INC. | | | | |
| | 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 3011 RED HILL AVE., BLDG. 4-108 | COSTA MESA | CA | 92926 | US |

| 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | |
|---|---|---|

8. AMENDMENT (COLLATERAL CHANGE): check only one box.

Describe collateral ☐ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

9. NAME of SECURED PARTY of RECORD AUTHORIZING THIS AMENDMENT

Partners For Growth III, L.P.

10. OPTIONAL FILER REFERENCE DATA

Debtor: Irvine Sensors Corporation - ISC8

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

Mary Cowan     8008265256

*DELAWARE DEPARTMENT OF STATE*
*U.C.C. FILING SECTION*
*FILED 01:22 PM 08/15/2013*
*INITIAL FILING # 2013 3202125*

*SRV: 130993372*

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

```
NATIONWIDE CREDIT SERVICES

729 MINER RD.



CLEVELAND OH 44143
```

---

**1. DEBTOR'S EXACT FULL LEGAL NAME** - insert only *one* debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME |
|---|
| IRVINE SENSORS CORPORATION |

OR

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 3001 RED HILL AVENUE SUITE 4-108 | COSTA MESA | CA | 92626 | US |

| | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | |
|---|---|---|---|
| | CORPORATION | DE | |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - insert only *one* debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME |
|---|
| |

OR

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | |
|---|---|---|---|
| | | | |

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only *one* secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME |
|---|
| SIEMENS INDUSTRY, INC. |

OR

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1000 DEERFIELD PARKWAY | BUFFALO GROVE | IL | 60089 | US |

**4. This FINANCING STATEMENT covers the following collateral:**

To secure payment and performance of all obligations Debtor hereby grants to Secured Party a continuing purchase money security interest in the following equipment described as: Qty.: One (1), Part #: W3T864358, Description: IonRight 5-8GPM Reverse Osmosis / CDI systems; One (1), W3T127730, PTC Twin Pre Treat Softener 16x65"; Two (2), W5TDIRAC0360FSP, 3.6 Cuft Carbon Pre Treat Canisters; One (1), W2T159701, Five Micron 20" Ion Right Pre Treat Cartridge; Three (3), W5TDIMB10360FSP, Mixed Bed 3.6 Cuft Deionization Polishers / Back Up; One (1), W2T159322, One Site 20" .2 Micron Final Filter; One (1), W2T159445, One Site 10" .2 Micron Vent Filter; One (1), W2T159700, One Site 20" 1 Micron Post Filter; One (1), W2T159701, One Site 20" 5 Micron Filter; One (1), W2T169640, One Site UV Sterilizer 3084; One (1), W2T164367, One Site UV Quartz Sleeve 3184; Four (4), W2T519068, Plate Caster; Two (2), W2T152075, 5 Range Quality Control Lights set as 200k/1 meg ohms; Two (2), W2T163161, Stainless Steel Pressure Gauges.

---

| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.    Attach Addendum      [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]     [optional] | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |
|---|---|---|---|---|

8. OPTIONAL FILER REFERENCE DATA

UCC# U141894

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

Mary Cowan      8008265256

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

NATIONWIDE CREDIT SERVICES

729 MINER RD.

CLEVELAND OH 44143

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 02:53 PM 09/19/2013
INITIAL FILING # 2013 3202125
AMENDMENT # 2013 3655777
SRV: 131107934

1a. INITIAL FINANCING STATEMENT FILE #

2013 3202125

1b. This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☐ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ ASSIGNMENT (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. AMENDMENT (PARTY INFORMATION): This Amendment affects ☐ Debtor or ☒ Secured Party of record. Check only one of these two boxes.

Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☒ CHANGE name and/or address: Give current record name in item 6a or 6b; also give new name (if name change) in item 7a or 7b and/or new address (if address change) in item 7c.

☐ DELETE name: Give record name to be deleted in item 6a or 6b.

☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7d-7g (if applicable).

6. CURRENT RECORD INFORMATION:

6a. ORGANIZATION'S NAME

SIEMENS INDUSTRY, INC.

OR

| 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

7. CHANGED (NEW) OR ADDED INFORMATION:

7a. ORGANIZATION'S NAME

SIEMENS WATER TECHNOLOGIES LLC (FKA) SIEMENS INDUSTRY, INC.

OR

| 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 4800 NORTH POINT PARKWAY SUITE 2 50, 2ND FLOOR | ALPHARETTA | GA | 30022 | US |

| 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | |
|---|---|---|
| | | |

8. AMENDMENT (COLLATERAL CHANGE): check only one box.

Describe collateral ☐ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

9. NAME of SECURED PARTY of RECORD AUTHORIZING THIS AMENDMENT

Siemens Industry, Inc.

10. OPTIONAL FILER REFERENCE DATA

UCC# U141894

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

Mary Cowan                                          8008265256

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

NATIONWIDE CREDIT SERVICES

729 MINER RD.

CLEVELAND OH 44143

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 12:37 PM 01/31/2014
INITIAL FILING # 2013 3202125
AMENDMENT    # 2014 0409458
SRV: 140117608

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE # | 1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. |
|---|---|
| 2013 3202125 | |

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ **ASSIGNMENT** (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. **AMENDMENT (PARTY INFORMATION):** This Amendment affects ☐ Debtor or ☒ Secured Party of record. Check only one of these two boxes.
Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☒ CHANGE name and/or address: Give current record name in item 6a or 6b; also give new name (if name change) in item 7a or 7b and/or new address (if address change) in item 7c.    ☐ DELETE name: Give record name to be deleted in item 6a or 6b.    ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7d-7g (if applicable).

6. CURRENT RECORD INFORMATION:

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| SIEMENS WATER TECHNOLOGIES LLC (FKA) SIEMENS INDUSTRY, INC. | | | |

OR

| 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

7. CHANGED (NEW) OR ADDED INFORMATION:

| 7a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| EVOQUA WATER TECHNOLOGIES LLC (FKA) SIEMENS WATER TECHNOLOGIES LLC | | | | | |

OR

| 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|---|
| | | | | | |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 4800 NORTH POINT PARKWAY SUITE 2 50, 2ND FLOOR | ALPHARETTA | GA | 30022 | US |

| 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | |
|---|---|---|
| | | |

8. **AMENDMENT (COLLATERAL CHANGE):** check only one box.

Describe collateral ☐ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

9. **NAME of SECURED PARTY of RECORD AUTHORIZING THIS AMENDMENT**

Siemens Water Technologies LLC (fka) Siemens Industry, Inc.

10. OPTIONAL FILER REFERENCE DATA

UCC# U141894

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

| A. NAME & PHONE OF CONTACT AT FILER [optional] | |
|---|---|
| Mary Cowan | 8008265256 |

**B. SEND ACKNOWLEDGMENT TO: (Name and Address)**

```
NATIONWIDE CREDIT SERVICES

729 MINER RD.



CLEVELAND OH 44143
```

*DELAWARE DEPARTMENT OF STATE*
*U.C.C. FILING SECTION*
*FILED 01:22 PM 08/15/2013*
*INITIAL FILING # 2013 3202133*

*SRV: 130993373*

---

## 1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| IRVINE SENSORS CORPORATION | | | | |

OR

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 3001 RED HILL AVENUE SUITE 4-108 | COSTA MESA | CA | 92626 | US |

| 1d. | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | |
|---|---|---|---|
| | CORPORATION | DE | |

## 2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |

OR

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2d. | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | |
|---|---|---|---|
| | | | |

## 3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| SIEMENS INDUSTRY, INC. | | | | |

OR

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1000 DEERFIELD PARKWAY | BUFFALO GROVE | IL | 60089 | US |

## 4. This FINANCING STATEMENT covers the following collateral:

To secure payment for all purchases from Secured Party, now and in the
future, Debtor hereby grants Secured Party a continuing security interest in
all of Debtor's presently owned or hereafter acquired (a) goods, (b)
instruments, (c) promissory notes (d) Chattel paper including electronic
chattel paper and tangible chattel paper, (e) documents, (f) books and records,
(g) accounts, (h) accounts receivable, (i) equipment, (j) inventory, (k)
commercial tort claims (l) general intangibles, (m) payment intangibles and (n)
software, together with all proceeds and all support obligations thereof.
Secured Party's security interest is explicitly limited to outstanding
obligations between Secured Party and Debtor.

---

| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.    Attach Addendum    [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]    [optional] | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |
|---|---|---|---|---|

8. OPTIONAL FILER REFERENCE DATA

UCC# U141946

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

Mary Cowan                                    8008265256

B. SEND ACKNOWLEDGMENT TO:  (Name and Address)

NATIONWIDE CREDIT SERVICES

729 MINER RD.

CLEVELAND OH 44143

*DELAWARE DEPARTMENT OF STATE*
*U.C.C. FILING SECTION*
*FILED 02:53 PM 09/19/2013*
*INITIAL FILING # 2013 3202133*
*AMENDMENT    # 2013 3655793*
*SRV: 131107937*

| 1a. INITIAL FINANCING STATEMENT FILE # | 1b.  This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. |
|---|---|
| 2013 3202133 | ☐ |

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ **ASSIGNMENT** (full or partial):  Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. **AMENDMENT (PARTY INFORMATION):** This Amendment affects ☐ Debtor  or  ☒ Secured Party of record. Check only one of these two boxes.

Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☒ CHANGE name and/or address: Give current record name in item 6a or 6b; also give new name (if name change) in item 7a or 7b and/or new address (if address change) in item 7c.   ☐ DELETE name: Give record name to be deleted in item 6a or 6b.   ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7d-7g (if applicable).

6. CURRENT RECORD INFORMATION:

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| SIEMENS INDUSTRY, INC. | | | |

| OR | 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|
| | | | | |

7. CHANGED (NEW) OR ADDED INFORMATION:

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| SIEMENS WATER TECHNOLOGIES LLC (FKA) SIEMENS INDUSTRY, INC. | | | |

| OR | 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 4800 NORTH POINT PARKWAY SUITE 2 50, 2ND FLOOR | ALPHARETTA | GA | 30022 | US |

| 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | |
|---|---|---|
| | | |

8. AMENDMENT (COLLATERAL CHANGE): check only one box.

Describe collateral ☐ deleted  or  ☐ added,  or  give entire ☐ restated collateral description,  or  describe collateral ☐ assigned.

9. **NAME of SECURED PARTY of RECORD AUTHORIZING THIS AMENDMENT**

Siemens Industry, Inc.

10. OPTIONAL FILER REFERENCE DATA

UCC# U141946

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

Mary Cowan                                          8008265256

B. SEND ACKNOWLEDGMENT TO:  (Name and Address)

```
NATIONWIDE CREDIT SERVICES

729 MINER RD.



CLEVELAND OH 44143
```

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 12:37 PM 01/31/2014
INITIAL FILING # 2013 3202133
AMENDMENT    # 2014 0409466
SRV: 140117619

1a. INITIAL FINANCING STATEMENT FILE #

2013 3202133

1b.  This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☐ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ ASSIGNMENT (full or partial):  Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. AMENDMENT (PARTY INFORMATION): This Amendment affects ☐ Debtor  or  ☒ Secured Party of record. Check only one of these two boxes.

Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☒ CHANGE name and/or address: Give current record name in item 6a or 6b; also give new name (if name change) in item 7a or 7b and/or new address (if address change) in item 7c.   ☐ DELETE name: Give record name to be deleted in item 6a or 6b.   ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7d-7g (if applicable).

6. CURRENT RECORD INFORMATION:

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| SIEMENS WATER TECHNOLOGIES LLC (FKA) SIEMENS INDUSTRY, INC. | | | |

OR

| 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

7. CHANGED (NEW) OR ADDED INFORMATION:

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| EVOQUA WATER TECHNOLOGIES LLC (FKA) SIEMENS WATER TECHNOLOGIES LLC | | | |

OR

| 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 4800 NORTH POINT PARKWAY SUITE 2 50, 2ND FLOOR | ALPHARETTA | GA | 30022 | US |

| 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION |
|---|---|
| | |

8. AMENDMENT (COLLATERAL CHANGE): check only one box.

Describe collateral ☐ deleted  or ☐ added, or give entire ☐ restated collateral description, or  describe collateral ☐ assigned.

9. NAME of SECURED PARTY of RECORD AUTHORIZING THIS AMENDMENT

Siemens Water Technologies LLC (fka) Siemens Industry, Inc.

10. OPTIONAL FILER REFERENCE DATA

UCC# U141946

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**A. NAME & PHONE OF CONTACT AT FILER [optional]**

Steve Morgan                                              9529080850

**B. SEND ACKNOWLEDGMENT TO:  (Name and Address)**

FARNAM STREET FINANCIAL, INC.

5850 OPUS PARKWAY

SUITE 240

MINNETONKA MN 55343

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 01:35 PM 11/06/2013
INITIAL FILING # 2013 4367216

SRV: 131278218

---

**1. DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| IRVINE SENSORS  CORPORATION | | | | |

OR

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 3001 RED HILL AVENUE B3-108 | COSTA MESA | CA | 92626 | US |

| | 1d. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | |
|---|---|---|---|
| | CORPORATION | DE | |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|

OR

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

| | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | |
|---|---|---|---|

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| FARNAM STREET FINANCIAL, INC. | | | | |

OR

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 5850 OPUS PARKWAY, SUITE 240 | MINNETONKA | MN | 55343 | US |

**4. This FINANCING STATEMENT covers the following collateral:**

Collateral Description  - please see attachment

---

5. ALTERNATIVE DESIGNATION - Lessee-Lessor

| 6. | This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.    Attach Addendum          [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]          [optional] | All Debtors | Debtor 1 | Debtor 2 |
|---|---|---|---|---|---|

8. OPTIONAL FILER REFERENCE DATA

IS062113

## ADDENDUM NO. 1

This transaction is a true lease and is not intended by the parties as a secured transaction. Filing is only intended to make the true lease a matter of public record. Farnam Street Financial, Inc. is the owner of all the equipment contained on this filing and any and all other equipment now or hereafter the subject of any lease agreement or lease schedule by and between the parties and all accessories, attachments, additions, and any substitutions and/or replacement of the equipment contained on this filing or any lease agreement or lease schedule between the parties. The lessee has no rights, express or implied, to sell, exchange, encumber, or otherwise dispose of any equipment contained on this filing or any lease agreement or lease schedule by and between the parties. The parties agree that this financing statement covers any and all equipment now or hereafter the subject of any lease agreement or lease schedule by and between the parties, including, but not limited to equipment contained on or subject to. Lease Agreement Number IS062113 or any lease schedule executed pursuant thereto, together with all substitutions, replacements, accessions, process, rent, revenue, insurance, and proceeds related to the equipment contained on this filing or any lease agreement or lease schedule by and between the parties.

Every Term is Agreed to and Accepted:
**FARNAM STREET FINANCIAL, INC.**
"LESSOR"

By: _____

Print
Name: Steven C. Morgan

Title: President

Date: Oct. 22, 2013

Every Term is Agreed to and Accepted:
**ISC8 INC.**
"LESSEE"

By: _____

Print
Name: JOHN VONG

Title: CFO

Date: 10 - 4 - 2013

Every Term is Agreed to and Accepted:
**IRVINE SENSORS CORPORATION**
"LESSEE"

By: _____

Print
Name: John C. Carson

Title: President & CEO

Date: 10 / 1 / 13

# UNIT PURCHASE AGREEMENT

This Unit Purchase Agreement (the "**Agreement**") is made as of September [__], 2014 by and between ISC8 Inc., a Delaware corporation (the "**Company**") and each of the investors listed on <u>Exhibit A</u> attached to this Agreement (each a "**Purchaser**" and together the "**Purchasers**").

## RECITALS

The Company desires to issue and sell and the Purchasers desire to purchase super senior secured convertible promissory notes in substantially the form attached to this Agreement as <u>Exhibit B</u> (each a "**Note**" and collectively the "**Notes**") which shall be convertible on the terms stated therein into equity securities of the Company and warrants in substantially the form attached to this Agreement as <u>Exhibit C</u> to purchase shares of the Company's common stock (each a "**Warrant**" and collectively the "**Warrants**") on the terms stated therein.  The Notes and Warrants issued herein shall be referred to collectively as "**Units**" and individually as a "**Unit**". The Units and any equity securities issuable upon conversion of the Notes or exercise of the Warrants including upon conversion of the Preferred Stock received upon conversion of the Notes and the shares of stock issued upon exercise of the warrants to be issued in connection with the conversion of the Notes are collectively referred to herein as the "**Securities**."

## AGREEMENT

In consideration of the mutual promises contained herein and other good and valuable consideration, receipt of which is hereby acknowledged, the parties to this Agreement agree as follows:

## SECTION 1

## PURCHASE AND SALE OF UNITS

1.1    **Sale and Issuance of Units**.    Subject to the terms and conditions of this Agreement, each Purchaser agrees to purchase at the Closing and the Company agrees to sell and issue to each Purchaser a Unit as set forth next to each Purchaser's name on <u>Exhibit A</u> to this Agreement.  In consideration for the payment of the purchase price by each Purchaser (the "**Purchase Price**"), such Purchaser shall receive a Unit consisting of (a) a Note in the original principal amount of the Purchase Price and (b) a five year Warrant to purchase such number of shares of stock of the equity issued in the next equity financing for the Company in an aggregate amount over $5,000,000 (the "**Qualified Financing**") as equal to one-fourth the Purchase Price paid by Purchaser divided by the purchase price per share of the equity issued in the Qualified Financing rounded up to the next whole number.  The Company's agreements with each of the Purchasers are separate agreements, and the sales of the Units to each of the Purchasers are separate sales.

1.2    **Closing; Delivery**.

(a)    The purchase, sale and issuance of the Units shall take place at one or more closings (each of which is referred to in this Agreement as a "**Closing**").  The initial

Closing (the "**Initial Closing**") shall take place on the date first set forth above, or at such other time as the Company and the Purchasers mutually agree upon, orally or in writing.  At each Closing, the Company shall deliver to each Purchaser the Unit to be purchased by such Purchaser against payment of the Purchase Price by (i) check or by wire transfer to the Company's bank account or an escrow account designated by the Company or (ii) the cancellation of debt.

(b)     Until the earlier of (i) such time as the aggregate amount of principal indebtedness subject to the terms of this Agreement equals a total of $3,000,000, or (ii) October 31, 2014, the Company may sell additional Units in subsequent Closings to such persons or entities as may be approved by the Board of Directors of the Company.  All such sales shall be made on the terms and conditions set forth in this Agreement.  Effective upon delivery of an executed copy of this Agreement by such persons or entities, any notes sold pursuant to this Section 1.2(b) shall be deemed to be "Notes" for all purposes under this Agreement and any warrants sold pursuant to this Section 1.2(b) shall be deemed to be "Warrants" for all purposes under this Agreement, and any purchasers thereof shall be deemed to be "Purchasers" for all purposes under this Agreement.

(c)     Use of Proceeds.  The proceeds of the sale and issuance of the Notes shall be used for working capital and general corporate purposes consistent with the needs of the Company.

1.3     **Security Interest**.  The indebtedness represented by the Notes shall be secured by all of the assets of the Company in accordance with the provisions of a security agreement among the Company and the Purchasers in the form attached to this Agreement as Exhibit D (the "**Security Agreement**").

1.4     **Escrow Agent**.  U.S. Bank National Association is acting only as an escrow agent in connection with the offering of securities described herein, and has not endorsed, recommended or guaranteed the purchase, value or repayment of such securities.

## SECTION 2

## REPRESENTATIONS AND WARRANTIES OF THE COMPANY.

The Company hereby represents and warrants to each Purchaser that:

2.1     **Organization, Good Standing and Qualification**.   The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to carry on its business as now conducted and as proposed to be conducted.

2.2     **Authorization**.  All corporate action required to be taken by the Company's Board of Directors, stockholders and creditors in order to authorize the Company to enter into the this Agreement, the Notes, the Warrants and the Security Agreement (collectively, the "**Transaction Agreements**"), and the authorization, sale, issuance and delivery of the Securities, and the performance of all obligations of the Company under the Transaction Agreements has been taken or will be taken prior to the Closing.  All action on the part of the officers of the Company necessary for the execution and delivery of the Transaction Agreements, the

Exh H_002

performance of all obligations of the Company under the Transaction Agreements to be performed as of the Closing, and the issuance and delivery of the Securities has been taken or will be taken prior to the Closing. The Transaction Agreements, when executed and delivered by the Company, shall constitute valid and legally binding obligations of the Company, enforceable against the Company in accordance with their respective terms except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other laws of general application relating to or affecting the enforcement of creditors' rights generally, (ii) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies, or (iii) to the extent the indemnification provisions contained in the Investors' Rights Agreement may be limited by applicable federal or state securities laws.

      2.3    **Valid Issuance of Securities**. The Securities, when issued, sold and delivered in accordance with the terms and for the consideration set forth in this Agreement, will be validly issued, fully paid and nonassessable and free of restrictions on transfer other than restrictions on transfer under the Transaction Agreements, applicable state and federal securities laws and liens or encumbrances created by or imposed by a Purchaser. Assuming the accuracy of the representations of the Purchasers in <u>Section 3</u> of this Agreement and subject to the filings described in <u>Section 2.4</u>, the Securities will be issued in compliance with all applicable federal and state securities laws. The Securities have been duly reserved for issuance, and upon issuance in accordance with the terms of the Company's Certificate of Incorporation, will be validly issued, fully paid and nonassessable and free of restrictions on transfer other than restrictions on transfer under the Transaction Agreements, applicable federal and state securities laws and liens or encumbrances created by or imposed by a Purchaser.

      2.4    **Governmental Consents and Filings**. Assuming the accuracy of the representations made by the Purchasers in <u>Section 3</u>, no consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any federal, state or local governmental authority is required on the part of the Company in connection with the consummation of the transactions contemplated by the Transaction Agreements, except for filings pursuant to Regulation D of the Securities Act, and applicable state securities laws, which have been made or will be made in a timely manner.

      2.5    **No Litigation**. There is no action, suit, proceeding, judgment, claim or investigation pending or, to the knowledge of the Company, threatened against the Company which could reasonably be expected in any manner to challenge or seek to prevent, enjoin, alter or materially delay any of the transactions contemplated by the Transaction Documents.

      2.6    **SEC Filings**.

        (a)    Since December 31, 2012, the Company has filed all reports, registrations, documents, filings, statements and submissions, together with any amendments thereto, that the Company was required to file with the SEC (the "**SEC Filings**"). As of the time it was filed (or, if amended or superseded by a filing prior to the date of this Agreement, then on the date of such filing): (i) each of the SEC Filings complied as to form in all material respects with the applicable requirements of the Act or the Securities Exchange Act of 1934, as amended (as the case may be), and (ii) none of the SEC Filings contained any untrue statement of a material fact

Exh H_003

or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.

(b)     The consolidated financial statements contained in the SEC Filings: (i) complied as to form in all material respects with the published rules and regulations of the SEC applicable thereto; (ii) were prepared in accordance with generally accepted accounting principles applied on a consistent basis throughout the periods covered, except as may be indicated in the notes to such financial statements and (in the case of unaudited financial statements) as permitted by Form 10-Q of the SEC, and except that unadjusted financial statements may not contain footnotes and are subject to year-end audit adjustments; and (iii) fairly present the consolidated financial position of the Company and its subsidiaries as of the respective dates thereof and the consolidated results of operations of the Company and its subsidiaries for the periods covered thereby.

## SECTION 3

## REPRESENTATIONS AND WARRANTIES OF THE PURCHASERS

Each Purchaser hereby represents and warrants to the Company that:

3.1     **Purchase Entirely for Own Account**.  The Securities to be acquired by the Purchaser will be acquired for investment for the Purchaser's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and the Purchaser has no present intention of selling, granting any participation in, or otherwise distributing the same. The Purchaser has not been formed for the specific purpose of acquiring any of the Securities.

3.2     **Knowledge**.  The Purchaser is aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire the Securities.

3.3     **Investment Experience**.  The Purchaser has substantial experience in evaluating and investing in private placement transactions of securities in companies similar to the Company and acknowledges that the Purchaser can protect its own interests.  The Purchaser has such knowledge and experience in financial and business matters so that the Purchaser is capable of evaluating the merits and risks of its investment in the Company.

3.4     **Speculative Nature of Investment**.   The Purchaser understands and acknowledges that an investment in the Company is highly speculative and involves substantial risks.  The Purchaser can bear the economic risk of the investment and is able, without impairing the Purchaser's financial condition, to hold the Securities for an indefinite period of time and to suffer a complete loss of the investment.

3.5     **Restricted Securities**.  The Purchaser understands that the Securities have not been registered under the Securities Act of 1933, as amended (the "**Act**"), by reason of a specific exemption from the registration provisions of the Act which depends upon, among other things, the bona fide nature of the investment intent and the accuracy of the Purchaser's representations as expressed herein.  The Purchaser understands that the Securities are "restricted securities" under applicable U.S. federal and state securities laws and that, pursuant to these laws, the

4

Purchaser must hold the Securities indefinitely unless they are registered with the Securities and Exchange Commission and qualified by state authorities, or an exemption from such registration and qualification requirements is available.  The Purchaser acknowledges that the Company has no obligation to register or qualify the Securities for resale except as set forth in the Investors' Rights Agreement.  The Purchaser further acknowledges that if an exemption from registration or qualification is available, it may be conditioned on various requirements including, but not limited to, the time and manner of sale, the holding period for the Securities, and on requirements relating to the Company which are outside of the Purchaser's control, and which the Company is under no obligation and may not be able to satisfy.

      3.6    **Legends**.  The Purchaser understands that the Securities, and any securities issued in respect thereof or exchange therefor, may bear one or all of the following legends:

      (a)    "THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF.  NO SUCH SALE OR DISTRIBUTION MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933."

      (b)    Any legend required by the Blue Sky laws of any state to the extent such laws are applicable to the shares represented by the certificate so legended.

      3.7    **Accredited Investor**.  The Purchaser is an accredited investor as defined in Rule 501(a) of Regulation D promulgated under the Act.

      3.8    **Foreign Investors**.  If a Purchaser is not a United States person (as defined by Rule 902(k) under the Act), such Purchaser hereby represents that it has satisfied itself as to the full observance of the laws of its jurisdiction in connection with any invitation to subscribe for the Securities or any use of this Agreement, including (i) the legal requirements within its jurisdiction for the purchase of the Securities, (ii) any foreign exchange restrictions applicable to such purchase, (iii) any governmental or other consents that may need to be obtained and (iv) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale or transfer of the Securities.  Such Purchaser's subscription and payment for, and his or her continued beneficial ownership of the Securities, will not violate any applicable securities or other laws of Purchaser's jurisdiction.  Such Purchaser also hereby represents that such Purchaser is not a "10-percent stockholder" as defined in Section 871(h) of the Internal Revenue Code of 1986, as amended.

## SECTION 4

## CONDITIONS OF THE PURCHASERS' OBLIGATIONS AT CLOSING

The obligations of each Purchaser to the Company under this Agreement are subject to the fulfillment, on or before the Closing, of each of the following conditions, unless otherwise waived:

4.1     **Representations and Warranties**.  The representations and warranties of the Company contained in <u>Section 2</u> shall be true on and as of the Closing with the same effect as though such representations and warranties had been made on and as of the date of the Closing.

4.2     **Qualifications**.    All authorizations, approvals or permits, if any, of any governmental authority or regulatory body of the United States or of any state that are required in connection with the lawful issuance and sale of the Securities pursuant to this Agreement shall be obtained and effective as of the Closing.

4.3     **Waivers**.  Any and all waivers and consents necessary to issue the Units and to waive any applicable anti-dilution provisions have been obtained prior to the Initial Closing.

4.4     **Security Agreement**.  The Company and the Purchasers shall have executed the Security Agreement.

## SECTION 5

## CONDITIONS OF THE COMPANY'S OBLIGATIONS AT CLOSING

The obligations of the Company to each Purchaser under this Agreement are subject to the fulfillment, on or before the Closing, of each of the following conditions, unless otherwise waived:

5.1     **Representations and Warranties**.  The representations and warranties of each Purchaser contained in <u>Section 3</u> shall be true on and as of the Closing with the same effect as though such representations and warranties had been made on and as of the Closing.

5.2     **Qualifications**.    All authorizations, approvals or permits, if any, of any governmental authority or regulatory body of the United States or of any state that are required in connection with the lawful issuance and sale of the Securities pursuant to this Agreement shall be obtained and effective as of the Closing.

5.3     **Delivery of Form W-8 BEN or Form W-9**.  Each Purchaser shall have completed and delivered to the Company a validly executed IRS Form W-8 BEN or IRS Form W-9, as applicable, establishing such Purchaser's exemption from withholding tax, which forms are attached as <u>Exhibit E</u> to this Agreement.

Exh H_006

## SECTION 6

## HOLDER REPRESENATIVE

6.1 **Appointment of Holder Representative**.   By becoming a party to this Agreement and acceptance of the Note issued hereunder, each Purchaser hereby appoints Griffin Partners LLC to serve as "**Holder Representative**".   Each Purchaser further agrees that the Holder Representative may be removed at any time by a vote of the Required Holders (as defined in the Note), and that if the Holder Representative is so removed, or if it at any time resigns or declines to serve as Holder Representative, the successor Holder Representative shall be the holder of the Notes that at any given time holds Notes in an aggregate principal amount that is greater than the aggregate principal amount of the Notes held by any other holder of the Notes.  Each Purchaser hereby (a) irrevocably authorizes the Holder Representative to (i) enter into the Security Agreement and (ii) at its discretion, to take or refrain from taking such actions as Holder Representative and to exercise or refrain from exercising such powers under the Notes or the Security Agreement as are delegated by the terms hereof or thereof, as applicable, together with all powers reasonably related thereto and (b) agrees and consents to all of the provisions of the Security Agreement.

6.2 **Concerning the Holder Representative**.

(a) <u>Standard of Conduct</u>.   The Holder Representative and its officers, directors, employees and agents shall be under no liability to any Purchaser or to any of their successors or assigns for any action or failure to act taken or suffered in its capacity as Holder Representative in the absence of gross negligence and willful misconduct, and any action or failure to act in accordance with an opinion of its counsel shall conclusively be deemed to be in the absence of gross negligence and willful misconduct.

(b) <u>No Implied Duties</u>.   The Holder Representative shall have no duties or responsibilities except as set forth in the Note and the Security Agreement, nor shall it have any fiduciary relationship with the Purchasers, and no implied covenants, responsibilities, duties, obligations or liabilities shall be read into the Note or the Security Agreement or otherwise exist against the Holder Representative.

(c) <u>Validity</u>.   The Holder Representative shall not be responsible to the Purchasers or to any of their successors or assigns (i) for the legality, validity, enforceability or effectiveness of the Note or the Security Agreement, (ii) for any recitals, reports, representations, warranties or statements contained in or made in connection with the Note or the Security Agreement, (iii) for the existence or value of any assets included in the Collateral (as defined in the Security Agreement), (iv) for the effectiveness of any lien purported to be created by the Security Agreement, or (v) unless the Holder Representative shall have failed to comply with <u>Section 6.2(a)</u>, for the perfection of the security interests created by the Security Agreement.

6.3 **Compliance**.  The Holder Representative shall not be obligated to ascertain or inquire as to the performance or observance of any of the terms of this Agreement or the Notes.

Exh H_007

6.4 **Employment of Agents and Counsel**. The Holder Representative may execute any of its duties as Holder Representative under the Transaction Agreements by or through employees, agents and attorneys-in-fact and shall not be responsible to any of the parties hereto for the default or misconduct of any such agents or attorneys-in-fact selected by the Holder Representative acting in the absence of gross negligence and willful misconduct. The Holder Representative shall be entitled to advice of counsel concerning all matters pertaining to the agency hereby created and its duties hereunder.

6.5 **Reliance on Documents and Counsel**. The Holder Representative shall be entitled to rely, and shall be fully protected in relying, upon any affidavit, certificate, cablegram, consent, instrument, letter, notice, order, document, statement, telecopy, telegram, telex or teletype message or writing reasonably believed in good faith by the Holder Representative to be genuine and correct and to have been signed, sent or made by the Person in question, including any telephonic or oral statement made by such Person, and, with respect to legal matters, upon an opinion or the advice of counsel selected by the Holder Representative.

6.6 **Holder Representative's Reimbursement**. The Company agrees to indemnify the Holder Representative for any losses arising from its appointment as Holder Representative or from the performance of its duties hereunder and to reimburse the Holder Representative for any reasonable expenses; *provided*, however, that the Holder Representative shall not be indemnified or reimbursed for liabilities or expenses to the extent resulting from its own gross negligence, bad faith or willful misconduct.

## SECTION 7

## MISCELLANEOUS.

7.1 **Successors and Assigns**. The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

7.2 **Governing Law**. This Agreement and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of the State of Delaware, without giving effect to principles of conflicts of law.

7.3 **Counterparts**. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument.

7.4 **Titles and Subtitles**. The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

8

7.5    **Notices**.    All notices, requests, demands, consents, instructions or other communications required or permitted hereunder shall in writing and faxed, mailed or delivered to each party as follows:

> (i) if to a Purchaser, at such Purchaser's address or facsimile number set forth in the Schedule of Purchasers attached as <u>Exhibit A</u>, or at such other address as such Purchaser shall have furnished Company in writing, or

> (ii) if to the Company, at:

> 151 Kalmus Drive
> Costa Mesa, CA 92626
> Attn: Chief Executive Officer

or at such other address or facsimile number as the Company shall have furnished to the Purchasers in writing. All such notices and communications shall be effective (a) when sent by Federal Express or other overnight service of recognized standing, on the business day following the deposit with such service; (b) when mailed, by registered or certified mail, first class postage prepaid and addressed as aforesaid through the United States Postal Service, upon receipt; (c) when delivered by hand, upon delivery; and (d) when faxed, upon confirmation of receipt.

7.6    **Fees and Expenses**.   At the Closing, the Company shall pay the reasonable fees and expenses of Foundation Law Group LLP, the counsel for Fundamental Master LP, in an amount not to exceed, in the aggregate, $10,000.

7.7    **Finder's Fee**.   Each party represents that it neither is nor will be obligated for any finder's fee or commission in connection with this transaction.   Each Purchaser agrees to indemnify and to hold harmless the Company from any liability for any commission or compensation in the nature of a finder's fee (and the costs and expenses of defending against such liability or asserted liability) for which each Purchaser or any of its officers, employees, or representatives is responsible.   The Company agrees to indemnify and hold harmless each Purchaser from any liability for any commission or compensation in the nature of a finder's fee (and the costs and expenses of defending against such liability or asserted liability) for which the Company or any of its officers, employees or representatives is responsible.

7.8    **Amendments and Waivers**.   Any term of this Agreement may be amended or waived only with the written consent of the Company and the Required Holders.   Any amendment or waiver effected in accordance with this <u>Section 7.8</u> shall be binding upon the Purchasers and each transferee of the Securities, each future holder of all such Securities and the Company.

7.9    **Severability**.   If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith, in order to maintain the economic position enjoyed by each party as close as possible to that under the provision rendered unenforceable.   In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (i) such provision shall be excluded from this Agreement, (ii) the balance of the Agreement shall be interpreted as if such

**Exh H_009**

provision were so excluded and (iii) the balance of the Agreement shall be enforceable in accordance with its terms.

7.10    **Entire Agreement**.    This Agreement, and the documents referred to herein constitute the entire agreement between the parties hereto pertaining to the subject matter hereof, and any and all other written or oral agreements existing between the parties hereto are expressly canceled.

7.11    **Exculpation Among Purchasers**.    Each Purchaser acknowledges that it is not relying upon any person, firm or corporation, other than the Company and its officers and directors, in making its investment or decision to invest in the Company.    Each Purchaser agrees that no Purchaser nor the respective controlling persons, officers, directors, partners, agents, or employees of any Purchaser shall be liable for any action heretofore or hereafter taken or omitted to be taken by any of them in connection with the Securities.

7.12    **CORPORATE SECURITIES LAW**.    THE SALE OF THE SECURITIES WHICH ARE THE SUBJECT OF THIS AGREEMENT HAS NOT BEEN QUALIFIED WITH THE COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA AND THE ISSUANCE OF THE SECURITIES OR THE PAYMENT OR RECEIPT OF ANY PART OF THE CONSIDERATION THEREFOR PRIOR TO THE QUALIFICATION IS UNLAWFUL, UNLESS THE SALE OF SECURITIES IS EXEMPT FROM THE QUALIFICATION BY SECTION 25100, 25102 OR 25105 OF THE CALIFORNIA CORPORATIONS CODE.    THE RIGHTS OF ALL PARTIES TO THIS AGREEMENT ARE EXPRESSLY CONDITIONED UPON THE QUALIFICATION BEING OBTAINED UNLESS THE SALE IS SO EXEMPT.

**[SIGNATURE PAGE FOLLOWS]**

Exh H_010

IN WITNESS WHEREOF, the parties hereto have executed this Unit Purchase Agreement as of the date first written above.

**COMPANY:**

**ISC8 INC.**
a Delaware corporation


By:‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗
      John Vong
      Chief Financial Officer

**SIGNATURE PAGE TO**
**UNIT PURCHASE AGREEMENT**

## OMNIBUS INVESTOR SIGNATURE PAGE TO
## ISC8 INC.
## UNIT PURCHASE AGREEMENT

The undersigned, in its capacity as a Purchaser, hereby executes and delivers the Unit Purchase Agreement to which this signature page is attached and agrees to be bound by the Unit Purchase Agreement on the date set forth on the first page of the Unit Purchase Agreement. This counterpart signature page, together with all counterparts of the Unit Purchase Agreement and signature pages of the other parties named therein, shall constitute one and the same instrument in accordance with the terms of the Unit Purchase Agreement.

**INDIVIDUALS**                                          **ENTITIES**

_____          _____
Print Name of Purchaser                              Print Name of Purchaser

_____          By:_____
Signature                                                         Signature

                                                                      Name:_____

                                                                      Title:_____

Mailing Address:                                         Telephone No.:_____

_____          Facsimile No: _____

_____          Email Address: _____

_____

Exh H_012

## <u>EXHIBIT A</u>

**SCHEDULE OF PURCHASERS**

| Name, Address and Facsimile <u>Number of Purchaser</u> | Original Principal <u>Amount of Note</u> |
|---|---|
| **Total** | **$  0.00** |

## EXHIBIT B

**FORM OF SENIOR SECURED CONVERTIBLE PROMISSORY NOTE**

# <u>EXHIBIT C</u>

## FORM OF WARRANT

# **EXHIBIT D**

## **FORM OF SECURITY AGREEMENT**

**Exh H_016**

# EXHIBIT E

## PURCHASER WITHHOLDING EXEMPTIONS

**Exh H_017**

## FORM OF SUPER SENIOR
## SECURED CONVERTIBLE PROMISSORY NOTE

**NEITHER THIS NOTE NOR THE SECURITIES ISSUABLE UPON THE CONVERSION HEREOF HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES REPRESENTED HEREBY MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (i) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL, IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (ii) UNLESS SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT.**

### ISC8 INC.

#### SUPER SENIOR SECURED CONVERTIBLE PROMISSORY NOTE

Issuance Date: XXX                                        Principal: U.S. $XXX

      **FOR VALUE RECEIVED**, ISC8 Inc., a Delaware corporation (the "***Company***"), hereby promises to pay to [Holder Name] or his registered assigns (the "***Holder***") the amount set out above opposite the caption "Principal" (as such amount may be increased or reduced from time to time pursuant to the terms hereof, whether through the payment of PIK Interest (as defined below) or through prepayment or otherwise, the "***Principal***") when due, whether upon the Maturity Date (as defined below), acceleration, prepayment or otherwise (in each case, in accordance with the terms hereof) and to pay Interest (as defined below) on the outstanding Principal at the rates, in the manner and at the times set forth herein.  This Senior Secured Convertible Promissory Note (including all Senior Secured Convertible Promissory Notes issued in exchange, transfer or replacement hereof) is part of the same series of notes as those senior secured convertible promissory notes issued pursuant to the Unit Purchase Agreement (the "***Notes***").  Certain capitalized terms used herein are defined in <u>Section 17</u>.

1.      **PAYMENTS OF PRINCIPAL**.

      (a)   <u>Voluntary</u>.  Subject to the Holder's right to convert under <u>Section 3</u>, the Company may prepay this Note at any time, in whole or in part, without penalty or premium; provided that at least an aggregate of 90 days of interest is being repaid with such prepayment in the event such prepayment is less than 90 days after the issuance of the Note being prepaid.  All prepayments of Principal made pursuant to this <u>Section 1(a)</u> shall be accompanied by accrued and unpaid Interest thereon through such prepayment date and subject to the proviso in the foregoing sentence.

      (b)   <u>Mandatory</u>.  Subject to the Holder's right to convert under <u>Section 3</u>, on the Maturity Date, the Holder shall surrender this Note to the Company and the Company shall pay

to the Holder in cash an amount equal to the outstanding Principal and accrued and unpaid Interest thereon.

2.      **INTEREST**.  Simple interest shall accrue on the outstanding Principal at the Interest Rate (the "*Interest*") from and including the date set forth above opposite the caption "Issuance Date" (the "*Issuance Date*") until the Principal is paid in full, shall be computed on the basis of a 365-day year and actual days elapsed.

3.      **CONVERSION OF NOTE**. This Note shall be convertible into equity securities of Company, on the terms and conditions set forth in this <u>Section 3</u>.

(a)      <u>Voluntary Conversion</u>.  At any time after Issuance Date, upon election by the Holder, all of the Conversion Amount shall convert into Company Conversion Securities at the Conversion Rate.

(b)      <u>Automatic Conversion</u>.  Upon the consummation of a Qualified Equity Financing, all of the Conversion Amount shall automatically without any further action on the part of the Holder convert into Company Conversion Securities at the Conversion Rate.

(c)      <u>Mandatory Conversion</u>.  Upon the vote of the Required Holders, all of the Conversion Amount shall automatically without any further action on the part of the Holder convert into Company Conversion Securities at the Conversion Rate.

(d)      <u>Conversion Rate</u>.  The Conversion Amount is convertible into shares of the same class of equity issued in the Qualified Equity Financing (the "*Company Conversion Securities*") by dividing the Conversion Amount by the lowest price per share at which the Company Conversion Securities are sold in the Qualified Equity Financing (the "*Conversion Rate*").

(e)      <u>Mechanics of Conversion</u>.  To convert this Note into Company Conversion Securities on any date (the "*Conversion Date*") pursuant to <u>Section 3(a)</u>, the Holder shall transmit by facsimile (or otherwise deliver), for receipt on or prior to 5:00 p.m., Pacific Time, on such date, written notice to the Company electing to convert any portion or all of the Conversion Amount of this Note (the "*Conversion Notice*").  In the event of a conversion of the Conversion Amount into Company Conversion Securities, the Holder must be an Accredited Investor (as such term is defined in Rule 501 under the Securities Act) on the Conversion Date.  Additionally, in the case of conversion pursuant to <u>Section 3(b)</u>, the Holder must enter into and execute the same documents, satisfy the same conditions and agree to be bound by the same terms as all other investors that participated in the Qualified Equity Financing.  As soon as practicable after the Conversion Date (but in no event more than ten (10) Business Days after the Conversion Date), the Company shall issue and deliver to the Holder a certificate (bearing such legends as are required by applicable state and federal securities laws in the opinion of counsel to the Company), registered in the name of the Holder or its designee, for the number of Company Conversion Securities to which the Holder shall be entitled.  The Person or Persons entitled to receive the Company Conversion Securities issuable upon a conversion of this Note shall be treated for all purposes as the record holder or holders of such Company Conversion Securities on the Conversion Date to the extent permitted by applicable law.

Exh I_002

(f)    <u>Transfer and Other Taxes</u>.  The Company shall pay any and all taxes that may be payable with respect to the issuance and delivery of Company Conversion Securities upon conversion of the Conversion Amount; provided that the Company shall not be required to pay any tax that may be payable in respect of any transfer involved in the issue and delivery of Company Conversion Securities to any Person other than the Holder or with respect to any income tax due by the Holder with respect to such Company Conversion Securities issued upon conversion.

4.    **EVENTS OF DEFAULT; RIGHTS UPON EVENT OF DEFAULT**.

(a)    <u>Events of Default</u>.  Each of the following events (so long as it is continuing) shall constitute an "***Event of Default***":

(i)    any Change of Control;

(ii)    the Company's failure to pay to the Holder any amount of Principal, Interest or other amounts when and as due under this Note, provided, that in the case of a failure to pay Interest when and as due, such failure shall constitute an Event of Default only if such failure continues for a period of at least five (5) Business Days;

(iii)    any event of default under, redemption of or acceleration prior to maturity of any Indebtedness of the Company or any of its Subsidiaries (other than this Note) in an aggregate principal amount in excess of $500,000;

(iv)    a final judgment or judgments for the payment of money aggregating in excess of $500,000 are rendered against the Company or any of its Subsidiaries and which judgments are not, within sixty (60) days after the entry thereof, bonded, discharged or stayed pending appeal, or are not discharged within sixty (60) days after the expiration of such stay; provided, however, that any judgment which is covered by insurance or an indemnity from a creditworthy party shall not be included in calculating the $500,000 amount set forth above so long as the Company provides the Holder Representative with a written statement from such insurer or indemnity provider (which written statement shall be reasonably satisfactory to the Holder Representative) to the effect that such judgment is covered by insurance or an indemnity and the Company will receive the proceeds of such insurance or indemnity within thirty (30) days of the issuance of such judgment or such later date as provided by the terms of such insurance policy;

(v)    any representation or warranty made by the Company in this Note, the Unit Purchase Agreement or the Security Agreement shall prove to be materially false or misleading as of the date made or deemed made;

(vi)    the Company shall breach any covenant or other material term or condition of this Note, the Unit Purchase Agreement or the Security Agreement and, in the case of a breach of a covenant or term or condition which is curable, such breach continues for a period of at least ten (10) consecutive Business Days;

(vii)    any material provision of this Note, the Unit Purchase Agreement or the Security Agreement ceases to be of full force and effect other than by its terms, or the

3

Company contests in writing (or supports any other person in contesting) the validity or enforceability of any provision of this Note, the Unit Purchase Agreement or the Security Agreement;

(viii)    the Security Agreement shall for any reason (other than pursuant to the terms thereof) cease to create a valid and perfected lien, with the priority required by the Security Agreement, on, and security interest in, any material portion of the Collateral purported to be covered thereby, subject to Permitted Liens; or

(ix)    any Event of Default (as defined in the Turner Notes) occurs with respect to any Turner Note.

(b)    <u>Acceleration</u>.  Upon the occurrence and during the continuance of an Event of Default, the Holder Representative may, and at the request of the Required Holders shall, take either or both of the following actions: (i) declare all or any part of the Outstanding Note Obligations to be immediately due and payable; and (ii) exercise on behalf of itself and the other Holders all rights and remedies available to it under the Security Agreement and applicable law. To the extent that the Holder Representative declares this Note to be immediately due and payable, the Company shall pay the sum of the Outstanding Note Obligations to the Holder within five (5) Business Days after the date that the Outstanding Note Obligations are declared due and payable, and upon full payment, the Note shall be extinguished.

5.    **RIGHTS UPON FUNDAMENTAL TRANSACTION**.  The Company shall not enter into or be party to a Fundamental Transaction unless the Successor Entity assumes in writing all of the obligations of the Company under this Note in accordance with the provisions of this <u>Section 5</u> pursuant to written agreements in form and substance satisfactory to and approved by the Required Holders (such approval not to be unreasonably withheld or delayed and the Required Holders shall not be permitted to approve any written agreement that materially modifies, alters or changes the terms of the Notes in a manner adverse to the Holders) prior to such Fundamental Transaction, including agreements to deliver to the Holder in exchange for this Note a security of the Successor Entity evidenced by a written instrument substantially similar in form and substance to this Note, including, without limitation, having a principal amount and interest rate equal to the principal amount and the interest rate of this Note and having similar ranking to this Note, and satisfactory to the Required Holders (any such approval not to be unreasonably withheld or delayed).  Upon the occurrence of any Fundamental Transaction, the Successor Entity shall succeed to, and be substituted for (so that from and after the date of such Fundamental Transaction, the provisions of this Note referring to the "Company" shall refer instead to the Successor Entity), and may exercise every right and power of the Company and shall assume all of the obligations of the Company under this Note with the same effect as if such Successor Entity had been named as the Company herein.  The provisions of this Section shall apply similarly and equally to successive Fundamental Transactions and shall be applied without regard to any limitations on the redemption of this Note.

6.    **COVENANTS**.

(a)    <u>Incurrence of Indebtedness</u>.  So long as this Note is outstanding, without the affirmative vote or written consent of the Required Holders, the Company shall not, and the

**Exh I_004**

Company shall not permit any of its Subsidiaries to, directly or indirectly, incur or guarantee, assume or suffer to exist any Indebtedness, other than (i) the Indebtedness evidenced by this Note, and (ii) Permitted Indebtedness.

(b)    Existence of Liens.  So long as this Note is outstanding, the Company shall not, and the Company shall not permit any of its Subsidiaries to, directly or indirectly, allow or suffer to exist any Lien other than Permitted Liens.

(c)    Restricted Payments.  The Company shall not, and the Company shall not permit any of its Subsidiaries to, directly or indirectly, redeem, defease, repurchase, repay or make any payments in respect of, by the payment of cash or cash equivalents (in whole or in part, whether by way of open market purchases, tender offers, private transactions or otherwise), all or any portion of any Indebtedness described in clause (i) of the definition of Permitted Indebtedness, whether by way of payment in respect of principal of (or premium, if any) or interest on such Indebtedness if at the time such payment is due or is otherwise made or, after giving effect to such payment, an event constituting, or that with the passage of time and without being cured would constitute, an Event of Default has occurred and is continuing.

7.    **AMENDMENTS**.  The affirmative vote at a meeting duly called for such purpose or the written consent without a meeting of the Required Holders shall be required for any amendment or waiver of this Note or any amendment to the Security Agreement (including to release all or substantially all of the Collateral, in any transaction or series of related transactions); *provided* that no such amendment or waiver shall adversely affect the rights of the holders of the Turner Notes.

8.    **REISSUANCE OF THIS NOTE**.

(a)    Transfer.  The Company may, as a condition to the transfer of any of this Note, require that the request for transfer be accompanied by an opinion of counsel reasonably satisfactory to the Company, to the effect that the proposed transfer does not result in a violation of the Securities Act, unless such transfer is covered by an effective registration statement or by Rule 144 or Rule 144A under the Securities Act; *provided*, *however*, that an opinion of counsel shall not be required for a transfer by a Holder that is (i) a partnership transferring to its partners or former partners in accordance with partnership interests, (ii) a corporation transferring to a wholly owned subsidiary or a parent corporation that owns all of the capital stock of the Holder, (iii) a limited liability company transferring to its members or former members in accordance with their interest in the limited liability company, (iv) an individual transferring to the Holder's family member or trust for the benefit of an individual Holder, or (v) transferring its Note to any Affiliate of the Holder, in the case of an institutional investor, or other Person under common management with such Holder; *provided*, *further*, that (A) the transferee in each case agrees to be subject to the restrictions in this Section 8 and provides the Company with a representation letter containing substantially the same representations and warranties of a "Purchaser" set forth in the Unit Purchase Agreement, (B) the Company satisfies itself that the number of transferees is sufficiently limited and (C) in the case of transferees that are partners or limited liability company members, the transfer is for no consideration.  It is understood that the certificates evidencing any Notes may bear substantially the following legends (in addition to any other

5

legends as legal counsel for the Company deems necessary or advisable under the applicable state and federal securities laws or any other agreement to which the Company is a party):

"NEITHER THIS NOTE NOR THE SECURITIES ISSUABLE UPON THE CONVERSION HEREOF HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES REPRESENTED HEREBY MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (i) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL, IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (ii) UNLESS SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT."

If this Note is to be transferred in compliance with the foregoing, the Holder shall surrender this Note to the Company, whereupon the Company will forthwith issue and deliver upon the order of the Holder a new Note (in accordance with Section 8(d)), registered as the Holder may request, representing the outstanding Principal being transferred by the Holder and, if less than the entire outstanding Principal is being transferred, a new Note (in accordance with Section 8(d)) to the Holder representing the outstanding Principal not being transferred.

(b)     Lost, Stolen or Mutilated Note.  Upon receipt by the Company of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Note, and, in the case of loss, theft or destruction, of an indemnification undertaking by the Holder to the Company, in customary form and, in the case of mutilation, upon surrender and cancellation of this Note, the Company shall execute and deliver to the Holder a new Note (in accordance with Section 8(d)) representing the outstanding Principal.

(c)     Note Exchangeable for Different Denominations.  This Note is exchangeable, upon the surrender hereof by the Holder at the principal office of the Company, for a new Note or Notes (in accordance with Section 8(d)) representing in the aggregate the outstanding Principal of this Note, and each such new Note will represent such portion of such outstanding Principal as is designated by the Holder at the time of such surrender.

(d)     Issuance of New Notes.  Whenever the Company is required to issue a new Note pursuant to the terms of this Note, such new Note (i) shall be of like tenor with this Note, (ii) shall represent, as indicated on the face of such new Note, the Principal remaining outstanding (or in the case of a new Note being issued pursuant to Section 8(a) or Section 8(c), the Principal designated by the Holder which, when added to the principal represented by the other new Notes issued in connection with such issuance, does not exceed the Principal remaining outstanding under this Note immediately prior to such issuance of new Notes), (iii) shall have an issuance date, as indicated on the face of such new Note which is the same as the Issuance Date of this Note, (iv) shall have the same rights and conditions as this Note, and (v) shall represent accrued and unpaid Interest of this Note from the Issuance Date.

Exh I_006

9.    **REMEDIES, CHARACTERIZATIONS, OTHER OBLIGATIONS, BREACHES AND INJUNCTIVE RELIEF**.

(a)    The remedies provided in this Note shall be cumulative and in addition to all other remedies available at law or in equity (including a decree of specific performance and/or other injunctive relief), and, subject to Section 9(a), nothing herein shall limit the Holder's right to pursue monetary damages for any failure by the Company to comply with the terms of this Note.  Amounts set forth or provided for herein with respect to payments and the like (and the computation thereof) shall be the amounts to be received by the Holder and shall not, except as expressly provided herein, be subject to any other obligation of the Company (or the performance thereof).  The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Holder and that the remedy at law for any such breach may be inadequate.  The Company therefore agrees that, in the event of any such breach or threatened breach, the Holder shall be entitled, in addition to all other available remedies, to an injunction restraining any breach, without the necessity of showing economic loss and without any bond or other security being required.

(b)    Notwithstanding the foregoing, the right of the Holder to receive payment of Principal and Interest on this Note, on or after the respective due dates set forth herein, or to bring suit for the enforcement of any such right to payment, shall not be impaired or affected without the consent of the Holder.

10.    **PAYMENT OF COLLECTION, ENFORCEMENT AND OTHER COSTS**.  If (a) this Note is placed in the hands of an attorney for collection or enforcement or is collected or enforced through any legal proceeding or the Holder otherwise takes action to collect amounts due under this Note or to enforce the provisions of this Note or (b) there occurs any bankruptcy, reorganization, receivership of the Company or other proceedings affecting Company creditors' rights and involving a claim under this Note, then the Company shall pay the costs incurred by the Holder for such collection, enforcement or action or in connection with such bankruptcy, reorganization, receivership or other proceeding, including, but not limited to, reasonable attorneys' fees and disbursements.

11.    **CONSTRUCTION; HEADINGS**.  This Note shall be deemed to be jointly drafted by the Company and the Holder and shall not be construed against any person as the drafter hereof.  The headings of this Note are for convenience of reference and shall not form part of, or affect the interpretation of, this Note.

12.    **FAILURE OR INDULGENCE NOT WAIVER.**  No failure or delay on the part of the Holder in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privilege.

13.    **NOTICES; PAYMENTS**.

(a)    Notices.  All notices, requests, consents, and other communications under this Note shall be in writing and shall be deemed delivered (i) when delivered, if delivered personally, (ii) four business days after being sent by registered or certified mail, return receipt

7

requested, postage prepaid; (iii) one Business Day after being sent via a reputable nationwide overnight courier service guaranteeing next business day delivery, or (iv) when receipt is acknowledged, in the case of facsimile, in each case to the intended recipient as set forth below:

      (i)      If to the Holder, at its address set forth next to the Holder's name on <u>Exhibit A</u> to the Unit Purchase Agreement.

      (ii)      If to the Company:

ISC8 Inc.
151 Kalmus Drive
Costa Mesa, CA 92626
Attention: Chief Executive Officer

or at such other address as the Company or the Holder each may specify by written notice to the other parties hereto in accordance with this <u>Section 13</u>.  The Company shall provide the Holder with prompt written notice of all actions taken pursuant to this Note, including in reasonable detail a description of such action and the reason therefore.

      (b)    <u>Payments</u>.  Whenever any payment of cash is to be made by the Company to any Person pursuant to this Note, such payment shall be made in lawful money of the United States of America by a check drawn on the account of the Company and sent via overnight courier service to such Person at such address as previously provided to the Company in writing; *provided* that the Holder may elect to receive a payment of cash via wire transfer of immediately available funds by providing the Company with prior written notice setting out such request and the Holder's wire transfer instructions.  Whenever any amount expressed to be due by the terms of this Note is due on any day which is not a Business Day, the same shall instead be due on the next succeeding day which is a Business Day.

      (c)    <u>Withholding Taxes</u>.  All payments made by the Company hereunder shall be made without withholding for or on account of any present or future taxes (other than overall net income taxes imposed on the recipient).  If any such withholding is so required, the Company shall make the withholding, pay the amount withheld to the appropriate authority before penalties attach thereto or interest accrues thereon and pay to the recipient such additional amount as may be necessary to ensure that the net amount actually received by the recipient free and clear of such taxes (including taxes on such additional amount) is equal to the amount that the recipient would have received had such withholding not been made.  If the recipient is required to pay any such taxes, penalties or interest, the Company shall reimburse the recipient for that payment on demand.  If the Company pays any such taxes, penalties or interest, it shall deliver official tax receipts or other evidence of payment to the recipient on whose account such withholding was made on or before the thirtieth day after payment.  The Holder agrees to provide, promptly following the Company's request therefore, such forms or certifications as it is legally able to provide to establish an exemption from, or a reduction in, any withholding taxes that might otherwise apply.

Exh I_008

14.    **CANCELLATION**.  After all Principal, accrued Interest and other amounts at any time owed on this Note have been paid in full, this Note shall automatically be deemed canceled, shall be surrendered to the Company for cancellation and shall not be reissued.

15.    **WAIVER OF NOTICE**.  To the extent permitted by law, the Company hereby waives demand, notice, protest and all other demands and notices in connection with the delivery, acceptance, performance, default or enforcement of this Note.

16.    **GOVERNING LAW**.  This Note shall be construed and enforced in accordance with, and all questions concerning the construction, validity, interpretation and performance of this Note shall be governed by, the internal laws of the State of Delaware, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of Delaware or any other jurisdictions) that would cause the application of the laws of any jurisdictions other than the State of Delaware.

17.    **CERTAIN DEFINITIONS**.  For purposes of this Note, the following terms shall have the following meanings:

(a)    "*Affiliate*" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with such entity provided that, for purposes of this definition, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or by contract or otherwise.

(b)    "*Business Day*" means any day other than Saturday, Sunday or other day on which commercial banks in the city of Los Angeles are authorized or required by law to remain closed.

(c)    "*Change of Control*" means any Fundamental Transaction other than (i) a Fundamental Transaction in which holders of the Company's voting power immediately prior to the Fundamental Transaction continue after the Fundamental Transaction to hold publicly traded securities and, directly or indirectly, the voting power of the surviving entity or entities necessary to elect a majority of the members of the board of directors (or their equivalent if other than a corporation) of such entity or entities, (ii) a Fundamental Transaction with any Holder, any Affiliate of any Holder or any person otherwise related to or associated with a Holder, or (iii) pursuant to a migratory merger effected solely for the purpose of changing the jurisdiction of incorporation of the Company.

(d)    "*Collateral*" has the meaning given to such term in the Security Agreement.

(e)    "*Common Stock*" means the Common Stock of the Company.

(f)    "*Company*" has the meaning set forth in the introductory paragraph of this Note.

Exh I_009

(g)  "***Company Conversion Securities***" has the meaning set forth in Section 3(d).

(h)  "***Contractual Obligation***" means, with respect to any Person, any contract, agreement, deed, mortgage, lease, sublease, license, sublicense or other legally enforceable commitment, promise, undertaking, obligation, arrangement, instrument or understanding, whether written or oral, to which or by which such Person is a party or otherwise subject or bound or to which or by which any property, business, operation or right of such Person is subject or bound.

(i)  "***Conversion Amount***" means, on the Conversion Date, the sum of (i) the Principal, and (ii) accrued and unpaid Interest with respect to the Principal.

(j)  "***Conversion Rate***" has the meaning set forth in Section 3(d).

(k)  "***Custodian***" means a receiver, trustee, assignee, liquidator or similar official.

(l)  "***Event of Default***" has the meaning set forth in Section 4(a).

(m)  "***Exchange Act***" means the Securities Exchange Act of 1934, as amended.

(n)  "***Fundamental Transaction***" means that the Company shall, directly or indirectly, in one or more related transactions, (i) consolidate or merge with or into (whether or not the Company is the surviving corporation) another Person, or (ii) sell, assign, transfer, convey or otherwise dispose of all or substantially all of the assets of the Company to another Person, or (iii) allow another Person to make a purchase, tender or exchange offer that is accepted by the holders of more than the 50% of the outstanding shares of Common Stock (not including any shares of Common Stock held by the Person or Persons making or party to, or associated or affiliated with the Persons making or party to, such purchase, tender or exchange offer), or (iv) consummate a stock purchase agreement or other business combination (including, without limitation, a reorganization, recapitalization, spin-off or scheme of arrangement) with another Person whereby such other Person acquires more than the 50% of the outstanding shares of Common Stock (not including any shares of Common Stock held by the other Person or other Persons making or party to, or associated or affiliated with the other Persons making or party to, such stock purchase agreement or other business combination), or (v) reorganize, recapitalize or reclassify its Common Stock.

(o)  "***GAAP***" means generally accepted accounting principles as promulgated by the Financial Accounting Standards Board, as in effect from time to time.

(p)  "***Guarantee***" means, with respect to any Person, (i) any guarantee of the payment or performance of, or any contingent obligation in respect of, any Indebtedness or other Liability of any other Person, (ii) any other arrangement whereby credit is extended to any obligor (other than such Person) on the basis of any promise or undertaking of such Person (A) to pay the Indebtedness or other Liability of such obligor, (B) to purchase any obligation owed by such obligor, (C) to purchase or lease assets under circumstances that are designed to enable such obligor to discharge one or more of its obligations or (D) to maintain the capital, working

10

**Exh I_010**

capital, solvency or general financial condition of such obligor and (iii) any liability as a general partner of a partnership or as a venturer in a joint venture in respect of Indebtedness or other Liabilities of such partnership or venture.

(q)   "*Holder*" has the meaning set forth in the introductory paragraph of this Note.

(r)   "*Holder Representative*" means Griffin Partners LLC, or such other Person appointed to act as Holder Representative pursuant to the Unit Purchase Agreement.

(s)   "*Indebtedness*" means, with respect to any Person, and without duplication, all Liabilities, including all obligations in respect of principal, accrued interest, penalties, fees and premiums, of such Person (i) for borrowed money (including amounts outstanding under overdraft facilities), (ii) evidenced by notes, bonds, debentures or other similar Contractual Obligations, (iii) in respect of "earn-out" obligations and other obligations for the deferred purchase price of property, goods or services (other than trade payables or accruals incurred in the ordinary course of business), (iv) for the capitalized liability under all capital leases of such Person (determined in accordance with GAAP), (v) in respect of letters of credit and bankers' acceptances, (vi) for Contractual Obligations relating to interest rate protection, swap agreements and collar agreements, in each case, to the extent payable if such Contractual Obligation is terminated at the Closing, and (vii) in the nature of Guarantees of the obligations described in clauses (i) through (vi) above of any other Person.

(t)   "*Interest*" has the meaning set forth in Section 2.

(u)   "*Interest Period*" means the period beginning on and including the Issuance Date and ending on and including the Maturity Date.

(v)   "*Interest Rate*" means twelve percent (12%) per annum; *provided* that upon the occurrence and during the continuance of an Event of Default, the Interest Rate shall be increased to twenty percent (20%) per annum.  In the event that such Event of Default is subsequently cured or waived, the Interest Rate shall be reduced to twelve percent (12%) per annum as of the date of such cure or waiver, it being understood, however, that unless the Holder otherwise agrees in writing, such reduction shall not apply retroactively to the period when such Event of Default was continuing.

(w)   "*Issuance Date*" has the meaning set forth in Section 2.

(x)   "*Liability*" means, with respect to any Person, any liability or obligation of such Person whether known or unknown, whether asserted or unasserted, whether determined, determinable or otherwise, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, whether directly incurred or consequential, whether due or to become due and whether or not required under GAAP to be accrued on the financial statements of such Person.

(y)   "*Lien*" or "*Liens*" means any mortgage, lien, pledge, charge, security interest or other similar encumbrance upon or in any property or assets (including accounts and contract rights) owned by the Company or any of its Subsidiaries.

11

(z)    "***Material Adverse Effect***" means any (i) adverse effect on the issuance or validity of this Note or the transactions contemplated hereby or on the ability of the Company to perform its obligations under this Note, or (ii) material adverse effect on the condition (financial or otherwise), properties, assets, liabilities, business or operations of the Company and its Subsidiaries taken as a whole.

(aa)    "***Maturity Date***" means the one year anniversary of the date of issuance of this Note.

(bb)    "***Notes***" has the meaning set forth in the introductory paragraph of this Note.

(cc)    "***Outstanding Note Obligations***" means the outstanding Principal, accrued and unpaid Interest and any other amounts outstanding under this Note as of any point in time.

(dd)    "***Permitted Indebtedness***" means (i) Indebtedness incurred by the Company that is made expressly subordinate in right of payment to the Indebtedness evidenced by this Note, as reflected in a written agreement reasonably acceptable to the Holder Representative and approved by the Holder Representative in writing, and which Indebtedness does not provide at any time for (A) the payment, prepayment, repayment, repurchase or defeasance, directly or indirectly, of any principal or premium, if any, thereon until ninety-one (91) days after the Maturity Date or later and (B) total interest and fees at a rate in excess of six percent (6%) per annum, (ii) Indebtedness secured by Permitted Liens, (iii) Indebtedness to trade creditors or for professional services incurred in the ordinary course of business, (iv) any Indebtedness owing under the Notes or the Turner Notes, and (v) extensions, refinancings and renewals of any items of Permitted Indebtedness described in clauses (i) through (iv) above, provided that the principal amount is not increased or the terms modified to impose more burdensome terms upon the Company or its Subsidiary, as the case may be.

(ee)    "***Permitted Liens***" means (i) any Lien for taxes not yet due or delinquent or being contested in good faith by appropriate proceedings for which adequate reserves have been established in accordance with GAAP, (ii) any statutory Lien arising in the ordinary course of business by operation of law with respect to a liability that is not yet due or delinquent, (iii) any Lien created by operation of law, such as materialmen's liens, mechanics' liens and other similar liens, arising in the ordinary course of business with respect to a liability that is not yet due or delinquent or that are being contested in good faith by appropriate proceedings, (iv) Liens securing the Company's obligations under the Notes and the Turner Notes, (v) Liens (A) upon or in any equipment acquired or held by the Company or any of its Subsidiaries to secure the purchase price of such equipment or indebtedness incurred solely for the purpose of financing the acquisition or lease of such equipment, or (B) existing on such equipment at the time of its acquisition, provided that the Lien is confined solely to the property so acquired and improvements thereon, and the proceeds of such equipment, (vi) Liens incurred in connection with the extension, renewal or refinancing of the indebtedness secured by Liens of the type described in clauses (i) through (v) above, provided that any extension, renewal or replacement Lien shall be limited to the property encumbered by the existing Lien and the principal amount of the Indebtedness being extended, renewed or refinanced does not increase, (viii) leases or subleases and licenses and sublicenses granted to others in the ordinary course of the Company's business, not interfering in any material respect with the business of the Company and its

12

Subsidiaries taken as a whole, (ix) Liens in favor of customs and revenue authorities arising as a matter of law to secure payments of custom duties in connection with the importation of goods, and (x) Liens arising from judgments, decrees or attachments in circumstances not constituting an Event of Default under Section 4(a)(iv).

(ff) "*Person*" means an individual, a limited liability company, a partnership, a joint venture, a corporation, a trust, an unincorporated organization, any other entity and a government or any department or agency thereof.

(gg) "*Principal*" has the meaning given in the introductory paragraph of this Note.

(hh) "*Qualified Equity Financing*" means the consummation by the Company prior to the Maturity Date of a financing pursuant to which it sells equity securities with an aggregate sales price of not less than $5,000,000, excluding any and all convertible bridge notes which are converted into equity (including this Note and the other Notes), and with the principal purpose of raising capital.

(ii) "*Register*" has the meaning set forth in Section 19.

(jj) "*Required Holders*" means the holders of Notes representing at least a majority of the aggregate principal amount of the Notes whether or not converted pursuant to Section 3 or prepaid by the Company.

(kk) "*SEC*" means the United States Securities and Exchange Commission.

(ll) "*Securities Act*" means the Securities Act of 1933, as amended.

(mm)"*Security Agreement*" means the security agreement dated as of September [__], 2014, between the Company and the Holder Representative, as amended from time to time.

(nn) "*Subsidiary*" means any corporation, association trust, limited liability company, partnership, joint venture or other business association or entity (i) at least 50% of the outstanding voting securities of which are at the time owned or controlled directly or indirectly by the Company or (ii) with respect to which the Company possesses, directly or indirectly, the power to direct or cause the direction of the affairs or management of such Person.

(oo) "*Successor Entity*" means the Person, which may be the Company, formed by, resulting from or surviving any Fundamental Transaction or the Person with which such Fundamental Transaction shall have been made.

(pp) "*Turner Notes*" refers to those Senior Subordinated Secured Convertible Promissory Notes issued by the Company in 2013 using J.P. Turner & Company, L.L.C. as a commissioned placement agent.

(qq) "*Unit Purchase Agreement*" means that certain Unit Purchase Agreement dated as of September [__], 2014 by and between the Company and certain purchasers of Notes.

13

18.    **SECURITY**. The Notes shall be secured by and to the extent provided in the Security Agreement, as amended through the date hereof.

19.    **REGISTERED OBLIGATION**.  The Company shall establish and maintain a record of ownership (the "***Register***") in which it will register by book entry the interest of the Holder and of each subsequent assignee in this Note, and in the right to receive any payments of principal and interest or any other payments hereunder, and any assignment of any such interest. Notwithstanding anything herein to the contrary, this Note is intended to be treated as a registered obligation for federal income tax purposes and the right, title, and interest of the Holder and its assignees in and to payments under this Note shall be transferable only upon notation of such transfer in the Register.  This Section shall be construed so that the Note is at all times maintained in "registered form" within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the Internal Revenue Code and any related regulations (or any successor provisions of the Code or such regulations).

**[SIGNATURE PAGE FOLLOWS]**

14

**IN WITNESS WHEREOF**, the Company has caused this Note to be duly executed as of the Issuance Date set out above.

**ISC8 INC.**


By:_____
    John Vong
    Sr. Vice President and Chief Financial
    Officer

**Accepted and Agreed:**

**HOLDER**


By:_____

Name:_____

Title:_____

**SIGNATURE PAGE TO**
**SUPER SENIOR SECURED**
**CONVERTIBLE PROMISSORY NOTE**

# WARRANT

THIS WARRANT ("**WARRANT**") AND THE SECURITIES ISSUABLE HEREUNDER HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 AS AMENDED, OR ANY STATE SECURITIES LAWS. THEY MAY NOT BE SOLD, OFFERED FOR SALE PLEDGED OR OTHERWISE TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT AND ANY APPLICABLE STATE SECURITIES LAWS, OR AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED.

| | |
|---|---|
| Company: | ISC8 INC., a Delaware corporation (the "**Company**") |
| Shares of Warrant Stock: | [_____] |
| Class of Shares: | [_____] Preferred Stock, $0.01 par value per share |
| Exercise Price: | $[_____] per share |
| Issue Date: | September __, 2014 |
| Expiration Date: | [___ years from date of deal close] |

THIS WARRANT CERTIFIES THAT for value received in connection with its purchase of that certain securities including a Super Senior Secured Convertible Promissory Note issued by the Company pursuant to the Unit Purchase Agreement by and between the Company and certain investors dated September [__], 2014, [Investor Name] or its registered assigns (hereinafter called the "**Holder**") is entitled to purchase from ISC8 Inc., the above referenced number of fully paid and non-assessable shares (the "**Warrant Stock**") of [_____] Preferred Stock of the Company (the "**Preferred Stock**") which shall be convertible in shares of common stock of the Company (the "**Common Stock**"), at the Exercise Price per Share referenced above; the Number of Shares of Warrant Stock referenced above, which are purchasable upon exercise of this Warrant are subject to proportional adjustment from time to time as described herein.

**Section 1**          **Term, Price, Exercise and Exchange of Warrant.**

          1.1          Term of Warrant.  This Warrant shall be exercisable or exchangeable from the Issue Date until the Expiration Date.

          1.2          Exercise Price.  The price per share at which the Warrant Stock is issuable upon Exercise or Exchange of this Warrant shall be $[_____], subject to Section 1.3(a) and subject to adjustment from time to time as set forth herein (the "**Exercise Price**").

          1.3          Exercise of Warrant; Exchange of Warrant.

          (a)          This Warrant may be Exercised (as defined below) in whole or in part, upon surrender to the Company at its then principal offices in the United States of this Warrant, together with the form of election to Exchange or Exercise attached hereto as Exhibit A (the "**Election**") duly completed and executed, and upon payment to the Company of the Exercise Price for the number of shares of Warrant Stock in respect of which this Warrant is then being exercised (an "**Exercise**").  In whole or in part in lieu of an Exercise, Holder may exchange this Warrant by indicating so in the Election and proceeding in accordance with the remainder of this Section 1.3 (an "**Exchange**").

          (b)          Upon an Exchange, the Holder shall receive Warrant Stock such that, without the payment of any funds, the Holder shall surrender this Warrant in exchange for the number of shares of Warrant Stock equal to "X" (as defined below), computed using the

following formula:

$$X = \frac{Y * (A-B)}{A}$$

Where

| | | |
|---|---|---|
| X | = | the number of shares of Warrant Stock to be issued to Holder |
| Y | = | the number of shares of Warrant Stock to be exchanged under this Warrant |
| A | = | the Fair Market Value of one share of Warrant Stock |
| B | = | the Exercise Price (as adjusted to the date of such calculations) |
| * | = | multiplied by |

(c)     For purposes of this Warrant, the "**Fair Market Value**" of one share of Warrant Stock shall be equal to the number of shares of Common Stock into which the Preferred Stock shall be convertible based on (i) if the Common Stock is or becomes listed on a national stock exchange or is quoted on the Nasdaq Global Select Market or Nasdaq Global Market, the average closing sale price reported on such exchange or market during the five consecutive trading days prior to the date on which Holder delivers its Election to the Company, or (ii) if the Common Stock is traded over-the-counter, the highest closing bid price reported for the Common Stock during the trading day on which Holder delivers its Election to the Company, and if there has been no such reported bid price for such day, the next prior day(s) until the first such reported bid price.  If the Preferred Stock is not traded as contemplated in clauses (i) or (ii), above, the Fair Market Value of the Warrant Stock shall be the price per share which the Company could obtain from a willing buyer for shares of Preferred Stock sold by the Company from its authorized but unissued shares, as the Board of Directors of the Company ("**Board**") shall determine in its reasonable good faith judgment, but in no event less than the price at which qualified employee stock options issued at such time are exercisable. In the event that Holder elects to convert the Warrant Stock through Exchange in connection with a transaction in which the Warrant Stock is converted into or exchanged for another security, Holder may effect a Exchange directly into such other security.

(d)     Upon surrender of this Warrant, and the duly completed and executed Election, and payment of the Exercise Price or conversion of this Warrant through Exchange, the Company shall issue and deliver within 3 business days to the Holder or such other person as the Holder may designate in writing a certificate or certificates for the number of shares of Warrant Stock issuable pursuant to the terms of this Warrant upon Exercise or Exchange.  Such certificate or certificates shall be deemed to have been issued and any person so designated to be named therein shall be deemed to have become a holder of record of such Warrant Stock as of the date of the surrender of this Warrant, and the duly completed and executed Election, and payment of the Exercise Price in the case of an Exercise or conversion of this Warrant through Exchange; provided, that if the date of surrender of this Warrant and payment of the Exercise Price is not a business day, the certificates for the Warrant Stock shall be deemed to have been issued as of the next business day (whether before or after the Expiration Date).  If this Warrant is exchanged or exercised in part, a new warrant of the same tenor and for the number of shares of Warrant Stock not exchanged or exercised shall be executed by the Company and delivered to Holder.

1.4     <u>Fractional Interests</u>.  The Company shall not be required to issue fractions of shares of Warrant Stock upon the Exercise or Exchange of this Warrant.  If any fraction of a share

of Warrant Stock would be issuable upon the exchange of this Warrant (or any portion thereof), the Company shall purchase such fraction for an amount in cash equal to the Fair Market Value of the Warrant Stock.

   1.5  <u>Automatic Conversion on Expiration Date</u>.  In the event that, on the Expiration Date, the Fair Market Value of one share of Preferred Stock (or other security issuable upon the Exercise or Exchange hereof) as determined in accordance with <u>Section 1.3(c)</u> is greater than the Exercise Price in effect on such date, then this Warrant shall automatically be deemed on and as of such date to be converted pursuant to <u>Section 1.3</u> as to all Warrant Stock (or such other securities) for which it shall not previously have been Exercised or Exchanged, and the Company shall promptly deliver a certificate representing the Warrant Stock (or such other securities) issued upon such conversion to the Holder.

   1.6  <u>Treatment of Warrant Upon Acquisition of Company</u>.

    (a)  "**Acquisition**".  For the purpose of this Warrant, "**Acquisition**" means any sale or other disposition of all or substantially all of the assets of the Company in whatever form, or any reorganization, consolidation, or merger of the Company (whether in a single transaction or multiple related transactions) where the holders of the Company's securities before the transaction beneficially own less than 50% of the outstanding voting securities of the surviving entity after the transaction(s).

    (b)  <u>Treatment of Warrant at Acquisition</u>.  Upon the closing of any Acquisition, the successor entity (if applicable in such Acquisition) shall, as condition to such Acquisition, either: (i) assume the obligations of this Warrant, and this Warrant shall be exercisable for the same securities as would be payable for the Warrant Stock issuable upon exchange of the unexchanged portion of this Warrant as if such Warrant Stock were outstanding on the record date for the Acquisition (and the Warrant Price and/or number of shares of Warrant Stock shall be adjusted accordingly) or (ii) purchase this Warrant at its "Fair Value" (as described in clause (c) below, the "**Purchase Price**").

    (c)  <u>Purchase at Fair Value</u>.

    For purposes of this Warrant, "**Fair Value**" shall mean that value determined by the parties using a European Black-Scholes Option-Pricing Model (the "Black-Scholes Calculation") with the following assumptions: (A) a risk-free interest rate equal to the risk-free interest rate at the time of the closing of the Acquisition (or as close thereto as practicable), (B) a contractual life of the Warrant equal to the remaining term of this Warrant as of the date of the announcement of the Acquisition, (C) an annual dividend yield equal to dividends declared on the underlying Warrant Stock (including securities into which the Warrant Stock may be convertible) during the term of this Warrant (calculated on an annual basis), and (D) a volatility factor of the expected market price of the Company's Common Stock comprised of: (1) if the Company is publicly traded on a national securities exchange or is quoted on the Nasdaq Global Select Market or Nasdaq Global Market, its volatility over the one year period ending on the day prior to the announcement of the Acquisition, (2) if the Common Stock is traded over-the-counter, its volatility over the one year period ending on the day prior to the announcement of the Acquisition, or (3) if the Company is a non-public company, the volatility, over the one year period prior to the Acquisition, of an average of publicly-traded companies in the same or similar industry to the Company with such companies having similar revenues.  The Purchase Price determined in accordance with the above shall be paid upon the initial closing of the Acquisition and shall not be subject to any post-Acquisition closing contingencies or adjustments; provided,

however, the parties may take such post-Acquisition closing contingencies or adjustments into account in determining the Purchase Price, and if the parties take any post-Acquisition closing contingencies or adjustments into account, then upon the partial or complete removal of those post-Acquisition closing contingencies or adjustments, a new Black-Scholes Calculation would be made using all of the same inputs except for the value of the Company's Common Stock (as determined under subclause (D)), and any increase in Fair Value (and, correspondingly, Purchase Price), including, without limitation, as a result of any earn-out or escrowed consideration, would be paid in full to Holder immediately after those post-Acquisition closing contingencies or adjustments can be determined or achieved.

**Section 2.        Exchange and Transfer of Warrant.**

(a)        This Warrant may be transferred, in whole or in part, without restriction, subject to (i) Holder's compliance with applicable securities laws and delivery of an opinion of competent counsel as to the same, if so requested by the Company, and (ii) the transferee holder of the new Warrant assuming in writing the obligations of the Holder set forth in this Warrant. Notwithstanding and without the necessity of delivering an opinion of counsel, Holder may at any time transfer this Warrant in whole or in part to any affiliate. By its acceptance of this Warrant, each such affiliate transferee will be deemed to have made to the Company each of the representations and warranties set forth in Section 7 and agrees to be bound by all of the terms and conditions of this Warrant as if the original Holder hereof. A transfer may be registered with the Company by submission to it of this Warrant, together with the Assignment Form attached hereto as Exhibit B duly completed and executed. After the Company's receipt of this Warrant and the Assignment Form so completed and executed, the Company will issue and deliver to the transferee a new warrant (representing the portion of this Warrant so transferred) at the same Exercise Price per share and otherwise having the same terms and provisions as this Warrant, which the Company will register in the new holder's name. In the event of a partial transfer of this Warrant, the Company shall concurrently issue and deliver to the transferring holder a new warrant that entitles the transferring holder to purchase the balance of this Warrant not so transferred and that otherwise is upon the same terms and conditions as this Warrant. Upon the due delivery of this Warrant for transfer, the transferee holder shall be deemed for all purposes to have become the holder of the new warrant issued for the portion of this Warrant so transferred, effective immediately prior to the close of business on the date of such delivery, irrespective of the date of actual delivery of the new warrant representing the portion of this Warrant so transferred.

(b)        In the event of the loss, theft or destruction of this Warrant, the Company shall execute and deliver an identical new warrant to the Holder in substitution therefor upon the Company's receipt of (i) evidence reasonably satisfactory to the Company of such event and (ii) if requested by the Company, an indemnity agreement reasonably satisfactory in form and substance to the Company. In the event of the mutilation of or other damage to the Warrant, the Company shall execute and deliver an identical new warrant to the Holder in substitution therefor upon the Company's receipt of the mutilated or damaged warrant.

(c)        The Company shall pay all reasonable costs and expenses incurred in connection with the Exchange, Exercise, transfer or replacement of this Warrant, including, without limitation, the costs of preparation, execution and delivery of a new warrant and of share certificates representing all Warrant Stock.

ISC8 – Warrant – Super Senior Notes

4

**Section 3.**     **Certain Covenants.**

(a)     The Company shall at all times reserve for issuance and keep available out of its authorized and unissued Preferred Stock, solely for the purpose of providing for the exchange of this Warrant, such number of shares of Preferred Stock as shall from time to time be sufficient therefor.  The Company shall at all times reserve for issuance and keep available out of its authorized and unissued Common Stock, solely for the purpose of providing for the exchange of Warrant Stock, such number of shares of Common Stock as shall from time to time be sufficient therefor.

(b)     The Company will not, by amendment or restatement of its Certificate of Incorporation or Bylaws or through reorganization, consolidation, merger, amalgamation, sale of assets or otherwise, avoid or seek to avoid the observance or performance of any of the terms of this Warrant.  Without limiting the foregoing, the Company will not increase the par value of any Warrant Stock receivable upon the exchange of this Warrant above the amount payable therefor upon such exchange.

(c)     So long as Holder holds this Warrant, the Company shall deliver to Holder such reports as it provides to its stockholders generally, as and when delivered to such stockholders. Notwithstanding the foregoing, the Company shall provide Holder quarterly and annual financial statements upon request, if such statements are not publicly available.   The parties shall not treat the Warrant or the Warrant Stock as being granted or issued as property transferred in connection with the performance of services or otherwise as compensation for services rendered.

**Section 4.**     **Adjustments to Exercise Price and Number of Shares of Warrant Stock.**

4.1     <u>Adjustments</u>.  The Exercise Price shall be subject to adjustment from time to time in accordance with this <u>Section 4</u>.  Upon each adjustment of the Exercise Price pursuant to this <u>Section 4</u>, the Holder shall thereafter be entitled to acquire upon exchange, at the Exercise Price resulting from such adjustment, the number of shares of Warrant Stock obtainable by multiplying the Exercise Price in effect immediately prior to such adjustment by the number of shares of Warrant Stock acquirable immediately prior to such adjustment and dividing the product thereof by the new Exercise Price resulting from such adjustment.

4.2     <u>Subdivisions, Combinations and Stock Dividends</u>.  If the Company shall at any time subdivide by split-up or otherwise, its outstanding Preferred Stock into a greater number of shares, or issue additional Preferred Stock as a dividend or otherwise with respect to any Preferred Stock, the Exercise Price in effect immediately prior to such subdivision or share dividend shall be proportionately reduced and the number of shares acquirable upon Exercise or Exchange hereunder shall be proportionately increased.  Conversely, in case the outstanding Preferred Stock of the Company shall be combined into a smaller number of shares, the Exercise Price in effect immediately prior to such combination shall be proportionately increased.

4.3     <u>Reclassification, Exchange, Substitutions, Etc.</u>   Upon any reclassification, exchange, substitution, or other event that results in a change of the number and/or class of the securities issuable upon exchange or exercise of this Warrant, Holder shall be entitled to receive and the Company shall promptly issue an amended warrant for the number and kind of securities and property that Holder would have received for the Warrant Stock if this Warrant had been Exercised or Exchanged immediately before such reclassification, exchange, substitution, or other event.  The amendment to this Warrant shall provide for adjustments (as determined in good faith

by the Board) which shall be as nearly equivalent as may be practicable to the adjustments provided for in this Section 4.3, without limitation, adjustments to the Warrant Price and to the number of securities or property issuable upon Exercise or Exchange of the new Warrant. The provisions of this Section 4.3 shall similarly apply to successive reclassifications, exchanges, substitutions, or other similar events.

   4.4. Notices of Record Date, Etc.  In the event that the Company shall:

   (1) declare or propose to declare any dividend upon its Preferred Stock or Common Stock, whether payable in cash, property, stock or other securities and whether or not a regular cash dividend, or

   (2)  offer for sale any additional shares of any class or series of the Company's stock or securities exchangeable for or convertible into such stock in any transaction that would give rise (regardless of waivers thereof) to pre-emptive rights of any class or series of stockholders, or

   (3)  effect or approve (by stockholder vote or otherwise) any reclassification, exchange, substitution or recapitalization of the capital stock of the Company, including any subdivision or combination of its outstanding capital stock, or consolidation or merger of the Company with, or sale of all or substantially all of its assets to, another corporation, or to liquidate, dissolve or wind up (including an assignment for the benefit of creditors), or

   (4)  offer holders of registration rights the opportunity to participate in any public offering of the Company's securities,

then, in connection with such event, the Company shall give to Holder:

  (i) at least ten (10) days prior written notice of the date on which the books of the Company shall close or a record shall be taken for such a dividend or offer in respect of the matters referred to in (1) or (2) above;

  (ii) in the case of the matters referred to in (3) above, at least ten (10) days prior written notice of the date when the same shall take place; and

  (iii)  in the case of the matter referred to in (4) above, the same notice as is given or required to be given to the holders of such registration rights.  If, within thirty (30) days after the Company has given any such notice to Holder, the Company receives a written request from Holder to register any of its Warrant Stock (a "**Registration Request**"), the Company shall use its best efforts to cause such Warrant Stock to be included in the securities to be covered by the registration statement proposed to be filed by the Company.  A Registration Request shall include the intended method of disposition of the Warrant Stock and the Warrant Stock shall be included in the proposed registration statement to the extent required to permit the sale or other disposition by Holder in accordance with the Registration Request. Notwithstanding the foregoing, the Company shall not have any obligation to register any Warrant Stock under this Section 4.4(4)(iii) if doing so would conflict with the Priority Registration Rights (as defined below).  The registration rights granted herein shall terminate at such time as all of the Warrant Stock held by Holder may be sold pursuant to Rule 144 under the Securities Act during any ninety (90) day period.

Such notice in accordance with the foregoing clause (1) shall also specify, in the case of any such dividend, the date on which the holders of capital stock shall be entitled thereto and the terms of

such dividend, and such notice in accordance with clause (2) shall also specify the date on which the holders of capital stock shall be entitled to exchange their capital stock for securities or other property deliverable upon such reorganization, reclassification, exchange, substitution, consolidation, merger or sale, as the case may be, and the terms of such exchange. Each such written notice shall be given by first class mail, postage prepaid, addressed to the holder of this Warrant at the address of Holder.

4.5     Adjustment by Board.  If any event occurs as to which, in the opinion of the Board, the provisions of this Section 4 are not strictly applicable or if strictly applicable would not fairly protect the rights of the Holder in accordance with the essential intent and principles of such provisions, then the Board shall make an adjustment in the application of such provisions, in accordance with such essential intent and principles, so as to protect such rights, but in no event shall any adjustment have the effect of increasing the Exercise Price as otherwise determined pursuant to any of the provisions of this Section 4, except in the case of a combination of shares of a type contemplated in Section 4.2 and then in no event to an amount larger than the Exercise Price as adjusted pursuant to Section 4.2.

4.6     Officers' Statement as to Adjustments.  Whenever the Exercise Price and/or number of shares of Warrant Stock subject to the Warrant is required to be adjusted as provided in this Section 4, the Company shall forthwith file at its principal office with a copy to the Holder notice parties set forth in Section 9 a statement, signed by the Chief Executive Officer or Chief Financial Officer of the Company, showing in reasonable detail the facts requiring such adjustment, the Exercise Price and number of issuable shares that will be effective after such adjustment; provided, however, such statement shall not be required to the extent the information otherwise required by this Section 4.6 is available through the Company's current reports filed with the Securities and Exchange Commission.

4.7     Issue of Securities other than Preferred Stock.  In the event that at any time, as a result of any adjustment made pursuant to this Section 4, Holder thereafter shall become entitled to receive any securities of the Company, other than Preferred Stock, the number of such other shares so receivable upon Exercise or Exchange of this Warrant shall be subject to adjustment from time to time in a manner and on terms as nearly equivalent as practicable to the provisions with respect to the Preferred Stock contained in this Section 4.

**Section 5.     Rights and Obligations of the Warrant Holder**.  Except as otherwise specified in this Warrant, this Warrant shall not entitle the Holder to any rights of a holder of Preferred Stock in the Company until such time as this Warrant is exchanged or exercised.

**Section 6.     Representations, Warranties and Covenants of the Company**.  The Company represents and warrants to, and covenants with, Holder that:

6.1     Corporate Power; Authorization.  The Company has all requisite corporate power and has taken all requisite corporate action to execute and deliver this Warrant, to sell and issue the Warrant and Warrant Stock and to carry out and perform all of its obligations hereunder. This Warrant has been duly authorized, executed and delivered on behalf of the Company by the person executing this Warrant and constitutes the valid and binding agreement of the Company, enforceable in accordance with its terms, except (i) as limited by applicable bankruptcy, insolvency, reorganization or similar laws relating to or affecting the enforcement of creditors' rights generally and (ii) as limited by equitable principles generally.

6.2     Validity of Securities.  The issuance and delivery of the Warrant is not subject to preemptive or any similar rights of the stockholders of the Company (which have not been duly waived) or any liens or encumbrances except for restrictions on transfer provided for herein or under applicable federal and state securities laws; and when the Warrant Stock is issued upon Exercise or Exchange in accordance with the terms hereof, and this Warrant is converted into Warrant Stock, such securities will be, at each such issuance, validly issued, fully paid and nonassessable, in compliance with all applicable securities laws and free of any liens or encumbrances except for restrictions on transfer provided for herein or under applicable federal and state securities laws.

6.3     No Conflict. The execution and delivery of this Warrant do not, and the consummation of the transactions contemplated hereby will not, conflict with, or result in any violation of, or default (with or without notice or lapse of time, or both), or give rise to a right of termination, cancellation or acceleration of any obligation or to a loss of a material benefit, under, any provision of the Certificate of Incorporation or Bylaws of the Company or any mortgage, indenture, lease or other agreement or instrument, permit, concession, franchise, license, judgment, order, decree, statute, law, ordinance, rule or regulation applicable to the Company, its properties or assets, in each case, the effect of which would have a material adverse effect on the Company or materially impair or restrict its power to perform its obligations as contemplated hereby.

6.4     Governmental and other Consents. No consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any governmental authority or other person or entity is required on the part of the Company in connection with the issuance, sale and delivery of the Warrant and the Warrant Stock, except such filings as shall have been made prior to and shall be effective on and as of the date hereof. All stockholder consents required in connection with issuance of the Warrant and Warrant Stock have either been obtained by Borrower or no such consents are required.

6.5     Exempt from Registration. Assuming the accuracy of the representations and warranties of Holder in Section 7, the offer, sale and issuance of the Warrant and the Warrant Stock will be exempt from the registration requirements of the Securities Act pursuant to 506 of Regulation D under the Securities Act and from the registration and qualification requirements of applicable state securities laws.  Neither the Company nor any agent on its behalf has solicited or will solicit any offers to sell or has offered to sell or will offer to sell all or any part of Securities to any person or persons so as to bring the sale of such shares of Warrant Stock by the Company within the registration provisions of the Securities Act.

6.6     Reporting Obligations. Borrower is and will remain subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act and (i) has filed and will file all required reports under Section 13 or 15(d) of the Exchange Act, as applicable, other than Form 8-K reports. Without limiting the foregoing, if the Company ceases to timely file periodic reports under the Exchange Act, the Company shall from time to time promptly provide a copy of its most recent annual, quarterly and other interim reports to Holder.

6.7     Non-Public Information. To the extent the Company provides any material nonpublic information to Holder, the Company shall cease doing so during any period requested by Holder. To the extent required, the Company will publicly disclose the terms of this Agreement on Form 8-K under the Exchange Act (including it as an exhibit thereto if it deems it required under applicable law) promptly following the date hereof.

6.8    <u>Legends</u>.    The Company shall remove any restrictive securities legends on Warrant Stock resulting from Exercise or Exchange of the Warrant as soon as permitted by applicable law.

**Section 7.    Representations and Warranties of Holder**.    Holder hereby represents and warrants to the Company as of the Closing Date as follows:

7.1    <u>Investment Experience</u>.    Holder is an "accredited investor" within the meaning of Rule 501 under the Securities Act, and was not organized for the specific purpose of acquiring the Securities.    Holder is aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire the Securities.    Holder has such business and financial experience as is required to give it the capacity to protect its own interests in connection with the purchase of the Securities.

7.2    <u>Investment Intent</u>.    Holder is purchasing the Warrant for investment for its own account only and not with a view to, or for resale in connection with, any "distribution" thereof within the meaning of the Securities Act.    Holder understands that the Warrant has not been registered under the Securities Act or registered or qualified under any state securities law in reliance on specific exemptions therefrom, which exemptions may depend upon, among other things, the bona fide nature of Holder's investment intent as expressed herein.

7.3    <u>Authorization</u>.    Holder has all requisite power and has taken all requisite action required of it to carry out and perform all of its obligations hereunder.    The execution and delivery of this Warrant has been duly authorized, executed and delivered on behalf of Holder and constitutes the valid and binding agreement of Holder, enforceable in accordance with its terms, except (i) as limited by applicable bankruptcy, insolvency, reorganization or similar laws relating to or affecting the enforcement of creditors' rights generally and (ii) as limited by equitable principles generally. The consummation of the transactions contemplated herein and the fulfillment of the terms herein will not result in a breach of any of the terms or provisions of Holder's constitutional documents or instruments.

**Section 8.    Restricted Stock Legend.**

This Warrant and the Warrant Stock have not been registered under any securities laws. Accordingly, any share certificates issued pursuant to the Exercise or Exchange of this Warrant shall (until receipt of an opinion of counsel in customary form that such legend is no longer necessary) bear the following legend:

THIS WARRANT AND THE WARRANT STOCK ISSUABLE UPON EXERCISE OR EXCHANGE HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "ACT"), AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF.    NO SUCH SALE OR DISTRIBUTION MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL IN CUSTOMARY FORM THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE ACT.

**Exh J_009**

**Section 9.        Notices.**

      Any notice or other communication required or permitted to be given here shall be in writing and shall be effective (a) upon hand delivery or delivery by e-mail or facsimile at the address or number designated below (if delivered on a business day during normal business hours where such notice is to be received) or the first business day following such delivery (if delivered other than on a business day during normal business hours where such notice is to be received), or (b) on the third business day following the date of mailing by express courier service, fully prepaid, addressed to such address, or upon actual receipt of such mailing, whichever shall first occur. The addresses for such communication shall be:

      if to Holder, at

      ___[contact address of purchaser]_____
      —_____
      _____
      Attention:  _____
      Email: _____

      with a copy (not constituting notice) to

      _____
      _____
      _____
      Attention: _____
      Email: _____

      If to the Company:

      ISC8, Inc.
      840 F Avenue
      Plano, TX 75093
      Attn:  John Vong
      email: jvong@isc8.com

      with a copy to:

      Disclosure Law Group
      One America Plaza
      600 West Broadway, Suite 700
      San Diego, CA 92101
      Attention: Daniel W. Rumsey

Each party hereto may from time to time change its address for notices under this Section 9 by giving at least 10 calendar days' notice of such changes address to the other party hereto.

**Section 10.        Amendments and Waivers.**  This Warrant and any term hereof may be changed, waived, discharged or terminated only by an instrument in writing signed by the party against which enforcement of such change, waiver, discharge or termination is sought. This Warrant may only be amended by an instrument in writing signed by both parties.

**Section 11.        Applicable Law; Severability**.  This Warrant shall be governed by and construed and enforced in accordance with the laws of the State of California.  If any one or more of the provisions contained in this Warrant, or any application of any provision thereof, shall be invalid, illegal, or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and all other applications of any provision thereof shall not in any way be affected or impaired thereby.

**Section 12.        Construction; Headings**.  The terms "**Exercise**" and "**Exchange**" may be used interchangeably from time to time in this Warrant, the only substantive difference being that the exercise of rights under this Warrant by Exercise will require payment of cash consideration per share equal to the Exercise Price. The headings used in this Warrant are for the convenience of the parties only and shall not be used in construing the provisions hereof.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the Company has caused this Warrant to be duly executed on the day and year first above written.

COMPANY:                              ACKNOWLEDGED AND AGREED:

ISC8 INC                              HOLDER:


By: _____          By: _____.
    John Vong                             [title]
    Chief Financial Officer

**<u>EXHIBIT A</u>**

To:

ELECTION TO EXCHANGE OR EXERCISE

1.      The undersigned hereby exercises its right to Exchange its Warrant for _____ fully paid, validly issued and nonassessable shares of Warrant Stock in accordance with the terms thereof.

2.      The undersigned hereby elects to Exercise the attached Warrant for fully paid, validly issued and nonassessable shares of Warrant Stock by payment of $_____ as specified in the attached Warrant.  This right is exercised with respect to _____ shares.

        [Strike the paragraph above that does not apply.]

The undersigned requests that certificates for such shares be issued in the name of, and delivered to:

                _____
                _____
                _____

3.      By its execution below and for the benefit of the Company, the undersigned hereby restates each of the representations and warranties in <u>Section 7</u> of the Warrant as of the date hereof.


Date: _____        [Holder]


                By _____
                    Name:
                    Title:

## **EXHIBIT B**

## **ASSIGNMENT FORM**

To:

    The undersigned hereby assigns and transfers this Warrant to

_____
 (Insert assignee's social security or tax identification number)

_____
(Print or type assignee's name, address and postal code)

_____

_____

and irrevocably appoints _____ to transfer this Warrant on the books of the Company.

Date: _____  _____

                    By _____
                    Name: _____

                    Title: _____

## SECURITY AGREEMENT

THIS SECURITY AGREEMENT (this "**Security Agreement**") is executed as of September[__], 2014, by ISC8, Inc., a Delaware corporation ("**Debtor**"), and Griffin Partners, LLC, a Delaware limited partnership, in its capacity as Holder Representative under the Notes (as such term is defined below) (in such capacity, together with any successor appointed pursuant to the terms of the Notes, "**Holder Representative**").

RECITALS

A.    Debtor desires to issue up to $3,000,000 in aggregate principal amount of Super Senior Secured Convertible Promissory Notes (the "**Notes**") to certain investors who may purchase the Notes (such purchasers, collectively the "**Purchasers**") under the terms of the Note Purchase Agreement by and between the Debtor and the signatories thereto, dated September [__], 2014 ("**Purchase Agreement**").

B.    The execution and delivery of this Security Agreement is a condition precedent to the willingness of the Purchasers to enter into the Purchase Agreement and purchase and extend credit under the Notes.

ACCORDINGLY, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Debtor and Holder Representative hereby agree as follows:

**1.    REFERENCE TO LOAN DOCUMENTS**.  This Security Agreement is one of the "*Transaction Agreements*" referred to in the Purchase Agreement.

**2.    CERTAIN DEFINITIONS**.  Unless otherwise defined herein, or the context hereof otherwise requires, each term defined in any of the Notes or the UCC is used in this Security Agreement with the same meaning; *provided that*, if the definition given to such term in the Notes conflicts with the definition given to such term in the UCC, the Notes definition shall control to the extent legally allowable; and if any definition given to such term in *Chapter 9* of the UCC conflicts with the definition given to such term in any other chapter of the UCC, the *Chapter 9* definition shall prevail.  As used herein, the following terms have the meanings indicated:

**Collateral** has the meaning set forth in Section 4 hereof.

**Collateral Obligor** means any person or entity obligated with respect to any of the Collateral, whether as an account debtor, obligor on an instrument, issuer of securities, or otherwise.

**Copyrights** has the meaning set forth in Section 4(b) hereof.

**Intellectual Property** has the meaning set forth in Section 4(d) hereof.

**Obligation** means, collectively, all indebtedness, liabilities, and obligations of Debtor to the holders of the Notes and the Holder Representative arising under the Notes and this Security Agreement.  The Obligation shall include, without limitation, future, *as well as* existing,

Exh K_001

indebtedness, liabilities, and obligations owed by Debtor to the holders of the Notes and the Holder Representative arising under the Notes and this Security Agreement.

**Patents** has the meaning set forth in Section 4(c) hereof.

**Permitted Liens** means the liens and Security Interests permitted by the Notes, including, for the avoidance of doubt, the liens and Security Interests securing Debtor's obligations with respect to any senior secured debt ("**Senior Debt**").

**Security Interest** means the security interest granted and the pledge and assignment made under Section 3 hereof.

**Trademarks** has the meaning set forth in Section 4(d) hereof.

**UCC** means the Uniform Commercial Code, including each such provision as it may subsequently be renumbered, as enacted in the State of New York or other applicable jurisdiction, as amended at the time in question.

3.    **SECURITY INTEREST**.  In order to secure the full and complete payment and performance of the Obligation when due, Debtor hereby grants to Holder Representative for the benefit of the holders of the Notes a Security Interest in all of Debtor's rights, titles, and interests in and to the Collateral and pledges, collaterally transfers, and assigns the Collateral to Holder Representative for the benefit of the holders of the Notes, all upon and subject to the terms and conditions of this Security Agreement, which Security Interest shall be subordinated to any security interest granted with respect to Senior Debt.  Such Security Interest is granted and pledge and assignment are made as security only and shall not subject Holder Representative to, or transfer or in any way affect or modify, any obligation of Debtor with respect to any of the Collateral or any transaction involving or giving rise thereto.  If the grant, pledge, or collateral transfer or assignment of any specific item of the Collateral is expressly prohibited by any contract or by law, then the Security Interest created hereby nonetheless remains effective to the extent allowed by such contract, the UCC or other applicable laws, but is otherwise limited by that prohibition.

4.    **COLLATERAL**.  As used herein, the term "**Collateral**" means the following items and types of property, wherever located, now owned or in the future acquired by Debtor, and all proceeds and products thereof, and any substitutes or replacements therefor:

(a)    All accounts, chattel paper (whether tangible or electronic), goods (including inventory, equipment, and any accessions thereto), software, instruments, investment property, documents, deposit accounts, money, commercial tort claims, letters of credit or letter-of-credit rights, supporting obligations, tax refunds, general intangibles (including payment intangibles) and all books and records pertaining to the foregoing;

(b)    (i) All copyrights (whether statutory or common law, registered or unregistered), works protectable by copyright, copyright registrations, copyright licenses, and copyright applications of Debtor, including, without limitation, all of Debtor's right, title, and interest in and to all copyrights registered in the United States Copyright Office or anywhere else in the world and also including, without limitation, the copyrights set forth on Schedule B; (ii) all

2

renewals, extensions, and modifications thereof; (iii) all income, licenses, royalties, damages, profits, and payments relating to or payable under any of the foregoing; (iv) the right to sue for past, present, or future infringements of any of the foregoing; and (v) all other rights and benefits relating to any of the foregoing throughout the world; in each case, whether now owned or hereafter acquired by Debtor (the "**Copyrights**");

(c)    (i) All patents, patent applications, patent licenses, and patentable inventions of Debtor, including, without limitation, registrations, recordings, and applications thereof in the United States Patent and Trademark Office or in any similar office or agency of the United States, any state thereof or any other country or any political subdivision thereof; (ii) all continuations, divisions, renewals, extensions, modifications, substitutions, reexaminations, continuations-in-part, or reissues of any of the foregoing; (iii) all income, royalties, profits, damages, awards, and payments relating to or payable under any of the foregoing; (iv) the right to sue for past, present, and future infringements of any of the foregoing; and (v) all other rights and benefits relating to any of the foregoing throughout the world; in each case, whether now owned or hereafter acquired by Debtor (the "**Patents**");

(d)    (i) All trademarks, trademark licenses, trade names, corporate names, company names, business names, fictitious business names, trade styles, service marks, certification marks, collective marks, logos, other business identifiers, all registrations, recordings, and applications thereof, including, without limitation, registrations, recordings, and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any state thereof or any other country or any political subdivision thereof; (ii) all reissues, extensions, and renewals thereof; (iii) all income, royalties, damages, and payments now or hereafter relating to or payable under any of the foregoing, including, without limitation, damages or payments for past or future infringements of any of the foregoing; (iv) the right to sue for past, present, and future infringements of any of the foregoing; (v) all rights corresponding to any of the foregoing throughout the world; and (vi) all goodwill associated with and symbolized by any of the foregoing, in each case, whether now owned or hereafter acquired by Debtor (the "**Trademarks**", and collectively with the Copyrights and the Patents, the "**Intellectual Property**"); *provided* that (i) with respect to any Trademarks, applications in the United States Patent and Trademark Office to register Trademarks or service marks on the basis of the Debtor's "intent to use" such Trademarks or service marks will not be deemed to be Collateral unless and until a "Statement of Use" or "Amendment to Allege Use" has been filed and accepted in the United States Patent and Trademark Office, whereupon such application shall be automatically subject to the Security Interest granted herein and deemed to be included in the Collateral;

(e)    All present and future distributions, income, increases, profits, combinations, reclassifications, improvements, and products of, accessions, attachments, and other additions to, tools, parts, and equipment used in connection with, and substitutes and replacements for, all or part of the Collateral described above;

(f)    All present and future accounts, contract rights, general intangibles, chattel paper, documents, instruments, cash and noncash proceeds, and other rights arising from or by virtue of, or from the voluntary or involuntary sale or other disposition of, or collections with respect to, or insurance proceeds payable with respect to, or proceeds payable by virtue of

3

warranty or other claims against the manufacturer of, or claims against any other person or entity with respect to, all or any part of the Collateral heretofore described in this clause or otherwise; and

(g)     All present and future security for the payment to Debtor of any of the Collateral described above and goods which gave or will give rise to any such Collateral or are evidenced, identified, or represented therein or thereby.

The description of the Collateral contained in this Section 4 shall not be deemed to permit any action prohibited by this Security Agreement or by the terms incorporated in this Security Agreement.  Furthermore, notwithstanding any contrary provision, Debtor agrees that, if, but for the application of this paragraph, granting a Security Interest in the Collateral would constitute a fraudulent conveyance under *11 U.S.C. § 548* or a fraudulent conveyance or transfer under any state fraudulent conveyance, fraudulent transfer, or similar law in effect from time to time (each a "**fraudulent conveyance**"), then the Security Interest remains enforceable to the maximum extent possible without causing such Security Interest to be a fraudulent conveyance, and this Security Agreement is automatically amended to carry out the intent of this paragraph.

5.     **REPRESENTATIONS AND WARRANTIES**.  Debtor represents and warrants to Holder Representative as of the date hereof that:

(a)     Transaction Agreements.  Certain representations and warranties in the Transaction Agreements are applicable to it or its assets or operations, and each such representation and warranty is true and correct.

(b)     Binding Obligation/Perfection.  This Security Agreement creates a legal, valid, and binding Security Interest in and to the Collateral in favor of Holder Representative and enforceable against Debtor except as the enforceability thereof may be limited by bankruptcy, insolvency, moratorium, reorganization or similar laws affecting the enforcement of creditors' rights generally, and except for judicial limitations on the enforcement of the remedy of specific performance and other equitable remedies.  For Collateral in which the Security Interest may be perfected by the filing of Financing Statements, once those Financing Statements have been properly filed in the applicable jurisdiction, and, in the case of the Registered IP (as defined below) with respect to which a security interest may be perfected by filing, recording or registration in the United States (or any political subdivisions thereof) and its territories and possessions, upon the receipt and recording of a short form of this Security Agreement with the United States Patent and Trademark Office or the United States Copyright Office, as applicable, the Security Interest in such Collateral will be fully perfected, subject only to Permitted Liens.  Other than the Financing Statements and with respect to this Security Agreement, there are no other financing statements or control agreements covering any Collateral, other than those evidencing Permitted Liens.  The creation of the Security Interest does not require the consent of any person or entity that has not been obtained.

(c)     Debtor Information.  Debtor's exact legal name, mailing address, jurisdiction of organization, type of entity, and state issued organizational identification number are as set forth on Schedule A hereto.

4

(d)     Location/Fixtures.   (i) Debtor's place of business and chief executive office is where Debtor is entitled to receive notices hereunder; the present and foreseeable location of Debtor's books and records concerning any of the Collateral that is accounts is as set forth on Schedule A hereto, and the location of all other Collateral, including, without limitation, Debtor's inventory and equipment is as set forth on Schedule A hereto; and, *except* as noted on Schedule A hereto, all such books, records, and Collateral are in Debtor's possession.

(e)     Governmental Authority.   No authorization, approval, or other action by, and no notice to or filing with, any governmental authority is required for the pledge by Debtor of the Collateral pursuant to this Security Agreement or for the execution, delivery, or performance of this Security Agreement by Debtor, other than filings with applicable governmental authorities to perfect the Security Interests created hereby.

(f)     Liens.   Debtor owns all existing Collateral free and clear of all liens, *except* Permitted Liens.

(g)     Intellectual Property.

(i)     All of Debtor's interests in the Debtor's issued Patents, Patent applications, registered Trademarks, Trademark applications, registered Copyrights, and Copyright applications are identified on Schedule B hereto (the "**Registered IP**").

(ii)     Debtor is the owner of the Registered IP included in the Collateral, free and clear of any liens *other than* (A) any Permitted Liens or (B) any licenses permitted by Section 8(c).

**6.     COVENANTS**.   Until the Obligation is paid and performed in full, Debtor covenants and agrees with Holder Representative that Debtor will:

(a)     Information/Record of Collateral.   Maintain, at the place where Debtor is entitled to receive notices under the Notes, a current record of where all material Collateral is located, permit representatives of Holder Representative at any time, upon reasonable prior written notice during normal business hours to inspect and make abstracts from such records (*provided*, that so long as no Default exists, Holder Representative shall conduct such inspections no more frequently than annually), and furnish to Holder Representative, at such intervals as Holder Representative may reasonably request, such documents, lists, descriptions, certificates, and other information as may be reasonably necessary or proper to keep Holder Representative informed with respect to the identity, location, and status of the Collateral.

(b)     Schedules.   Notwithstanding any other provision herein, Debtor's failure to describe any Collateral required to be listed on any schedule hereto shall not impair Holder Representative's Security Interest therein.

(c)     Obligations.   Notwithstanding anything contained herein to the contrary, (i) Debtor shall remain liable under the contracts, agreements, documents, and instruments included in the Collateral to the extent set forth therein to perform all of its duties and obligations thereunder to the same extent as if this Security Agreement had not been executed, and (ii) unless and until Holder Representative forecloses thereon and becomes the owner thereof

5

pursuant to the exercise of its remedies hereunder, Holder Representative shall not have any liability or obligation under any of such contracts, agreements, documents and instruments, and Holder Representative shall not be obligated to perform any of the obligations or duties of Debtor thereunder or to take any action to collect or enforce any claim for payment assigned thereunder.

(d)    Notices.  (i) Except as may be otherwise expressly permitted under the terms of the Transaction Agreements, promptly notify Holder Representative of (A) any claim, action, or proceeding that materially affects title to all or any of the Collateral or the Security Interest; (B) any material damage to or loss of any material Collateral, and (C) the occurrence of any other event or condition (including, without limitation, matters as to lien priority) that could have a material adverse effect on the Collateral (taken as a whole) or the Security Interest created hereunder; and (ii) give Holder Representative thirty (30) days written notice before any proposed (A) relocation of its principal place of business or chief executive office, (B) change of its name or identity; (C) relocation of the place where its books and records concerning its accounts are kept; (D) relocation of any Collateral (*other than* delivery of inventory in the ordinary course of business to third party contractors for processing and sales of inventory in the ordinary course of business or as permitted by the Transaction Agreements) to a location not described on the attached Schedule A, and (E) change of its jurisdiction of organization or organizational identification number, as applicable.  Prior to making any of the changes contemplated in *clause (ii)* preceding, Debtor shall execute and deliver all such additional documents and perform all additional acts as Holder Representative may reasonably request in order to continue or maintain the existence and priority of the Security Interest in all of the Collateral.

(e)    Further Assurances. At Debtor's expense and Holder Representative's reasonable request (i) after a Default, file or cause to be filed such applications and take such other actions as Holder Representative may reasonably request to obtain the consent or approval of any governmental authority to Holder Representative's rights hereunder, including, without limitation, the right to sell all the Collateral upon a Default without additional consent or approval from such governmental authority (and, because Debtor agrees that Holder Representative's remedies at law for failure of Debtor to comply with this provision would be inadequate and that such failure would not be adequately compensable in damages, Debtor agrees that its covenants in this provision may be specifically enforced); (ii) from time to time, either before or after a Default, promptly execute and deliver to Holder Representative all such other assignments, certificates, supplemental documents, and financing statements, and do all other acts or things as Holder Representative may reasonably request in order to more fully create, evidence, perfect, continue, and preserve the priority of the Security Interest and  to carry out the provisions of this Security Agreement; and (iii) either before or after a Default, pay all filing fees in connection with any financing, continuation, or termination statement or other instrument with respect to the Security Interest.

(f)    Encumbrances.  Not create, permit, or suffer to exist, and shall defend the Collateral against, any lien or other encumbrance on the Collateral other than Permitted Liens, and shall defend Debtor's rights in the Collateral and Holder Representative's Security Interest in, the Collateral against the claims and demands of all persons or entities except those holding or claiming Permitted Liens.

6

(g)     <u>Collection of Accounts</u>.  In accordance with prudent business practices, endeavor to collect or cause to be collected from each account debtor under its accounts, as and when due, any and all amounts owing under such accounts.

(h)     <u>Intellectual Property</u>.

(i)     Give Holder Representative prompt written notice if Debtor shall obtain rights to or become entitled to the benefit of any additional issued patents, registered trademarks or registered copyrights (or makes application therefor) that are not identified on <u>Schedule B</u> hereto; if requested by Holder Representative, promptly (but in no event later than 30 days thereafter) deliver to Holder Representative an appropriate short form of this Security Agreement, containing a description of such additional Registered IP, for recording by the United States Patent and Trademark Office or the United States Copyright Office, as applicable; and cooperate as reasonably necessary to enable Holder Representative to make such recordations.

(ii)     If a Default exists, use its reasonable efforts to obtain any consents, waivers, or agreements necessary to enable Holder Representative to exercise its rights and remedies with respect to the Intellectual Property.

(iii)     Not transfer, assign or otherwise dispose of any of the Intellectual Property included in the Collateral except as permitted in the Note.

(iv)     Except to the extent that failure to act could not reasonably be expected to have a Material Adverse Effect, take all commercially reasonable steps necessary to (x) maintain the validity and enforceability of any Registered IP and maintain such Registered IP in full force and effect and (y) pursue the application, obtain the relevant registration and maintain the registration of each of its Patents, Trademarks and Copyrights, including, without limitation, by the payment of required fees and taxes, the filing of responses to office actions issued by the U.S. Patent and Trademark Office, the U.S. Copyright Office or other governmental authorities, the filing of applications for renewal or extension, the filing of affidavits, the filing of divisional, continuation, continuation-in-part, reissue and renewal applications or extensions, the payment of maintenance fees and the participation in interference, reexamination, opposition, cancellation, infringement and misappropriation proceedings.

(v)     Except to the extent that failure to act could not reasonably be expected to have a Material Adverse Effect, not do or permit any act or knowingly omit to do any act whereby any of its Intellectual Property may lapse, be terminated, or become invalid or unenforceable or placed in the public domain (or in case of a trade secret, lose its competitive value).

(vi)     Except to the extent that failure to act could not reasonably be expected to have a Material Adverse Effect, take all commercially reasonable steps to preserve and protect each item of its Intellectual Property, including, without limitation, maintaining the quality of any and all products or services used or provided in connection with any of the Trademarks, consistent with the quality of the products and services as of

7

Exh K_007

the date hereof, and taking all commercially reasonable steps necessary to ensure that all licensed users of any of the Trademarks abide by the applicable license's terms with respect to the standards of quality.

Notwithstanding the foregoing provisions of this subsection (i) or anything to the contrary in this Security Agreement, nothing in this Security Agreement shall prevent Debtor from discontinuing the use or maintenance of any of its Intellectual Property, the enforcement of its license agreements or the pursuit of actions against infringers, if Debtor determines in its reasonable business judgment that such discontinuance is desirable in the conduct of its business.

**7.     DEFAULT; REMEDIES**.  If a Default exists, Holder Representative may, at its election (but subject to Section 9 below and to the terms and conditions of the Transaction Agreements), exercise any and all rights available to a secured party under the UCC, in addition to any and all other rights afforded by the Transaction Agreements, at law, in equity, or otherwise, including, without limitation, (a) requiring Debtor to assemble all or part of the Collateral and make it available to Holder Representative at a place to be designated by Holder Representative which is reasonably convenient to Debtor and Holder Representative, (b) surrendering any policies of insurance on all or part of the Collateral and receiving and applying the unearned premiums as a credit on the Obligation, (c) applying by appropriate judicial proceedings for appointment of a receiver for all or part of the Collateral (and Debtor hereby consents to any such appointment), and (d) applying to the Obligation any cash held by Holder Representative under this Security Agreement.

(a)     Notice.  Reasonable notification of the time and place of any public sale of the Collateral, or reasonable notification of the time after which any private sale or other intended disposition of the Collateral is to be made, shall be sent to Debtor and to any other person or entity entitled to notice under the UCC.  It is agreed that notice sent or given not less than ten calendar days prior to the taking of the action to which the notice relates is reasonable notification and notice for the purposes of this subparagraph.

(b)     Condition of Collateral; Warranties.  Holder Representative has no obligation to clean-up or otherwise prepare the Collateral for sale.  Holder Representative may sell the Collateral without giving any warranties as to the Collateral.  Holder Representative may specifically disclaim any warranties of title or the like.  This procedure will not be considered adversely to affect the commercial reasonableness of any sale of the Collateral.

(c)     Compliance with Other Laws.  Holder Representative may comply with any applicable state or federal laws in connection with a disposition of the Collateral and compliance will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral.

(d)     Application of Proceeds.  Holder Representative shall apply the proceeds of any sale or other disposition of the Collateral under this Section 7 in the following order: *first*, to the payment of all expenses incurred in retaking, holding, and preparing any of the Collateral for sale(s) or other disposition, in arranging for such sale(s) or other disposition, and in actually selling or disposing of the same (all of which are part of the Obligation); *second*, toward repayment of amounts expended by Holder Representative under Section 8; *third,* toward

8

payment of the balance of any amounts due with respect to Priority Liens, including with respect to the Senior Debt; and *fourth*, toward payment of the balance of the Obligation in the order and manner as Holder Representative determines in its sole discretion. Any surplus remaining shall be delivered to Debtor or as a court of competent jurisdiction may direct. If the proceeds are insufficient to pay the Obligation in full, then Debtor shall remain liable for any deficiency.

(e)     Sales on Credit. If Holder Representative sells any of the Collateral upon credit, Debtor will be credited only with payments actually made by the purchaser, received by the Holder Representative, and applied to the indebtedness of the purchaser. In the event the purchaser fails to pay for the Collateral, Holder Representative may resell the Collateral and Debtor shall be credited with the proceeds of the sale.

## 8.     OTHER RIGHTS OF HOLDER REPRESENTATIVE.

(a)     Performance. If Debtor fails to pay when due all taxes on any of the Collateral in the manner required by the Transaction Agreements, or fails to preserve the priority of the Security Interest in any of the Collateral, or fails to keep the Collateral insured as required by the Transaction Agreements, or otherwise fails to perform any of its obligations under the Transaction Agreements with respect to the Collateral, then Holder Representative may, at its option, but without being required to do so, and upon prior written notice to Debtor if no Default otherwise exists, pay such taxes, prosecute or defend any suits in relation to the Collateral, or insure and keep insured the Collateral in any amount deemed appropriate by Holder Representative, or take all other action which Debtor is required, but has failed or refused, to take under the Transaction Agreements. Any sum which may be expended or paid by Holder Representative under this subparagraph (including, without limitation, court costs and reasonable attorneys' fees) shall be payable by Debtor to Holder Representative upon demand and shall be part of the Obligation.

(b)     Collection. If a Default exists and upon written notice from Holder Representative, each Collateral Obligor with respect to any payments on any of the Collateral (including, without limitation, insurance proceeds payable by reason of loss or damage to any of the Collateral) is hereby authorized and directed by Debtor to make payment directly to Holder Representative, regardless of whether Debtor was previously making collections thereon. Until such notice is given, Debtor is authorized to retain and expend all payments made on Collateral. If a Default exists, Holder Representative shall have the right in its own name or in the name of Debtor to compromise or extend time of payment with respect to all or any portion of the Collateral for such amounts and upon such terms as Holder Representative may determine; to demand, collect, receive, receipt for, sue for, compound, and give acquittances for any and all amounts due or to become due with respect to Collateral; to take control of cash and other proceeds of any Collateral; to endorse the name of Debtor on any notes, acceptances, checks, drafts, money orders, or other evidences of payment on Collateral that may come into the possession of Holder Representative; to sign the name of Debtor on any invoice or bill of lading relating to any Collateral, on any drafts against Collateral Obligors or other persons or entities making payment with respect to Collateral, on assignments and verifications of accounts or other Collateral and on notices to Collateral Obligors making payment with respect to Collateral; to send requests for verification of obligations to any Collateral Obligor; and to do all other acts and things necessary to carry out the intent of this Security Agreement. If a Default exists and any

9

Collateral Obligor fails or refuses to make payment on any Collateral when due, Holder Representative is authorized, in its sole discretion, either in its own name or in the name of Debtor, to take such action as Holder Representative shall deem appropriate for the collection of any amounts owed with respect to Collateral or upon which a delinquency exists.  Regardless of any other provision hereof, however, Holder Representative shall never be liable for its failure to collect, or for its failure to exercise diligence in the collection of, any amounts owed with respect to Collateral, nor shall it be under any duty whatsoever to anyone *except* Debtor to account for funds that it shall actually receive hereunder.

(c)    Intellectual Property.  For purposes of enabling Holder Representative to exercise its rights and remedies under this Security Agreement and enabling Holder Representative and its successors and assigns to enjoy the full benefits of the Collateral, Debtor hereby grants to Holder Representative an irrevocable, nonexclusive license (exercisable without payment of royalty or other compensation to Debtor) to use, license, or sublicense any of Debtor's rights in the Intellectual Property to the extent such rights are transferable but only during such time as a Default exists.  During the existence of a Default, Debtor shall provide Holder Representative with reasonable access to all media in which any of the Intellectual Property may be recorded or stored and all computer programs used for the completion or printout thereof.  This license shall also inure to the benefit of all successors, assigns, and transferees of Holder Representative.  If a Default exists, Holder Representative may require that Debtor assign all of its right, title, and interest in and to the Intellectual Property or any part thereof to Holder Representative or such other person or entity as Holder Representative may designate pursuant to documents satisfactory to Holder Representative.  If no Default exists, then Debtor shall have the exclusive right and license to use the Intellectual Property in the ordinary course of business and the exclusive right to grant to other persons or entities licenses and sublicenses with respect to the Intellectual Property.

(d)    Use and Operation of Collateral.  Should any Collateral come into the possession of Holder Representative while a Default exists, Holder Representative may use or operate such Collateral for the purpose of preserving it or its value pursuant to the order of a court of appropriate jurisdiction or in accordance with any other rights held by Holder Representative in respect of such Collateral.  Debtor covenants to promptly reimburse and pay to Holder Representative, at Holder Representative's request, the amount of all reasonable expenses (including, without limitation, the cost of any insurance and payment of taxes or other charges) incurred by Holder Representative in connection with its custody and preservation of Collateral, and all such expenses, costs, taxes and other charges shall be payable by Debtor to Holder Representative upon demand and shall become part of the Obligation.  However, the risk of accidental loss or damage to, or diminution in value of, Collateral is on Debtor, and Holder Representative shall have no liability whatever for failure to obtain or maintain insurance, nor to determine whether any insurance ever in force is adequate as to amount or as to the risks insured.  With respect to Collateral that is in the possession of Holder Representative, Holder Representative shall have no duty to fix or preserve rights against prior parties to such Collateral and shall never be liable for any failure to use diligence to collect any amount payable in respect of such Collateral, but shall be liable only to exercise reasonable care in the safekeeping of any Collateral in its possession (it being agreed that treatment substantially equal to that which the Holder Representative accords its own property shall be deemed to constitute the exercise of

10

reasonable care) and to account to Debtor for what it may actually collect or receive thereon. The provisions of this subparagraph are only applicable during the existence of a Default.

(e)    Power of Attorney.  Debtor hereby irrevocably constitutes and appoints Holder Representative and any officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact with full power and authority in the name of Debtor or in its own name, while a Default exists, to take any and all action and to execute any and all documents and instruments which Holder Representative at any time and from time to time deems necessary or desirable to accomplish the purposes of this Security Agreement and, without limiting the generality of the foregoing, Debtor hereby gives Holder Representative the power and right on behalf of Debtor and in its own name to do any of the following while a Default exists, without notice to or the consent of Debtor:

(i)    to use the Intellectual Property or to grant or issue any exclusive or non-exclusive license under the Intellectual Property to anyone else, and to perform any act necessary for the Holder Representative to assign, pledge, convey, or otherwise transfer title in or dispose of the Intellectual Property to any other person or entity;

(ii)    to demand, sue for, collect, or receive, in the name of Debtor or in its own name, any money or property at any time payable or receivable on account of or in exchange for any of the Collateral and, in connection therewith, endorse checks, notes, drafts, acceptances, money orders, documents of title or any other instruments for the payment of money under the Collateral or any policy of insurance;

(iii)    to pay or discharge taxes, liens, or other encumbrances levied or placed on or threatened against the Collateral;

(iv)    to notify post office authorities to change the address for delivery of Debtor to an address designated by Holder Representative and to receive, open, and dispose of mail addressed to Debtor; and

(v)    (A) to direct account debtors and any other parties liable for any payment under any of the Collateral to make payment of any and all monies due and to become due thereunder directly to Holder Representative or as Holder Representative shall direct; (B) to receive payment of and receipt for any and all monies, claims, and other amounts due and to become due at any time in respect of or arising out of any Collateral; (C) to sign and endorse any invoices, freight or express bills, bills of lading, storage or warehouse receipts, drafts against debtors, assignments, proxies, stock powers, verifications, and notices in connection with accounts and other documents relating to the Collateral; (D) to commence and prosecute any suit, action, or proceeding at law or in equity in any court of competent jurisdiction to collect the Collateral or any part thereof and to enforce any other right in respect of any Collateral; (E) to defend any suit, action, or proceeding brought against Debtor with respect to any Collateral; (F) to settle, compromise, or adjust any suit, action, or proceeding described above and, in connection therewith, to give such discharges or releases as Holder Representative may deem appropriate; (G) to exchange any of the Collateral for other property upon any merger, consolidation, reorganization, recapitalization, or other readjustment of the

11

issuer thereof and, in connection therewith, deposit any of the Collateral with any committee, depositary, transfer agent, registrar, or other designated agency upon such terms as Holder Representative may determine; (H) to add or release any guarantor, indorser, surety, or other party to any of the Collateral; (I) to renew, extend, or otherwise change the terms and conditions of any of the Collateral; (J) to endorse Debtor's name on all applications, documents, papers, and instruments necessary or desirable in order for Holder Representative to use or maintain any of the Intellectual Property; (K) to make, settle, compromise or adjust any claims under or pertaining to any of the Collateral (including claims under any policy of insurance); (L) to file on behalf of Debtor any financing statements or continuation statements with respect to the Security Interests created hereby, and to do any and all acts and things to protect and preserve the Collateral, including, without limitation, the protection and prosecution of all rights included in the Collateral; and (M) to sell, transfer, pledge, convey, make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though Holder Representative were the absolute owner thereof for all purposes, and to do, at Holder Representative's option and Debtor's expense, at any time, or from time to time, all acts and things which Holder Representative deems necessary to protect, preserve, maintain, or realize upon the Collateral and Holder Representative's Security Interest therein. This power of attorney is a power coupled with an interest and shall be irrevocable unless or until all principal and interest payable under the Note have been repaid in full. Holder Representative shall be under no duty to exercise or withhold the exercise of any of the rights, powers, privileges, and options expressly or implicitly granted to Holder Representative in this Security Agreement, and shall not be liable for any failure to do so or any delay in doing so.  Neither Holder Representative nor any person or entity designated by Holder Representative shall be liable for any act or omission or for any error of judgment or any mistake of fact or law. This power of attorney is conferred on Holder Representative solely to protect, preserve, maintain, and realize upon its Security Interest in the Collateral. Holder Representative shall not be responsible for any decline in the value of the Collateral and shall not be required to take any steps to preserve rights against prior parties or to protect, preserve, or maintain any Lien given to secure the Collateral; provided, however, that the Holder Representative shall use reasonable care in the safekeeping of any Collateral in its possession (it being agreed that treatment substantially equal to that which the Holder Representative accords its own property shall be deemed to constitute the exercise of reasonable care).

9.    **MISCELLANEOUS**.

(a)    <u>Continuing Security Interest</u>.    This Security Agreement creates a continuing Security Interest in the Collateral and shall (i) remain in full force and effect until the Obligation is paid and performed in full; and (ii) inure to the benefit of and be enforceable by Holder Representative and its successors, transferees, and assigns.  Without limiting the generality of the foregoing <u>clause (ii)</u>, Holder Representative may assign or otherwise transfer any of their respective rights under this Security Agreement to any other person or entity upon ten business day's prior written notice to Debtor provided that the assignee agrees to be bound by the terms and conditions of the Transaction Agreements.  To the extent of such assignment or transfer, such person or entity shall thereupon become vested with all the rights and benefits in respect thereof granted herein or otherwise to Holder Representative.  Upon payment in full of

12

the Obligation, Debtor shall be entitled to the return, upon its request and at its expense, of (i) any confidential information provided to Holder Representative or its agents or assignees pursuant to the Transaction Agreements and (ii) such of the Collateral as shall not have been sold or otherwise applied pursuant to the terms hereof.

        (b)    <u>Termination and Release</u>.

        (i)    Upon the full and final payment and performance of the Obligation, this Security Agreement shall automatically terminate.

        (ii)    The liens created by this Security Agreement on any of the Collateral shall be automatically released if Debtor disposes of such Collateral pursuant to a transaction permitted by the Note.

        (iii)    In connection with any termination or release pursuant to clauses (i) or (ii), Holder Representative shall promptly execute and deliver to Debtor, at Debtor's expense, all documents that Debtor shall reasonably request to evidence such termination or release. Any execution and delivery of documents pursuant to this Section 10(b)(iii) shall be without recourse to or warranty by Holder Representative.

        (c)    <u>Actions Not Releases</u>.  The Security Interest and Debtor's obligations and Holder Representative's rights hereunder shall not be released, diminished, impaired, or adversely affected by the occurrence of any one or more of the following events: (i) the taking or accepting of any other security or assurance for any or all of the Obligation; (ii) any release, surrender, exchange, subordination, or loss of any security or assurance at any time existing in connection with any or all of the Obligation; (iii) the modification of, amendment to, or waiver of compliance with any terms of any of the other Transaction Agreements without the notification or consent of Debtor, *except* as required therein; (iv) the insolvency, bankruptcy, or lack of corporate or trust power of any party at any time liable for the payment of any or all of the Obligation, whether now existing or hereafter occurring; (v) any renewal, extension, or rearrangement of the payment of any or all of the Obligation, either with or without notice to or consent of Debtor, or any adjustment, indulgence, forbearance, or compromise that may be granted or given by Holder Representative to Debtor; (vi) any neglect, delay, omission, failure, or refusal of Holder Representative to take or prosecute any action in connection with any other agreement, document, guaranty, or instrument evidencing, securing, or assuring the payment of all or any of the Obligation; (vii) any failure of Holder Representative to notify Debtor of any renewal, extension, or assignment of the Obligation or any part thereof, or the release of any Collateral or other security, or of any other action taken or refrained from being taken by Holder Representative against Debtor or any new agreement between or among Holder Representative and Debtor, *it being understood that* except as expressly provided herein or required by law, Holder Representative shall not be required to give Debtor any notice of any kind under any circumstances whatsoever with respect to or in connection with the Obligation, including, without limitation, notice of acceptance of this Security Agreement or any Collateral ever delivered to or for the account of Holder Representative hereunder; (viii) the illegality, invalidity, or unenforceability of all or any part of the Obligation against any party obligated with respect thereto by reason of the fact that the Obligation, or the interest paid or payable with respect thereto, exceeds the amount permitted by applicable laws, the act of creating the

13

Obligation, or any part thereof, is *ultra vires*, or the officers, partners, or trustees creating same acted in excess of their authority, or for any other reason; or (ix) if any payment by any party obligated with respect thereto is held to constitute a preference under applicable laws or for any other reason Holder Representative is required to refund such payment or pay the amount thereof to someone else.

(d)     Waivers.  Except to the extent expressly otherwise provided herein or in other Transaction Agreements and to the fullest extent permitted by applicable laws, Debtor waives (i) any right to require Holder Representative to proceed against any other person or entity, to exhaust its rights in Collateral, or to pursue any other right which Holder Representative may have; (ii) with respect to the Obligation, presentment and demand for payment, protest, notice of protest and nonpayment, and notice of the intention to accelerate; and (iii) all rights of marshaling in respect of any and all of the Collateral.

(e)     Financing Statement; Authorization.  Debtor hereby irrevocably authorizes Holder Representative at any time and from time to time to file in any UCC jurisdiction any initial financing statements and amendments thereto (without the requirement for Debtor's signature thereon) that (i) indicate the Collateral (A) as all assets of Debtor or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the UCC of the state or such jurisdiction or whether such assets are included in the Collateral hereunder, or (B) as being of an equal or lesser scope or with greater detail, and (ii) contain any other information required by Article 9 of the UCC of the state or such jurisdiction for the sufficiency or filing office acceptance of any financing statement or amendment, including whether the Debtor is an organization, the type of organization, and any organization identification number issued to Debtor.  Debtor agrees to furnish any such information to Holder Representative promptly upon request.

(f)     Amendments.  This Security Agreement may be amended only by an instrument in writing executed jointly by Debtor and Holder Representative, and supplemented only by documents delivered or to be delivered in accordance with the express terms hereof.

(g)     Multiple Counterparts.  This Security Agreement has been executed in a number of identical counterparts, each of which shall be deemed an original for all purposes and all of which constitute, collectively, one agreement; but, in making proof of this Security Agreement, it shall not be necessary to produce or account for more than one such counterpart.

(h)     Parties Bound; Assignment.  This Security Agreement shall be binding on Debtor and Debtor's heirs, legal representatives, successors, and assigns and shall inure to the benefit of Holder Representative and Holder Representative's successors and assigns; *provided that* Debtor may not, without the prior written consent of Holder Representative, assign any rights, duties, or obligations hereunder.

(i)     General Authority of Holder Representative.  By acceptance of the benefits of this Security Agreement, each holder of the Notes (whether or not a signatory hereto) shall be deemed irrevocably (a) to consent to the appointment of Holder Representative as its agent hereunder, (b) to confirm that Holder Representative shall have the authority to act as the exclusive agent of such Person for the enforcement of any provisions of this Security Agreement

14

Exh K_014

against Debtor, the exercise of remedies hereunder and the giving or withholding of any consent or approval hereunder relating to any Collateral or Debtor's obligations with respect thereto, (c) to agree that it shall not take any action to enforce any provisions of this Security Agreement against Debtor, to exercise any remedy hereunder or to give any consents or approvals hereunder except as expressly provided in this Security Agreement or in the Notes and (d) to agree to be bound by the terms of this Security Agreement.

        (j)    <u>GOVERNING LAW</u>.  THIS SECURITY AGREEMENT SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, AND ALL QUESTIONS CONCERNING THE CONSTRUCTION, VALIDITY, INTERPRETATION AND PERFORMANCE OF THIS NOTE SHALL BE GOVERNED BY, THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO ANY CHOICE OF LAW OR CONFLICT OF LAW PROVISION OR RULE (WHETHER OF THE STATE OF DELAWARE OR ANY OTHER JURISDICTIONS) THAT WOULD CAUSE THE APPLICATION OF THE LAWS OF ANY JURISDICTIONS OTHER THAN THE STATE OF DELAWARE.

*Remainder of Page Intentionally Blank.*
*Signature Page to Follow.*

15

Exh K_015

EXECUTED as of the date first stated in this Security Agreement.

**DEBTOR:**

**ISC8, INC.**

By: _____
      Name:
      Title:

**HOLDER REPRESENTATIVE:**

**GRIFFIN PARTNERS, LLC**

By: _____
      Name:
      Title:

**SIGNATURE PAGE TO
SECURITY AGREEMENT**

_____

as a Holder of Notes


By: _____
    Name:
    Title:


**SIGNATURE PAGE TO
SECURITY AGREEMENT**

Exh K_017

## SCHEDULE A

## DEBTOR INFORMATION AND LOCATION OF COLLATERAL

A.    Exact Legal Name of Debtor:        ISC8, Inc.

B.    Mailing Address of Debtor:         151 Kalmus Drive
                                         Costa Mesa, CA 92626

C.    Type of Entity:                    Corporation

D.    Jurisdiction of Organization:      Delaware

E.    State Issued Organizational        2149404
      Identification Number:

F.    Location of Books and Records:     151 Kalmus Drive, Costa Mesa, California 92626

G.    Location(s) of Collateral:         151 Kalmus Drive, Costa Mesa, California 92626


H.    Jurisdiction(s) for Filing         Delaware
      Financing Statements:

## SCHEDULE B

A.    Registered Copyrights and Copyright Applications:

    None

B.    Issued Patents and Patent Applications:

    Patent Applications:

| **Patent Title** | **Country** | **Status** | **Application No.** | **Filed** |
|---|---|---|---|---|
| Portable Lip Reading Sensor System | U.S. | Patent | 8,271,262 | 9/18/2012 |
| Thermal Power Distribution System | U.S. | Non-Provisional | 12/657,090 | 1/14/2010 |
| Micro Gas Cell Array Device and Method | U.S. | Patent | 8,264,689 | 9/11/2012 |
| Micro-Combustion Power System with Dual Counter-Flow | U.S. | Non-Provisional | 12/584,460 | 9/4/2009 |
| Micro-Image Acquisition and Transmission System | U.S. | Patent | 8,362,673 | 1/29/2013 |
| Micro-Image Acquisition and Transmission System | U.S. | Non-Provisional | 13/711,373 | 12/11/2012 |
| Multi-Layer Photon Counting Electronic Module | U.S. | Non-Provisional | 12/924,141 | 9/20/2010 |
| Launch Tube Deployable Surveillance and Reconnaissance System (TOWHAWK) | U.S. | Non-Provisional | 12/799,297 | 4/21/2010 |
| Energy Efficient Micro Combustion System for Power Generation and Fuel Processing | U.S. | Patent | 8,546,680 | 10/1/2013 |
| Energy-Efficient Micro-Combustion System for Power Generation and Fuel Processing | U.S. | Non-Provisional | 12/909,332 | 10/21/2010 |
| Micro-Combustion Power System with Metal Foam Heat Exchanger | U.S. | Non-Provisional | 12/800,746 | 5/21/2010 |
| Apparatus Comprising Artificial Neuronal Assembly | U.S. | Patent | 8,510,244 | 8/13/2013 |
| Frequency Modulated Micro-Gyroscope Signal Processing Device and Method | U.S. | Patent | 8,327,705 | 12/11/2012 |
| Frequency Modulated Micro-Gyro Half-Period Signal Processing Method | U.S. | Non-Provisional | 13/982,537 | 10/15/2012 |
| Phase Sensing LADAR Using Atmospheric Absorption Bands | U.S. | Patent | 8,279,420 | 10/2/2012 |
| AM Chirp LADAR Readout Circuit and Module | U.S. | Patent | 8,125,367 | 2/28/2012 |
| Gravity operated, rotatable lens curtain for thermal imager | U.S. | Patent | 8,411,346 | 4/2/2013 |

| | | | | |
|---|---|---|---|---|
| Tamper -Resistant Electronic Circuit and Module Incorporating Electrically Conductive Nano-Structures | U.S. | Non-Provisional | 12/806,127 | 8/4/2010 |
| Energy Harvesting Buoy | U.S. | Patent | 8,415,819 | 4/9/2013 |
| Secure Anti-Tamper Integrated Layer Security Device Comprising Nano-Structures | U.S. | Non-Provisional | 13/045,880 | 3/11/2011 |
| Thermal Management Device Comprising Thermally Conductive Heat Spreader with Electrically Isolated Through-Hole Vias | U.S. | Non-Provisional | 12/925,147 | 10/13/2010 |
| Ultra-Low Profile Multi-Chip Module | U.S. | Non-Provisional | 12/925,620 | 10/25/2010 |
| Compact Intelligent Surveillance System Comprising Intent Recognition | U.S. | Non-Provisional | 12,928,083 | 12/1/2010 |
| High Density Array Module and Connector | U.S. | Non-Provisional | 12/928,797 | 12/16/2010 |
| Quick Release Launch connector for micro unmanned aerial vehicle | U.S. | Non-Provisional | 12/928,796 | 12/16/2010 |
| Aerial Surveillance System and Method | U.S. | Non-Provisional | 12/928,458 | 12/9/2010 |
| Anti-Tampering Obscurity Using Firmware Power Mirror Compiler | U.S. | Patent | 8,384,413 | 2/26/2013 |
| Large Displacement Micro-Lamellar Grating Interferometer | U.S. | Non-Provisional | 13/010,745 | 1/20/2011 |
| Fast, High Resolution 3-D Flash LADAR Imager | U.S. | Non-Provisional | 13/099,829 | 5/3/2011 |
| Multi-Source Imagery and Geopositional Exploitation | U.S. | Non-Provisional | 13/109,793 | 5/17/2011 |
| Wear-Resistant Conformal Coating for Micro-Channel Structure | U.S. | Non-Provisional | 13/155,986 | 6/8/2011 |
| Anti-Tampering Detection Using Target Circuit RF Signature | U.S. | Non-Provisional | 13/098,738 | 5/2/2011 |
| Switched and Smart Switched Tracking Power Supply | U.S. | Non-Provisional | 13/098,684 | 5/2/2011 |
| EAGLE - High-Speed Processor Core Comprising Direct Processor-to-Memory Interconnectivity | U.S. | Patent | 8,519,739 | 8/27/2013 |
| High-Speed Processor Core Comprising Mapped Auxilliary Component Functionality | U.S. | Non-Provisional | 13/965,810 | 8/13/2013 |
| Sensor Element and System Comprising Wide Field-of-View 3-D Imaging LIDAR | U.S. | Non-Provisional | 13/108,172 | 5/16/2011 |
| Background Limited Focal Plane Array Assembly | U.S. | Non-Provisional | 13/589,231 | 8/20/2012 |
| Long Range Acquisition and Tracking SWIR Sensor System Comprising Micro-Lamellar Spectrometer | U.S. | Non-Provisional | 13/397,275 | 2/15/2012 |

Exh K_020

| | | | | |
|---|---|---|---|---|
| Active Tracking and Imaging Sensor System Comprising Illuminator Analysis Function | U.S. | Non-Provisional | 13/563,794 | 8/1/2012 |
| Multi-Operations Sensor System | U.S. | Non-Provisional | 13/671,643 | 11/8/2012 |
| Ultra High Resolution Holographic Camera | U.S. | Non-Provisional | 13/908,758 | 6/3/2013 |
| Multi-Spectral Sensor System Comprising a Plurality of Buttable Focal Plane Arrays | U.S. | Non-Provisional | 13/655,563 | 10/19/2012 |
| Self-Calibrating Targeting Sight | U.S. | Non-Provisional | 13/292,325 | 11/9/2011 |
| Low-Power LIDAR Scan and Receive Device and Method | U.S. | Non-Provisional | 13912282 | 6/7/2013 |
| Threshold Detection Method and Device for LIDAR Time of Flight System Using Differentiated Gaussian Signal | U.S. | Non-Provisional | 13/425,535 | 3/21/2012 |
| Threshold Detection Method, Module and Readout Integrated Circuit Layer for LIDAR Time of Flight System Using Differentiated Gaussian Signal | U.S. | Non-Provisional | 13/430,075 | 3/26/2012 |
| Sensor System Comprising Stacked Micro-Channel Plate Detector | U.S. | Non-Provisional | 13/338,332 | 12/28/2011 |
| Low Power Image Intensifier Device Comprising black Silicon Detector Element | U.S. | Non-Provisional | 13/272,341 | 10/13/2011 |
| LIDAR System Comprising Large Area Micro-Channel Plate Focal Plane Array | U.S. | Non-Provisional | 13/372,184 | 2/13/2012 |
| Stacked Micro-Channel Plate Assembly Comprising a Micro-Lens | U.S. | Non-Provisional | 13/338,328 | 12/28/2011 |
| Wirebond Through-Via Structure and Method | U.S. | Non-Provisional | 13/209,898 | 8/15/2011 |
| Anti-Tamper Wrapper Interconnect Method and Device | U.S. | Non-Provisional | 13/370,381 | 2/10/2012 |
| Method for Fabricating a Small Footpring Chip-Scale Package and a Device Made from the Method | U.S. | Non-Provisional | 13/399,051 | 2/17/2012 |
| Method for Fabricating a Neo-Layer Using Stud Bumped Bare Die | U.S. | Patent | 8,609,473 | 12/17/2013 |
| Cap Chip and Reroute Layer for Stacked Microelectronic Module | U.S. | Non-Provisional | 13/549,695 | 7/16/2012 |
| Method for Control of Solder Collapse in Stacked Microelectronic Structure | U.S. | Non-Provisional | 13/209,933 | 8/15/2011 |
| Method for Depackaging Prepackaged Integrated Circuit Die and a Procedure From the Method | U.S. | Patent | 8,586,407 | 11/19/2013 |

Exh K_021

| | | | | |
|---|---|---|---|---|
| Method for Defining an Electronically Conductive Metal Structure on a Three-Dimensional Element and a Device Made From the Method | U.S. | Non-Provisional | 13/267,651 | 10/6/2011 |
| Nano-Resonator Inertial Sensor Assembly | U.S. | Patent | 8,584,524 | 11/19/2013 |
| Zero-Added Footprint Captive Float Nut | U.S. | Non-Provisional | 13/526,221 | 6/18/2012 |
| Semiconductor Micro-Connector With Through-Hole via and a Method for Making the Same | U.S. | Non-Provisional | 13/479,585 | 5/24/2012 |
| Gravity-Stabilized Sensor Mount for Moving Platform | U.S. | Non-Provisional | 13/457,566 | 4/27/2012 |
| GPS-Independent Positioning Method | U.S. | Non-Provisional | 13/772,589 | 2/21/2013 |
| Method and Apparatus for Foldable Wing UAV | U.S. | Non-Provisional | 13/774,157 | 2/22/2013 |
| Tamper Resistant Memory Device with Variable Data Transmission Rate | U.S. | Non-Provisional | 13/363,571 | 2/1/2012 |
| Imaging Device and Method for Video Data Transmission Optimization | U.S. | Non-Provisional | 13/480,629 | 5/25/2012 |
| Wave Energy Capture System (WECS) | U.S. | Non-Provisional | 13/487,404 | 6/4/12 |
| Stacked Physically Uncoloeable Function Sense and Respond Module | U.S. | Non-Provisional | 13/486,500 | 6/1/2012 |
| Local Alignment & Positioning Device and Method | U.S. | Non-Provisional | 13/567,277 | 8/6/2012 |
| Launch Device for Tube-Launched Projectile | U.S. | Non-Provisional | 13/769,430 | 2/18/2013 |
| Thermally-Managed Electronic Device | U.S. | Non-Provisional | 13/625,019 | 9/24/2012 |
| Self-calibrating Micro-Gyroscope | U.S. | Non-Provisional | 13/763,151 | 2/8/2013 |
| Cyber Behavior Analysis and Detection Method, System and Architecture | U.S. | Non-Provisional | 13/693,226 | 12/4/2012 |
| Neo-Carrier comprising T-Connect and Through Via Structures | U.S. | Provisional | 61/577,443 | 12/19/2011 |
| Neo-Carrier comprising T-Connect and Through Via Structures | U.S. | Non-Provisional | 13/736,192 | 1/8/2013 |
| High Sensitivity Micro Piezoelectric Tunable Resonator | U.S. | Non-Provisional | 13/744,064 | 1/17/2013 |
| Autonomous Remote Anchor System (ARAS) | U.S. | Non-Provisional | 13/796,009 | 3/12/2013 |
| Hovering Surveillance Air Vehicle | U.S. | Non-Provisional | 13/848,443 | 3/21/2013 |
| LIDAR Comprising Polyhedron Transmission and Receiving Scanning Element | U.S. | Non-Provisional | 13/852,457 | 3/28/2013 |

Exh K_022

| | | | | |
|---|---|---|---|---|
| Imaging Apparatus and Meethod Comprising Imager and Optics Actuator Means | U.S. | Non-Provisional | 13/875,037 | 5/1/2013 |
| Imaging Apparatus Comprising Imager and Optics Actuator Means to Increase Depth of Field | U.S. | Provisional | 61/772,636 | 3/5/2013 |
| Hyper-spectral and Hyper-spatial Search, Track and Recognition Sensor | U.S. | Non-Provisional | 13/948,766 | 7/23/2013 |
| Persistent Imaging Surveillance System | U.S. | Non-Provisional | 14/013,737 | 8/29/2013 |
| Solid State Drive Memory Device Comprising Secure Erase Function | U.S. | Non-Provisional | 13/923,310 | 6/20/2013 |
| Time of Flight and Amplitude Detecting LIDAR Receiver circuit Using FIFO Architecture | U.S. | Non-Provisional | 14/053,209 | 10/14/2013 |
| Offset Axis Laser Scanner Apparatus | U.S. | Non-Provisional | 14/057,065 | 10/18/2013 |
| Device and Method for Detection of Anomalous Behavior in a Computer Network | U.S. | Non-Provisional | 14/147,105 | 1/3/2014 |
| Low Power Blast Dosimeter | U.S. | Non-Provisional | 14/064,292 | 10/28/2013 |
| MEMS Drive and Beam-Steering Apparatus | U.S. | Non-Provisional | 14/068,714 | 10/31/2013 |
| System and Method for Network Traffic Data Retention and Correlated Information Management | U.S. | Non-Provisional | 13/672,579 | 11/8/2012 |
| System & Method for Run-Time Correlation Operations on Multi-Domain Network Activities | U.S. | Non-Provisional | 13/673,238 | 11/9/2012 |
| System and Method for High-Performance Storage and Retrieval of Correlated Network Traffic Data | U.S. | Non-Provisional | 13/673,469 | 11/9/2012 |
| Black Silicon Thermal Interface Device and Method | U.S. | Non-Provisional | 14/545,780 | 1/14/2014 |
| Device for Creating Convolute Channel in a Solid Structure (TDEM) | U.S. | Provisional | 61/760,681 | 2/5/2013 |
| High-Sensitivity Frequenty-Modulated Micro-Gyro | U.S. | Provisional | 61/791,298 | 3/15/2013 |
| Analysis, Labeling and Exploitation of Data in Real Time for Hyper-Spectral Sensors | U.S. | Provisional | 61/802,700 | 3/17/2013 |
| Thermally-Managed Stacked Electronic Module | U.S. | Provisional | 61/863,576 | 8/8/2013 |

C.     Registered Trademarks and Trademark Applications:

Registered Trademarks:

| Serial # | Registration # | Trademark |
|---|---|---|
| 78922582 | 3302416 | NEO-STACK |
| 78544618 | 3087338 | PMTV |
| 77722549 | 3714810 | TOWHAWK |
| 76552662 | 3252640 | IRVINE SENSORS CORPORATION (design plus words) |

Trademark Applications:

| Serial # | Trademark |
|----------|-----------|
| 85247679 | VAULT-SMM |
| 85238833 | VAULT-MM |

ISC8
Summary of Payroll by name

| Domestic | Type | [b] 9/26/2014 | [c] 9/22/2014 | Total | $ Insider |
|---|---|---|---|---|---|
| Johanna Kirsten Bay | Insider | $ 11,706.52 | $ 768.48 | $ 12,475.00 | $ 12,475.00 |
| Jonathan Bengtson | | $ 5,590.05 | $ 559.00 | $ 6,149.05 | |
| John Carson | | $ - | $ - | $ - | |
| Jan Cioffi | | $ 1,550.16 | 155.02 | $ 1,705.18 | |
| Llewellyn Derry | | $ 7,038.59 | 703.86 | $ 7,742.45 | |
| Neal Devin Jones | | $ 8,695.54 | 869.55 | $ 9,565.09 | |
| Craig Lanning | | $ 3,726.41 | 372.64 | $ 4,099.05 | |
| Scott Millis | Insider | $ 7,413.97 | 741.40 | $ 8,155.36 | $ 8,155.36 |
| Namchi Nguyen | | $ 2,691.25 | 269.13 | $ 2,960.38 | |
| Andrea Rodriguez | | $ 2,070.32 | 207.03 | $ 2,277.36 | |
| John Vong | Insider | $ 6,634.02 | 663.40 | $ 7,297.42 | $ 7,297.42 |
| Scott Wells | | $ 4,133.76 | 413.38 | $ 4,547.14 | |
| Ewa Zwonarz | | $ 3,623.07 | 362.31 | $ 3,985.38 | |
| Gryphon's Door LLC (Marcus Williams) [a] | Insider | $ 10,975.00 | $ 1,500.00 | $ 12,475.00 | $ 12,475.00 |
| Total Payroll - Domestic | | $ 75,848.65 | $ 7,585.19 | $ 83,433.84 | $ 40,402.78 |
| Payroll fees | | $ 600.00 | | | |
| Total | | $ 76,448.65 | $ 7,585.19 | $ 83,433.84 | $ 40,402.78 |

| International | Aug-14 | | | |
| | Italy | Dubai | | Total |
|---|---|---|---|---|
| Margo Perego | 10,308.63 | | | 10,308.63 |
| Ivano Pirovano | 6,412.09 | | | 6,412.09 |
| Alessandro Zanetti | 5,907.48 | | | 5,907.48 |
| Ivan Nardi | 5,370.43 | | | 5,370.43 |
| Marco Gemonie | | 13,760.70 | | 13,760.70 |
| Total payroll - International | 27,998.62 | 13,760.70 | 0.00 | 41,759.32 |
| | | | 0.00 | 0.00 |
| Grand Total | $ 104,447.28 | $ 21,345.89 | $ - | $ 125,193.17 |

Exh L_001

ISCB, Inc.
Pre-Petition Payroll

Pay period: September 8-21, 2014
Paycheck date: September 26, 2014

| | | Gross Amount | Federal | OASDI Limit $117K | Medicare | State | State SDI | Total Employee Taxes | Total Other Deduction | Net Amount | Total Employer Taxes | Total Payroll Liabilities |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Insider | | 40,386.40 | (15,051.61) | - | (368.10) | (1,402.83) | - | (6,822.54) | (885.41) | 32,678.45 | 368.10 | 40,754.50 |
| Non Insider | | 36,339.20 | (14,903.19) | (2,253.03) | (526.92) | (831.94) | (148.09) | (8,263.17) | (2,651.04) | 25,424.99 | 2,779.95 | 39,119.15 |
| Total payroll & contractor | | 76,725.60 | (19,554.80) | (2,253.03) | (895.02) | (2,234.77) | (148.09) | (15,085.71) | (3,536.45) | 79,873.85 | 3,148.05 | 79,873.85 |
| Total payroll processing fees | | | | | | | | | | | | 600.00 |
| Total | | 76,725.60 | (19,554.80) | (2,253.03) | (895.02) | (2,234.77) | (148.09) | (15,085.71) | (3,536.45) | 58,103.44 | 3,148.05 | 80,473.65 |

| Employee Name | Type | Gross Amount | Federal | OASDI Limit $117K | Medicare | State | State SDI | Total Employee Taxes | Total Other Deduction | Net Amount | Employer Taxes | Total Payroll Liabilities |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Rihanna Kirsten Bay * | Insider | 11,539.20 | (2,795.18) | - | (167.32) | (1,018.56) | | (3,981.06) | (341.49) | 7,216.65 | 167.32 | 11,706.52 |
| Jonathan Bengston | | 5,192.80 | (784.26) | (321.95) | (75.30) | | | (1,181.51) | (138.46) | 3,872.83 | 397.25 | 5,590.05 |
| John Carson | | 1,440.00 | (132.35) | (89.28) | (20.88) | | | (242.51) | - | 1,197.49 | 110.16 | 1,550.16 |
| John Cioffi | | 6,538.40 | (911.03) | (405.38) | (94.81) | | | (1,411.22) | (754.61) | 4,372.57 | 500.19 | 7,038.59 |
| Evelyn Derry | | 3,461.60 | (633.64) | (214.62) | (50.19) | | | (806.90) | (150.54) | 2,504.16 | 264.81 | 3,726.41 |
| Jewel Devin Jones | | 8,077.60 | (1,300.34) | (500.81) | (117.13) | (308.15) | | (1,635.00) | (1,100.72) | 5,341.88 | 617.94 | 8,695.54 |
| Scott Millis | Insider | 7,308.00 | | | (105.97) | (220.24) | | (1,406.31) | (340.60) | 5,561.09 | 105.97 | 7,413.97 |
| Doug Lanning | | 2,500.00 | (160.72) | (155.00) | (36.25) | (30.43) | (75.27) | (404.77) | (263.15) | 1,832.08 | 191.25 | 2,691.25 |
| Ranchi Nguyen | | 1,923.20 | (283.57) | (119.24) | (27.89) | (22.37) | (18.58) | (523.83) | (64.88) | 1,334.49 | 147.12 | 2,070.32 |
| Andrea Rodriguez | | 6,539.20 | (956.09) | | (94.82) | (74.56) | | (1,435.18) | (203.32) | 4,900.70 | 94.82 | 6,634.02 |
| John Vong | Insider | 3,840.00 | (696.01) | (238.08) | (55.68) | (384.27) | | (989.77) | | 2,850.23 | 293.76 | 4,133.76 |
| Scott Wells | | 3,365.60 | (579.76) | (208.67) | (48.80) | (198.56) | (31.87) | (1,067.66) | (178.68) | 2,119.26 | 257.47 | 3,623.07 |
| Iowa Zwonarz | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| Employee Total: | | 61,725.60 | (9,554.80) | (2,253.03) | (895.02) | (2,234.77) | (148.09) | (15,085.71) | (3,536.45) | 43,103.44 | 3,148.05 | 64,873.65 |

| Contractor | Type | Gross Amount | Federal | OASDI Limit $117K | Medicare | State | State SDI | Total Employee Taxes | Total Other Deduction | Net Amount | Employer Taxes | Total Payroll Liabilities |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Gryphon's Door LLC (Marcus Williams)* [a] | Insider | 15,000.00 | - | - | - | - | - | - | - | 15,000.00 | - | 15,000.00 |

| | | Gross Amount | Federal | OASDI Limit $117K | Medicare | State | State SDI | Total Employee Taxes | Total Other Deduction | Net Amount | Employer Taxes | Total Payroll Liabilities |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Payroll total: | | 61,725.60 | (9,554.80) | (2,253.03) | (895.02) | (2,234.77) | (148.09) | (15,085.71) | (3,536.45) | 43,103.44 | 3,148.05 | 65,473.65 |
| Total paycheck fees (approx.) for 9/22/14 Payroll: | | | | | | | | | | | | 300.00 |
| Total paycheck fees (approx.) for 9/26/14 Payroll: | | | | | | | | | | | | 300.00 |
| Total paycheck fees: | | | | | | | | | | | | 600.00 |
| Total | | 76,725.60 | (9,554.80) | (2,253.03) | (895.02) | (2,234.77) | (148.09) | (15,085.71) | (3,536.45) | 58,103.44 | 3,148.05 | 80,473.65 |

* Please note that these employees' claims are capped at the statutory maximum of $12,475.

[a] Contractor

Exh M_001

**RCR, Inc.**
**Pre-Petition Payroll**

Pay period: September 22 - 23, 2014
Number of days:
Paycheck date: September 26, 2014

1

| Employee Name | Type | Gross Amount | Federal | OASDI (SSA) 6.20% | Medicare 1.45% | State | State-SDI | Total Employee Taxes | Benefit Deductions | Flex Account | 401K Contributions | 401K Loan Payment | Child Support | Total Other Deduction | Net Amount | ER OASDI | ER Medicare | Total Employer Taxes | Total Payroll Liabilities |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Johanna Kitchen Bay * | Insider | 1,155.00 | (505.16) | (160.37) | (16.73) | (101.86) | (7.53) | (682.25) | (14.15) | | | | | (14.15) | 1,363.84 | 16.73 | 7.53 | 39.75 | 1,170.65 |
| Jonathan Remington | | 529.25 | (79.43) | (25.35) | (5.75) | (13.20) | | (108.15) | | | | | | | 307.28 | 32.20 | 7.53 | 39.72 | 509.00 |
| John Carson | | 144.00 | (13.24) | (8.93) | (2.09) | | (1.80) | (14.25) | | | | | | | 119.75 | 8.93 | 2.09 | 11.02 | 155.02 |
| Joe Cioffi | | 653.84 | (30.18) | (40.54) | (9.48) | | (1.85) | (141.12) | (14.70) | | (5.00) | | | (75.45) | 437.26 | 40.54 | 9.48 | 50.02 | 753.86 |
| Llewellyn Berry | | 807.75 | (50.08) | (50.08) | (11.71) | (30.82) | (7.51) | (183.10) | (66.44) | | | | | (110.07) | 514.59 | 50.08 | 11.71 | 61.79 | 869.55 |
| Neal Devin Jones | | 346.15 | (52.39) | (21.46) | (5.02) | | | (83.15) | (60.37) | | | (9.02) | | (155.02) | 205.42 | 24.46 | 5.02 | 29.48 | 372.64 |
| Craig Lanning | | 730.80 | (180.03) | (45.51) | (10.60) | (22.01) | | (160.10) | (14.06) | | | | | (34.06) | 556.11 | 45.31 | 10.60 | 55.91 | 741.60 |
| Scott Mills | | 250.00 | (16.07) | (15.50) | (3.63) | (10.61) | (2.42) | (40.46) | | | (24.32) | | | (26.32) | 183.21 | 15.50 | 3.63 | 19.13 | 269.13 |
| Nuwen Nguyen | | 150.22 | (28.30) | (11.72) | (2.79) | | (1.86) | (52.38) | | | | | | (8.49) | 89.35 | 11.72 | 2.79 | 14.51 | 207.00 |
| Andrea Rodriguez | | 653.92 | (95.61) | (31.61) | (7.48) | (18.41) | | (134.12) | (9.09) | | | | | (20.13) | 490.07 | 31.61 | 7.48 | 39.09 | 663.40 |
| John Vong | | 384.05 | (69.60) | (23.81) | (5.57) | | (1.88) | (99.98) | | | | | | (17.87) | 231.93 | 23.81 | 5.57 | 29.38 | 413.38 |
| Scott Welsh | | 136.56 | (37.98) | (4.88) | (4.88) | | (1.60) | (49.36) | | | (19.64) | | | (20.13) | 211.93 | 4.88 | 4.88 | 25.75 | 362.31 |
| Eva Zworonowicz | | | | | | | | | | (2.96) | | | | | | | | | |
| **Employee Total** | | **7,672.56** | **(955.48)** | **(225.59)** | **(89.58)** | **(223.48)** | **(14.81)** | **(1,508.57)** | **(212.39)** | **(43.96)** | **(24.64)** | **(59.02)** | **(13.85)** | **(353.60)** | **5,810.34** | **225.30** | **89.50** | **314.81** | **7,987.37** |

| | | Gross Amount | Federal | OASDI 6.20% | Medicare 1.45% | State | State-SDI | Total Employee Taxes | Benefit Deductions | Flex Account | 401K Contributions | 401K Loan Payment | Child Support | Total Other Deduction | Net Amount | ER OASDI | ER Medicare | Total Employer Taxes | Total Payroll Liabilities |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Insider | | 6,172.56 | (955.48) | (225.59) | (89.58) | (223.48) | (14.81) | (1,508.57) | (212.39) | (43.96) | (24.64) | (59.02) | (13.85) | (353.60) | 4,310.34 | 225.30 | 89.50 | 314.81 | 6,487.37 |
| Non Insider | | | | | | | | | | | | | | | | | | | |
| Total payroll & contractor | | 6,172.56 | (955.48) | (225.59) | (89.58) | (223.48) | (14.81) | (1,508.57) | (212.39) | (43.96) | (24.64) | (59.02) | (13.85) | (353.60) | 4,310.34 | 225.30 | 89.50 | 314.81 | 6,487.37 |
| Total | | | | | | | | | | | | | | | | | | | |
| Payroll processing fees | | | | | | | | | | | | | | | | | | | |

| Contractor | | Gross Amount |
|---|---|---|
| Grayfish's Desk LLC (Marcus Williams) [a] | | 1,500.00 |
| Payroll total: | | 7,672.56 |

Paycheck fees (expense) for 9/22/14 Payroll
Paycheck fees (expense) for 9/26/14 Payroll
Total paycheck fees

Employer Total | 1,500.00 | 1,500.00

* Please note that these employees' claims are capped at the statutory maximum of $12,475.

[a] Contractor

ISC8, Inc.
Benefits per Month

| Employee Name | Total | | Employee Portion | | Employer Portion | |
|---|---|---|---|---|---|---|
| | United Healthcare | Guardian | United Healthcare | Guardian | United Healthcare | Guardian |
| Johanna Kirsten Bay | $ 1,424.85 | $ 219.34 | $ 724.85 | $ 15.04 | $ 700.00 | $ 204.30 |
| Jonathan Bengtson | $ - | $ 80.29 | $ - | $ - | $ - | $ 80.29 |
| Jan Cioffi | $ - | $ 32.49 | $ - | $ - | $ - | $ 32.49 |
| Llewellyn Derry | $ 2,249.76 | $ 258.94 | $ 1,099.76 | $ 21.46 | $ 1,150.00 | $ 237.48 |
| Neal Devin Jones | $ 2,003.25 | $ 273.57 | $ 853.25 | $ 21.46 | $ 1,150.00 | $ 252.11 |
| Craig Lanning | $ 1,454.70 | $ 219.93 | $ 304.70 | $ 21.46 | $ 1,150.00 | $ 198.47 |
| Scott Millis | $ 1,402.27 | $ 189.06 | $ 602.27 | $ 11.52 | $ 800.00 | $ 177.54 |
| Namchi Nguyen | $ - | $ 120.26 | $ - | $ - | $ - | $ 120.26 |
| Andrea Rodriguez | $ 484.90 | $ 73.30 | $ 134.90 | $ 5.68 | $ 350.00 | $ 67.62 |
| John Vong | $ - | $ 213.07 | $ - | $ 15.04 | $ - | $ 198.03 |
| Ewa Zwonarz | $ 484.90 | $ 91.72 | $ 317.75 | $ 5.68 | $ 167.15 | $ 86.04 |
| Total: | | | | | $ 5,467.15 | $ 1,654.63 |
| Total employer portion paid by ISC8: | | | | | | $ 7,121.78 |

United Healthare - medical insurance
Guardian - dental, vision, long term disability and basic term life

Exh O_001

honor its prepetition policies relating to such insurance.  The Debtor believes it is current under these obligations and that there are no arrears with respect to Employees' insurance.  Attached hereto as **Exhibit O** is a spreadsheet reflecting the Debtor's normally incurred benefit obligations.

37.    _Worker's Compensation Premiums_.  Additionally, the Debtor is obligated to pay worker's compensation insurance premiums for its Employees.  In the past and when Debtor was a much larger operation, the Debtor owed approximately $85,000 in annual worker's compensation premiums.  The Debtor has not received an invoice updated to reflect Debtor's smaller business size, but expects it to arrive in the next few weeks.  Debtor seeks authority to pay this obligation in the ordinary course of its business as part of its Employee Obligations.

38.    _Retirement Benefits Plan_.  The Debtor offers eligible Employees the opportunity to participate in a 401(k) Savings and Retirement Plan ("401(k) Plan").  The Debtor does not contribute to the 401(k) on behalf of its Employees.  However, the Debtor forwards amounts equal to the Employee's chosen contributions from its operating accounts to appropriate third-party recipients on behalf of its Employees, and thus seeks authority to continue the 401(k) Plan and forward any prepetition amounts as necessary.  These deductions from Employees' regular paychecks are reflected in **Exhibits L through O.**

**J.    Reimbursable Expenses.**

39.    Employees may submit certain business-related expenses to the Debtor for reimbursement.  These expenses include, among other things, car rental, meals, business supplies, and other business-related costs, including those charged by Employees onto corporate credit cards.  As of the Petition Date, the Debtor estimates it owes Employees a _de minimis_ amount of reimbursements, however the Debtor seeks authority, but not direction, to pay these Employee Expenses and to continue to pay them postpetition in the ordinary course of business.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 24th day of September, 2014, at Half Moon Bay, California.

Johanna Kirsten Bay

12

1145546

| SR. Secured Note | | | | |
| --- | --- | --- | --- | --- |
| Committed | | Proposed | | Total | Post Petition Lenders |
| $ | 20 | $ | 80 | $ | 100 | Griffin Fund II |
| $ | 35 | | | $ | 35 | Fundamental/Kreiger/Samuels |
| | | $ | 50 | $ | 50 | Reuben Richards |
| $ | 25 | $ | 25 | $ | 50 | Kurt Adlemean |
| $ | 250 | $ | 125 | $ | 375 | Bud FeldKamp |
| | | $ | 25 | $ | 25 | Southshore |
| | | $ | 50 | $ | 50 | Ladyface - Mike Poutre |
| | | $ | 100 | $ | 100 | Granite Partners - Warrant Lammert and Alex T |
| | | $ | 100 | $ | 100 | Ambassador LLC - Garret |
| | | $ | 50 | $ | 50 | Chris Lahidji |
| $ | 200 | $ | 500 | $ | 700 | Mike Bassignoni |
| $ | 530 | $ | 1,105 | $ | 1,635 | |

Potential Additional Funders

Seth Hamot/Costa Brava

Ron Chez

**ISC8, Inc.**
**Four - Week Cash Flow Projection**

| | Week Ending Sep. 26, 2014 | | | Week Ending Oct 3, 2014 | | | Week Ending Oct 10, 2014 | | | Week Ending Oct 17, 2014 | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Budget | Actual | Variance | Budget | Actual | Variance | Budget | Actual | Variance | Budget | Actual | Variance | Budget | Actual | Variance |
| Cash Balance, Beginning | 26,917 | - | - | 118,193 | - | - | 97,937 | - | - | 25,891 | - | - | 26,917 | - | - |
| **Receipts** | | | | | | | | | | | | | | | |
| A/R | 200,000 | - | - | 50,000 | - | - | 55,000 | - | - | - | - | - | 255,000 | - | - |
| DIP Financing (Notes) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Receipts** | 200,000 | - | - | 50,000 | - | - | 55,000 | - | - | - | - | - | 305,000 | - | - |
| **Total Cash Available** | 226,917 | - | - | 168,193 | - | - | 152,937 | - | - | 25,891 | - | - | 331,917 | - | - |
| **Disbursement** | | | | | | | | | | | | | | | |
| **Salary - net** | | | | | | | | | | | | | | | |
| Itemize insiders separately | - | - | - | - | - | - | - | - | - | - | - | - | 68,625 | - | - |
| US Employees | 27,967 | - | - | - | - | - | 68,625 | - | - | - | - | - | 58,650 | - | - |
| Health - (taken from ee's paycheck) | 1,910 | - | - | - | - | - | 30,683 | - | - | - | - | - | 4,181 | - | - |
| Flex | 396 | - | - | - | - | - | 2,271 | - | - | - | - | - | 835 | - | - |
| Child support | 125 | - | - | - | - | - | 440 | - | - | - | - | - | 263 | - | - |
| International Employees | 41,759 | - | - | - | - | - | 138 | - | - | - | - | - | 41,759 | - | - |
| 401k | 920 | - | - | - | - | - | 837 | - | - | - | - | - | 1,757 | - | - |
| Total | 73,077 | - | - | - | - | - | 102,993 | - | - | - | - | - | 176,070 | - | - |
| Payroll Tax | 19,428 | - | - | - | - | - | 20,914 | - | - | - | - | - | 40,341 | - | - |
| Payroll services | 600 | - | - | - | - | - | 300 | - | - | - | - | - | 900 | - | - |
| **Legal Fees** | | | | | | | | | | | | | | | |
| Disclosure Law Group (subject to Court approval) | - | - | - | 5,000 | - | - | - | - | - | - | - | - | 5,000 | - | - |
| **Insurance** | | | | | | | | | | | | | | | |
| General Liability Insurance - workers' comp, etc. | - | - | - | 25,000 | - | - | - | - | - | - | - | - | 25,000 | - | - |
| CNA - umbrell and auto | - | - | - | 2,800 | - | - | - | - | - | - | - | - | 2,800 | - | - |
| D&O | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| United Health | - | - | - | 20,000 | - | - | - | - | - | - | - | - | 20,000 | - | - |
| Colonial - supplemental | - | - | - | 500 | - | - | - | - | - | - | - | - | 500 | - | - |
| Flac - supplemental | - | - | - | 100 | - | - | - | - | - | - | - | - | 100 | - | - |
| Guardian - vision, dental, etc. | - | - | - | 1,100 | - | - | - | - | - | - | - | - | 1,100 | - | - |
| Total | - | - | - | 49,500 | - | - | - | - | - | - | - | - | 49,500 | - | - |
| **Rent** | | | | | | | | | | | | | | | |
| Copper Tree - Costa Mesa Rent | - | - | - | 2,946 | - | - | - | - | - | - | - | - | 2,946 | - | - |
| Regus - Texas rent | - | - | - | 4,000 | - | - | - | - | - | - | - | - | 4,000 | - | - |
| Global IP Net works - Colo - Texas | - | - | - | 750 | - | - | - | - | - | - | - | - | 750 | - | - |
| Total | - | - | - | 7,696 | - | - | - | - | - | - | - | - | 7,696 | - | - |
| **Utilities** | | | | | | | | | | | | | | | |
| Electricity | - | - | - | - | - | - | - | - | - | 1,000 | - | - | 1,000 | - | - |
| Cleyond - Costa Mesa telephone | - | - | - | 60 | - | - | - | - | - | - | - | - | 60 | - | - |
| ADT - Costa Mesa alarm | - | - | - | - | - | - | - | - | - | 1,000 | - | - | 1,000 | - | - |
| Global Meet - conferencing line | 500 | - | - | - | - | - | - | - | - | - | - | - | 500 | - | - |
| Time Warner - Costa Mesa | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total | 500 | - | - | 60 | - | - | - | - | - | 2,000 | - | - | 2,560 | - | - |
| **Equipment Leases** | | | | | | | | | | | | | | | |
| Dell | - | - | - | - | - | - | - | - | - | 1,314 | - | - | 1,314 | - | - |
| GE - copier | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Western Financial | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 9/24/2014 |
| Total | - | - | - | - | - | - | - | - | - | 1,314 | - | - | 1,314 | - | - |

## ISC8, Inc.
### Four - Week Cash Flow Projection

| | Week Ending Sep. 26, 2014 Budget | Actual | Variance | Week Ending Oct 3, 2014 Budget | Actual | Variance | Week Ending Oct. 10, 2014 Budget | Actual | Variance | Week Ending Oct. 17, 2014 Budget | Actual | Variance | Total Budget | Actual | Variance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Travel | 1,000 | - | - | - | - | - | 1,000 | - | - | 1,000 | - | - | 3,000 | - | - |
| Office supplies | | | | | | | | | | | | | | | |
| Staples | - | - | - | - | - | - | 25 | - | - | - | - | - | 25 | - | - |
| Sparklettes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total | - | - | - | - | - | - | 25 | - | - | - | - | - | 25 | - | - |
| Postage and Storage | | | | | | | | | | | | | | | |
| Postage supplies | - | - | - | - | - | - | 500 | - | - | - | - | - | 500 | - | - |
| Oneil Storage - of sit storage | - | - | - | - | - | - | - | - | - | 1,000 | - | - | 1,000 | - | - |
| Total | - | - | - | - | - | - | 500 | - | - | 1,000 | - | - | 1,500 | - | - |
| Software | | | | | | | | | | | | | | | |
| Microsoft | - | - | - | - | - | - | - | - | - | 400 | - | - | 400 | - | - |
| Total | - | - | - | - | - | - | - | - | - | 400 | - | - | 400 | - | - |
| Marketing | - | - | - | 7,000 | - | - | - | - | - | - | - | - | 7,000 | - | - |
| Outside Services | | | | | | | | | | | | | | | |
| CompuShare - transfer agent fees | - | - | - | - | - | - | - | - | - | 1,500 | - | - | 1,500 | - | - |
| Incorporating Services - Secretary State | 120 | - | - | - | - | - | - | - | - | - | - | - | 120 | - | - |
| Radius - International back office | 15,000 | - | - | - | - | - | - | - | - | - | - | - | 15,000 | - | - |
| Total | 15,120 | - | - | - | - | - | - | - | - | 1,500 | - | - | 16,620 | - | - |
| Total Disbursement | 108,724 | - | - | 70,256 | - | - | 127,046 | - | - | 5,900 | - | - | 311,926 | - | - |
| Cash Balance, ending | 118,193 | - | - | 97,937 | - | - | 25,891 | - | - | 19,991 | - | - | 19,991 | - | - |

**Note**
Payroll are paid one week in arrear. For the pay date of Sept 26, 2014, normal paid period would be through Sept 19, 2014.
For this analysis, the Sept 26, 2014 pay date is paid through Sept 22, 2014

2 of 2

9/24/2014

**Exh B_002**

**$3.5 million Senior Subordinated Convertible Promissory Note - Bridge Note**

| Name | Original Funding Date | Interest Accrual Begin Date | Maturity Date | Total Principle & Interest |
|---|---|---|---|---|
| Alvin Fund LLC | 02/12/14 | 02/12/14 | 07/31/14 | 210,630.14 |
| Fundamental Master LP | 02/12/14 | 02/12/14 | 07/31/14 | 157,972.60 |
| Jay Krieger | 02/12/14 | 02/12/14 | 07/31/14 | 52,657.53 |
| Fundamental Master LP | 02/13/14 | 02/13/14 | 07/31/14 | 105,260.27 |
| Jay Krieger | 02/13/14 | 02/13/14 | 07/31/14 | 26,315.07 |
| Griffin Fund | 02/13/14 | 02/13/14 | 07/31/14 | 26,315.07 |
| Jay Krieger | 02/14/14 | 02/14/14 | 07/31/14 | 26,301.37 |
| **Subtotal** | | | | **605,452.05** |

**ISC8**
**Listing of Bridge Note Investopr**
**$6.0 million Bridge Note**

| Date Fund Received | Maturity Date | From | Purchase Price | OID | Original Principal |
|---|---|---|---|---|---|
| 2/21/2014 | 7/31/2014 | Fundamental Master LP | $ 50,000 | $ 16,667 | $ 66,667 |
| 2/21/2014 | 7/31/2014 | Fundamental Credit LP | $ 125,000 | $ 41,667 | $ 166,667 |
| 3/3/2014 | 7/31/2014 | Fundamental Credit LP | $ 50,000 | $ 16,667 | $ 66,667 |
| 3/3/2014 | 7/31/2014 | Pargold | $ 100,000 | $ 33,333 | $ 133,333 |
| 3/3/2014 | 7/31/2014 | Griffin Fund II LP | $ 37,500 | $ 12,500 | $ 50,000 |
| 3/5/2014 | 7/31/2014 | Kurt Adelman | $ 25,000 | $ 8,333 | $ 33,333 |
| 3/7/2014 | 7/31/2014 | Reuben Richard | $ 250,000 | $ 83,333 | $ 333,333 |
| 3/21/2014 | 7/31/2014 | Fundamental Master LP | $ 50,000 | $ 16,667 | $ 66,667 |
| 3/21/2014 | 7/31/2014 | Fundamental Master LP | $ 50,000 | $ 16,667 | $ 66,667 |
| 3/21/2014 | 7/31/2014 | Fundamental Credit LP | $ 50,000 | $ 16,667 | $ 66,667 |
| 3/26/2014 | 7/31/2014 | Fundamental Credit LP | $ 125,000 | $ 41,667 | $ 166,667 |
| 3/27/2014 | 7/31/2014 | Fundamental Credit LP | $ 50,000 | $ 16,667 | $ 66,667 |
| 4/2/2014 | 7/31/2014 | Southshore Capital Partners LP | $ 100,000 | $ 33,333 | $ 133,333 |
| 4/2/2014 | 7/31/2014 | Fundamental Master LP | $ 200,000 | $ 66,667 | $ 266,667 |
| 4/9/2014 | 7/31/2014 | Fundamental Credit LP | $ 50,000 | $ 16,667 | $ 66,667 |
| 4/9/2014 | 7/31/2014 | Fundamental Master LP | $ 50,000 | $ 16,667 | $ 66,667 |
| 4/10/2014 | 7/31/2014 | Pargold | $ 100,000 | $ 33,333 | $ 133,333 |
| 4/11/2014 | 7/31/2014 | Thomas R. Stone | $ 25,000 | $ 8,333 | $ 33,333 |
| 4/21/2014 | 7/31/2014 | Fundamental Master LP | $ 25,000 | $ 8,333 | $ 33,333 |
| 4/23/2014 | 7/31/2014 | Fundamental Credit LP | $ 25,000 | $ 8,333 | $ 33,333 |
| 4/23/2014 | 7/31/2014 | Gayner Family Trust | $ 25,000 | $ 8,333 | $ 33,333 |
| 4/24/2014 | 7/31/2014 | KC Gamma Opportunity Fund | $ 25,000 | $ 8,333 | $ 33,333 |
| 4/25/2014 | 7/31/2014 | Pargold | $ 25,000 | $ 8,333 | $ 33,333 |
| 4/25/2014 | 7/31/2014 | Southshore Capital Partners LP | $ 25,000 | $ 8,333 | $ 33,333 |
| 5/1/2014 | 7/31/2014 | Fundamental Credit LP | $ 100,000 | $ 33,333 | $ 133,333 |
| 5/1/2014 | 7/31/2014 | Fundamental Master LP | $ 50,000 | $ 16,667 | $ 66,667 |
| 5/9/2014 | 7/31/2014 | Trancoso Partners LP | $ 30,000 | $ 10,000 | $ 40,000 |
| 5/12/2014 | 7/31/2014 | John W. Krieger | $ 15,000 | $ 5,000 | $ 20,000 |
| 5/13/2014 | 7/31/2014 | John W. Krieger | $ 18,000 | $ 6,000 | $ 24,000 |
| 5/19/2014 | 7/31/2014 | Griffin Fund II LP | $ 43,750 | $ 14,583 | $ 58,333 |
| 5/23/2014 | 7/31/2014 | Thomas R. Stone | $ 10,000 | $ 3,333 | $ 13,333 |
| 5/23/2014 | 7/31/2014 | Stephen & Shannan Bishop Family Trust | $ 76,000 | $ 25,333 | $ 101,333 |
| 5/23/2014 | 7/31/2014 | Fundamental Master LP | $ 25,000 | $ 8,333 | $ 33,333 |
| 5/23/2014 | 7/31/2014 | Fundamental Credit LP | $ 25,000 | $ 8,333 | $ 33,333 |
| 5/30/2014 | 7/31/2014 | Redwood Fund LP | $ 125,000 | $ 41,667 | $ 166,667 |
| 5/30/2014 | 7/31/2014 | Gayner Family Trust | $ 25,000 | $ 8,333 | $ 33,333 |
| 5/30/2014 | 7/31/2014 | John W. Krieger | $ 25,000 | $ 8,333 | $ 33,333 |
| 6/4/2014 | 7/31/2014 | Trancoso Partners LP | $ 50,000 | $ 16,667 | $ 66,667 |
| 6/6/2014 | 7/31/2014 | Fundamental Master LP | $ 25,000 | $ 8,333 | $ 33,333 |
| 6/6/2014 | 7/31/2014 | Fundamental Master LP | $ 20,000 | $ 6,667 | $ 26,667 |
| 6/6/2014 | 7/31/2014 | Fundamental Master LP | $ 25,000 | $ 8,333 | $ 33,333 |
| 6/11/2014 | 7/31/2014 | John W. Krieger | $ 87,397 | $ 29,132 | $ 116,530 |
| 6/11/2014 | 7/31/2014 | Griffin Fund LP | $ 87,397 | $ 29,132 | $ 116,530 |
| 6/13/2014 | 7/31/2014 | Redwood Fund LP | $ 75,000 | $ 25,000 | $ 100,000 |
| 6/17/2014 | 7/31/2014 | KC Gamma Opportunity Fund | $ 25,000 | $ 8,333 | $ 33,333 |
| 6/30/2014 | 7/31/2014 | Trancoso Partners LP | $ 37,000 | $ 12,333 | $ 49,333 |
| 7/7/2014 | 7/31/2014 | Griffin Fund LP | $ 40,000 | $ 13,333 | $ 53,333 |
| 7/8/2014 | 7/31/2014 | Trancoso Partners LP | $ 33,000 | $ 11,000 | $ 44,000 |
| 7/21/2014 | 7/31/2014 | Griffin Partners II LP | $ 328,000 | $ 109,333 | $ 437,333 |
| 7/21/2014 | 7/31/2014 | Fundamental Master LP | $ 107,000 | $ 35,667 | $ 142,667 |
| 7/21/2014 | 7/31/2014 | Fundamental Credit LP | $ 53,000 | $ 17,667 | $ 70,667 |
| 7/25/2014 | 7/31/2014 | Griffin Fund II LP | $ 16,666 | $ 5,555 | $ 22,221 |
| 7/28/2014 | 7/31/2014 | Fundamental Master LP | $ 9,008 | $ 3,003 | $ 12,011 |
| 7/28/2014 | 7/31/2014 | Fundamental Credit LP | $ 12,313 | $ 4,104 | $ 16,417 |

| Date Fund Received | Maturity Date | From | Purchase Price | OID | Original Principal |
|---|---|---|---|---|---|
| 7/29/2014 | 7/31/2014 | Griffin Fund II LP | $ 83,300 | $ 27,767 | $ 111,067 |
| 7/31/2014 | 7/31/2014 | Fundamental Master LP | $ 28,063 | $ 9,354 | $ 37,418 |
| 7/31/2014 | 7/31/2014 | Fundamental Credit LP | $ 13,937 | $ 4,646 | $ 18,582 |
| 8/1/2014 | 7/31/2014 | Griffin Fund II LP | $ 30,600 | $ 10,200 | $ 40,800 |
| 8/3/2014 | 7/31/2014 | Griffin Fund II LP | $ 6,500 | $ 2,167 | $ 8,667 |
| 8/8/2014 | 7/31/2014 | Fundamental Credit LP | $ 6,139 | $ 2,046 | $ 8,185 |
| 8/8/2014 | 7/31/2014 | Fundamental Master LP | $ 12,361 | $ 4,120 | $ 16,481 |
| 8/27/2014 | 7/31/2014 | Gayner Family Trust | $ 25,000 | $ 8,333 | $ 33,333 |
| 9/4/2014 | 7/31/2014 | John W. Krieger | $ 25,000 | $ 8,333 | $ 33,333 |
| 9/5/2014 | 7/31/2014 | Thomas R. Stone | $ 100,000 | $ 33,333 | $ 133,333 |
| 9/8/2014 | 7/31/2014 | Fundamental Master LP | $ 8,000 | $ 2,667 | $ 10,667 |
| 9/9/2014 | 7/31/2014 | Jacqueline Samols Krieger | $ 40,000 | $ 13,333 | $ 53,333 |
| 9/19/2014 | 7/31/2014 | Pargold | $ 250,000 | $ 83,333 | $ 333,333 |
| | | **Total:** | **$ 3,864,932** | **$ 1,288,311** | **$ 5,153,242** |

## SECURITY AGREEMENT

THIS SECURITY AGREEMENT (this "**Security Agreement**") is executed as of March 6, 2014, by ISC8, Inc., a Delaware corporation ("**Debtor**"), and Fundamental Master LP, a Delaware limited partnership, in its capacity as Holder Representative under the Notes (as such term is defined below) (in such capacity, together with any successor appointed pursuant to the terms of the Notes, "**Holder Representative**").

RECITALS

A.    Debtor desires to issue up to $6.0 million in aggregate principal amount of Senior Subordinated Secured Convertible Promissory Notes due 2014 (the "**Notes**") to certain investors who may purchase the Notes (such purchasers, collectively the "**Purchasers**") under the terms of the Note Purchase Agreement by and between the Debtor and the signatories thereto, dated March __, 2014 ("**Purchase Agreement**").

B.    The execution and delivery of this Security Agreement is a condition precedent to the willingness of the Purchasers to enter into the Purchase Agreement and purchase and extend credit under the Notes.

ACCORDINGLY, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Debtor and Holder Representative hereby agree as follows:

**1.    REFERENCE TO LOAN DOCUMENTS.**  This Security Agreement is one of the "*Transaction Agreements*" referred to in the Purchase Agreement.

**2.    CERTAIN DEFINITIONS.**  Unless otherwise defined herein, or the context hereof otherwise requires, each term defined in any of the Notes or the UCC is used in this Security Agreement with the same meaning; *provided that*, if the definition given to such term in the Notes conflicts with the definition given to such term in the UCC, the Notes definition shall control to the extent legally allowable; and if any definition given to such term in *Chapter 9* of the UCC conflicts with the definition given to such term in any other chapter of the UCC, the *Chapter 9* definition shall prevail.  As used herein, the following terms have the meanings indicated:

**Collateral** has the meaning set forth in Section 4 hereof.

**Collateral Obligor** means any person or entity obligated with respect to any of the Collateral, whether as an account debtor, obligor on an instrument, issuer of securities, or otherwise.

**Copyrights** has the meaning set forth in Section 4(b) hereof.

**Intellectual Property** has the meaning set forth in Section 4(d) hereof.

**Obligation** means, collectively, all indebtedness, liabilities, and obligations of Debtor to the holders of the Notes and the Holder Representative arising under the Notes and this Security

Agreement.   The Obligation shall include, without limitation, future, *as well as* existing, indebtedness, liabilities, and obligations owed by Debtor to the holders of the Notes and the Holder Representative arising under the Notes and this Security Agreement.

**Patents** has the meaning set forth in Section 4(c) hereof.

**Permitted Liens** means the liens and Security Interests permitted by the Notes, including, for the avoidance of doubt, the liens and Security Interests securing Debtor's obligations with respect to any senior secured debt ("**Senior Debt**").

**Previous Senior Debt** means all obligations, liabilities and indebtedness of every nature of the Debtor from time to time owed to the holders of Senior Debt issued prior to the date hereof, including, without limitation, the principal amount of all debts, claims and indebtedness, accrued and unpaid interest and all costs and expenses, whether primary, secondary, direct, contingent, fixed or otherwise, heretofore, now and from time to time hereafter owing, due or payable, whether before or after the filing of a Proceeding under the Bankruptcy Code together with any interest accruing thereon after the commencement of a Proceeding, without regard to whether or not such interest is an allowed claim.

**Security Interest** means the security interest granted and the pledge and assignment made under Section 3 hereof.

**Trademarks** has the meaning set forth in Section 4(d) hereof.

**UCC** means the Uniform Commercial Code, including each such provision as it may subsequently be renumbered, as enacted in the State of New York or other applicable jurisdiction, as amended at the time in question.

3.    **SECURITY INTEREST**.   In order to secure the full and complete payment and performance of the Obligation when due, Debtor hereby grants to Holder Representative for the benefit of the holders of the Notes a Security Interest in all of Debtor's rights, titles, and interests in and to the Collateral and pledges, collaterally transfers, and assigns the Collateral to Holder Representative for the benefit of the holders of the Notes, all upon and subject to the terms and conditions of this Security Agreement, which Security Interest shall be subordinated to any security interest granted with respect to Senior Debt.   Such Security Interest is granted and pledge and assignment are made as security only and shall not subject Holder Representative to, or transfer or in any way affect or modify, any obligation of Debtor with respect to any of the Collateral or any transaction involving or giving rise thereto.   If the grant, pledge, or collateral transfer or assignment of any specific item of the Collateral is expressly prohibited by any contract or by law, then the Security Interest created hereby nonetheless remains effective to the extent allowed by such contract, the UCC or other applicable laws, but is otherwise limited by that prohibition.

4.    **COLLATERAL**.   As used herein, the term "**Collateral**" means the following items and types of property, wherever located, now owned or in the future acquired by Debtor, and all proceeds and products thereof, and any substitutes or replacements therefor:

2

030814-DLG1

(a)     All accounts, chattel paper (whether tangible or electronic), goods (including inventory, equipment, and any accessions thereto), software, instruments, investment property, documents, deposit accounts, money, commercial tort claims, letters of credit or letter-of-credit rights, supporting obligations, tax refunds, general intangibles (including payment intangibles) and all books and records pertaining to the foregoing;

(b)     (i) All copyrights (whether statutory or common law, registered or unregistered), works protectable by copyright, copyright registrations, copyright licenses, and copyright applications of Debtor, including, without limitation, all of Debtor's right, title, and interest in and to all copyrights registered in the United States Copyright Office or anywhere else in the world and also including, without limitation, the copyrights set forth on Schedule B; (ii) all renewals, extensions, and modifications thereof; (iii) all income, licenses, royalties, damages, profits, and payments relating to or payable under any of the foregoing; (iv) the right to sue for past, present, or future infringements of any of the foregoing; and (v) all other rights and benefits relating to any of the foregoing throughout the world; in each case, whether now owned or hereafter acquired by Debtor (the "**Copyrights**");

(c)     (i) All patents, patent applications, patent licenses, and patentable inventions of Debtor, including, without limitation, registrations, recordings, and applications thereof in the United States Patent and Trademark Office or in any similar office or agency of the United States, any state thereof or any other country or any political subdivision thereof; (ii) all continuations, divisions, renewals, extensions, modifications, substitutions, reexaminations, continuations-in-part, or reissues of any of the foregoing; (iii) all income, royalties, profits, damages, awards, and payments relating to or payable under any of the foregoing; (iv) the right to sue for past, present, and future infringements of any of the foregoing; and (v) all other rights and benefits relating to any of the foregoing throughout the world; in each case, whether now owned or hereafter acquired by Debtor (the "**Patents**");

(d)     (i) All trademarks, trademark licenses, trade names, corporate names, company names, business names, fictitious business names, trade styles, service marks, certification marks, collective marks, logos, other business identifiers, all registrations, recordings, and applications thereof, including, without limitation, registrations, recordings, and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any state thereof or any other country or any political subdivision thereof; (ii) all reissues, extensions, and renewals thereof; (iii) all income, royalties, damages, and payments now or hereafter relating to or payable under any of the foregoing, including, without limitation, damages or payments for past or future infringements of any of the foregoing; (iv) the right to sue for past, present, and future infringements of any of the foregoing; (v) all rights corresponding to any of the foregoing throughout the world; and (vi) all goodwill associated with and symbolized by any of the foregoing, in each case, whether now owned or hereafter acquired by Debtor (the "**Trademarks**", and collectively with the Copyrights and the Patents, the "**Intellectual Property**"); *provided* that (i) with respect to any Trademarks, applications in the United States Patent and Trademark Office to register Trademarks or service marks on the basis of the Debtor's "intent to use" such Trademarks or service marks will not be deemed to be Collateral unless and until a "Statement of Use" or "Amendment to Allege Use" has been filed and accepted in the United States Patent and Trademark Office, whereupon such application

3

shall be automatically subject to the Security Interest granted herein and deemed to be included in the Collateral;

(e)   All present and future distributions, income, increases, profits, combinations, reclassifications, improvements, and products of, accessions, attachments, and other additions to, tools, parts, and equipment used in connection with, and substitutes and replacements for, all or part of the Collateral described above;

(f)   All present and future accounts, contract rights, general intangibles, chattel paper, documents, instruments, cash and noncash proceeds, and other rights arising from or by virtue of, or from the voluntary or involuntary sale or other disposition of, or collections with respect to, or insurance proceeds payable with respect to, or proceeds payable by virtue of warranty or other claims against the manufacturer of, or claims against any other person or entity with respect to, all or any part of the Collateral heretofore described in this clause or otherwise; and

(g)   All present and future security for the payment to Debtor of any of the Collateral described above and goods which gave or will give rise to any such Collateral or are evidenced, identified, or represented therein or thereby.

The description of the Collateral contained in this Section 4 shall not be deemed to permit any action prohibited by this Security Agreement or by the terms incorporated in this Security Agreement. Furthermore, notwithstanding any contrary provision, Debtor agrees that, if, but for the application of this paragraph, granting a Security Interest in the Collateral would constitute a fraudulent conveyance under *11 U.S.C. § 548* or a fraudulent conveyance or transfer under any state fraudulent conveyance, fraudulent transfer, or similar law in effect from time to time (each a **"fraudulent conveyance"**), then the Security Interest remains enforceable to the maximum extent possible without causing such Security Interest to be a fraudulent conveyance, and this Security Agreement is automatically amended to carry out the intent of this paragraph.

5.    **REPRESENTATIONS AND WARRANTIES**. Debtor represents and warrants to Holder Representative as of the date hereof that:

(a)   Transaction Agreements. Certain representations and warranties in the Transaction Agreements are applicable to it or its assets or operations, and each such representation and warranty is true and correct.

(b)   Binding Obligation/Perfection. This Security Agreement creates a legal, valid, and binding Security Interest in and to the Collateral in favor of Holder Representative and enforceable against Debtor except as the enforceability thereof may be limited by bankruptcy, insolvency, moratorium, reorganization or similar laws affecting the enforcement of creditors' rights generally, and except for judicial limitations on the enforcement of the remedy of specific performance and other equitable remedies. For Collateral in which the Security Interest may be perfected by the filing of Financing Statements, once those Financing Statements have been properly filed in the applicable jurisdiction, and, in the case of the Registered IP (as defined below) with respect to which a security interest may be perfected by filing, recording or registration in the United States (or any political subdivisions thereof) and its territories and

030814-DLG1

Exh E_004

possessions, upon the receipt and recording of a short form of this Security Agreement with the United States Patent and Trademark Office or the United States Copyright Office, as applicable, the Security Interest in such Collateral will be fully perfected, subject only to Permitted Liens. Other than the Financing Statements and with respect to this Security Agreement, there are no other financing statements or control agreements covering any Collateral, other than those evidencing Permitted Liens. The creation of the Security Interest does not require the consent of any person or entity that has not been obtained.

(c)      Debtor Information.   Debtor's exact legal name, mailing address, jurisdiction of organization, type of entity, and state issued organizational identification number are as set forth on Schedule A hereto.

(d)      Location/Fixtures.   (i) Debtor's place of business and chief executive office is where Debtor is entitled to receive notices hereunder; the present and foreseeable location of Debtor's books and records concerning any of the Collateral that is accounts is as set forth on Schedule A hereto, and the location of all other Collateral, including, without limitation, Debtor's inventory and equipment is as set forth on Schedule A hereto; and, *except* as noted on Schedule A hereto, all such books, records, and Collateral are in Debtor's possession.

(e)      Governmental Authority.   No authorization, approval, or other action by, and no notice to or filing with, any governmental authority is required for the pledge by Debtor of the Collateral pursuant to this Security Agreement or for the execution, delivery, or performance of this Security Agreement by Debtor, other than filings with applicable governmental authorities to perfect the Security Interests created hereby.

(f)      Liens.   Debtor owns all existing Collateral free and clear of all liens, *except* Permitted Liens.

(g)      Intellectual Property.

(i)      All of Debtor's interests in the Debtor's issued Patents, Patent applications, registered Trademarks, Trademark applications, registered Copyrights, and Copyright applications are identified on Schedule B hereto (the "**Registered IP**").

(ii)      Debtor is the owner of the Registered IP included in the Collateral, free and clear of any liens *other than* (A) any Permitted Liens or (B) any licenses permitted by Section 8(c).

6.      **COVENANTS**.   Until the Obligation is paid and performed in full, Debtor covenants and agrees with Holder Representative that Debtor will:

(a)      Information/Record of Collateral.   Maintain, at the place where Debtor is entitled to receive notices under the Notes, a current record of where all material Collateral is located, permit representatives of Holder Representative at any time, upon reasonable prior written notice during normal business hours to inspect and make abstracts from such records (*provided*, that so long as no Default exists, Holder Representative shall conduct such inspections no more frequently than annually), and furnish to Holder Representative, at such intervals as Holder Representative may reasonably request, such documents, lists, descriptions,

5

030814-DLG1

certificates, and other information as may be reasonably necessary or proper to keep Holder Representative informed with respect to the identity, location, and status of the Collateral.

(b)     Schedules.  Notwithstanding any other provision herein, Debtor's failure to describe any Collateral required to be listed on any schedule hereto shall not impair Holder Representative's Security Interest therein.

(c)     Obligations.  Notwithstanding anything contained herein to the contrary, (i) Debtor shall remain liable under the contracts, agreements, documents, and instruments included in the Collateral to the extent set forth therein to perform all of its duties and obligations thereunder to the same extent as if this Security Agreement had not been executed, and (ii) unless and until Holder Representative forecloses thereon and becomes the owner thereof pursuant to the exercise of its remedies hereunder, Holder Representative shall not have any liability or obligation under any of such contracts, agreements, documents and instruments, and Holder Representative shall not be obligated to perform any of the obligations or duties of Debtor thereunder or to take any action to collect or enforce any claim for payment assigned thereunder.

(d)     Notices.  (i) Except as may be otherwise expressly permitted under the terms of the Transaction Agreements, promptly notify Holder Representative of (A) any claim, action, or proceeding that materially affects title to all or any of the Collateral or the Security Interest; (B) any material damage to or loss of any material Collateral, and (C) the occurrence of any other event or condition (including, without limitation, matters as to lien priority) that could have a material adverse effect on the Collateral (taken as a whole) or the Security Interest created hereunder; and (ii) give Holder Representative thirty (30) days written notice before any proposed (A) relocation of its principal place of business or chief executive office, (B) change of its name or identity; (C) relocation of the place where its books and records concerning its accounts are kept; (D) relocation of any Collateral (*other than* delivery of inventory in the ordinary course of business to third party contractors for processing and sales of inventory in the ordinary course of business or as permitted by the Transaction Agreements) to a location not described on the attached Schedule A, and (E) change of its jurisdiction of organization or organizational identification number, as applicable.  Prior to making any of the changes contemplated in *clause (ii)* preceding, Debtor shall execute and deliver all such additional documents and perform all additional acts as Holder Representative may reasonably request in order to continue or maintain the existence and priority of the Security Interest in all of the Collateral.

(e)     Further Assurances. At Debtor's expense and Holder Representative's reasonable request (i) after a Default, file or cause to be filed such applications and take such other actions as Holder Representative may reasonably request to obtain the consent or approval of any governmental authority to Holder Representative's rights hereunder, including, without limitation, the right to sell all the Collateral upon a Default without additional consent or approval from such governmental authority (and, because Debtor agrees that Holder Representative's remedies at law for failure of Debtor to comply with this provision would be inadequate and that such failure would not be adequately compensable in damages, Debtor agrees that its covenants in this provision may be specifically enforced); (ii) from time to time, either before or after a Default, promptly execute and deliver to Holder Representative all such

6

030814-DLG1

other assignments, certificates, supplemental documents, and financing statements, and do all other acts or things as Holder Representative may reasonably request in order to more fully create, evidence, perfect, continue, and preserve the priority of the Security Interest and  to carry out the provisions of this Security Agreement; and (iii) either before or after a Default, pay all filing fees in connection with any financing, continuation, or termination statement or other instrument with respect to the Security Interest.

(f)    Encumbrances.  Not create, permit, or suffer to exist, and shall defend the Collateral against, any lien or other encumbrance on the Collateral other than Permitted Liens, and shall defend Debtor's rights in the Collateral and Holder Representative's Security Interest in, the Collateral against the claims and demands of all persons or entities except those holding or claiming Permitted Liens.

(g)    Collection of Accounts.  In accordance with prudent business practices, endeavor to collect or cause to be collected from each account debtor under its accounts, as and when due, any and all amounts owing under such accounts.

(h)    Intellectual Property.

(i)    Give Holder Representative prompt written notice if Debtor shall obtain rights to or become entitled to the benefit of any additional issued patents, registered trademarks or registered copyrights (or makes application therefor) that are not identified on Schedule B hereto; if requested by Holder Representative, promptly (but in no event later than 30 days thereafter) deliver to Holder Representative an appropriate short form of this Security Agreement, containing a description of such additional Registered IP, for recording by the United States Patent and Trademark Office or the United States Copyright Office, as applicable; and cooperate as reasonably necessary to enable Holder Representative to make such recordations.

(ii)    If a Default exists, use its reasonable efforts to obtain any consents, waivers, or agreements necessary to enable Holder Representative to exercise its rights and remedies with respect to the Intellectual Property.

(iii)    Not transfer, assign or otherwise dispose of any of the Intellectual Property included in the Collateral except as permitted in the Note.

(iv)    Except to the extent that failure to act could not reasonably be expected to have a Material Adverse Effect, take all commercially reasonable steps necessary to (x) maintain the validity and enforceability of any Registered IP and maintain such Registered IP in full force and effect and (y) pursue the application, obtain the relevant registration and maintain the registration of each of its Patents, Trademarks and Copyrights, including, without limitation, by the payment of required fees and taxes, the filing of responses to office actions issued by the U.S. Patent and Trademark Office, the U.S. Copyright Office or other governmental authorities, the filing of applications for renewal or extension, the filing of affidavits, the filing of divisional, continuation, continuation-in-part, reissue and renewal applications or extensions, the payment of

7

Exh E_007

maintenance fees and the participation in interference, reexamination, opposition, cancellation, infringement and misappropriation proceedings.

(v)    Except to the extent that failure to act could not reasonably be expected to have a Material Adverse Effect, not do or permit any act or knowingly omit to do any act whereby any of its Intellectual Property may lapse, be terminated, or become invalid or unenforceable or placed in the public domain (or in case of a trade secret, lose its competitive value).

(vi)    Except to the extent that failure to act could not reasonably be expected to have a Material Adverse Effect, take all commercially reasonable steps to preserve and protect each item of its Intellectual Property, including, without limitation, maintaining the quality of any and all products or services used or provided in connection with any of the Trademarks, consistent with the quality of the products and services as of the date hereof, and taking all commercially reasonable steps necessary to ensure that all licensed users of any of the Trademarks abide by the applicable license's terms with respect to the standards of quality.

Notwithstanding the foregoing provisions of this subsection (i) or anything to the contrary in this Security Agreement, nothing in this Security Agreement shall prevent Debtor from discontinuing the use or maintenance of any of its Intellectual Property, the enforcement of its license agreements or the pursuit of actions against infringers, if Debtor determines in its reasonable business judgment that such discontinuance is desirable in the conduct of its business.

7.    **DEFAULT; REMEDIES.**  If a Default exists, Holder Representative may, at its election (but subject to Section 9 below and to the terms and conditions of the Transaction Agreements), exercise any and all rights available to a secured party under the UCC, in addition to any and all other rights afforded by the Transaction Agreements, at law, in equity, or otherwise, including, without limitation, (a) requiring Debtor to assemble all or part of the Collateral and make it available to Holder Representative at a place to be designated by Holder Representative which is reasonably convenient to Debtor and Holder Representative, (b) surrendering any policies of insurance on all or part of the Collateral and receiving and applying the unearned premiums as a credit on the Obligation, (c) applying by appropriate judicial proceedings for appointment of a receiver for all or part of the Collateral (and Debtor hereby consents to any such appointment), and (d) applying to the Obligation any cash held by Holder Representative under this Security Agreement.

(a)    Notice.  Reasonable notification of the time and place of any public sale of the Collateral, or reasonable notification of the time after which any private sale or other intended disposition of the Collateral is to be made, shall be sent to Debtor and to any other person or entity entitled to notice under the UCC.  It is agreed that notice sent or given not less than ten calendar days prior to the taking of the action to which the notice relates is reasonable notification and notice for the purposes of this subparagraph.

(b)    Condition of Collateral; Warranties.  Holder Representative has no obligation to clean-up or otherwise prepare the Collateral for sale.  Holder Representative may sell the Collateral without giving any warranties as to the Collateral.  Holder Representative may

8

030814-DLG1

specifically disclaim any warranties of title or the like. This procedure will not be considered adversely to affect the commercial reasonableness of any sale of the Collateral.

(c)     Compliance with Other Laws. Holder Representative may comply with any applicable state or federal laws in connection with a disposition of the Collateral and compliance will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral.

(d)     Application of Proceeds. Holder Representative shall apply the proceeds of any sale or other disposition of the Collateral under this Section 7 in the following order: *first*, to the payment of all expenses incurred in retaking, holding, and preparing any of the Collateral for sale(s) or other disposition, in arranging for such sale(s) or other disposition, and in actually selling or disposing of the same (all of which are part of the Obligation); *second*, toward repayment of amounts expended by Holder Representative under Section 8; *third,* toward payment of the balance of any amounts due with respect to Priority Liens, including with respect to the Senior Debt; and *fourth*, toward payment of the balance of the Obligation in the order and manner as Holder Representative determines in its sole discretion. Any surplus remaining shall be delivered to Debtor or as a court of competent jurisdiction may direct. If the proceeds are insufficient to pay the Obligation in full, then Debtor shall remain liable for any deficiency.

(e)     Sales on Credit. If Holder Representative sells any of the Collateral upon credit, Debtor will be credited only with payments actually made by the purchaser, received by the Holder Representative, and applied to the indebtedness of the purchaser. In the event the purchaser fails to pay for the Collateral, Holder Representative may resell the Collateral and Debtor shall be credited with the proceeds of the sale.

## 8.     OTHER RIGHTS OF HOLDER REPRESENTATIVE.

(a)     Performance. If Debtor fails to pay when due all taxes on any of the Collateral in the manner required by the Transaction Agreements, or fails to preserve the priority of the Security Interest in any of the Collateral, or fails to keep the Collateral insured as required by the Transaction Agreements, or otherwise fails to perform any of its obligations under the Transaction Agreements with respect to the Collateral, then Holder Representative may, at its option, but without being required to do so, and upon prior written notice to Debtor if no Default otherwise exists, pay such taxes, prosecute or defend any suits in relation to the Collateral, or insure and keep insured the Collateral in any amount deemed appropriate by Holder Representative, or take all other action which Debtor is required, but has failed or refused, to take under the Transaction Agreements. Any sum which may be expended or paid by Holder Representative under this subparagraph (including, without limitation, court costs and reasonable attorneys' fees) shall be payable by Debtor to Holder Representative upon demand and shall be part of the Obligation.

(b)     Collection. If a Default exists and upon written notice from Holder Representative, each Collateral Obligor with respect to any payments on any of the Collateral (including, without limitation, insurance proceeds payable by reason of loss or damage to any of the Collateral) is hereby authorized and directed by Debtor to make payment directly to Holder Representative, regardless of whether Debtor was previously making collections thereon. Until

9

Exh E_009

such notice is given, Debtor is authorized to retain and expend all payments made on Collateral. If a Default exists, Holder Representative shall have the right in its own name or in the name of Debtor to compromise or extend time of payment with respect to all or any portion of the Collateral for such amounts and upon such terms as Holder Representative may determine; to demand, collect, receive, receipt for, sue for, compound, and give acquittances for any and all amounts due or to become due with respect to Collateral; to take control of cash and other proceeds of any Collateral; to endorse the name of Debtor on any notes, acceptances, checks, drafts, money orders, or other evidences of payment on Collateral that may come into the possession of Holder Representative; to sign the name of Debtor on any invoice or bill of lading relating to any Collateral, on any drafts against Collateral Obligors or other persons or entities making payment with respect to Collateral, on assignments and verifications of accounts or other Collateral and on notices to Collateral Obligors making payment with respect to Collateral; to send requests for verification of obligations to any Collateral Obligor; and to do all other acts and things necessary to carry out the intent of this Security Agreement. If a Default exists and any Collateral Obligor fails or refuses to make payment on any Collateral when due, Holder Representative is authorized, in its sole discretion, either in its own name or in the name of Debtor, to take such action as Holder Representative shall deem appropriate for the collection of any amounts owed with respect to Collateral or upon which a delinquency exists. Regardless of any other provision hereof, however, Holder Representative shall never be liable for its failure to collect, or for its failure to exercise diligence in the collection of, any amounts owed with respect to Collateral, nor shall it be under any duty whatsoever to anyone *except* Debtor to account for funds that it shall actually receive hereunder.

(c)    Intellectual Property.  For purposes of enabling Holder Representative to exercise its rights and remedies under this Security Agreement and enabling Holder Representative and its successors and assigns to enjoy the full benefits of the Collateral, Debtor hereby grants to Holder Representative an irrevocable, nonexclusive license (exercisable without payment of royalty or other compensation to Debtor) to use, license, or sublicense any of Debtor's rights in the Intellectual Property to the extent such rights are transferable but only during such time as a Default exists.  During the existence of a Default, Debtor shall provide Holder Representative with reasonable access to all media in which any of the Intellectual Property may be recorded or stored and all computer programs used for the completion or printout thereof.  This license shall also inure to the benefit of all successors, assigns, and transferees of Holder Representative.  If a Default exists, Holder Representative may require that Debtor assign all of its right, title, and interest in and to the Intellectual Property or any part thereof to Holder Representative or such other person or entity as Holder Representative may designate pursuant to documents satisfactory to Holder Representative.  If no Default exists, then Debtor shall have the exclusive right and license to use the Intellectual Property in the ordinary course of business and the exclusive right to grant to other persons or entities licenses and sublicenses with respect to the Intellectual Property.

(d)    Use and Operation of Collateral.  Should any Collateral come into the possession of Holder Representative while a Default exists, Holder Representative may use or operate such Collateral for the purpose of preserving it or its value pursuant to the order of a court of appropriate jurisdiction or in accordance with any other rights held by Holder Representative in respect of such Collateral.  Debtor covenants to promptly reimburse and pay to Holder Representative, at Holder Representative's request, the amount of all reasonable expenses

10

Exh E_010

(including, without limitation, the cost of any insurance and payment of taxes or other charges) incurred by Holder Representative in connection with its custody and preservation of Collateral, and all such expenses, costs, taxes and other charges shall be payable by Debtor to Holder Representative upon demand and shall become part of the Obligation. However, the risk of accidental loss or damage to, or diminution in value of, Collateral is on Debtor, and Holder Representative shall have no liability whatever for failure to obtain or maintain insurance, nor to determine whether any insurance ever in force is adequate as to amount or as to the risks insured. With respect to Collateral that is in the possession of Holder Representative, Holder Representative shall have no duty to fix or preserve rights against prior parties to such Collateral and shall never be liable for any failure to use diligence to collect any amount payable in respect of such Collateral, but shall be liable only to exercise reasonable care in the safekeeping of any Collateral in its possession (it being agreed that treatment substantially equal to that which the Holder Representative accords its own property shall be deemed to constitute the exercise of reasonable care) and to account to Debtor for what it may actually collect or receive thereon. The provisions of this subparagraph are only applicable during the existence of a Default.

       (e)    <u>Power of Attorney</u>. Debtor hereby irrevocably constitutes and appoints Holder Representative and any officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact with full power and authority in the name of Debtor or in its own name, while a Default exists, to take any and all action and to execute any and all documents and instruments which Holder Representative at any time and from time to time deems necessary or desirable to accomplish the purposes of this Security Agreement and, without limiting the generality of the foregoing, Debtor hereby gives Holder Representative the power and right on behalf of Debtor and in its own name to do any of the following while a Default exists, without notice to or the consent of Debtor:

       (i)    to use the Intellectual Property or to grant or issue any exclusive or non-exclusive license under the Intellectual Property to anyone else, and to perform any act necessary for the Holder Representative to assign, pledge, convey, or otherwise transfer title in or dispose of the Intellectual Property to any other person or entity;

       (ii)    to demand, sue for, collect, or receive, in the name of Debtor or in its own name, any money or property at any time payable or receivable on account of or in exchange for any of the Collateral and, in connection therewith, endorse checks, notes, drafts, acceptances, money orders, documents of title or any other instruments for the payment of money under the Collateral or any policy of insurance;

       (iii)    to pay or discharge taxes, liens, or other encumbrances levied or placed on or threatened against the Collateral;

       (iv)    to notify post office authorities to change the address for delivery of Debtor to an address designated by Holder Representative and to receive, open, and dispose of mail addressed to Debtor; and

       (v)    (A) to direct account debtors and any other parties liable for any payment under any of the Collateral to make payment of any and all monies due and to become due thereunder directly to Holder Representative or as Holder Representative

11

030814-DLG1

shall direct; (B) to receive payment of and receipt for any and all monies, claims, and other amounts due and to become due at any time in respect of or arising out of any Collateral; (C) to sign and endorse any invoices, freight or express bills, bills of lading, storage or warehouse receipts, drafts against debtors, assignments, proxies, stock powers, verifications, and notices in connection with accounts and other documents relating to the Collateral; (D) to commence and prosecute any suit, action, or proceeding at law or in equity in any court of competent jurisdiction to collect the Collateral or any part thereof and to enforce any other right in respect of any Collateral; (E) to defend any suit, action, or proceeding brought against Debtor with respect to any Collateral; (F) to settle, compromise, or adjust any suit, action, or proceeding described above and, in connection therewith, to give such discharges or releases as Holder Representative may deem appropriate; (G) to exchange any of the Collateral for other property upon any merger, consolidation, reorganization, recapitalization, or other readjustment of the issuer thereof and, in connection therewith, deposit any of the Collateral with any committee, depositary, transfer agent, registrar, or other designated agency upon such terms as Holder Representative may determine; (H) to add or release any guarantor, indorser, surety, or other party to any of the Collateral; (I) to renew, extend, or otherwise change the terms and conditions of any of the Collateral; (J) to endorse Debtor's name on all applications, documents, papers, and instruments necessary or desirable in order for Holder Representative to use or maintain any of the Intellectual Property; (K) to make, settle, compromise or adjust any claims under or pertaining to any of the Collateral (including claims under any policy of insurance); (L) to file on behalf of Debtor any financing statements or continuation statements with respect to the Security Interests created hereby, and to do any and all acts and things to protect and preserve the Collateral, including, without limitation, the protection and prosecution of all rights included in the Collateral; and (M) to sell, transfer, pledge, convey, make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though Holder Representative were the absolute owner thereof for all purposes, and to do, at Holder Representative's option and Debtor's expense, at any time, or from time to time, all acts and things which Holder Representative deems necessary to protect, preserve, maintain, or realize upon the Collateral and Holder Representative's Security Interest therein. This power of attorney is a power coupled with an interest and shall be irrevocable unless or until all principal and interest payable under the Note have been repaid in full. Holder Representative shall be under no duty to exercise or withhold the exercise of any of the rights, powers, privileges, and options expressly or implicitly granted to Holder Representative in this Security Agreement, and shall not be liable for any failure to do so or any delay in doing so. Neither Holder Representative nor any person or entity designated by Holder Representative shall be liable for any act or omission or for any error of judgment or any mistake of fact or law. This power of attorney is conferred on Holder Representative solely to protect, preserve, maintain, and realize upon its Security Interest in the Collateral. Holder Representative shall not be responsible for any decline in the value of the Collateral and shall not be required to take any steps to preserve rights against prior parties or to protect, preserve, or maintain any Lien given to secure the Collateral; provided, however, that the Holder Representative shall use reasonable care in the safekeeping of any Collateral in its possession (it being

030814-DLG1

Exh E_012